## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re* | Chapter 11 |
| **MELINTA THERAPEUTICS, INC.**, *et al.*, | Case No. 19-12748 (LSS) |
| Debtors.[1] | Jointly Administered |

**MOTION OF DEBTORS FOR ORDERS (I)(A)
ESTABLISHING BIDDING PROCEDURES; (B)
APPROVING EXPENSE REIMBURSEMENT
(C) ESTABLISHING PROCEDURES RELATING TO THE
ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES, INCLUDING NOTICE OF PROPOSED CURE
AMOUNTS; (D) APPROVING FORM AND MANNER OF
NOTICE OF ALL PROCEDURES, PROTECTIONS,
SCHEDULES, AND AGREEMENTS; (E) SCHEDULING A
HEARING TO CONSIDER ANY PROPOSED SALE; AND
(F) GRANTING CERTAIN RELATED RELIEF; AND
(II)(A)APPROVING ANY SALE OF SUBSTANTIALLY ALL
OF DEBTORS' ASSETS AND (B) AUTHORIZING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES
IN CONNECTION WITH THE SALE; AND (C) GRANTING
RELATED RELIEF OR, IN THE ALTERNATIVE (III)(A)
AUTHORIZING DEBTORS' ASSUMPTION OF
RESTRUCTURING SUPPORT AGREEMENT AND (B)
GRANTING RELATED RELIEF**

Melinta Therapeutics, Inc. ("**Melinta Therapeutics**") and certain of its affiliates,

the debtors and debtors-in-possession in the above-captioned cases (collectively, the "**Debtors**,"

the "**Company**," or "**Melinta**"), hereby move (this "**Motion**") this Court, pursuant to sections

105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are: Melinta
Therapeutics, Inc. (0364); Cempra Pharmaceuticals, Inc. (5814); CEM-102 Pharmaceuticals, Inc. (4262);
Melinta Subsidiary Corp. (9437); Rempex Pharmaceuticals, Inc. (6000); and Targanta Therapeutics Corporation
(1077). The address of the Debtors' corporate headquarters is 44 Whippany Road, Suite 280, Morristown, New
Jersey 07960.

2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"),

and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "**Local Bankruptcy Rules**"), for entry of

(i) an order, substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures**

**Order**"), (a) authorizing and approving certain proposed bidding and sale procedures,

substantially in the form attached hereto as **Exhibit B** (the "**Bidding Procedures**"), in

connection with a transaction (a "**Transaction**")[2] involving either a sale of certain or all of the

Debtors' assets (the "**Assets**" and a sale thereof pursuant to Bankruptcy Code section 363, a

"**Section 363 Asset Sale**") or, in the case of a transaction structured pursuant to a chapter 11 plan

(a "**Plan Sale**"), the newly issued equity interests of reorganized Melinta Therapeutics (the

"**Reorganized Melinta Common Stock**"), the proposed Expense Reimbursement (as defined

herein), certain proposed assumption procedures in connection with the sale (the "**Assumption**

**Procedures**"), and the form and manner of notice of all procedures, protections, schedules, and

agreements, (b) scheduling a hearing (the "**RSA/Sale Hearing**") to consider final approval of the

Section 363 Asset Sale or the Debtors' assumption of the Restructuring Support Agreement, as

applicable, and (c) granting related relief; and (ii) following the RSA/Sale Hearing, should the

Debtors elect to pursue a Section 363 Asset Sale, an order (the "**Sale Order**"), to be filed in

advance of the RSA/Sale Hearing, (a) approving the sale to the Successful Bidder (as defined in

the Bidding Procedures) (or, if the Successful Bidder fails to consummate the Sale, to the Back-

Up Bidder (as defined in the Bidding Procedures)), which sale shall be free and clear of all liens,

claims, encumbrances, and other interests, (b) authorizing the assumption or assumption and

---

[2]    The term "**Transaction**," as used in the Bidding Procedures, refers to a Section 363 Asset Sale or a Plan Sale, as applicable.

assignment of certain executory contracts and unexpired leases (collectively, the "**Designated Contracts**"), and (c) granting related relief or, in the alternative, (iii) following the RSA/Sale Hearing, should the Debtors elect to pursue the Supporting Lender Transaction (as defined herein), an order (the "**RSA Order**") (a) authorizing the Debtors' assumption of the Restructuring Support Agreement (as defined herein) and (b) granting related relief. In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Peter Milligan in Support of Chapter 11 Petitions and First-Day Papers* [Docket No. 17] (the "**First-Day Declaration**").[3] In further support of this Motion, the Debtors respectfully represent as follows:

**RELIEF REQUESTED**

1.      By this Motion, the Debtors request entry of the following:

(a)     the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**:

     (i)     authorizing and approving the Bidding Procedures, substantially in the form attached hereto as **Exhibit B**, in connection with the Sale;

     (ii)    approving the Expense Reimbursement for the Supporting Lenders;

     (iii)   scheduling an auction for the Assets (the "**Auction**") to be held on February 13, 2020, at 9:00 a.m. (prevailing Eastern Time);

     (iv)    approving the Assumption Procedures in respect of the Designated Contracts and approving the form and manner of service of the Contract Assumption Notice;

     (v)     approving the form and manner of service of the Sale Notices (as defined herein);

     (vi)    granting related relief;

(b)     following the RSA/Sale Hearing, in the event the Debtors elect to pursue a Section 363 Asset Sale, entry of the Sale Order:

---

[3]     Capitalized terms used but not defined herein shall the meanings ascribed to them in the First-Day Declaration or the proposed Bidding Procedures, as applicable.

(i)     authorizing and approving the sale of the Assets to the Successful Bidder (or, if the Successful Bidder fails to consummate the Sale, to the Back-Up Bidder) free and clear of all liens, claims, encumbrances, and other interests; and

(ii)    authorizing and approving the assumption or assumption and assignment of the Designated Contracts;

(iii)   granting related relief;

(c)     following the RSA/Sale Hearing, in the event the Supporting Lenders are deemed the Successful Bidder, entry of the RSA Order:

(i)     authorizing the Debtors to assume the Restructuring Support Agreement; and

(ii)    granting related relief.

## PRELIMINARY STATEMENT

2.      Following an extensive prepetition marketing process, the Debtors entered into a Restructuring Support Agreement with the lenders under the Deerfield Facility (collectively, the "**Supporting Lenders**"), pursuant to which the Supporting Lenders will acquire 100% of the Reorganized Melinta Common Stock in satisfaction of their claims under the Prepetition Credit Agreement (the "**Prepetition Credit Agreement Claims**").[4] The Debtors intend to file within 21 days after the Petition Date, a chapter 11 plan of reorganization (the "**Plan**") and accompanying disclosure statement reflecting the terms of the Restructuring Support Agreement and providing for the consummation of the transactions set forth therein.[5]

3.      While the Supporting Lender Transaction represents the best Transaction offer the Debtors have received to date, and provides an actionable path to a confirmable chapter 11 plan,

---

[4]     The "**Restructuring Support Agreement**" or "**RSA**" is that certain Restructuring Support Agreement among Melinta Therapeutics and the Support Lenders, dated as of December 27, 2019. A copy of the Restructuring Support Agreement is attached hereto as **Exhibit E**.

[5]     The Supporting Lenders' proposal to acquire the Debtors in accordance with the Restructuring Support Agreement is referred to herein as the "**Supporting Lender Transaction**."

the Debtors—consonant with their overarching objective of maximizing the value of their estates for the benefit of all stakeholders—intend to conduct a postpetition bidding process to further "market check" the Secured Lender Transaction. To this end, and as contemplated by the Restructuring Support Agreement, the Debtors hereby seek approval of the Bidding Procedures (and related assumption and noticing procedures) for the solicitation of bids for a Transaction.

4.        As set forth more fully in the Bidding Procedures, the Debtors will consider proposals structured as either a Plan Sale or a Section 363 Asset Sale. Upon receipt of the bids, the Debtors (in consultation with the Consultation Parties) will review all proposed transactions to determine whether there are any Qualified Bids other than the Supporting Lender Transaction. If so, the Debtors will hold an Auction to identify the Successful Bidder (as defined in the Bidding Procedures). In the event that the Successful Bid (as defined in the Bidding Procedures) is structured as a Section 363 Asset Sale, the Debtors will seek approve of such sale at the RSA/Sale Hearing and then prosecute a chapter 11 plan of liquidation. Should the Supporting Lenders be deemed the Successful Bidder, the Debtors will seek authority to assume the Restructuring Support Agreement at the RSA/Sale Hearing and thereafter seek confirmation of the Plan. For this reason, by this Motion, and as an alternative to entry of the Sale Order, the Debtor seek entry of the RSA Order, authorizing the Debtors to assume the Restructuring Support Agreement, in the event that the Supporting Lenders are the Successful Bidder. Upon the Debtors' assumption of the Restructuring Support Agreement, the Debtors' marketing process will terminate, and the Debtors will be obligated, in accordance with the terms of the Restructuring Support Agreement, to pursue the Supporting Lender Transaction.

5.        In recognition of the considerable time, energy, and resources that the Supporting Lenders have expended in connection with the Supporting Lender Transaction, if the Supporting

Lenders are not the Successful Bidder (or if the Debtors consummate any Transaction other than the Supporting Lender Transaction), the Debtors seek authority to reimburse the Supporting Lenders for their reasonable and actual fees and expenses incurred in connection with the Supporting Lender Transaction, in an amount not to exceed $2,000,000 (the "**Expense Reimbursement**").

**JURISDICTION AND VENUE**

6.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

7.      The legal predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363, and 365, Bankruptcy Rules 2002, 6004, and 6006, and Local Bankruptcy Rule 6004-1.

8.      Pursuant to Rule 9013-1(f) of the Local Bankruptcy Rules, the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

**BACKGROUND**

**I.      The Chapter 11 Cases**

9.      On December 27, 2019 (the "**Petition Date**"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Chapter 11 Cases are jointly administered.

10.    The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

11.    To date, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") has not appointed a creditors' committee in the Chapter 11 Cases, nor has any trustee or examiner been appointed therein.

12.    Melinta is a biopharmaceutical company focused on developing and commercializing differentiated anti-infective medications. The Company's mission is to stem the public health threat posed by bacterial antibiotic resistance through the research and creation of antibiotics for serious gram-positive and gram-negative types of bacterial infections. Melinta currently has four medications in its antibiotic portfolio, which are sold under the brand names of Baxdela, Vabomere, Orbactiv, and Minocin (collectively, the "**Medications**"). The Company's business operations, corporate and capital structures, and restructuring efforts are described in greater detail in the First-Day Declaration.

## II.    The Debtors' Prepetition Marketing Efforts

13.    In the approximately four-month period leading up to the Petition Date, the Company, assisted by its professional advisors,[6] canvassed and evaluated a wide array of potential restructuring alternatives, including a sale of all or a portion of the Company's business, third-party financing alternatives, a "standalone" restructuring of the Company's balance sheet, and various permutations of the foregoing. The Company considered both in- and out-of-court implementation alternatives.

---

[6]    The Company's restructuring advisors are Skadden, Arps, Slate, Meagher & Flom LLP ("**Skadden**") and Cole Schotz P.C. as legal counsel, Jefferies LLC ("**Jefferies**") as investment banker, and Portage Point Partners, LLC, as financial advisor.

14.    The Company and Jefferies launched a formal marketing process in mid-September. The marketing process solicited indications of interest for both potential buyers and parties interested in providing financing to the Debtors. The Company and Jefferies contacted or were contacted by 77 parties with respect to a sale transaction, including 48 potential strategic buyers and 29 financial buyers.[7]

15.    Of the 77 potential bidders with whom the Debtors and Jefferies had contact, 30 executed NDAs and were provided access to a dataroom containing confidential information regarding the Debtors, their business, and their Assets. Of these 30 parties, 18 expressed further interest in participating in a transaction and had further discussions with the Debtors and their advisors regarding potential transactions.

16.    The Debtors and Jefferies established October 24, 2019, as the deadline for the submission of initial indications of interest from potential transaction counterparties.[8] On October 24, 2019, the Debtors received three indications of interest from interested parties, each of which proposed a purchase of the Debtors' assets. Following the October 24 deadline, one additional party provided an indication of interest for the Assets.[9] The Debtors and their advisors worked with the parties submitting the indications of interest to refine and progress the offers set forth therein. This process involved numerous management meetings, telephonic and in-person conversations, and responses to extensive diligence requests. The process also involved

---

[7]    The Company and Jefferies also reached out to 47 potential capital providers, with six signing non-disclosure agreements ("**NDAs**") and gaining access to the Company's virtual dataroom established in connection with the sales and marketing process. None of these potential capital providers submitted an indication of interest (as defined below).

[8]    The Debtors had initially set earlier deadlines for indications of interest, but extended these deadlines on multiple occasions to accommodate potential bidders' timelines.

[9]    Consistent with their overarching objective of achieving the higher or otherwise best transaction offer possible, the Debtors and Jefferies decided against rigid enforcement of the indication-of-interest deadline.

negotiations with the bidders in order to improve the terms set forth in the indications of interest. A number of parties contacted by the Company and Jefferies (including multiple parties who submitted an indication of interest) have indicated that they remain interested in a transaction with the Company, but that they require additional time to be fully prepared to transact.

17.     Following their review of the indications of interest and further discussions with their advisors, the Debtors determined that the offer submitted by the Supporting Lenders was the highest and best initial offer. The Supporting Lenders subsequently informed the Company that they intend to pursue their proposed transaction as an acquisition of the Company's equity under a plan, rather than an acquisition of the Company's assets through a section 363 process. Against this backdrop, the Company and its advisors developed the Bidding Procedures and the Restructuring Support Agreement to enable the Company to simultaneously pursue the Supporting Lenders Transaction, while continuing the marketing process, all with the goal of maximizing the value of their Assets.

## III.    The Bidding Procedures

18.     The Bidding Procedures are designed to promote participation and active bidding and ensuring an orderly marketing process consistent with the timeline available to the Debtors under the terms of the Restructuring Support Agreement and Interim Cash Collateral Order. The Bidding Procedures describe, among other things, the procedures for interested parties to access due diligence, the process for written, irrevocable offers ("**Bids**"), the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of any auction, the selection and approval of any ultimately successful bidders, and the deadlines with respect to the foregoing. The Bidding Procedures will allow the Debtors to conduct the Sale process in a controlled, fair, and open manner and maximize value for stakeholders.

19.    In accordance with Local Bankruptcy Rule 6004-1, the below chart summarizes

the Bidding Procedures and the procedures for conducting the Auction:[10]

| Qualification of Bidders<br>*(Local Bankruptcy Rule 6004-1(c)(i)(A))* | Any party that submits to the Debtors (i) an executed confidentiality agreement in such form reasonably satisfactory to the Debtors, and (ii) reasonable evidence demonstrating the party's financial capability to consummate a Transaction as reasonably determined by the Debtors may be granted access to diligence materials. |
|---|---|
| Qualified Bids<br>*(Local Bankruptcy Rule 6004-1(c)(i)(B))* | A "Qualified Bid" is the proposed Supporting Lender Transaction, or, a written offer to enter into a Transaction with the Debtors, submitted to the Debtors and their advisors, so as to be received on or before the Bid Deadline that satisfies each of the following conditions:<br><br>*Good-Faith Offer; Partial Bids*: Each Bid must constitute a good-faith, *bona fide* offer to (i) purchase all or a portion of the Assets through a Section 363 Asset Sale (it being understood that partial bids may be permitted only if (x) the combined consideration exceeds the value of the Supporting Lender Transaction and (y) either (1) such partial bids either close simultaneously unless otherwise agreed by the Supporting Lenders in their sole and absolute discretion or (2) the partial bid closing first is an acquisition of assets relating only to Baxdela) or (ii) purchase the Reorganized Melinta Common Stock through a Plan Sale.<br><br>*Cash Consideration*: Each Bid must offer cash consideration for the Assets or the Reorganized Melinta Common Stock in an amount sufficient (when taken together with unacquired cash-on-hand on the expected closing date of the Transaction contemplated by such Bid, as forecasted in good faith by the Debtors) to repay in full, in cash, the amount of the then-current Credit Bid.<br><br>*Good-Faith Deposit*: Each Bid (other than the Supporting Lender Transaction) must be accompanied by a deposit in the amount of 10% of cash consideration of the Purchase Price (as defined in the Modified Transaction Agreement (as defined below)), before any reductions for assumed liabilities (the "**Good-Faith Deposit**"). |

---

[10]    The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall govern. Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms have the meaning ascribed to them in the Bidding Procedures.

*Same or Better Terms*: Each Bid must be on terms that in their totality are determined by the Debtors (in consultation with the Consultation Parties), in their business judgment, to be the same or better than the terms of the Supporting Lender Transaction in their totality.

*Executed Agreement*: Each Bid must include executed transaction documents, signed by an authorized representative of such Potential Bidder, pursuant to which the Potential Bidder proposes to effectuate a Transaction (a "**Modified Transaction Agreement**"). The Modified Transaction Agreement for a Bid that proposes a Section 363 Asset Sale must be based on the form of asset purchase agreement (to be filed as a supplement hereto in advance of the hearing to consider approval of the Bidding Procedures) (the "**Form Purchase Agreement**");[11] the Modified Transaction Agreement for a Bid that proposes a Plan Sale must be based on the Restructuring Support Agreement and the Plan. Each Bid must also include a copy of the Modified Transaction Agreement marked against the Form Purchase Agreement or the Restructuring Support Agreement and the Plan, as applicable, to show all changes requested by the Potential Bidder (including those related to the assumption or assumption and assignment of contracts and licenses and other material terms such that the Debtors may determine how such Bid compares to the terms of the Form Purchase Agreement or the Restructuring Support Agreement and the Plan, as applicable, and competing Bids). Each Modified Transaction Agreement must provide (i) a commitment to close within two business days after all closing conditions are met and in any event no later than 75 days after the Auction (the "**Cash Collateral Outside Date**"), and (ii) a representation that the Potential Bidder will (A) make all necessary filings under the Hart Scott Rodino Antitrust Improvements Act of 1976, as amended (the "**HSR Act**") within five calendar days following the execution date of the Modified Transaction Agreement and (B) use at least "reasonable best efforts" to satisfy all regulatory conditions (including all necessary acts under the HSR Act).

*Minimum Bid*: A Bid must propose a minimum purchase price, including any assumption of ordinary-course liabilities (to the extent readily quantifiable) and any cure costs the Bidder

---

[11] The Debtors intend to file the Form Purchase Agreement as a supplement to this Motion in advance of the hearing to consider entry of the Bidding Procedures Order. As part of this supplement, the Debtors will provide a summary of the terms of the Form Purchase Agreement consistent with the applicable Bankruptcy Rules and Local Rules.

proposes to pay, that in the Debtors' reasonable business judgment (in consultation with the Consultation Parties) has a value greater than the sum of: (i) (A) $140 million (representing the aggregate amount of Prepetition Credit Agreement Claims (and Expense Reimbursement, as applicable) to be satisfied pursuant to the Plan in connection with the Supporting Lender Transaction) *less* (B) the amount of unacquired cash-on-hand on the expected closing date of the Transaction contemplated by such Bid, as forecasted in good faith by the Debtors, *plus* (ii) $1 million (the "**Overbid Amount**"), *plus* (iii) any incremental costs or costs savings, as the case may be, associated with closing the Transaction contemplated in such Bid as compared to the Supporting Lender Transaction (including incremental costs or costs savings, as the case may be, related to professional fees and time required to close such Transaction) (it being understood that if it would be less costly to close such Transaction than the Supporting Lender Transaction, then the amount contemplated by this clause (iii) will be a negative number) (the sum of (i) through (iii) being the "**Minimum Bid Amount**"); *provided* that notwithstanding the foregoing, all Bids must offer cash consideration in an amount (when taken together with unacquired cash-on-hand on the expected closing date of the Transaction contemplated by such Bid, as forecasted in good faith by the Debtors) sufficient to repay in full, in cash, the amount of the then-current Credit Bid.

*Designation of Assigned Contracts and Leases*: A Bid must identify any and all executory contracts and unexpired leases of the Debtors that the Potential Bidder wishes to be assumed or assumed and assigned pursuant to the Transaction. A Bid must specify whether the Debtors or the Potential Bidder will be responsible for any cure costs associated with such assumption or assumption and assignment and include a good-faith estimate of such cure costs (which estimate shall be provided by the Debtors).

*Designation of Assumed Liabilities*: A Bid must identify all liabilities which the Potential Bidder proposes to assume.

*Corporate Authority*: A Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Transaction and may not require, prior to consummation, the approval of the board of directors (or comparable governing body) and/or equity holders of such Bidder; *provided* that, if the Potential Bidder is an entity specially formed for the purpose of effectuating the

Transaction, then the Potential Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Transaction by the equity holder(s) of such Potential Bidder.

*Disclosure of Identity of Potential Bidder*: A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Assets or the Reorganized Melinta Common Stock or otherwise participating in connection with such Bid (including the identity of any parent companies of such entity), and the complete terms of any such participation, including any connections, agreements, arrangements, or understandings with the Debtors, the Supporting Lenders, or any other known, potential, prospective bidder, or Potential Bidder, or any officer, director, or equity holder of the Debtors.

*Proof of Financial Ability to Perform*: A Bid must include written evidence that the Debtors may reasonably conclude, in consultation with their advisors and the Consultation Parties, demonstrates that the Potential Bidder has the necessary financial ability to timely consummate a Transaction and must further contain information that can be publicly filed and/or disseminated providing adequate assurance of future performance of all contracts and leases to be assumed and assigned in such Transaction. Such information must include, *inter alia*, the following:

1. contact names and telephone numbers for verification of financing sources;

2. written evidence of the Potential Bidder's ability to finance its Bid with cash on hand, available lines of credit, uncalled capital commitments or otherwise available funds, and/or substantially final form financing commitment letter(s) with no diligence conditions, which letter(s) must be substantially complete and capable of execution prior to the RSA/Sale Hearing, in an aggregate amount equal to the cash portion of such Bid or the posting of an irrevocable letter of credit from a reputable financial institution (as determined in the Debtors' discretion) issued in favor of the Debtors in the amount of the cash portion of such Bid, in each case, as are needed to close the Transaction;

3. the Potential Bidder's most current audited (if any) and latest unaudited financial statements or, if the bidder is an entity formed for the purpose of making a bid, the current audited (if any) and latest unaudited financial

statements of the equity holder(s) of the bidder or such other form of financial disclosure, and a guaranty from such equity holder(s);

4.  a description of the Potential Bidder's *pro forma* capital structure; and

5.  any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such Potential Bidder has the ability to promptly close the Transaction.

*Regulatory and Third-Party Approvals*: A Bid must set forth each regulatory and third-party approval (including any consents required from counterparties to intellectual property licenses) required for the Potential Bidder to consummate the Transaction, and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals.

*Conditions/Contingencies*: Except as provided in the Restructuring Support Agreement, a Bid must not be subject to material conditions or contingencies to closing, including, without limitation, governmental approval, obtaining financing, internal approvals, or further due diligence, other than regulatory and third-party approvals of the type addressed in paragraph (IV)(l) of the Bidding Procedures. For the avoidance of doubt, the confirmation requirements prescribed by Bankruptcy Code section 1129 shall not be construed as impermissible conditions or contingencies for purposes of this paragraph.

*Bid Irrevocable*: A Bid must provide that it is irrevocable until two business days after the closing of the Transaction. Each Potential Bidder (except for the Supporting Lenders) further agrees that its Bid, if not chosen as the Successful Bidder, shall serve, without modification, as a Backup Bidder (as defined below), as may be designated by the Debtors at the RSA/Sale Hearing or the Confirmation Hearing, as applicable, in the event the Successful Bidder fails to close as, provided in the Successful Bidder Transaction Agreement (as modified, if at all) and the Sale Order or the Confirmation Order, as applicable.

*As-Is, Where-Is*: A Bid structured as a Section 363 Asset Sale must include the following disclaimer in the Modified Transaction Agreement:

EXCEPT AS EXPRESSLY SET FORTH IN ARTICLE [•] OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT DELIVERED BY ANY SELLER PURSUANT TO THIS AGREEMENT (I) THE SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, RELATING TO THE BUSINESS, THE ASSETS OR THE ASSUMED LIABILITIES, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO VALUE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR FOR ORDINARY PURPOSES, OR ANY OTHER MATTER, (II) THE SELLERS MAKE NO, AND HEREBY DISCLAIM ANY, OTHER REPRESENTATION OR WARRANTY REGARDING THE BUSINESS, THE ASSETS OR THE ASSUMED LIABILITIES, AND (III) THE ASSETS AND THE ASSUMED LIABILITIES ARE CONVEYED ON AN "AS IS, WHERE IS" BASIS AS OF THE CLOSING, AND THE PURCHASER SHALL RELY UPON ITS OWN EXAMINATION THEREOF. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY ANCILLARY DOCUMENT DELIVERED BY ANY SELLER PURSUANT TO THIS AGREEMENT, THE SELLERS MAKE NO REPRESENTATION OR WARRANTY REGARDING ANY BUSINESS OTHER THAN THE BUSINESS, ANY ASSETS OTHER THAN THE ASSETS OR ANY LIABILITIES OTHER THAN THE ASSUMED LIABILITIES, AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.

Each Bid that is structured as a Plan Sale must include substantially the same disclaimer, with appropriate modifications to reflect such structure.

*Time Frame for Closing*: A Bid by a Potential Bidder must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within 75 days following the conclusion of the Auction.

*Consent to Jurisdiction*: Each Potential Bidder must (i) submit to the jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtors, the Bidding Procedures, the Auction, any Modified Transaction Agreement, or the construction and enforcement of documents relating to any Transaction, (ii) waive any right to a jury trial in connection with any disputes relating to the Debtors, the Bidding Procedures, the Auction,

| | |
|---|---|
| | any Modified Transaction Agreement, or the construction and enforcement of documents relating to any Transaction, and (iii) commit to the entry of a final order or judgment in any way related to the Debtors, the Bidding Procedures, the Auction, any Modified Transaction Agreement, or the construction and enforcement of documents relating to any Transaction if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

*No Bid Protections*: A Bid must not entitle the Potential Bidder to any break-up fee, termination fee, transaction fee, expense reimbursement, or any similar type of payment or reimbursement, and, by submitting a Bid, the Potential Bidder waives the right to pursue a substantial contribution claim under Bankruptcy Code section 503 related in any way to the submission of its Bid or participation in any Auction. Each Potential Bidder presenting a Bid will bear its own costs and expenses (including legal fees) in connection with any proposed Transaction. For the avoidance of doubt, the Supporting Lenders shall not be considered a Potential Bidder for purposes of this paragraph. |
| **Expense Reimbursement** *(Local Bankruptcy Rule 6004-1(c)(i)(C))* | In recognition of the considerable time, energy and resources that the Supporting Lenders have expended in connection with the Supporting Lender Transaction, if the Supporting Lenders are not the Successful Bidder (or if the Debtors consummate any Plan or Section 363 Asset Sale of all or substantially all of the Debtors' Assets other than the Supporting Lender Transaction), the Debtors seek authority to reimburse the Supporting Lenders for their reasonable and actual fees and expenses incurred in connection with the Supporting Lender Transaction, in an amount not to exceed $2,000,000 (the "**Expense Reimbursement**"). |
| **Modification of Bidding and Auction Procedures** *(Local Bankruptcy Rule 6004-1(c)(i)(D))* | Except as otherwise provided in the Restructuring Support Agreement, the Bidding Procedures, or the Bidding Procedures Order, the Debtors (in consultation with the Consultation Parties) reserve the right as they may reasonably determine to be in the best interest of their estates and in the exercise of their fiduciary duties to: (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (d) reject any Bid (other than a Credit Bid by the Supporting Lenders) that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or |

|  | (iii) contrary to the best interests of the Debtors and their estates; (e) impose additional terms and conditions with respect to all potential bidders (other than the Supporting Lenders); (f) extend the deadlines set forth herein (with the approval of the Supporting Lenders); and (g) continue or cancel the Auction and/or RSA/Sale Hearing, including by announcement in open court without further notice (with the approval of the Supporting Lenders). |
|---|---|
| **Closing with Alternative Backup Bidders** *(Local Bankruptcy Rule 6004-1(c)(i)(E))* | A Bid must provide that it is irrevocable until two business days after the closing of the Transaction. Each Potential Bidder further agrees that its Bid, if not chosen as the Successful Bidder, shall serve, without modification, as a Backup Bidder (as defined below), as may be designated by the Debtors at the RSA/Sale Hearing or the Confirmation Hearing, as applicable, in the event the Successful Bidder fails to close as, provided in the Successful Bidder Transaction Agreement (as modified, if at all) and the Sale Order or the Confirmation Order, as applicable. |
| **Date, Time, Place, and Notice of Auction** *(Local Bankruptcy Rule 6004-1(c)(ii)(A))* | The Auction, if necessary, shall take place on **February 13, 2020, at 9:00 a.m. (prevailing Eastern Time)** at the offices of [proposed] counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036, or such other place and time as the Debtors shall notify all Qualified Bidders that have submitted Qualified Bids (including the Supporting Lenders) and the Consultation Parties. The Auction may be postponed, adjourned, or cancelled as the Debtors (in consultation with the Consultation Parties) deem appropriate. Reasonable notice as is reasonably practicable under the circumstances of such postponement or adjournment and the time and place for the commencement or resumption of the Auction or cancellation shall be given to all Qualified Bidder. Otherwise, the Sellers shall pursue Court approval of the Supporting Lender Transaction set forth in the Restructuring Support Agreement. |
| **No Collusion** *(Local Bankruptcy Rule 6004-1(c)(ii)(B))* | Each Qualified Bidder (including the Supporting Lenders) participating in the Auction must confirm that it (i) has not engaged in any collusion with respect to the bidding or any Transaction and (ii) has reviewed, understands, and accepts the Bidding Procedures. |
| **Auction Participants** *(Local Bankruptcy Rule 6004-1(c)(ii)(C))* | Only the Debtors, the Consultation Parties, and any Qualified Bidder (including the Supporting Lenders), in each case, along with their representatives and counsel, or such other parties as the Debtors shall determine, shall attend the Auction. |

| Transcription or Video Recording<br>*(Local Bankruptcy Rule 6004-1(c)(ii)(D))* | Bidding at the Auction will be transcribed. |
|---|---|

## IV.    Key Dates and Deadlines

20.    The table below sets forth the proposed key dates and deadlines with respect to

the Sale process:

| | |
|---|---|
| January 24, 2020, at 10:00 a.m. (prevailing Eastern Time) | Proposed hearing to consider entry of the Bidding Procedures Order |
| January 24, 2020 at 11:59 p.m. (prevailing Eastern Time) | Deadline for Debtors to provide non-debtor Parties with (i) a list of Designated Contracts, and (ii) notice of the proposed Cure Amounts for the Designated Contracts |
| February 7, 2020, at 4:00 p.m. EST | Deadline to object to the Debtors' proposed assumption or assumption and assignment of Designated Contracts and related Cure Amounts |
| February 7, 2020, at 4:00 p.m. EST | Deadline to object to Section 363 Asset Sale ("**Sale Objection Deadline**")[12] |
| February 10, 2020, at 4:00 p.m. EST | Bid Deadline |
| February 11, 2020, at 4:00 p.m. EST | Deadline for Debtors to notify bidders of whether their Bids are Qualified Bids |
| February 13, 2020, at 9:00 a.m. EST | Auction to be held (if necessary) |
| February 14, 2020, at 10:00 a.m. (prevailing Eastern Time) | Deadline for Debtors to (i) file with the Bankruptcy Court the Notice of Successful Bidder and (ii) provide notice to non-Debtor parties of any Designated Contracts |
| February 17, 2020, at 4:00 p.m. EST | Deadline for Debtors and other parties to file responses to Sale Objections |

---

[12]    This objection deadline applies to all objections to the Motion and the sale of the Assets to a Successful Bidder, with the exception of objections solely related to the identity of the Successful Bidder, any changes to the Form Purchase Agreement, and adequate assurance of future performance by the Successful Bidder.

*(cont'd)*

| February 19, 2020, at 4:00 p.m. (prevailing Eastern Time) | Deadline to object to (i) conduct of the Auction, (ii) the proposed Sale to the Successful Bidder, and (iii) the ability of the Successful Bidder to provide adequate assurance of future performance, or the proposed form of adequate assurance of future performance, with respect to the assumption or assumption and assignment of any Designated Contracts (the "**Supplemental Objection Deadline**") |
|---|---|
| February 20, 2020, at [●].m. (prevailing Eastern Time)[13] | Deadline for Debtors and other parties to file responses to Supplemental Sale Objections |
| [February 20, 2020, at [●].m. (prevailing Eastern Time)][14] | Date of Proposed RSA/Sale Hearing to consider either (i) entry of the Sale Order or (ii) assumption of the Restructuring Support Agreement |

## V.    The Restructuring Support Agreement

21.    Following extensive, good-faith negotiations, the Debtors and the Supporting Lenders agreed to the terms of the Restructuring Support Agreement, which was executed on December 27, 2019. As noted, the Restructuring Support Agreement contemplates the Supporting Lenders' acquisition of 100% of the Reorganized Melinta Common Stock under a Plan, while permitting the Debtors to continue soliciting other Transaction Proposals in accordance with the Bidding Procedures. In the event that the Supporting Lenders are the Successful Bidder, the Debtors hereby seek authority to assume the Restructuring Support Agreement. Upon the Debtors' assumption of the Restructuring Support Agreement, the Debtors' marketing process will terminate, and the Debtors will be obligated, in accordance with the terms of the Restructuring Support Agreement, to pursue the Supporting Lender Transaction.

---

[13]    Subject to date of RSA/Sale Hearing.

[14]    Subject to Court availability.

*(cont'd)*

22.     The Restructuring Support Agreement contains various representations, warranties, covenants, and closing conditions. The following is a summary of the key terms of the Restructuring Support Agreement related to the Chapter 11 Cases:[15]

| **Obligations of the Supporting Lenders**<br><br>*Article III* | Subject in each case to the terms of the RSA, the Supporting Lenders have agreed to, among other things:<br><br>• Negotiate all Definitive Documents in good faith, reasonably agree to extensions of the Milestones to the extent required to accommodate this Court's calendar, and comply with their obligations under the RSA;<br><br>• Provide notice to the Company of certain events or conditions that are material to the Supporting Lender Transaction;<br><br>• Vote their claims in favor of the Plan, not change such votes, and not object to or oppose the Plan; and<br><br>• Negotiate in good faith with the Debtors regarding any impediments to the consummation of the Plan.<br><br>Moreover, subject in each case to the terms of the RSA, the Supporting Lenders have agreed to not, among other things:<br><br>• Object to or oppose the Company's actions and pleadings filed in accordance with the RSA and in furtherance of the Restructuring; or<br>• Take certain other actions that would be inconsistent with the terms of the RSA. |
|---|---|
| **Obligations of the Debtors**<br><br>*Article IV* | Subject in each case to the terms of the RSA, the Debtors have agreed to, among other things:<br><br>• Use commercially reasonable efforts to approve the Plan, support the Supporting Lender Transactions, comply with the RSA and comply with the Milestones;<br><br>• Provide advance copies of the Definitive Documents and certain other papers and negotiate with respect to such documents in good faith with the Supporting Lenders;<br><br>• Pursue entry of and comply with the terms of the Cash Collateral Order; |

---

[15]    Capitalized terms used in this paragraph shall have the meaning ascribed to them in the Restructuring Support Agreement. The summary contained herein is subject in its entirety to the terms and provisions of the Restructuring Support Agreement or other documents referenced therein, and in the event of any inconsistency between this summary and the terms and provisions in the Restructuring Support Agreement, the terms and provisions of the Restructuring Support Agreement shall control.

|  | • Pay all Transaction Expenses; |
|---|---|
|  | • Provide notice to the Supporting Lenders of certain events or conditions that are material to the Supporting Lender Transaction; and |
|  | • Negotiate in good faith with the Debtors regarding any impediments to the consummation of the Plan. |
|  | Moreover, subject in each case to the terms of the RSA, the Debtors have agreed to not, among other things: |
|  | • Object to or oppose implementation of the Supporting Lender Transactions; |
|  | • Except for in accordance with the Bidding Procedures, solicit, propose, or pursue any Alternative Transaction; |
|  | • Seek to amend or modify the Definitive Documentation; or |
|  | • Take certain other actions that would be inconsistent with the terms of the RSA. |
| **Fees Related to the Supporting Lender Transaction**<br><br>*Section 10.13* | The Debtors shall pay (a) one Business Day prior to the Petition Date, (b) subject to the Cash Collateral Orders, including the payment procedures set forth therein, on the Effective Date and (c) otherwise in accordance with the terms of any applicable fee letters and court orders during the pendency of the Chapter 11 Cases, all accrued and unpaid fees, costs and expenses of the Supporting Lenders in connection with the Restructuring (*provided that* the amount paid pursuant to (a) above shall be agreed by the Debtors and the Supporting Lenders and shall be less than the total amount of accrued and unpaid expenses owing to the Supporting Lenders as of such date), including, without limitation, the fees, costs and expenses of (i) Sullivan & Cromwell LLP, (ii) Houlihan Lokey Capital, Inc., (iii) Landis Rath, (iv) any other professionals that may be retained by the Supporting Lenders in connection with the Restructuring and (v) counsel for the Prepetition Agent. |
| **Mutual Termination**<br><br>*Section 9.1(a)* | The RSA and the obligations thereunder may be terminated by mutual written consent to terminate the RSA among the Company and the Requisite Supporting Lenders. |
| **Supporting Lender Termination Events**<br><br>*Section 9.1(b)* | The RSA provides that, subject to the terms thereof, the Supporting Lenders may terminate upon three Business Days' notice from the Supporting Lenders to the Debtors any time after and during the continuance of, among other events, the following:<br><br>• Certain breaches of representations of the covenants, agreements or representations or warranties in the RSA by |

| | |
|---|---|
| | the Debtors; |
| | • Payments by the Debtors out of the ordinary course of business and inconsistent with the Budget, subject to Permitted Variances; |
| | • Dismissal or conversion of the Chapter 11 Cases or denial of Confirmation Order; |
| | • The Debtors' failure to comply with the Milestones; or |
| | • A challenge by the Debtors to the validity, perfection, or priority of the Supporting Lenders' claims. |
| **Debtor Termination Events**<br><br>*Section 9.1(d)* | The RSA provides that, subject to the terms thereof, the Debtors may terminate upon three Business Days' notice from the Debtors to the Supporting Lenders any time after and during the continuance of, among other events, the following:<br><br>• Certain breaches of representations of the covenants, agreements or representations or warranties in the RSA by the Supporting Lenders;<br><br>• Failure of the Supporting Lenders to provide an extension of the Milestones as required to accommodate this Court's calendar;<br><br>• If, at any time, Deerfield fails to collectively hold or control 66.67% or more of the aggregate principal amount of the Prepetition Credit Agreement Claims; or<br><br>• The filing by the Supporting Lenders of any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with the RSA. |
| **Milestones** | The RSA provides for the following Milestones:<br><br>• On or before the date that is 21 days after the Petition Date, a Chapter 11 plan of reorganization (the "**Acceptable Plan**") and related disclosure statement (the "**Disclosure Statement**"), in each case, in form and substance satisfactory to the Prepetition Lenders in their sole and absolute discretion, will be filed;<br><br>• On or before the date that is 30 days after the Petition Date, a hearing to approve the Bidding Procedures will have occurred;<br><br>• On or before the date that is 31 days after the Petition Date, an order approving the Bidding Procedures will have been entered;<br><br>• On or before the date that is 56 days after the Petition Date, |

|  | a hearing to approve the Disclosure Statement will have occurred; |
|  | • On or before the date that is 57 days after the Petition Date, an order confirming the Disclosure Statement will have been entered; |
|  | • On or before the date that is 70 days after the Petition Date, the Auction shall have been held or the Debtors shall have publicly announced, in accordance with the Bidding Procedures, that the Auction was cancelled. |
|  | • On or before the date that is 90 days after the Petition Date, a confirmation hearing to approve the Acceptable Plan will have occurred; |
|  | • On or before the date that is 91 days after the Petition Date, a confirmation order of the Acceptable Plan will have been entered (the "**Confirmation Order**"); and |
|  | • As promptly as possible after entry of the Confirmation Order but not later than 106 days after the Petition Date, the Acceptable Plan will become effective. |
| **Proposed Treatment of Claims**<br><br>*Restructuring Term Sheet Part II* | The Restructuring Term Sheet proposes the following treatment of claims against and interest in the Debtors:<br><br>*Administrative Claims and Priority Tax Claims*: Each holder of an allowed administrative claim or priority tax claim shall (a) be paid in full in cash on the later of (i) the Plan Effective Date or (ii) the date such claim becomes due and payable in the ordinary course of business or (b) receive such distribution acceptable to the Requisite Supporting Lenders as necessary to unimpair such claims.<br><br>*Other Priority Claims*: Each holder of an allowed other priority claim shall be (a) paid in full in cash on the later of (i) the Plan Effective Date and (ii) the date such claim becomes payable in the ordinary course of business or (b) receive such distribution acceptable to the Requisite Supporting Lenders as necessary to unimpair such claims.<br><br>*Other Secured Claims*: Each holder of an allowed other secured claim shall (a) be paid in full in cash on the later of (i) the Plan Effective Date and (ii) the date such claim becomes payable in the ordinary course of business or (b) receive such distribution acceptable to the Requisite Supporting Lenders as necessary to unimpair such claims<br><br>*Prepetition Credit Agreement Claims*: If the Prepetition Lenders are the Successful Bidders, each holder of an allowed Prepetition Credit Agreement Claim shall, in exchange for |

(a) the portion of such Prepetition Credit Agreement Claim that was credit bid in connection with the Transaction (plus any incremental consideration bid by the Prepetition Lenders), receive its *pro rata* share of 100% of the Reorganized Melinta Common Stock and (b) with respect to the remaining portion, if any, of such Prepetition Credit Agreement Claims, receive its *pro rata* share of such distribution, if any, provided to holders of General Unsecured Claims.

If a third-party bidder is the Successful Bidder, each holder of an allowed Prepetition Credit Agreement Claim shall, in full and final satisfaction, settlement, and release of and in exchange for such claim, receive its *pro rata* share of the Distributable Cash,[16] until such claim is paid in full in cash.

*General Unsecured Claims*: If the Prepetition Lenders are the Successful Bidders, unless otherwise agreed by each of the Company, the Requisite Supporting Lenders, and the applicable creditor, each holder of an allowed general unsecured claim shall receive such distribution as may be necessary to satisfy Bankruptcy Code section 1129(a)(7).

If a third-party bidder is the Successful Bidder, each holder of an allowed general unsecured claim shall receive its *pro rata* share of Distributable Cash, if any, remaining after all Prepetition Credit Agreement Claims have been paid in full in cash.

*Intercompany Claims and Intercompany Interests*: Each intercompany claim and intercompany interest (including all interests held by the Debtors in non-debtor subsidiaries) shall at the election of the Debtors, with the approval of the Requisite Supporting Lenders, be either (a) reinstated or (b) deemed automatically cancelled, extinguished, and discharged, in each case, for no consideration.

*Subordinated or Recharacterized Claims*: Each claim (a) subject to subordination under section 510(b) of the Bankruptcy Code or (b) recharacterized as equity by order of the Bankruptcy Court, in each case shall be cancelled, extinguished, and discharged, and the holder thereof shall not receive or retain any property under the Plan on account of such claim.

---

[16]    "**Distributable Cash**" means all cash held by the Debtors on the Plan Effective Date after consummating the sale to a third-party bidder (including the net cash proceeds of such sale), less amounts required to (a) pay in full all administrative claims (including professional fee claims), priority tax claims, other priority claims, and other secured claims and (b) fund any other cash obligations specified in the Plan.

| | *Equity Interests in Melinta Therapeutics*: Each equity interest in Melinta Therapeutics (including common and preferred stock, options, warrants, and other agreements or rights to acquire the same (including any arising under or in connection with any employment agreement, incentive plan, benefit plan, or the like)) shall be cancelled, extinguished, and discharged, and the holder thereof shall not receive or retain any property under the Plan on account of such interest. |
|---|---|

## VI.    Assumption Procedures

23.    The Debtors are also seeking approval of the Assumption Procedures to facilitate the fair and orderly assumption or assumption and assignment (as applicable) of certain executory contracts in connection with the Transaction. The key provisions of the Assumption Procedures are:

- **Contract Assumption Notice**. No fewer than 14 calendar days prior to the Sale Objection Deadline (the "**Assumption and Assignment Service Deadline**"), the Debtors shall serve a notice of contract assumption in substantially the form attached hereto as **Exhibit C** (the "**Contract Assumption Notice**") via first-class mail on all counterparties to all contracts expected to be Designated Contracts after consultation with the Supporting Lenders, and provide a copy of the same to the Supporting Lenders and the Consultation Parties. The Contract Assumption Notice shall inform each recipient of the timing and procedures relating to such assumption, and, to the extent applicable, (i) the title of the executory contract or unexpired lease, as applicable, (ii) the name of the counterparty to the executory contract or unexpired lease, as applicable, (iii) the Debtors' good-faith estimates of the amount of the required cure payments (the "**Cure Amounts**") (if any) required in connection with the executory contract or unexpired lease, as applicable, and (iv) the Sale Objection Deadline; *provided, however*, that service of a Contract Assumption Notice does not constitute an admission that any contract is an executory contract or that the stated Cure Amount related to any contract or unexpired lease constitutes a claim against the Debtors or a right against any Successful Bidder (all rights with respect thereto being expressly reserved), and all rights are reserved for the Successful Bidder, following the Auction, to assert that any Cure Amount is lower than the Debtors' estimate, subject to each counterparty's opportunity to object. Further, the inclusion of a contract or unexpired lease, as applicable, on the Contract Assumption Notice is not a guarantee that such contract or unexpired lease, as applicable, will ultimately be assumed or assumed and assigned.

- **Cure Amounts and Adequate Assurance of Future Performance**. The payment of the applicable Cure Amounts by the Debtors or the Successful Bidder, as applicable, shall (i) effect a cure of all defaults existing thereunder and (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default.

- **Additions**. The Debtors may designate, up to the date that is two business days before the RSA/Sale Hearing (the "**Designation Deadline**"), additional executory contracts and/or unexpired leases as agreements to be assumed by the Debtors and assigned to the Successful Bidder (the "**Additional Designated Contracts**"); *provided, however*, that, if the Debtors have elected to pursue a Plan Sale, the Designation Deadline (as used in this Motion, the Bidding Procedures and the Bidding Procedures Order) shall be the deadline to file the plan supplement, or such later date as may be approved by this Court in any order approving a disclosure statement and related solicitation procedures. Within three business days of notice of the Additional Designated Contracts by the Debtors, the Debtors shall serve a Contract Assumption Notice on each of the counterparties to such Additional Designated Contracts and their counsel of record, if any, indicating (i) that the Debtors intend to assume and assign the counterparty's executory contract or unexpired lease, as applicable, to the Successful Bidder, (ii) any assignee, and (iii) the corresponding estimated Cure Amount.

- **Eliminations**. The Debtors may remove any executory contract or unexpired lease, as applicable, to be assumed by the Debtors and assigned to the Successful Bidder (the "**Eliminated Agreements**") until the Designation Deadline or, if the Supporting Lenders are the Successful Bidder, in accordance with the RSA. The Debtors shall, as soon as reasonably practicable after identifying an Eliminated Agreement, serve a notice (a "**Removal Notice**") on each of the impacted counterparties and their counsel of record, if any, indicating that the Debtors no longer intend to assign the counterparty's contract or unexpired lease, as applicable, to the Successful Bidder in connection with the Transaction.

- **Supplemental Contract Assumption Notice**. Although the Debtors intend to make a good-faith effort to identify all Designated Contracts that may be assumed and assigned in connection with a Transaction, the Debtors may discover that certain executory contracts were inadvertently omitted from the Designated Contracts list, or the Successful Bidder may identify other executory contracts that they desire to assume and assign in connection with the Transaction. Accordingly, the Debtors reserve the right at any time after the Assumption and Assignment Service Deadline and before the closing of a Transaction, to (i) supplement the list of Designated Contracts with previously omitted executory contracts, (ii) remove Designated Contracts from the list of executory contracts ultimately selected as Designated Contracts that a Successful Bidder proposes be assumed and assigned to it in connection with a Transaction, and/or (iii) modify the previously stated Cure Amount associated with any Designated Contracts. In the event the Debtors exercise any of these reserved rights, the Debtors will promptly serve a supplemental notice of contract assumption or assumption and assignment (a "**Supplemental Assumption Notice**") on each of the counterparties to such Designated Contracts and their counsel of record, if any, and the Consultation Parties; *provided, however*, the Debtors may not add an executory contract to the list of Designated Contracts that has been previously rejected by the Debtors by order of the Court. Each Supplemental Assumption Notice will include the same information with respect to listed Designated Contracts as was included in the Contract Assumption Notice.

- **Objections**. Objections, if any, to the proposed assumption and assignment or the Cure Amount proposed with respect thereto *must* (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Bankruptcy Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Amount, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon, so as to be actually received by proposed counsel to the Debtors and counsel to the Supporting Lenders on or before 14 days after service of the Contract Assumption Notice (the "**Cure Objection Deadline**"), or such deadline set forth in the applicable Supplemental Assumption Notice, which deadline shall be no earlier than 14 days after service of such Supplemental Assumption Notice. If the Successful Bidder proposes a Section 363 Asset Sale, then the deadline to object to assumption or assumption and assignment solely with respect to the adequate assurance of future payment from the Successful Bidder shall be extended to February 19, 2020, at 4:00 p.m.;[17] *provided*, *however*, that the deadline to object to the Cure Amount or other matters unrelated to the identity of the Successful Bidder shall not be extended.

24.    Any party that does not timely object to the Cure Amount, the proposed

assumption or assumption and assignment of a Designated Contract or Additional Designated

Contract listed on the Contract Assumption Notice or Supplemental Assumption Notice, any

Section 363 Asset Sale, or the assumption of the RSA is deemed to have consented (whether the

Transaction is implemented through a Plan Sale or a Section 363 Asset Sale) to (a) such Cure

Amount, (b) the assumption or assumption and assignment of such Designated Contract or

Additional Designated Contract (including the adequate assurance of future payment), (c) the

related relief requested in the Motion, (d) the Section 363 Asset Sale, and (e) the assumption of

the RSA. Such party shall be forever barred and estopped (including in connection with a

confirmation hearing for any chapter 11 plan) from objecting to the Cure Amount, the

assumption or assumption and assignment of the Designated Contract or Additional Designated

---

[17]    The Debtors will file, as promptly as possible after the close of the Auction, but, in any event by February 14, 2020, at 10:00 a.m., a Notice of Successful Bidder (as defined herein). The Debtors will also transmit the Notice of Successful Bidder via email and fax to the counterparties to the Designated Contracts (to the extent the Debtors have email and fax information for such parties) and post the Notice of Successful Bidder on the Debtors' claims and noticing agent's website.

Contract, adequate assurance of future performance, the relief requested herein, whether applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Successful Bidder and/or the reorganized Debtors, for purposes of section 365(c)(1) of the Bankruptcy Code and from asserting any additional cure or other amounts against the Debtors and the Successful Bidder with respect to such party's Designated Contract or Additional Designated Contract.

## VII.    Notice Procedures

25.    **Notice of RSA/Sale Hearing**. Within seven days after entry of the Bidding Procedures Order, or as soon thereafter as practicable (the "**Mailing Date**"), the Debtors (or their agents) shall serve the Motion, the Bidding Procedures Order, and the Bidding Procedures by first-class mail, postage prepaid, upon (a) all entities reasonably known by the Debtors to have expressed a *bona fide* interest in a potential Transaction during the two years preceding the date hereof; (b) all entities known to have asserted any claim, liens, interests, or encumbrances in or upon any of the Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) the U.S. Trustee; (e) counsel to the administrative agent under the Deerfield Facility; (f) counsel to Deerfield; (g) counsel to Vatera; (h) counsel to Oikos; (i) counsel to the Medicines Company; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; (l) the parties included on the Debtors' consolidated list of their 30 largest unsecured creditors; (m) the United States Attorney for the District of Delaware; (n) the Food and Drug Administration; and (o) all parties entitled to notice pursuant to Local Bankruptcy Rules 2002-a(b) and 9013-1(m).

26.    **Sale Notice.** In addition, on the Mailing Date or as soon as reasonably practicable thereafter, the Debtors shall serve a sale notice, substantially in the form annexed hereto as **Exhibit D** (the "**Sale Notice**") by first-class mail, postage prepaid or, for those parties who have

consented to receive notice by the ECF system, by ECF, upon all other known creditors of the Debtors. The Debtors shall also post a Sale Notice and the Bidding Procedures Order on the website of the Debtors' claims and noticing agent. Such notice shall be sufficient and proper notice of the Transaction with respect to known interested parties.

27.     **Publication Notice**. On the Mailing Date or as soon as practicable thereafter, the Debtors shall publish notice of the proposed Transaction, substantially in the form of the Sale Notice (the "**Publication Notice**"), in the national edition of *The Wall Street Journal* or *The New York Times*. The Debtors submit that such Publication Notice shall be sufficient and proper notice of any Section 363 Asset Sale to any other interested parties whose identities are unknown to the Debtors.

28.     **Notice of Successful Bidder**. As soon as possible after the conclusion of the Auction, the Debtors shall file, but not serve (except for service on counterparties to Designated Contracts), a notice identifying any Successful Bidder (the "**Post-Auction Notice**," and collectively with the Sale Notice and Publication Notice, the "**Sale Notices**").

## BASIS FOR RELIEF AND APPLICABLE AUTHORITY

**I.     A Section 363 Asset Sale Represents a Sound Exercise of the Debtors' Business Judgment.**

29.     Ample authority exists for approval of the Bidding Procedures, the Expense Reimbursement, and any Section 363 Asset Sale. The Debtors submit that application of the section 363(b) standard for sales outside of the ordinary course of a debtor's business is met here. Section 363(b) of the Bankruptcy Code provides, in relevant part: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1). This Court's power under Bankruptcy Code section 363 is supplemented by Bankruptcy Code section 105(a), which provides in relevant part: "The Court

may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title." *Id.* § 105(a). As set forth below, the Debtors submit they have satisfied

the requirements of Bankruptcy Code sections 105, 363, and 365 as those sections have been

construed by courts in the Third Circuit.

30.     "Under Delaware law, the business-judgment rule operates as a presumption 'that

directors making a business decision, not involving self-interest, act on an informed basis, in

good faith and in the honest belief that their actions are in the corporation's best interest.'"

*Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 462

(D. Del. 2004) (quoting *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988)); *accord Ad Hoc*

*Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 555 n.111

(D. Del. 2008). Thus, this Court should grant the relief requested in this Motion if the Debtors

demonstrate a sound business justification therefor. *See In re Del. & Hudson Ry. Co.*, 124 B.R.

169, 179 (D. Del. 1991).

31.     The Debtors have sound business justifications for selling the Assets at this time

through the proposed postpetition marketing process. After protracted negotiations and an

extensive prepetition marketing process, the Debtors have arrived at the terms of the

Restructuring Support Agreement, which the Debtors consider represents the best available

restructuring alternative at present. Moreover, through the postpetition marketing process and the

Bidding Procedures, the Debtors will continue to subject the Supporting Lender Transaction to

higher and better offers. The marketing process set forth in the Bidding Procedures is value

maximizing, in that it allows Potential Bidders maximum flexibility to structure Bids in a manner

that best suits the goals of the Potential Bidder, while ensuring that Qualified Bids provide

maximum value for the Assets or the Reorganized Melinta Common Stock. To this end, in the

event that a Bid is submitted which (a) contemplates a Section 363 Asset Sale, and (b) is higher and better than the Supporting Lender Transaction, this Court should approve the Section 363 Asset Sale.

## II.    The Bidding Procedures Are Fair and Are Designed to Elicit the Highest or Otherwise Best Transaction Alternative.

32.    Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The purpose of sale procedures is to promote competitive bidding and maximize the value of the Debtors' assets. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992).

33.    The Bidding Procedures are appropriate under these applicable standards and are designed to ensure that the bidding process is fair and will yield the maximum value for their estates and stakeholders. The Bidding Procedures proposed herein are designed to maximize the value received for in a Transaction by facilitating a competitive bidding process in which all Potential Bidders are encouraged to participate and submit competing bids (while giving Potential Bidders flexibility in structuring their Bids). The Bidding Procedures provide potential bidders with sufficient notice and opportunity to acquire information necessary to submit timely and informed bids at each stage of the sale process. Thus, the Debtors and all parties in interest can be assured that the consideration received will be fair and reasonable. At the same time, the Bidding Procedures provide the Debtors with the opportunity to consider all competing bids and to select, in their reasonable business judgment, and after consultation with the Consultation Parties and their advisors, the highest and best Transaction offer.

III.    **The Proposed Expense Reimbursement Should Be Authorized.**

34.    The Debtors seek authorization to pay the Expense Reimbursement of up to $2,000,000 to the Supporting Lenders in the event that the Supporting Lenders are not the Successful Bidder (or if the Debtors consummate any Plan or Section 363 Asset Sale of all or substantially all of the Debtors' Assets other than the Supporting Lender Transaction). Approval of expense reimbursements and other forms of bidding protections in connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code has become established practice in chapter 11 cases. Such bidding protections enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor with an opportunity to enhance the value to its estate through an auction process. Historically, bankruptcy courts have approved bidding incentives similar to the Expense Reimbursement pursuant to the business-judgment rule. *See Integrated Res., Inc.*, 147 B.R. at 654–63; *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28–29 (Bankr. S.D.N.Y. 1989).

35.    The United States Court of Appeals for the Third Circuit, however, has established standards for determining the propriety of bidding incentives in the bankruptcy context. *See O'Brien Envtl. Energy, Inc.*, 181 F.3d at 533–38; *see also In re Reliant Energy Channelview LP*, 594 F.3d 200 (3d Cir. 2010). The Court has held that even though bidding incentives are measured against a business-judgment standard in nonbankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context. *See O'Brien Envtl. Energy*, 181 F.3d at 535. Accordingly, to be approved, bidding incentives must provide some postpetition benefit to the debtor's estate. *See id.*

36.    The amount of the Expense Reimbursement is reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended by the Supporting Lenders. Notwithstanding the fact that the Supporting Lenders are existing

secured lenders of the Debtors, the Supporting Lenders have performed and will continue to perform substantial incremental work to formulate, document, and close the Supporting Lender Transaction, including, without limitation, conducting substantial due diligence concerning the Debtors' business and Assets (recognizing that potential ownership and operation the reorganized Debtors presents incremental risks and other considerations beyond those faced by a secured lender); negotiating and documenting the terms of use of cash collateral, the Bidding Procedures, and the Restructuring Support Agreement; addressing regulatory and other administrative requirements associated with a potential acquisition of the Reorganized Melinta Common Stock; and negotiating, drafting, and supporting certain the Definitive Documentation that has not yet been prepared as of the Petition Date. All of these efforts have positioned the Debtors, with the support of their largest prepetition creditors, to commence these Chapter 11 Cases with a path to maximize value and emerge from chapter 11.

37. Moreover, the Expense Reimbursement is actually necessary to preserve the value of the estate. The Expense Reimbursement was heavily negotiated and was necessary to secure the Supporting Lenders' commitment under the Restructuring Support Agreement. As such, the Expense Reimbursement enables the Debtors to ensure a value maximizing Transaction, while, at the same time, providing them with the potential of even greater benefit to the estates. Moreover, payment of the Expense Reimbursement will not diminish the Debtors' estates.

38. Courts in this and other districts have approved protections similar to the Expense Reimbursement as reasonable and consistent with the type and range of bidding protection typically approved. *See, e.g.*, *In re Empire Generating Co. LLC,* Case No. 19-23007 (RDD) (Bankr. S.D.N.Y. June 10, 2019) (approving expense reimbursement of up to $2 million and break-up fee of $1 million for secured lender credit bidding existing debt); *In re Pernix Sleep*

*Inc.*, Case No. 19-10323 (CSS) (Bankr. D. Del. Mar. 22, 2019) (approving expense reimbursement of up to $1.134 million for secured lender credit bidding existing debt); *In re Sancilio Pharma.*, Case No. 18-11333 (CSS) (Bankr D. Del. June 28, 2018) (approving break-up fee of $450,000 and expense reimbursement of up to $1 million for secured lender credit bidding existing debt); *In re Standard Register Co.*, Case No. 15-10541 (BLS) (Bankr. D. Del. Apr. 15, 2015) (approving an expense reimbursement of up to $1.5 million for secured lender credit bidding existing debt).

## IV. Any Section 363 Asset Sale Will Satisfy the Requirements of Bankruptcy Code Section 363(F) for a Sale Free and Clear of Interests.

39.     The Supporting Lender Transaction contemplates the acquisition of the Reorganized Melinta Common Stock through the Restructuring Support Agreement and a chapter 11 Plan. However, in the event that the Successful Bidder proposes a Section 363 Asset Sale, the Debtors seek authority to sell the Assets free and clear of any interest, pursuant to Bankruptcy Code section 363(f).

40.     Bankruptcy Code section 363(f) provides:

The Trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –

> (1)     applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)     such interest is in *bona fide* dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

41.     As Bankruptcy Code section 363(f) is stated in the disjunctive, when proceeding pursuant to section 363(b), it is only necessary to meet one of the five conditions of section 363(f). The Debtors submit that one or more of the conditions set forth in section 363(f) of the Bankruptcy Code will be satisfied with respect to any Section 363 Asset Sale.

42.     The primary lienholders with respect to the Assets are the Supporting Lenders who, by virtue of the Restructuring Support Agreement, have consented, pursuant to Bankruptcy Code section 363(f)(2), to the Bidding Procedures. The Debtors anticipate that any Section 363 Asset Sale will satisfy Bankruptcy Code section 363 by virtue of either (a) generating proceeds with an aggregate value that exceeds the Supporting Lenders' liens, or (b) the Supporting Lenders' consent to such Section 363 Asset Sale.

43.     The Debtors will send the Sale Notice to, among others, all parties who assert liens or claims against the Assets. Any holder of a claim against or interest in the assets who does not object to the Section 363 Asset Sale will be deemed to have consented to the sale of the Assets free and clear. 11 U.S.C. 363(f)(2); *see Hargrave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994). Moreover, the Debtors believe that any parties that do object on the basis that they hold liens or claims against the Assets will either (a) be holders of liens or claims that are subject to a *bona fide* dispute or (b) would be compelled to accept cash in satisfaction of their interests. *Cf.* 11 U.S.C. §§ 363(f)(3) & 363(f)(5).

44.     Any lienholder also will be adequately protected by having its liens, if any, attach to the proceeds of the Section 363 Asset Sale, in the same order of priority, with the same validity, force, and effect, that such creditor had prior to the sale, subject to any claims and defenses that the Debtors and their estates may possess with respect thereto. *Cf. id.* § 363(f)(3). Therefore, pursuant to Bankruptcy Code section 363, the Debtors may sell the Assets free and

clear of all liens, claims, and encumbrances, except to the extent of the permitted encumbrances, if the Debtors elect to pursue a Section 363 Asset Sale.

45.     The Debtors also submit that it is appropriate to sell the Assets free and clear of successor liability relating to the Debtors' businesses. Such a provision ensures that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to one or more of the Debtors. Courts have consistently held that a buyer of a debtor's assets pursuant to a Bankruptcy Code section 363 sale takes free and clear from successor liability relating to the debtor's business. *See, e.g., In re Trans World Airlines, Inc.*, 322 F.3d 283, 288–93 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 585–87 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *Amphenol Corp. v. Shandler (In re Insilco Techs., Inc.)*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory); *see also In re Gen. Motors Corp.*, 407 B.R. 463, 505–06 (Bankr. S.D.N.Y. 2009) (holding that "[t]he law in this Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction."); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("*[I]n personam* claims, including any potential state successor or transferee liability claims against New Chrysler, as well as *in rem* interests, are encompassed by section 363(f) and are therefore extinguished by the Sale.").

46.     The purpose of an order authorizing the transfer of assets free and clear of all liens, claims, encumbrances and all other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct. Moreover, without such assurances, the Debtors would run the risk that potential bidders may not enter the Auction or, if they did, would do so with reduced bid amounts. To that end, if the Debtors elect to pursue a Section 363 Asset Sale, the Successful Bidder should not be liable under any theory of successor liability relating to the Debtors' businesses, but should hold the Assets free and clear.

## V.    Credit Bidding Should Be Authorized Under Bankruptcy Code Section 363(k).

47.     Pursuant to section 363(k) of the Bankruptcy Code, unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Section 363(k) allows such secured creditor to bid the full face amount of its claim. *See Cohen* v. *KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006) (stating that interpreting section 363(k) of the Bankruptcy Code to cap credit bids at the economic value of the underlying collateral "is theoretically nonsensical").

48.     The Bidding Procedures propose that the Supporting Lenders may credit bid all or a portion of the Prepetition Credit Agreement Claims "to the fullest extent permitted by Section 363(k)." As set forth in greater detail in the Cash Collateral Order, the Supporting Lenders are the beneficiaries of a lien over substantially all of the Assets being sold pursuant to the Bidding Procedures. As such, the Credit Bid is permissible, to the fullest extent permitted by Section 363(k). Moreover, the Supporting Lenders are prohibited, absent further order of this Court, from credit bidding any Prepayment Fee under the Prepetition Credit Agreement.

VI.   **Any Successful Bidder Should Be Entitled to the Protections of Bankruptcy Code Section 363(m).**

49.    Bankruptcy Code section 363(m) provides in relevant part that the reversal or modification on appeal of an authorization under section 363(b) of a sale or lease of property does not affect the validity of a sale or lease under such authorization to a buyer who bought or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. *See* 11 U.S.C. § 363(m). Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *See Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assocs., Ltd. (In re Mark Bell Furniture Warehouse, Inc.)*, 992 F.2d 7, 8 (1st Cir. 1993); *Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, Case No. 03-51524, 2007 WL 1428477, at *2 (Bankr. D. N.J. May 11, 2007); *Abbotts Dairies of Pa.*, 788 F.2d at 147.

50.    As set forth in greater detail herein, the Debtors' marketing efforts and negotiations with Potential Bidders have been and will continue to be undertaken at arm's-length and without collusion, with all parties having the opportunity to be represented by their own sophisticated counsel. Accordingly, the Debtors request that any Sale Order include a provision that the Successful Bidder for the Assets is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code. The Debtors believe that providing the Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Assets and that, if the Debtors elect to pursue a Section 363 Asset Sale, the closing of the Section 363 Asset Sale will occur promptly. Moreover, neither the Debtors nor any Potential Bidder has engaged in any conduct that would cause or permit any Section 363 Asset Sale to be avoided under section 363(n) of the Bankruptcy Code. Additionally, the Bidding Procedures are designed

to prevent the Debtors or the Successful Bidder (or the Backup Bidder as defined in the Bidding

Procedures) from engaging in any conduct that would cause or permit any Section 363 Asset

Sale to the Successful Bidder (or the Backup Bidder) pursuant thereto and hereto, to be avoided

under section 363(n) of the Bankruptcy Code.

## VII.   Assumption of the Restructuring Support Agreement Is Authorized by Section 365(a) of the Bankruptcy Code.

51.   In the event that the Supporting Lenders are the Successful Bidder, the Debtors

respectfully submit that this Court should authorize the Debtors to assume the Restructuring

Support Agreement pursuant to Bankruptcy Code section 365(a). The Debtors' decision to

assume the Restructuring Support Agreement, if applicable, following the marketing process,

represents (and will continue to represent) an exercise of sound business judgment. Bankruptcy

Code section 365(a) provides that a debtor "subject to the court's approval, may assume or reject

any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The decision to

assume an executory contract or unexpired lease is a matter within the "business judgment" of

the debtor. *See In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) *(*the "resolution

of [the] issue of assumption or rejection will be a matter of business judgment by the bankruptcy

court"*); Nat'l Labor Relations Bd. v. Bildisco & Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d

Cir. 1982), *aff'd*, 465 U.S. 573 (1984); *see also In re Trans World Airlines, Inc.*, 261 B.R. 103,

120–21 (Bankr. D. Del. 2001).

52.   When applying the business-judgment rule in connection with a decision under

Bankruptcy Code section 365, courts show great deference to a debtor's business decisions. *See

e.g.*, *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 162 (Bankr. D. Del. 2006) ("Courts have

uniformly deferred to the business judgment of the debtor to determine whether the rejection of

an executory contract or unexpired lease by the debtor is appropriate under section 365(a).");

*Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling-Pittsburg Steel Corp.)*, 72 B.R. 845, 849 (Bankr. W.D. Penn. 1987) ("Ordinarily, courts accord the debtor's business judgment a great amount of deference since the decision to assume or reject an executory contract is an administrative not a judicial matter."). Application of the business-judgment rule requires a court to approve a debtor's business decision unless the decision is the product of bad faith, whim, or caprice. *See Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985); *see also In re Caribbean Petroleum Corp.*, 444 B.R. 263, 268 (Bankr. D. Del. 2010).

53.     The Restructuring Support Agreement provides the Debtors with an actionable path to confirmation of a Plan and emergence from chapter 11, and emergence from Chapter 11, all with the support of the Debtors' largest creditor.[18] The Restructuring Support Agreement was negotiated in good faith and at arm's length. Moreover, the Debtors will seek approval of the Restructuring Support Agreement only if the Supporting Lender Transaction emerges as the Successful Bid—in other words, after the Supporting Lender Transaction has been thoroughly market-tested, and parties with alternative transaction proposals have had a full opportunity to present such proposals for evaluation by the Debtors and the consultation parties. In this way, the process ensures that the Debtors will receive the highest and best value for the Assets or the Reorganized Melinta Common Stock (as applicable). For these reason, assumption of the Restructuring Support Agreement reflects an exercise of the Debtors' sound business judgment, satisfying the standard for assumption in this District.

---

[18]   Consistent with the requirements for confirmation of a chapter 11 plan, the Plan contemplated by the Restructuring Support Agreement will provide for the payment in full in cash of the Debtors' administrative and priority claims or such other treatment as may be necessary to render such claims unimpaired. The Debtors not that, in evaluating Bids that propose a Section 363 Asset Sale, they will consider whether the Bid offer sufficient cash consideration to confirm a chapter 11 plan of liquidation, including cash sufficient to render all administrative and priority claims

54.     Moreover, payment of the Transaction Expenses on the terms and conditions set forth in the RSA should be approved. The payment of these expenses were key aspects of the consideration embodied in the RSA, and encouraged the Supporting Lenders to negotiate and agree to the RSA, the proposed Plan, and the transactions contemplated thereby.

55.     Courts in this District have approved debtors' assumption of agreements similar to the RSA. *See*, *e.g.*, *In re Hexion Holdings LLC*, Case No. 19-10684 (KG) (Bankr. D. Del. May 15, 2019); *In re New Mach Gen, LLC*, Case NO. 18-11368 (MFW) (Bankr. D. Del. July 2, 2018); *In re FirstRain, Inc.*, Case No. 17-11249 (LSS) (Bankr. D. Del. June 21, 2017); *In re Aspect Software Parent, Inc.*, Case No. 16-10597 (MFW) (Bankr. D. Del. Apr. 21, 2016); *In re Altegrity, Inc.*, Case No. 15-10226 (LSS) (Bankr. D. Del. Mar. 16, 2015).

## VIII.    Assumption of Executory Contracts and Unexpired Leases Should Be Authorized.

56.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g.*, *In re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (debtor's decision to assume or reject executory contract is governed by business-judgment standard and can only be overturned if decision was "product of bad faith, whim, or caprice"); *see also In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39–40 (3d Cir. 1989) (same). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Grp. of Institutional Inv'rs v. Chi. M. St. P. & P.R. Co.*, 318 U.S.

523, 550–51 (1943); *Sharon Steel Corp.*, 872 F.2d at 36, 39–40. "The business judgment test

'requires only that the trustee [or debtor in possession] demonstrate that [assumption or]

rejection of the executory contract will benefit the estate.'" *Wheeling-Pittsburgh Steel Corp. v.*

*West Penn Power Co.* (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D.

Pa. 1987) (first alteration in original)(quoting *In re Stable Mews Assocs.*, 41 B.R. 594, 596

(Bankr. S.D.N.Y 1984)). "[Any] [m]ore exacting scrutiny would slow the administration of the

debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private

control of administration of the estate, and threaten the court's ability to control a case

impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an

executory contract, it must "cure[, or provide] adequate assurance that the [debtor] will promptly

cure" any default, including compensation for any "actual pecuniary loss" relating to such

default. 11 U.S.C. § 365(b)(1).

57.     Once an executory contract is assumed, the trustee or debtor in possession may

elect to assign such contract. *See L.R.S.C. Co. v. Rickel Home Ctrs., Inc.* (In re Rickel Home

Ctrs., Inc.), 209 F.3d 291, 299 (3d Cir. 2000) ("[T]he Code generally favors free assignability as

a means to maximize the value of the debtor's estate . . . ."); *see also Leonard v. Gen. Motors*

*Corp.*( In re Headquarters Dodge, Inc.), 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of

section 365(f) is to assist trustee in realizing the full value of the debtor's assets). Section

365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free

from anti-assignment restrictions, providing, in pertinent part, that:

> [n]otwithstanding a provision in an executory contract or unexpired lease of the
> debtor, or in applicable law, that prohibits, restricts, or conditions the assignment
> of such contract or lease, the trustee may assign such contract or lease under
> paragraph (2) of this subsection.

11 U.S.C. § 365(f)(1). Furthermore, section 365(f)(3) of the Bankruptcy Code prohibits

enforcement of any clause creating a right to modify or terminate the contract or lease upon a

proposed assumption or assignment thereof. *See* 11 U.S.C. § 365(f)(3). *See, e.g., In re Jamesway*

*Corp.*, 201 B.R. 73, 77–78 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) of the Bankruptcy Code

prohibits enforcement of any lease clause creating a right to terminate the lease because it is

being assumed or assigned, thereby indirectly barring assignment by a debtor). Other courts have

recognized that provisions that have the effect of restricting assignments cannot be enforced. *See*

*In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 356(f)

[sic], courts and commentators like have construed the terms to not only render unenforceable

lease provisions which prohibit assignment outright, but also lease provisions that are so

restrictive that they constitute *de facto* anti-assignment provisions.")

58.    Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an

executory contract . . . only if . . . the trustee assumes such contract . . . and . . . adequate

assurance of future performance . . . is provided." 11 U.S.C. § 365(f)(2). The meaning of

"adequate assurance of future performance" depends on the facts and circumstances of each case,

but should be given a "practical, pragmatic construction." *In re DBSI, Inc.*, 405 B.R. 698, 708

(Bankr. D. Del. 2009); *EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp.* (In re

Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992), *aff'd*, 993 F.2d 300 (2d Cir.

1993); *see also In re Decora Indus. Inc.*, 2002 WL 32332749 at *8 (D. Del. May 20, 2002)

("adequate assurance falls short of an absolute guaranty of payment"); *Carlisle Homes, Inc. v.*

*Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

59.    Adequate assurance may be provided by demonstrating the assignee's financial

health and experience in managing the type of enterprise or property assigned. *See, e.g., In re*

*Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

60.     To facilitate and effect the Transaction, the Debtors request approval under Bankruptcy Code section 365 of the Debtors' assumption or assumption and assignment (as applicable) of the Designated Contracts to the Successful Bidder. The Debtors further request that the Sale Order provide that the Designated Contracts will remain in full force and effect for the benefit of, the Successful Bidder (and be transferred to a Successful Bidder, to the extent applicable) notwithstanding any provisions in the Designated Contracts, including those described in Bankruptcy Code sections 365(b)(2) and (f)(1) and (3), that prohibit such assumption or assumption and assignment.

61.     The Bidding Procedures contemplate that a Transaction may be completed pursuant to either a Section 363 Asset Sale or a Plan Sale. The Debtors propose to serve Contract Assumption Notices on all counterparties to Designated Contracts as set forth herein and in the Bidding Procedures Order, and provide such counterparties with an opportunity to object to assumption (or assumption and assignment, as applicable) and the Debtors' proposed Cure Amount. In the event that the Debtors elect to pursue a Section 363 Asset Sale, the Designated Contracts will be assumed at closing of such Section 363 Asset Sale. In the event that the Debtors elect to pursue a Plan Sale, such Designated Contracts will be assumed in accordance with the Plan. In the event that the Debtors elect to pursue a Plan Sale (a) counterparties to Designated Contracts who received a Contract Assumption Notice in accordance with this Motion and did not object to the proposed assumption or Cure Amount shall be deemed to have consented to the assumption in connection with the Plan Sale, and (b) the Debtors will be

permitted, in accordance with the orders of this Court related to the Debtors' disclosure statement and Plan, to designate additional contracts for assumption by the Debtors, provided that such contracts were not previously rejected by order of this Court.

62.     The Debtors' assumption or assumption and assignment of the Designated Contracts to the Successful Bidder meets the business-judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. The assumption or assumption and assignment is necessary for the Successful Bidder to conduct business going forward. Because no purchaser would take the Assets without certain executory contracts and unexpired leases, the assumption and assignment of such agreements is essential to securing the highest or otherwise best offer for the Assets. Further, upon consummation of any Section 363 Asset Sale, the Debtors will no longer continue to operate the Assets and will therefore have no use for any of the executory contracts and unexpired leases previously utilized in the ordinary course of the operation of the Assets.

63.     To the extent that any defaults exist under any executory contract or unexpired lease that is to be assumed or assumed and assigned in connection with the sale of the Assets, the Debtors of the Successful Bidder, as applicable, will cure any such default prior to such assumption or assumption and assignment.

64.     The Debtors contemplate that the Successful Bidder will be able to provide adequate assurance of future performance in connection with any assumed or assumed and assigned executory contracts and unexpired leases, because such Successful Bidder must submit evidence sufficient to demonstrate its financial wherewithal and ability to consummate the Transaction. In addition, under the Assumption Procedures, the non-Debtor party to any

Designated Contract will have the opportunity to object to adequate assurance of future performance by the Successful Bidder.

65.     If the Debtors elect to pursue a Section 363 Asset Sale, the Debtors will present facts at the Sale Hearing to show the financial credibility, willingness, and ability of the Successful Bidder to perform under the Designated Contracts. The Sale Hearing thus will afford the Court and other interested parties the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance under the Designated Contracts, as required under Bankruptcy Code section 365(b)(1)(C). Further, as set forth above, the Debtors will give notice to all parties to the Designated Contracts of their intention to assume or assume and assign the Designated Contracts, as the case may be, and what the Debtors believe are the Cure Amounts.

66.     Accordingly, the Debtors submit that implementation of the proposed Assumption Procedures is appropriate in these cases. The Court, therefore, should have a sufficient basis to authorize the Debtors to reject or assume and assign contracts as will be set forth in the Successful Bidder's asset purchase agreement.

## IX.     The Forms of Notice and Notice Procedures for the Bidding Procedures, the Auction, and the RSA/Sale Hearing Are Reasonable and Appropriate.

67.     Pursuant to Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify creditors of the Sale, including a disclosure of the time and place of any auction, the terms and conditions of the Sale, and the deadline for filing any objections thereto. *See* Fed. R. Bankr. P. 2002 (a), (c).

68.     The Debtors submit that the notice procedures described above fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, the Auction, and the RSA/Sale Hearing to the Debtors' creditors and all

other interested parties that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Assets.

69.    Accordingly, the Debtors respectfully request that the Court approve the notice procedures set forth herein, including the form and manner of service of the Sale Notice, the Publication Notice, and the Notice of Successful Bidder and that no other or further notice of the Bidding Procedures, the Auction, and the RSA/Sale Hearing is necessary or required.

## X.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.

70.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d). The Debtors request that each of the Bidding Procedures Order and the Sale Order be effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

71.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before an order can be implemented. *See* Fed R. Bankr. P. 6004(h), 6006(d) advisory committee's note to 1999 amendment. The stay pursuant to Bankruptcy Rule 6004(h) may be waived to allow a Sale to close immediately "where there has been no objection to the procedure." *See* 10 COLLIER ON BANKRUPTCY ¶ 6004.11 (16th ed. 2016). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file an appeal. *Id.*

72.     Following the Sale Hearing, the Debtors seek to close the Sale as soon as possible following the Sale Hearing in order to maximize value received for the Assets. Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

**NOTICE**

73.     Notice of this Motion will be given to: (a) the U.S. Trustee, (b) counsel to the administrative agent under the Deerfield Facility, (c) counsel to Deerfield, (d) counsel to Vatera, (e) counsel to Oikos, (f) counsel to The Medicines Company, (g) the Internal Revenue Service, (h) the Securities and Exchange Commission, (i) the parties included on the Debtors' consolidated list of their 30 largest unsecured creditors, (j) the United States Attorney for the District of Delaware, (k) the Food and Drug Administration, (l) all parties who have expressed a written interest in the Assets within the last two years preceding the date hereof, (m) all entities known to have asserted any claim, liens, interests, or encumbrances in or upon any of the Assets, (n) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion, and (o) all parties entitled to notice pursuant to Bankruptcy Rule 2002(b) and Local Bankruptcy Rule 2002-1. The Debtors submit that, under the circumstances, no other or further notice is required.

**NO PRIOR REQUEST**

74.     No previous request for the relief sought herein has been made to this Court or any other court.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

The Debtors respectfully request that this Court enter the Bidding Procedures Order and, following the RSA/Sale Hearing, either the Sale Order, or the RSA Order, granting the relief sought herein and granting such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
December 30, 2019

COLE SCHOTZ P.C.

/s/ David R. Hurst
David R. Hurst (I.D. No. 3743)
J. Kate Stickles (I.D. No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Fax: (302) 652-3117

– and –

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Joseph O. Larkin (I.D. No. 4883)
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Fax: (302) 651-3001

– and –

Ron E. Meisler
Albert L. Hogan III
Christopher M. Dressel
155 North Wacker Drive
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Proposed Counsel to Debtors*
*and Debtors-in-Possession*