1
2
UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

3                                .   Chapter 11

IN RE:                     .

4                                .   Case No. 19-12748 (LSS)

MELINTA THERAPEUTICS, INC.,   .

5
*et al.,*                    .

                              .   Courtroom No. 2

6                              .   824 North Market Street

                              .   Wilmington, Delaware 19801

7                              .

                   Debtors.   .   January 28, 2020

8  . . . . . . . . . . . . . . . . .   1:30 P.M.

9
10
TRANSCRIPT OF SECOND DAY MOTIONS
BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

11
APPEARANCES:

12
For the Debtors:        David R. Hurst, Esquire

13                        MCDERMOTT WILL & EMERY LLP

                        The Nemours Building

14                        1007 North Orange Street, 4th Floor

                        Wilmington, Delaware 19801

15
                        - and -

16
                        Joseph O. Larkin, Esquire

17                        SKADDEN ARPS SLATE MEAGHER & FLOM

                        920 North King Street

18                        Wilmington, Delaware 19801

19
Audio Operator:        Electronically Recorded

20                        by Sherry Stiles & Brandon McCarthy

21
Transcription Company:  Reliable

                        1007 N. Orange Street

22                        Wilmington, Delaware 19801

                        (302)654-8080

23                        Email:  gmatthews@reliable-co.com

24
Proceedings recorded by electronic sound recording,
25 transcript produced by transcription service.

```
 1  APPEARANCES (Continued):

 2  For the Debtors:         Ron E. Meisler, Esquire
                             Albert L. Hogan, III, Esquire
 3                           Christopher M. Dressel, Esquire
                             SKADDEN ARPS SLATE MEAGHER & FLOM
 4                           155 North Wacker Drive
                             Chicago, Illinois 60606
 5
     For Vatera:             Gregg Galardi, Esquire
 6                           ROPES & GRAY LLP
                             920 North King Street, Suite 700
 7                           Wilmington, Delaware 19801

 8  For the U.S. Trustee:    Linda Richenderfer, Esquire
                             UNITED STATES DEPARTMENT OF JUSTICE
 9                           OFFICE OF THE UNITED STATES TRUSTEE
                             844 King Street, Suite 2207
10                           Lockbox 35
                             Wilmington, Delaware 19801
11
     For the Committee:      Rachel A. Parisi, Esquire
12                           Warren J. Martin, Jr., Esquire
                             PORZIO BROMBERG & NEWMAN P.C.
13                           100 Southgate Parkway
                             P.O. Box 1997
14                           Morristown, New Jersey 07962

15  For Deerfield:           Adam G. Landis, Esquire
                             LANDIS RATH & COBB LLP
16                           919 N. Market Street, Suite 1800
                             Wilmington, Delaware 19801
17
                             - and -
18
                             James L. Bromley, Esquire
19                           SULLIVAN & CROMWELL LLP
                             125 Broad Street
20                           New York, New York 10004

21

22

23

24

25
```

1    SECOND DAY MOTIONS:

2    **Wages Motion.**  Motion of Debtors for Entry of Interim and Final
     Orders Authorizing Debtors to Pay Prepetition Wages, Compensation,
3    and Employee Benefits (Filed December 27, 2019) [Docket No. 11]

4    **Ruling:  46**

5    **Bidding Procedures.**  Motion of Debtors for Orders (I)(A)
     Establishing Bidding Procedures; (B) Approving Expense
6    Reimbursement; (C) Establishing Procedures Relating to the
     Assumption or Assumption and Assignment of Certain Executory
7    Contracts and Unexpired Leases, Including Notice of Proposed Cure
     Amounts; (D) Approving Form and Manner of Notice of All Procedures,
8    Protections, Schedules, and Agreements; (E) Scheduling a Hearing to
     Consider any Proposed Sale; and (F) Granting Certain Related
9    Relief; and (II)(A) Approving any Sale of Substantially All of
     Debtors' Assets and (B) Authorizing the Assumption and Assignment
10   of Certain Executory Contracts and Unexpired Leases in Connection
     with the Sale; and (C) Granting Related Relief or, in the
11   Alternative (III)(A) Authorizing Debtors' Assumption of
     Restructuring Support Agreement and (B) Granting Related Relief
12   (Filed December 30, 2019) [Docket No. 67]

13   **KEIP Motion.**  Motion of Debtors for Entry of an Order Approving the
     Implementation of the Debtors' Key Employee Incentive Plan (Filed
14   January 3, 2020) [Docket No. 92 (Sealed); Docket No. 93 (Redacted)]

15   **Ruling:  212**

16   DEBTORS' WITNESS(s)

17   **Jeffrey Finger**

18          Cross-examination by Mr. Martin       54

19          Cross-examination by Mr. Galardi      57

20          Redirect examination by Mr. Hogan     63

21          Re-cross examination by Mr. Martin     68

22          Re-cross examination by Mr. Galardi    70

23          Redirect examination by Mr. Hogan     74

24          Direct examination by Mr. Bromley     75

25          Cross examination by Mr. Galardi      81

Cross examination by Mr. Martin        82

**Peter Milligan**

Cross examination by Mr. Martin        83

Cross examination by Mr. Bromley       93

Redirect examination by Mr. Hogan      101

Re-cross examination by Mr. Martin     102

Re-cross examination by Mr. Galardi    104

**David Gill**

Cross examination by Ms. Parisi        197

EXHIBITS:                                    ID     Rec'd

Declaration of Peter Milligan                        24

Declaration of Jeffrey Finger                        50

Declaration of David Gill                            195

Dempsey Declaration                                  203

1          (Proceedings commenced at 11:06 a.m.)

2               THE CLERK:  Please rise.

3               THE COURT:  Please be seated.

4               MR. HURST:  Good afternoon, Your Honor.

5               THE COURT:  Mr. Hurst.

6               MR. HURST:  For the record David Hurst from

7    McDermott Will & Emery representing Melinta Therapeutics and

8    its debtor affiliates, the debtors and debtors-in-possession

9    in these cases.

10               Your Honor, thank you for the brief adjournment to

11   allow the parties to work through some issues.  You can tell

12   from the length of the agenda that there are many issues.

13   So, we appreciate your indulgence.

14               Your Honor, with me from the company today we have

15   four representatives from the senior management and the

16   board.  First I want to introduce Mr. David Gill, he is our

17   chairman of the board.  Jennifer Sanfilippo is our interim

18   chief executive officer.  Peter Milligan, our chief financial

19   officer.  Susan Blum, back here, the chief accounting

20   officer.

21               THE COURT:  Welcome.

22               MR. HURST:  Then at counsel table with me, Your

23   Honor, Ron Meisler, Chris Dressel, and Al Hogan, and many

24   others that are supporting the efforts.

25               Unless Your Honor has any initial questions from

1  me I propose to turn over the podium to Mr. Meisler who will

2  discuss how we proceed to move forward today.

3          THE COURT:  That's fine.

4          MR. HURST:  Okay.  Thank you, Your Honor.

5          THE COURT:  Mr. Meisler?

6          MR. MEISLER:  Good afternoon, Your Honor.

7          THE COURT:  Good afternoon.

8          MR. MEISLER:  Ron Meisler of Skadden Arps on

9  behalf of the debtors, Melinta Therapeutics, and its

10  subsidiaries.

11          Thank you, Your Honor, for making time for us this

12  afternoon particularly in light of our lengthy agenda.  Your

13  Honor, before we get into the agenda items I'd like to

14  provide for the court a brief status update.

15          Your Honor, on January 14th of this year the

16  committee was appointed, the official creditors committee,

17  and shortly thereafter the committee selected Porzio and

18  Morris James as legal advisors, and FTI as its financial

19  advisor.

20          While unfortunately we have been unable to resolve

21  all the open issues with the committee in advance of this

22  afternoon's hearing we have been working constructively to

23  provide the committee with access to requested diligence.  We

24  have been keeping an open line of dialog between us, and the

25  committee and what may be our largest creditor Vatera.  And

1  to that end, Your Honor, we held in-person meeting in

2  Morristown, New Jersey this past Friday with the creditors

3  committee, and the members of the creditors committee, and

4  we'd like to believe that we really made a lot of progress

5  both getting to know one another and providing the

6  transparency that we all want as part of the Chapter 11

7  process.

8        We are committed, Your Honor, to continuing that

9  effort to work constructively with the committee and with

10  Vatera.  And we're going to make sure that there's sufficient

11  information for the committee to fulfill its statutory

12  duties. And I would hope that Mr. Martin, Warren Martin, of

13  Porzio would agree that we have really stretched out our arm

14  to make sure that they have what they need.

15        As a result of these efforts, Your Honor, we were

16  able to resolve the committee's objection to the employee

17  motion.  It's not going forward on an uncontested basis

18  because the U.S. Trustee still does have an objection, but it

19  is important to note that following our meeting on Friday the

20  committee does understand the importance of the work force to

21  the company and to the value maximization process that we

22  need to run here.  We'll get into that more as we talk about

23  the employee wages motion.

24        Your Honor, on January 17th, in accordance with

25  the RSA milestone, the debtors filed their plan and

1  disclosure statement, and the motion seeking approval of the

2  disclosure statement.  The disclosure statement is currently

3  set for an approval hearing on February 21st.  The plan, as

4  drafted, contains substantial flexibility for what might

5  happen as part of our marketing process and our hoped for

6  auction.

7          So, Your Honor, we're before you today seeking to

8  take our next steps in the life of a Chapter 11 debtor which,

9  among other things, as mentioned, includes the approval of

10  employee wages and the other value maximizing steps we need

11  to take including seeking approval of our marketing process,

12  of our bid procedures, of cash collateral, among other

13  things.

14          Your Honor, you're going to hear, of course, from

15  committee's counsel and from Vatera regarding their

16  objections, there are many of them, and we think it's

17  important to keep a few things in mind.  Your Honor, we have

18  been marketing this business in earnest with the help of

19  Jeffries for nearly 100 days prepetition.  Even before that

20  the company had started its own marketing process to test the

21  market for bidders.

22          So, we have been working hard to find a buyer and

23  we hope that as part of our process we will get bidders and

24  we believe that as part of that auction we hope that we will

25  drive up value.  The critical piece is to get bidders to

1  submit qualified bids and to move forward at auction.

2            Your Honor, we have a highly engaged and motivated

3  board and management team as you see with who has come here

4  to court today.  They have been working tirelessly to do what

5  is right for the company, to evaluate offers, to respond to

6  diligence requests, to meet with potential buyers and to move

7  the transaction process forward as expeditiously as possible.

8            Your Honor, we have an agreement with Deerfield,

9  our secured lender, that provides the company with an

10 executable path out of Chapter 11.  It provides for the

11 payment in full of administrative claims, priority claims,

12 cure, it preserves jobs and it expressly contemplates a fair

13 and open process for the solicitation of higher or better

14 bids.

15           Your Honor, I want to take a moment to comment

16 that we're so often in front of Delaware Courts in a 363

17 process.  The bid that we have on the table is so much better

18 than a 363 bid because it promises a confirmable plan.  Your

19 Honor, for that reason we think it's a good bid and a great

20 floor bid.

21           Your Honor, we continue to face business

22 uncertainty and operational risk.  And a prolonged stay in

23 Chapter 11, in our view, would not be conducive to value

24 maximization.  As you know, we received a number of

25 objections from the committee, from the U.S. Trustee, and

1  Vatera.   Notably, Vatera is a prolific writer and has cast

2  approximately a dozen objections to the company's requested

3  relief.

4         As noted, we've worked to resolve a number of

5  these issues in advance of this hearing.   As mentioned, we

6  resolved the employee wages motion and will work at this

7  hearing to explain to Your Honor all the different reasons

8  why we think what we put in front of you is a reasonable

9  decision and satisfies business judgement, and the other

10  standards that we need to satisfy where applicable.

11         Your Honor, given that we have 21 matters up

12  today, of which 16 are contested, we have some concerns that

13  we have insufficient time to get through the entirety of the

14  agenda.   For this reason we would like to propose that we

15  proceed in an order that differs from the agenda.

16         If I may approach, Your Honor, I have a sheet

17  setting forth our proposed ordering which in big picture

18  starts with the uncontested matters and then in progress of

19  priority starting with the wages motion.

20              THE COURT:   Okay.

21              MR. MEISLER:   Your Honor, if I may approach?

22              THE COURT:   You may.

23              MR. MEISLER:   Thank you, Your Honor.

24              MR. MEISLER:   Your Honor, thank you for hearing me

25  this morning.   Unless you have any further questions I

1  propose to cede the podium to Mr. Hurst who will address the

2  first of the uncontested matters.

3          THE COURT:  Yes.  I will hear the uncontested

4  matters first.

5          MR. HURST:  Your Honor, David Hurst for the

6  debtors.

7          Your Honor, Agenda Item Number 1, the first in our

8  list, is the final approval of the tax motion.  This was one

9  of our first day motions.  Your Honor granted the relief

10  requested on an interim basis, we sent it out on notice, we

11  received some comments from the committee which we

12  incorporated into the language of the final order, and then

13  we filed the order under certification of counsel.

14          Your Honor didn't enter the order.  So, I assumed

15  that you have questions or concerns.  I'm happy to address

16  those.

17          THE COURT:  I do have a question.

18          MR. HURST:  Okay.

19          THE COURT:  Paragraph 6, which shows the additions

20  that have been made.  I'd like to understand the import of

21  Subparagraph (f), what that is directed to.

22          MR. HURST:  Well, Your Honor, this language was

23  adopted at the request of the committee.  So, I'm going to

24  suggest that perhaps committee counsel address the concern

25  that was meant to be addressed by the language.

1          THE COURT:  That's fine.

2          MS. PARISI:  Thank you, Your Honor; Rachel Parisi,

3  Porzio Bromberg & Newman, on behalf of the committee.  I

4  apologize, we have a nice size binder here and I did not

5  include the redlines for the ones that we resolved.  So, I

6  apologize, Your Honor.

7          We did request language that was incorporated and

8  we appreciate the efforts to get this across the finish line.

9  (f) we did include, I believe, in the -- that language is

10  included in most of the orders --

11          THE COURT:  It is.

12          MS. PARISI:  -- if not all.  And I think its -- I

13  mean from our perspective, to the extent that there is any

14  payment or any rights provided under the order that were not

15  supposed to be provided we wanted to include a reservation

16  for the committee and the debtors to the extent that we

17  needed to somehow unwind or reverse a particular payment that

18  should not have been made pursuant to the order.

19          THE COURT:  How does that work?  So, I've entered

20  an order that permits a payment and that payment is made.

21  So, how does a third-party rely upon my order?

22          MS. PARISI:  I don't think it was meant to, in any

23  way, contradict anything that would have been ordered by Your

24  Honor, but simply if a payment was made that was intended to

25  be made pursuant to the order, but the committee, let's say,

1  for example, doesn't believe that that payment was authorized

2  to be made pursuant to the terms of the order that the

3  committee has reserved its rights.  It, perhaps, might not be

4  necessary because I think that right probably exists no

5  matter what, but we were being careful to include that

6  reservation.

7         THE COURT:  Well, I think this whole paragraph is

8  unnecessary, but I see this in all kinds of orders.  Here's

9  what this order doesn't do is basically is what this

10  paragraph says.  Well, this order doesn't do a whole lot of

11  things, okay.  It doesn't do what it doesn't do.  But now

12  what we've added to this order is something that says even

13  when a payment has been made under this order there is no

14  waiver of rights to contest the validity, amount,

15  classification or priority with respect to a payment that's

16  been made.  I don't understand that.

17         I don't understand how we could have something in

18  this order that says notwithstanding payment under this order

19  that -- if you're talking about a mistake was made, the

20  debtor meant to pay Party A and they paid Party B; we can

21  deal with that.  I don't understand how this doesn't undo my

22  order.  That is what I don't understand.

23         MS. PARISI:  Your Honor, we can work to tweak the

24  language.  That was not the intention of that particular

25  paragraph.

1          THE COURT:  Okay.  Well, when you look at it

2  compare it to Paragraph (b), okay, which deals with, I'll

3  call, the more typical reservation.  I need to understand the

4  difference between those two and the import of it.  I won't

5  sign it the way it's stated here.

6          MS. PARISI:  Sure, Your Honor. I think that with

7  respect to (b) if we included -- I think (b) is with respect

8  to the debtors and any sort of admission on the debtors'

9  behalf.  If the phrase "parties in interest" was included in

10  (b) I think the committee's concerns would be satisfied.  I

11  think that if Your Honor would accept that change I think

12  that could be something that perhaps clarifies any sort of

13  issue with the language.

14          THE COURT:  Okay.  Speak with the debtor about

15  that.

16          MS. PARISI:  Okay.  Thank you, Your Honor.

17          MR. HURST:  Thank you, Your Honor.

18          So, was that your only concern with respect to the

19  tax motion?

20          THE COURT:  Yes.  And that's my concern with

21  respect to the customer obligation motion --

22          MR. HURST:  It was critical vendor and also

23  utility.

24          THE COURT:  Yes.  All four of those, same concern.

25          MR. HURST:  Excellent.  Well, we have taken care

1   of four.  We will work with the committee to make sure that

2   we can resolve that issue, but I think maybe just adding that

3   the language, you know, including other parties in interest

4   in that Paragraph (b), 6(b), sounds like that will take care

5   of the issue.

6             THE COURT:  Okay.

7             MR. HURST:  All right, Your Honor.  Well, that

8   takes us then to the bar date.  So, let me see, the debtors

9   are seeking a bar date, Your Honor, of March 9th and are

10  proposing to serve the bar date materials by February 4th.

11  It's just a 34 day period within which the parties to receive

12  and then file their proofs of claim.  We received some very

13  limited comments from the U.S. Trustee and incorporated those

14  comments into the proposed form of order and the exhibits.

15  We filed the agreed order under a certification of counsel.

16  Your Honor, I sense you have a concern.

17            THE COURT:  Paragraph 13 of the order.

18            MR. HURST:  Okay.  I'm there.

19            THE COURT:  So, the language "absent further order

20  of the court" I assume was put in to try to address the

21  concern that I raise with almost every motion requesting a

22  bar date.  I am not going to take that compromise language.

23  So, the code says -- actually the rules say what happens if a

24  person doesn't file a claim by the bar date, and that is all

25  I am going to order.  They are not forever barred and joined,

1  (a) is stricken.  And adding the -- they're not forever

2  barred and enjoined from asserting a claim.  And the language

3  would simply flip the burden to the movant from the debtor.

4  A party files a late filed claim, file your objection.  If

5  you don't file an objection the claim is allowed.

6          So, it should read Any person or entity that is

7  required to file a proof of claim that doesn't go down to

8  (b), but check (b) against Rule 600 -- no, 3000 and whatever

9  which says the consequence of not filing a proof of claim

10 which I think is probably reflected here, but I didn't go

11 look at the rule.  Not treated as a creditor, don't get to

12 vote.

13          MR. HURST:  Sure.

14          THE COURT:  Not automatically disallowed.  It

15 doesn't say you can never raise a claim.  It says what it

16 says.  That is what I will approve.

17          MR. HURST:  Okay.

18          THE COURT:  Then your notices need to conform.

19          MR. HURST:  Sure.  We will conform that to the

20 rule and then change the notices.  Then we will submit it

21 under certification of counsel.

22          THE COURT:  Then I will sign it.

23          MR. HURST:  Thank you, Your Honor.

24          THE COURT:  Thank you.

25          MR. HURST:  Okay.  It looks like the next item up

1  is going to be our employee order and for that I will turn

2  over the podium to my colleagues from Skadden.

3          THE COURT:  Thank you.

4          MR. HURST:  Thank you, Your Honor.

5          MR. MEISLER:  Thank you, Your Honor. For the

6  record Ron Meisler of Skadden Arps on behalf of the debtors.

7          Your Honor, the next item to push forward is the

8  debtors' wages motion which was filed at Docket Number 11.

9  Your Honor, as I mentioned in my introductory comments we

10 received two objections to this motion; one from the U.S.

11 Trustee and one from the committee.

12         Your Honor, this motion has particular

13 significance to the debtors because, candidly, it's the glue

14 to maintain the work force.  Your Honor, we want to show that

15 the debtors support the work force.  The employee wages

16 motion is all about supporting the work force and, Your

17 Honor, that's why we put it up to the very top of the agenda.

18         Your Honor, the committee's objection has been

19 resolved as noted in our statement that we filed yesterday at

20 Docket Number 191.  For the record, Your Honor, the terms of

21 the settlement are that the debtors have agreed to adjourn

22 the request to pay commissions to what is referred as the

23 Baxdela sales employees.  Those were a subset of the sales

24 force that were given notice and their last day is, I

25 believe, February 10th, but mid-February to be sure.

1        Again, it's that universe that received WARN

2   notices and are subject to the debtors reduction and force.

3   So, we will push that to a future date at a hearing

4   subsequently to be noticed by the debtors.  And we will use

5   that time to work with the creditor's committee to see if we

6   can come to a consensual resolution with that subset of the

7   population.  Of course, the committee's rights with respect

8   to those payments to the Baxdela sales employees are

9   reserved.  As to the balance of the relief requested, Your

10  Honor, the committee supports the motion.

11        Your Honor, I'll pause for a moment in case Mr.

12  Martin has anything further to mention and, otherwise, I'll

13  continue.

14        THE COURT:  Mr. Martin?

15        MR. MARTIN:  Good morning, Your Honor.

16        THE COURT:  Good morning.

17        MR. MARTIN:  My *pro hac* papers.  Good morning.

18  Good afternoon.

19        THE COURT:  Good afternoon.

20        MR. MARTIN:  I think I have *pro hac* papers.  The

21  order has been signed.  So, thank you.

22        The committee had a lot of concerns because there

23  were some numbers that exceeded the statutory cap.  We met in

24  person, as Mr. Meisler pointed out, on Friday.  Six of the

25  seven committee members were present in person.  Some of

1  them, at least two of them I think, having to fly in from out

2  of town.  We listened to the concerns expressed by the

3  debtors' principals and what not.

4         While the committee took those to heart, you know,

5  we -- just to give a little bit more of the give and take we

6  had one committee member who said, you know, our job was

7  helping you sell products.  We had our own sales force.  And

8  we had to skip some bonuses to our people because you didn't

9  pay us.

10         So, with that give and take we came up with a

11 resolution which the committee got behind, which is the folks

12 who aren't being continued.  It's hard to justify right now

13 paying them prepetition wages under the rule and necessity.

14 It's not anything we're all happy about, but that was the

15 resolution that we reach.

16         So, we support it and we think it's fair.  We want

17 the remaining sales force to be motivated in the right

18 direction.

19         THE COURT:  Thank you.

20         MR. MEISLER:  Terrific.  Thank you, Your Honor.

21         I would note that with that change, Your Honor, we

22 believe that the 503(c) standard is now moot.  The reason why

23 we say that, Your Honor, is that with respect to the Baxdela

24 sales force we were trying to do something that was outside

25 of our sales program as it's written in our manual. That is

1  that outside a change of control, in other words a sale

2  transaction, if you're not there on the payment date then you

3  don't get paid your commission.

4         So, that was something that we thought was

5  important.  We still think it's important for maintain the

6  moral of the work force, but since we don't have to do

7  something outside of the ordinary course we no longer think

8  the 503(c) standard is relevant.

9         Your Honor, obviously, though, if you do have

10  questions and you think the standard applies we're ready to

11  argue it on whatever point you may want us to address.  The

12  same thing for the U.S. Trustee.

13         So, Your Honor, that leaves us with the objection

14  by the U.S. Trustee.  The trustee argues that the debtors may

15  not pay prepetition employee obligations in excess of the

16  priority cap set forth in 507(a)(4) and 507(a)(5) of the

17  Bankruptcy Code.  Your Honor, that proposition is not the

18  law.  Delaware, this district is a jurisdiction that

19  promotes, of course, value maximizing reorganizations.  And

20  the largest and most complicated businesses that need to

21  reorganize choose Delaware, amongst other jurisdictions, as

22  their venue in an effort to avoid liquidation, and loss of

23  jobs and value.  They do this because in this district the

24  courts here understand and agree with the doctrine of

25  necessity; meaning that payment of prepetition amounts that

1 are necessary to preserve the going concern value of the

2 debtors are permitted.

3         At the outset I would note that, in my view, even

4 the U.S. Trustee subscribes to the doctrine of necessity, as

5 evidenced by the lack of her objection, to the critical

6 vendor's motion and the customer programs motion.

7         Here, Your Honor, distinct from, say, for example,

8 the customer programs motion there is a statutory priority.

9 So, in other words, the code actually tells us that

10 notwithstanding even the doctrine of necessity, but the code

11 actually promotes reorganizing companies, promotes debtors to

12 pay employees.

13         Your Honor, Judge Sontchi explained in Gibson

14 Brands in July 2018 that in the face of similar objections

15 that a debtor cannot pay in excess of the priority cap.

16 Judge Sontchi explains, and I quote,

17         "The doctrine of necessity doesn't rely on the

18 provisions of 507 of the Code.  Critical trade vendors are

19 paid.  There's nothing in the code that you would give them,

20 those kinds of creditors, any kind of priority, yet those are

21 approved in certain cases based on a showing that there is a

22 risk of irreparable harm to the debtor's business.  That

23 limit is set forth in the code, no priority exists, and yet

24 those are approved."

25         He goes onto say with respect to the wages motion

1  at issue in that case, he says,

2         "It's not just good for a debtor or a debtor's

3  business to put that kind of weight on employees, many of

4  whom live paycheck to paycheck.  So, I understand, and

5  appreciate and endorse the statutory priority limitation and

6  it would certainly be the case in the vast majority of

7  instances that that would be the limit, but in this case I am

8  willing to make a rare exception."

9         Your Honor, in our case, since January 1st, 2020,

10  16 employees have resigned.  There's significant anxiety

11  about this motion and our ability to honor our commitments to

12  the workforce.  Again, that is why this employee wages motion

13  is so incredibly important to us; to maintain the value

14  maximizing marketing process that we have ongoing we need our

15  workforce to be with us shoulder to shoulder.

16         Your Honor, Judge Gross issued a memorandum of

17  opinion in LifeCare in 2013.  He justified those payments in

18  excess of the priority cap by saying that,

19         "Eligible employees, their efforts are necessary

20  to preserve the debtor's business.  As the debtors point out,

21  the courts permit payments to critical vendors when it

22  benefits the bankruptcy estate.  The same principal is at

23  work here, namely preservation of the estate."

24         With that, Your Honor, Judge Gross approved

25  payments in excess of the priority cap.  That is In Re LCI

1  Holding Company, Inc., Case Number 12-13319 found at 2013 WL

2  1101111.  That was March 15th, 2013.

3          Your Honor, we note that in other cases before

4  you, Chaparral, FTD companies, you similarly approved

5  payments under a wage motion in excess of the cap.

6          Your Honor, we go through the case law in our

7  papers and we lay the groundwork for the necessity of payment

8  doctrine in our motion at Paragraphs 79 through 83 in our

9  reply, at Paragraphs 14 through 19.  And as we note, this

10 doctrine has been around us for a long time; in fact, since

11 1882 when the Supreme Court issued an opinion that supported

12 the doctrine of necessity.

13         Courts unquestionably can and regularly do approve

14 payment sin excess of the priority amounts under this

15 necessity of payment doctrine when they are critical to

16 preserve and enhance value of the debtors' estate.  Here,

17 Your Honor, the debtors have made that determination and

18 these payments are necessary.

19         It brings us to the real issue that we are here

20 for today, Your Honor; have the debtors submitted sufficient

21 evidence to support the payment of prepetition employee

22 obligations as set forth in our wages motion.  Your Honor, we

23 submit that the answer to that question is yes and we believe

24 that evidence as set forth in the first day declaration of

25 Mr. Peter Milligan, the chief financial officer.  That

1  evidence is substantial and uncontroverted.  Your Honor, it

2  was moved into evidence at the first day hearing. We refer to

3  it again and we ask that Your Honor permit us to move that

4  evidence into hearing for this matter.  That declaration,

5  Your Honor, was filed at Docket Number 17.

6           Your Honor, I'd pause just for a moment in case

7  there is questions.

8           THE COURT:  Do you have a copy of the first day

9  declaration?

10          MR. MEISLER:  We surely do.

11          THE COURT:  I usually have one in my book, but I

12  don't seem to.

13          MR. MEISLER:  We have eight copies.  If I may

14  approach.

15          THE COURT:  You may.  Thank you.

16          Is there any objection to the submission of Mr.

17  Milligan's declaration into evidence at this hearing?

18      (No verbal response)

19          THE COURT:  I hear none.  It's admitted.

20      (Declaration of Peter Milligan, admitted)

21          MR. MEISLER:  Thank you, Your Honor.

22          So, I'd like to take this in pieces first dealing

23  with, if you will, the reimbursable expenses, then with

24  commissions, then vacation policy, severance plans and the

25  401(k) plan.

1        Your Honor, with respect to reimbursable expenses

2    candidly, Your Honor, we strongly believe that if an

3    individual has made an expense, as covered, an expense of the

4    company that they should be reimbursed.  Your Honor, the

5    amount of such expenses that we believe need to be reimbursed

6    is $167,000 dollars and change, approximately $316 dollars.

7    The number could tick-up if someone has not yet submitted

8    their expenses, but we believe the petition date, of course,

9    was December 27th.  So, we believe that most, if not all,

10   have submitted their expenses.

11       We do have approximately 187 employees.  So, when

12   you do the math, and considering that our sales force is on

13   the road all the time, so it's understandable that they would

14   incur those expenses and expect to be reimbursed.

15       Your Honor, 155,000 of the 167 mentioned was

16   honored pursuant to the interim order.  So, Your Honor, what

17   we're really talking about here is approximately $12,000

18   dollars in expenses that remain to be honored as well as any

19   that are submitted after the calculation was made.

20       Your Honor, I refer you to Paragraphs 114 and 115

21   of Mr. Milligan's declaration.  He says, specifically,

22       "I believe that the debtor's ability to reimburse

23   the reimbursable expenses has a significant effect on the

24   debtors' employees who are critical to the debtors' business.

25   Specifically, the debtors' sales employees spend significant

1  time on the road incurring expenses in support of sales of

2  the medications which are the debtors' primary driver of

3  revenue.  Thus, I believe that reimbursement of the

4  reimbursable expenses is critical to the morale of the

5  debtors' sale employees which in turn is paramount to

6  maximizing the value of the estates."

7          Your Honor, I could go on.  There is more

8  testimony in Paragraph 115, but I feel relatively

9  comfortable, Your Honor, that unless you have questions I do

10 believe that we have carried our burden.

11         THE COURT:  I don't have any questions on that.

12         MR. MEISLER:  Thank you, Your Honor.

13         Your Honor, I move next to the commission plan.

14 Your Honor, there are approximately 106 non-Baxdela sales

15 employees, sales people.  Mr. Milligan declared that making

16 these payments is critical to employee morale and retention.

17 As you know, we have now deferred the request to pay those

18 commissions to the Baxdela sales employees who were given

19 notice and who will be leaving mid-February.  We'd like to

20 note that the remaining employees, the commissions are

21 approximately 1.1 million, could be 1.17, 1.13, but in that

22 vicinity.

23         Your Honor, in Paragraph 97 of Mr. Milligan's

24 declaration he states, in part,

25         "Payments under the sales commission plan are

1  critical to maintaining the morale and productivity of the

2  debtors' sales force, and to maximizing the value of the

3  debtors' estates.  In particular, I believe that the debtors'

4  ability to maximize value and continue operations depends in

5  large part upon retention and motivation of the sales

6  employees."

7         Your Honor, I'd point you next to Paragraph 142

8  where Mr. Milligan says,

9         "The debtors seek to continue their ordinary

10 course employee compensation including sales commission plans

11 and related programs during the post-petition reorganization

12 process.  I believe the continuation of these programs is

13 essential to the success of the debtor's reorganization."

14        Then, Your Honor, I move you to Paragraph 143 of

15 Mr. Milligan's declaration where he says,

16        "Failing to honor these obligations would severely

17 hamper the debtors' ability to operate their businesses

18 during the Chapter 11 cases and, thus, endanger the debtors'

19 reorganization.  The debtors' employees possess knowledge

20 unique to the debtors' medications and operations. Replacing

21 the employees institutional knowledge would require the

22 debtors and the remaining employees to spend significant

23 time, capital and effort, all of which I believe would

24 distract the debtors from the task at hand in these Chapter

25 11 cases.  Thus, the loss of valuable employees would

1  diminish the debtors' ability to execute their value

2  maximizing strategy that would harm the debtors'

3  stakeholders.  I therefore believe that authorization to pay

4  the prepetition employee obligations is critical to maximize

5  value of the debtors' estate for all creditors and

6  stakeholders."

7         Your Honor, a particular -- the more a particular

8  employee exceeds the priority amount it means the individual

9  is a star.  Your Honor, we want to motivate that star to keep

10 selling, to keep doing his job, to keep doing here job, Your

11 Honor.  So, for that reason even if it exceeds the priority

12 amount, Your Honor, we believe it is necessary to preserve

13 the value of the estate to honor our commitment to that sales

14 person.

15        Your Honor, next I want to pause actually just to

16 address any questions you may have on the commission plan.

17        THE COURT:  I was looking to see if Mr. Milligan

18 says what portion of an employee's comp for a sales personnel

19 is in commission, but I do see that he states that it's an

20 integral part of their aggregate compensation package which I

21 would assume that it is.

22        MR. MEISLER:  Correct, Your Honor.  The sales

23 personnel, they view their commissions as part of their

24 ordinary course wage.

25        THE COURT:  Okay.

1          MR. MEISLER:  This is typical in the pharma

2   industry.  The sales personnel are so important to the

3   business.  Your Honor, me up here today is, in part, I think

4   it's important to send a message to that work force that we

5   support them.

6          Your Honor, the third item that want to address I

7   vacation time.  As we noted in our motion, in our reply with

8   respect to vacation time the debtors' policy is modest.  The

9   debtor does not pay out for unused vacation time unless state

10  law requires the company to do so.

11          And, Your Honor, we have, I guess, some good news.

12  The numbers that we had in our motion were 2019 numbers.  We

13  believed that we were going to have approximately $578,000

14  dollars of potential accrued, but unused vacation time.  Your

15  Honor, if somebody takes the vacation time, of course, we

16  wouldn't pay it out.  Because we rolled into a new year

17  today, as I stand before you, our estimate is up to 217,000.

18  So, a significant decrease and that is across approximately,

19  again, 187 or so employees.

20          Your Honor, this comes right down to state law.

21  State law requires a limited number of days of vacation to

22  roll over if they're unused.  That is the reason for the

23  policy.

24          Your Honor, at Paragraph 143 Mr. Milligan

25  testified to the failure of what would happen if we failed to

1 | honor the payment of the debtors' paid time off obligations.
2 | He says, specifically, that doing so would, and I quote,
3 |      "Severely hamper the debtors' ability to operate
4 | the business during these Chapter 11 cases and, thus,
5 | endanger the debtors' reorganization."
6 |      Your Honor, as mentioned, our next topic that we'd
7 | like to cover is the severance plan.  Your Honor, I'm hopeful
8 | that this one is easy because, Your Honor, we are not seeking
9 | to authorize payment of severance amounts, number one, to
10 | insiders at all, if we do so we will do so by separate
11 | motion, and, two, to the extent any employee would receive
12 | compensation that satisfies the cap or exceeds the cap then
13 | the severance dollars would not be paid out.
14 |      In other words, if we're using unused vacation, or
15 | commission, or 401(k), which I will speak to next, and we
16 | fill the cap in that way then we will not pay out any
17 | severance dollars.  If, however, we have dollars remaining in
18 | the priority cap then we would use those dollars to honor
19 | severance.
20 |      THE COURT:  Okay.
21 |      MR. MEISLER:  So, Your Honor, we believe that the
22 | severance plan, as its being sought in the motion, shouldn't
23 | be controversial including to the U.S. Trustee, but, of
24 | course, she will speak for herself.
25 |      Last, but of course not least, we have a 401(k)

1  matching plan.  We had in our motion that we believed that

2  the estimated amount would be $135,000 dollars.  Now that

3  we're in the New Year we are able to reconcile those numbers.

4  We believe, actually, it will be about $193,000 dollars.

5  Your Honor, those payments would count towards the cap.

6  Putting aside the commission plan, even if you add up the

7  unused vacation time and the maximum amount gets used and you

8  add up the 401(k) nobody exceeds the cap.  What will bust the

9  cap though, to be sure, is the commission plan.

10          We are not asking -- unlike the severance plan

11  we're not taking the same position with the 401(k) match nor

12  with the unused vacation.  We are asking to honor those in

13  full notwithstanding that they were earned other then three

14  days in the prepetition period.

15          So, again, Your Honor, I want to highlight that

16  the number that we believe is outstanding with respect to our

17  current workforce is approximately $193,000 dollars.  Your

18  Honor, we would ask that you grant us that relief.

19          Your Honor, with that I think I've given a

20  comprehensive overview of what we are seeking in our

21  arguments.  I pause in the event that you have any further

22  questions and, otherwise, cede the podium to the U.S.

23  Trustee.

24          THE COURT:  I just want to make sure I understand

25  which count towards the cap and which don't.  So, commission

1  doesn't.

2  MR. MEISLER:  Commission would exceed the cap.

3  THE COURT:  Right.

4  MR. MEISLER:  It does, Your Honor, count towards

5  the cap for purposes of severance.

6  THE COURT:  That is what I want to make sure I

7  understand, that piece of it.

8  MR. MEISLER:  Yes.

9  THE COURT:  So, say it again what counts towards

10  the cap or how the cap works.

11  MR. MEISLER:  Everything that an employee earns

12  would count towards a cap.  So, commissions, any payout of

13  unused vacation time, the 401(k) match.  I think that that is

14  really it as far as what an employee is owed that would show

15  up on an employee's W-2.

16  The company is contribution to say, for example, a

17  healthcare premium for the company that allows the company to

18  have healthcare insurance that would not count towards a cap

19  because it's not income for an individual employee.  It an

20  obligation that the company owes to make sure it honors its

21  healthcare obligations.

22  THE COURT:  Okay.  The severance plan, what you're

23  saying is that with respect to severance if other payments --

24  MR. MEISLER:  Correct.

25  THE COURT:  -- hit the cap then you are not going

1    to pay severance over and above that amount.  Is that right?

2            MR. MEISLER:  That's exactly right.  So, if we hit

3    $13,650 dollars on account of other items that would show-up

4    on an employee's W-2, commission plans, unused vacation,

5    401(k) match, if I'm not naming something, if it ends up on

6    their W-2 we have people at the company that are tracking

7    this and we have Portage Point, they're tracking it.

8            So, we commit to you, Your Honor, that nobody --

9    that until we come back before Your Honor to ask for

10   permission to honor severance in its entirety no employee is

11   going to get severance if that incremental dollar exceeds the

12   cap.

13           THE COURT:  Okay.

14           MR. MEISLER:  Your Honor, I do want to note,

15   though, that we do plan on coming back before Your Honor on

16   the balance of the severance.  We purposely didn't push it

17   forward today.  Number one, I know it's a hard decision.  I

18   know it's a hard issue.  Number two, it really also depends

19   upon what happens at auction.  It's very possible that a

20   bidder will take the majority of the workforce or maybe all

21   the workforce, who knows, and we think it's premature to

22   address it now as opposed to understanding where we are post-

23   auction.

24           THE COURT:  Thank you.

25           MR. MEISLER:  Thank you, Your Honor.

1           THE COURT:  Ms. Richenderfer.

2           MS. RICHENDERFER:  I didn't know if there was

3  anyone else who wanted to speak in favor.

4           THE COURT:  Okay.  Would anyone else like to speak

5  in favor?

6        (No verbal response)

7           THE COURT:  You're up.

8           MS. RICHENDERFER:  Good afternoon, Your Honor;

9  Linda Richenderfer from the Office of the United States

10  Trustee.

11           There are so many different ways of approaching

12  this.  First of all, I guess I am here to support in the

13  objection that was filed by the United States Trustee which

14  was called by the debtors as a programmatic objection in

15  Paragraph 3 of their filing. I would, instead, submit to the

16  court that the objection is based on the bankruptcy code, and

17  I will walk the court through it.

18           I think also debtors' counsel misspoke when he

19  said 16 employees have resigned since the filing.  At least

20  the information that I and the committee have was six

21  employees had resigned since the filing of the bankruptcy

22  petition.  So, if there is an additional 10 we have not been

23  updated as to that information.

24           Your Honor, let me start, I guess, where you

25  ended; that's not what the proposed final order says.  That

1   is one of the problems with the proposed final order.  The

2   proposed final order, looking at Docket Number 191-1,

3   Paragraph 2 is a standalone paragraph that says that debtors

4   may pay any amount due and owing to non-insider employees

5   pursuant to the severance policy up to the 13,650 priority

6   cap.  There is nothing in here that says, oh, but if they've

7   already gotten commissions, or if they have already gotten

8   vacation time, or if they've already gotten 401(k) payments

9   they don't get the 13,650.  That is the first issue.

10          The second issue is it's almost the end of

11  January.  Federal law requires that W-2 statements be sent to

12  all employees by the end of January.  Yet, debtors have not

13  been able to provide to me an employee by employee

14  reconciliation of how much is due and owing on commissions.

15  So, while we have a total amount which hasn't exactly been

16  nailed down yet, I heard different numbers being put on the

17  table there by Mr. Meisler, I don't know whether this total

18  amount means one employee is going to get $5,000 dollars and

19  another one is going to get $50,000 dollars taking them

20  significantly over the cap, or whether they're all going to

21  be averaging around the same and will be near the cap.

22          There have been other occasions when I know

23  debtors have come to this court and without objection by the

24  United States Trustee allowance has been made for payments

25  over the cap.  That was when we walked into court knowing the

1   total amount the debtor wanted to pay.  And we knew what is

2   was going to be per employee so we could look and see the

3   range.

4           I received an updated sheet for the current

5   employees, I think, as of last evening.  They still do not

6   know what the commissions will be per person. So, I don't

7   know what this court is being asked to approve.  I don't know

8   how much over the priority cap anyone individual may be

9   receiving for there to be any evaluation.  I am sure there

10  were many occasions, as sited by debtors' counsel, when other

11  courts and even this court approved payments over teh cap,

12  but I don't know that if in those opinions it tells you how

13  much over the cap.

14          I do know in other instances where I have been

15  involved and payments were made over the cap they were very

16  specifically delineated in the form of order.  There was a

17  total number and even if it wasn't in the order going into

18  the order we knew what the range was going to be per

19  employee, at least a top and a bottom number.  I don't have

20  that information.  I don't know the W-2's are going to go out

21  by the end of the month.  The debtors don't have it as of

22  today, but that information has not been provided.

23          I also think there should be a cap in here for the

24  401(k).  I mean there should be a number.  The concern, I

25  guess, overall, Your Honor, what I am getting to is it's

1  almost like we're giving a blank check to the debtor because

2  there is no caps that have been put in here for what each of

3  these items will be.

4        Again, if the severance in Paragraph 2 is subject

5  to what they get in the other paragraphs of the order that's

6  a totally different situation then the way the order reads

7  right now.  It's a different situation then what was

8  discussed during my discussions with the debtor.

9        I guess the same thing is vacation doesn't come

10 into play, it's my understanding, unless and until an

11 employee is terminated.  Then I am well aware that many

12 states require it to be paid out, but we're looking at right

13 now, today, what people are going to be paid.  And if, I

14 guess, somebody is terminated and they're owed vacation that

15 could be taken into account.  And if they have already

16 received 13,650 because of their commissions then I think

17 there should be another discussion.  It shouldn't be

18 automatic that you get to have two different buckets.  You

19 get to have a bucket for commissions and a bucket for

20 severance.

21        THE COURT:  I have to say commission -- I'm

22 sympathetic to commission for sales people, okay.  I'm

23 sympathetic because it's usually significant and the

24 representation is here that it is a significant part of their

25 overall compensation package.  And so to the extent that it's

1  been earned and it's owed subjecting that to a cap almost

2  seems to penalize your best performers.

3        MS. RICHENDERFER:  Your Honor, I'm not saying a

4  cap per person. I'm saying that at this point in time I would

5  have thought there would have been a reconciliation done so

6  that we knew in total for accounting purposes how much the

7  debtor was going to pay out on this prepetition commission

8  item and arrange what was going to go to the individual

9  employees.  There has to be, I guess, for budgetary purposes

10 that information should be available at this point in time.

11 And the fact that we don't have it that was part of the

12 reason for the objection on that.

13        THE COURT:  And I understand the informational

14 deficit.

15        MS. RICHENDERFER:  And if really what was meant

16 was that Paragraph 2 was supposed to be subject to other

17 payments that may have already been received by the employees

18 then that is something that can be worked on and that can be

19 revised.

20        As to expenses, Your Honor, I don't disagree that

21 they should be reimbursed.  And in the interim order we had a

22 cap that was put in there that's very close to what it sounds

23 like is due and owing.  So, I don't know why we don't just

24 carry that over and increase it to an amount that the debtors

25 now believe is due and owing because one of my concerns is

1  that in the interim order it allowed the debtors to reimburse

2  employees for up to $155,000 dollars.  The new order does not

3  have any.  It just reimburse employees and members of the

4  board of directors.  So, we're adding in members of the board

5  of directors in the final order.  I don't know what they are

6  owed.

7         I do know, and I have been given some numbers by

8  the debtor, as to what is owed to employees.  And a good

9  amount of what is owed to employees is on the corporate

10  American Express card.  It's not money that people have gone

11  out of pocket.  I'm not saying the company shouldn't pay.

12  I'm just saying that Paragraph 6 of the interim order had a

13  cap and Paragraph 5 of the final order should have a cap in

14  it.

15         Again, by now they should know.  I would be very

16  concerned if there is an employee who at this point in time

17  after the bankruptcy filing hasn't submitted their expenses

18  but, again, $25,000 dollar wiggle room can be possible, but,

19  again, there should be a cap especially once we start to

20  include the insiders in that category.

21         I am glad to see that the committee was able to

22  work with the debtors and as of last Friday got them to

23  delete out the Baxdela sales employees because for reasons

24  that we can go into in another point in time if and when that

25  becomes an issue before the court.

1        One of the things that was not addressed by

2   debtors' counsel is the proposed -- it's Paragraph 7 in the

3   final order, again, at Docket Number 191-1.  Your Honor, they

4   want the debtors to be authorized in their sole discretion to

5   pay the employee withholdings which include various taxes

6   that are taken out of all our salaries.

7        Your Honor, I had asked that in their sole

8   discretion be stricken.  It's my understanding from debtors

9   that there are prepetition payroll taxes that have been

10  withheld that have not yet been paid to the appropriate

11  taxing authority.  I had also asked that they put in here

12  requirement that they be paid in a certain number of days.

13  Again, I don't know how the W-2's are going to be correct.  I

14  don't know how these people are going to be able to file

15  their tax returns, if they're going to report taxes that were

16  taken out of their pay that have not yet been forwarded to

17  the appropriate taxing authority.  There is going to be some

18  confusion if they are reviewed or audited at the other end of

19  the line.

20        I don't know why it hasn't been resolved yet.

21  This has been an issue that my office was aware of since the

22  IDI, the day of the formation meeting.  I am told that the

23  money is available, but I don't know why it hasn't been paid

24  out yet.  And so those were -- I'm hitting the highlights

25  here, Your Honor, but the long and short of it is we need

1  some parameters around this.  Paragraph 2 needs to be

2  clearer.  Payroll taxes need to get paid.  And need to be

3  very clear about what is going to count against the capital

4  and what's not.  Commissions, I agree, they can be a large

5  part, but, again, the numbers should be known.  We should

6  know what we are allowing the debtors to pay out.

7              THE COURT:  Thank you.

8              Mr. Meisler?

9              MR. MEISLER:  Okay.  Thank you, Your Honor.

10             I heard six issues from the U.S. Trustee and I'd

11  like to take them one at a time.

12             Your Honor, as to the discrepancy in numbers, Your

13  Honor, I think the U.S. Trustee mentioned six employees.  I

14  mentioned to you 16.  I assure you 16 is the right number.  I

15  believe that the U.S. Trustee is mistaken when she says six.

16  I believe the information given to her was 6 percent, not six

17  individuals.

18             THE COURT:  Okay.

19             MR. MEISLER:  Now that number of 6 percent is no

20  longer accurate because at the time that people from my

21  office communicated the 6 percent we have since had

22  additional attrition.

23             Your Honor, as to the explanation that we had on

24  the record regarding the severance calculations of the

25  $16,650 cap I thought Paragraph 2 was sufficient.  It was

1  intended to capture that.  I have no issue whatsoever to

2  modify that language because clarity is always what we strive

3  for.  So, happy to work with the U.S. Trustee and submit an

4  agreed upon order, hopefully, that resolves that issue.

5         Your Honor, with respect to W-2's to be sure, I'm

6  not a tax lawyer, but what I believe is the rule is that

7  individual tax payers they account for their income on a tax

8  cash basis. So, because the commissions are paid in 2020 for

9  the Q-4 commissions my understanding is that it's a W-2 for

10 2020 and not 2019.

11        Now I also want to make a mention that the reason

12 why we know -- we know the sales in totality for the fourth

13 quarter is it would not exceed $1.5 million dollars of which

14 approximately $330 to $400,000 dollars is attributable to

15 Baxdela.  Now in order for us to figure out how much we owe

16 to each individual we have to trace every prescription and

17 every --

18        THE COURT:  I think the U.S. Trustee is at a cap

19 at this point.  So, I think that a cap can be inserted into

20 the order, an aggregate cap.

21        MR. MEISLER:  An aggregate cap.  Your Honor, that

22 would be fine.  I think for comfort we would probably want

23 $1.2 million dollars.

24        THE COURT:  I think that's fine.  I think a

25 cushion is fine.

1    MR. MEISLER:  Your Honor, I'm just going to turn

2  to -- I'm getting the nod of approval.  So, we're good there.

3         THE COURT:  Okay.

4         MR. MEISLER:  Your Honor, with respect to the 401

5  (k) we did give the U.S. Trustees Office information on an

6  individual by individual basis as to what the match is.  So,

7  candidly, I am not sure what the challenge is other than the

8  issue of generally don't exceed the 507(a)(3) and (a)(4) cap.

9         THE COURT:  I think she was at a cap on that as

10  well, an aggregate cap.  As I understood the objection as it

11  has been refined I think sit was an informational issue and a

12  cap issue.

13         MR. MEISLER:  Understood.  Your Honor, having a

14  cap of -- I know its 192,000 and there's a few more digits

15  after that $193,000 dollars.

16         THE COURT:  I would add cushion.

17         MR. MEISLER:  Oh, sorry.  I'm reminded that there

18  is a $10,000 dollar potential audit related to --

19         THE COURT:  I think you should speak to the U.S.

20  Trustee.  I think she will be reasonable to agree to a

21  cushion that you need.

22         MR. MEISLER:  Terrific.  So, I think that number,

23  for the record, is going to be $204,000 dollars to include

24  the $10,000 dollars from 2018.

25         Regarding the reimbursable expenses the U.S.

1  Trustee mentioned the Amex card that people have, a corporate

2  card.  While it's got the individuals name on it --

3           THE COURT:  I'm sure it does.

4           MR. MEISLER:  Right.  And so if the company

5  doesn't honor that expense, well, American Express is going

6  to be looking for that individual and we believe that's not

7  good for morale or maintaining our work force.

8           As for the board of directors it's true we do have

9  a submission of approximately $375 dollars.

10           THE COURT:  It's an expense reimbursement?

11           MR. MEISLER:  That it, yes.

12           THE COURT:  That's fine.

13           MR. MEISLER:  Terrific.  Thank you, Your Honor.

14           Then with regard to the payroll taxes we have no

15  issue with removing sole discretion.  Of course, we submit

16  the payroll taxes.  The issue with the payroll taxes it's

17  approximately $200,000 dollars that the company is just

18  reconciling to make sure that they don't overpay on payroll

19  taxes. We don't want to put a fuse on it because we don't

20  want to pay more then what we owe.

21           We absolutely will pay the payroll taxes.  We have

22  tens of millions of dollars of cushion to make sure that we -

23  - that is our cash on hand to make sure that we honor those

24  payroll taxes. So, we don't see any risk there and we would

25  be pleased to report to the U.S. Trustee, if necessary, on a

1  monthly basis to make sure she is aware of what is going on

2  in the payroll taxes.  I would bet it wouldn't take too many

3  reports before it's resolved.

4           THE COURT:  Okay.

5           MR. MEISLER:  Thank you, Your Honor.

6           THE COURT:  Thank you.  Okay.  Well, I am going to

7  approve the request, but go ahead, Ms. Richenderfer.

8           MS. RICHENDERFER:  Your Honor, it wasn't clear to

9  me whether or not debtors were agreeing that they would put

10 in a cap for the expenses.  I just wanted to clarify that.

11          THE COURT:  Thank you.

12          There is one in the proposed form of order that I

13 am looking at.  No, that's the interim.

14          MS. RICHENDERFER:  There's one in the interim, but

15 not in the final.

16          THE COURT:  They will put one in the final.

17          MS. RICHENDERFER:  Okay.

18          THE COURT:  Thank you.

19          MR. MEISLER:  Your Honor, I was not inclined to do

20 a cap on the expense reimbursement.  Obviously, we will if

21 you impose it on us.  We just don't want to come back so that

22 we're honoring someone's expenses that they incur for

23 purposes of pushing forward --

24          THE COURT:  I'm going to have you put in a cap and

25 if you need to exceed the cap you can inform the committee

1 | and the U.S. Trustee.  If you don't get agreement you can

2 | come to me.

3 |          MR. MEISLER:  Terrific.  Thank you, Your Honor.

4 |          THE COURT:  Okay.  I'm going to approve the

5 | request on a final basis to pay the wages and continue the

6 | additional compensation programs as requested in the first

7 | day wages motion with the express proviso that there be caps

8 | placed in the order as discussed on the record at the request

9 | of the Office of the United States Trustee.

10 |          I think it is acceptable in certain cases such as

11 | this one to exceed the cap where the testimony from the first

12 | day declaration supports the need to do so in order to ensure

13 | that the employees do not take the brunt of the filing of the

14 | bankruptcy proceeding.  And when I look at the categories of

15 | compensation claims or wage related claims that we are

16 | speaking about they don't concern me.  They are the

17 | reimbursable expenses of employees who charge something on a

18 | credit card, spent money on the debtors' behalf.

19 |          The commissions I have talked about.  They are

20 | central to sales people's employees, sales people's wages.  I

21 | think its acceptable when commission based salaries are a

22 | reason that someone is going over the cap.

23 |          With respect to vacation time my understanding

24 | here is that it's not paid out unless it's required under

25 | state law.  To me that is an acceptable reason to be paying

1   it so that the debtor is in compliance with state law.

2           The severance plan we've spoken about.  Please

3   coordinate with the Office of the United States Trustee to

4   ensure that that paragraph reflects the representations that

5   have been made to me, that there will not be pay-out on the

6   severance plan to the extent it causes an individual employee

7   to go over the cap given payments otherwise.

8           The 401(k) matching requirement the only objection

9   I heard with respect to that was, again, with respect to a

10  cap.  I think it's highly appropriate to make payments on

11  that type of compensation for people who are saving for

12  retirement.

13          So, under these circumstances the necessity of

14  payment doctrine permits me to approve this request and I

15  will do so.  I do appreciate the fact that the Office of the

16  United States Trustee raises questions.  I think it's

17  appropriate to have caps and to know exactly what is being

18  paid out.

19          I will look for a revised form of order.

20          MR. MEISLER:  Thank you, Your Honor.

21          MR. GALARDI:  Your Honor, Gregg Galardi on behalf

22  of Vatera.

23          Your Honor, the next matter on the agenda I just

24  wanted to point out because I am concerned about the agenda.

25  If Your Honor is familiar with 9029-3 of the hearing agenda

1  and you know the history of this probably as well as I do --

2           THE COURT:  I think I made the history on this.

3           MR. GALARDI:  I think you did, Your Honor.  And I

4  remember changing the history and having the rules.  And I

5  wouldn't rise because I don't really care about the agenda

6  numbers, but, Your Honor, and I would never say this about my

7  former firm, it's interesting that Number 18 on this agenda

8  is the injunction.

9           THE COURT:  I noticed that.

10          MR. GALARDI:  Frankly, it is Number 15 on the

11 docket.  It is the next lowest number and I would ask Your

12 Honor to go forward on that because, otherwise, we may be

13 enjoined because of a lack of time.

14          THE COURT:  Well, I had thought about that and I

15 had given my own thought to the order that we need to go

16 forward in.  And if, in fact, Vatera was looking to trade now

17 I'd move it up.

18          MR. GALARDI:  Your Honor, there's no evidence that

19 we're not.

20          THE COURT:  Well, is there evidence that you are?

21 Let me just ask flat out because I want to know --

22          MR. GALARDI:  We want the option to do so, Your

23 Honor, yes.

24          THE COURT:  Okay.  I'm going to put you ahead of

25 every retention motion.  So, we don't have to worry about

1  those, but I am going to take bid procedures and I'm going to

2  take the DIP --

3             UNIDENTIFIED SPEAKER:  Cash collateral.

4             THE COURT:  I'm sorry, cash collateral and the

5  KEIP. Then I am going to get to your matter.  And if we can't

6  make it I'll have you back here later this week or early next

7  week.

8             MR. GALARDI:  Thank you, Your Honor.

9             MR. MEISLER:  Thank you, Your Honor.

10            Your Honor, for the next matter I'm going to cede

11  the podium to my colleague Mr. Dressel.

12            THE COURT:  Mr. Dressel?

13            MR. DRESSEL:  Thank you, Your Honor.  For the

14  record Christopher Dressel of Skadden Arps on behalf of the

15  debtors.

16            Your Honor, this item is the debtor's motion to

17  establish bidding procedures related to the debtors' post-

18  petition sales and marketing process which we filed at Docket

19  Number 67.  There were several objections filed to this

20  motion.  Vatera filed an objection at Docket 127.  The

21  committee filed an objection at Docket 136.  The U.S. Trustee

22  filed its objection at Docket 147.  And we filed our reply at

23  Docket Number 163.  Deerfield filed a reply in support as

24  well at Docket Number 167.

25            Your Honor, in connection with the reply we filed

1  two supporting declarations.  We filed the declaration of

2  Jeffrey Finger who is a managing director at Jefferies, LLC,

3  which is the debtors proposed investment banker.  That was

4  filed at Docket Number 164.  And in addition to that we filed

5  a declaration of Peter Milligan, the debtors' chief financial

6  officer.  That was filed at Docket Number 165.

7        Your Honor, I would like to move the admission of

8  those declarations into evidence and in connection with that

9  I also have, on behalf of Mr. Milligan, a very short

10  clarifying proffer that relates to his declaration.

11        THE COURT:  Does anyone object to the declaration

12  of Mr. Finger being admitted into evidence?

13        MR. MARTIN:  Your Honor, subject to the

14  committee's right to conduct cross, which we would like to do

15  as part of this hearing, we have no objection.

16        THE COURT:  Okay.

17        UNIDENTIFIED SPEAKER:  Same thing, Your Honor.

18        THE COURT:  Okay.

19        MS. RICHENDERFER:  Same thing, Your Honor.

20        THE COURT:  Okay.  It's admitted subject to cross.

21     (Declaration of Jeffrey Finger, admitted)

22        THE COURT:  What about Mr. Milligan's declaration,

23  the same?

24        MR. MARTIN:  Same, Your Honor.

25        MS. RICHENDERFER:  Your Honor, I'm just concerned

1  about admitting it if there are clarifying things that need

2  to be done in a proffer.  I don't know what those are.

3        THE COURT:  Okay.  Well, let's hear the clarifying

4  proffer first and then I will ask again.

5        MR. DRESSEL:  Your Honor, Mr. Milligan would

6  testify that the figure of negative $1.3 million dollars

7  which is set forth in Paragraph 7 of his declaration is meant

8  to include average weekly accrued professional fee holdback

9  amounts.

10        That would be the conclusion of the proffer.

11        THE COURT:  It's not operational.

12        MS. RICHENDERFER:  No objection, Your Honor.

13        THE COURT:  Okay.  It's admitted.

14        MR. DRESSEL:  Your Honor, pursuant to the sale

15  motion the debtors are seeking approval of bidding procedures

16  to govern a post-petition marketing and auction process.  The

17  bidding procedures propose a calendar of dates.  Some of the

18  highlights include a proposed bid deadline of February 10th,

19  an auction on February 13th and a requested sale hearing on

20  February 20th.

21        Your Honor, we have made relatively limited

22  changes to the proposed form of order and proposed bidding

23  procedures to accommodate certain issues raised by the U.S.

24  Trustee.  As evidenced by the objection filed by the U.S.

25  Trustee we were not able to resolve all of the Offices

1  concerns, but we were able to resolve many.

2            If I may, Your Honor, I would like to approach

3  with blacklines of those documents.

4            THE COURT:  Okay.  Thank you.

5            MR. DRESSEL:  Your Honor, my colleague, Mr.

6  Fitzgerald, has copies of the same documents that I just

7  submitted and available for others in the courtroom.

8            THE COURT:  Okay.

9            MR. DRESSEL:  Your Honor, as an initial matter I

10 want to take a minute to discuss the purposes and objectives

11 of the debtors sale process.

12            THE COURT:  Well, wait a second.  I don't want

13 argument right now.  I would like evidence.  So, if we're

14 going to -- before getting into argument let's hear the

15 evidence.  If you have other evidence besides the two

16 declarations then I will take that.

17            MR. DRESSEL:  The two declarations are the

18 debtors' evidence for this matter.

19            THE COURT:  Okay.  Let's complete the evidentiary

20 record then.

21            MR. MARTIN:  Thank you, Your Honor. We'd like to

22 have Mr. Jeffrey Finger on the stand.

23            THE COURT:  Mr. Finger?

24             JEFFREY FINGER, DEBTOR WITNESS, SWORN

25            THE CLERK:  Please state your name and spell your

1  last name for the record.

2           THE WITNESS:  Jeffrey Finger. Last name is F-I-N-

3  G-E-R.

4                      CROSS EXAMINATION

5  BY MR. MARTIN:

6  Q    Good afternoon, Mr. Finger.

7  A    Good afternoon.

8           MR. MARTIN:  Your Honor, just by way of background

9  the debtor -- since these declarations were filed on Friday

10 they did make both Mr. Finger and Mr. Milligan available for

11 deposition this morning and we conducted depositions to

12 streamline this process so that we could do some true cross

13 and not use up extensive amounts of the court's time.

14          THE COURT:  I appreciate that.

15          MR. MARTIN:  Thank you to the debtors for making

16 them available.

17 BY MR. MARTIN:

18 Q    Mr. Finger, have you ever been to a bankruptcy court

19 auction?

20 A    I have.

21 Q    Okay.  Have you ever handled one as lead?

22 A    No.

23 Q    And so this is your first transaction as lead?

24 A    To the extent we go to auction, yes.

25 Q    It's true, is it not, that from at least December

1  forward you have been instructed by your client not to

2  consider potentially interested parties who propose anything

3  other than paying Deerfield in full in cash?

4  A    Can you restate the question, please?

5  Q    From and after December 1st or December, let's say

6  December.  From and after December you have been instructed

7  by your client not to consider potentially interested parties

8  who propose anything other than paying Deerfield in full in

9  cash?

10 A    That is not true.

11 Q    Okay.  What is true?

12 A    We entertained all interested parties bids including

13 certain that may not have provided 100 percent cash recovery

14 for Deerfield.

15 Q    What period of time is that?

16 A    Throughout the prepetition process.  When we decided to

17 file with a restructuring support agreement with Deerfield I

18 suppose then we probably did not continue to offer those

19 other options as an alternative.

20 Q    The option of doing anything other than paying

21 Deerfield in full in cash?

22 A    Based on our discussions with Deerfield.

23 Q    On January 21st, a week ago, the committee's

24 professionals provided you with the names of two additional

25 potentially interested parties and you have not reached out

1  to them yet, is that correct?

2  A     That is correct.

3  Q     One or more interested parties have asked you to

4  provide customer names to them, is that correct?

5  A     That is correct.

6  Q     And as an investment banker you recognize, do you not,

7  that customer names are important for formulating a bid?

8  A     I do.

9  Q     And you have not provided those customer names to

10 potentially interested parties because you are in the process

11 as of today, January 28th, of setting up a clean room?

12 A     That is correct.

13 Q     When do you expect that potentially interested parties

14 might be able to get that information?

15 A     Shortly in the coming days.

16 Q     And at least one bidder, Mr. Finger, has asked you for

17 a cure schedule for executory contracts.  Is that correct?

18 A     Yes.

19 Q     And you have not provided any cure schedule to

20 interested parties?

21 A     That is correct.

22 Q     Now when I asked you at the deposition today when you

23 would provide interested parties with a cure schedule you

24 could only answer soon, is that correct?

25 A     I believe I might have said imminently, but we will be

1  providing that shortly.

2  Q    Mr. Finger, additional interested parties have come

3  forward following the petition date, have they not?

4  A    Yes.

5  Q    Mr. Finger, sitting here today isn't it true that you

6  do not have a high-level of confidence that absent more work

7  you will receive a qualified bid in this case besides

8  Deerfield?

9  A    Can you restate the question?

10 Q    Sitting here today you do not have a "high level of

11 confidence" that you will receive an additional qualified

12 bid?

13 A    I am hopeful that we will.

14 Q    There is some wood to chop, is there not?

15 A    I don't follow.

16        MR. MARTIN:  Nothing further.

17        THE COURT:  Mr. Galardi?

18                     CROSS EXAMINATION

19 BY MR. GALARDI:

20 Q    Mr. Finger, do you have your declaration in front of

21 you?

22 A    I do.

23 Q    Okay.  Could you please turn to Paragraph 8 of your

24 declaration?  It refers to your being retained in August

25 2019, correct?

1  A      Yes.

2  Q      When did you actually start the marketing process?

3  A      I believe our first phone calls were in the middle of

4  September.

5  Q      Okay.  In Paragraph 8, three lines down, it says you

6  were retained to look at potential financing transactions,

7  correct?

8  A      That's correct.

9  Q      And in looking for potential financing transactions did

10 you look at the Deerfield secured debt?  Did you look at the

11 secured debt documents?

12 A      I'm generally familiar with the Deerfield debt.

13 Q      Did you determine whether those secured debt documents

14 allowed for an ABL to be *pari passu* with Deerfield?

15 A      I recall there is a carve-out for a permitted ABL.

16 Q      Okay.  Did you look for any potential financing that

17 would be *pari passu*?

18 A      We did offer that when we contacted financing sources.

19 Q      And did you continue to do so through the sale process?

20 A      Once all financing sources had declined interest or

21 failed to respond that is when that stopped.

22 Q      Okay.  So, there was no one who was looking to provide

23 an ABL, is that your testimony?

24 A      I don't recall.  What I would say is absent Deerfield's

25 consent.

1 | Q      So, Deerfield would have had to consent, correct?

2 | A      I believe that is the case.

3 | Q      But that's not true under their documents, isn't that

4 | correct?

5 | A      I don't recall.

6 | Q      Okay.  So, you don't know as you sit here today whether

7 | you required Deerfield's consent to do that ABL loan *pari*

8 | *passu*?

9 | A      I don't recall.

10 | Q      Okay.  But you recall, somehow, talking to the

11 | potential financing partners regarding that, but you don't

12 | recall telling them we don't need Deerfield's consent?

13 | A      We solicited interest for financing from, I believe it

14 | was, 47 different parties in a range of forms.

15 | Q      Okay.  But you don't recall telling them that you could

16 | do a $20 million dollar ABL without Deerfield's consent?

17 | A      I believe that it was mentioned as one of two or three

18 | different alternatives.

19 | Q      Now if you would turn to Paragraph 12 you have already

20 | mentioned that you have solicited 47 potential capital

21 | providers, correct?

22 | A      That's correct.

23 | Q      Did you provide those capital providers with what's

24 | called a teaser?

25 | A      Yes.

1  Q     Okay.  What is your understanding of a teaser, just so

2  we get it on the record?

3  A     General description of the company and the opportunity?

4  Q     Okay.  And did you provide those with a teaser with

5  respect to a potential *pari passu* $20 million dollar loan

6  that might keep the company out of bankruptcy?

7  A     I don't believe a text was specifically written as

8  such.

9  Q     Okay.  Now did you solicit anyone to do an alternative

10 plan of reorganization that might pay Deerfield over time in

11 full, but over time?

12 A     We offered potential interested parties to pursue an

13 acquisition of the assets or, I believe, through a plan

14 structure.

15 Q     Okay.  But did you ever suggest to any of the potential

16 bidders that they may be able to do a plan that pays

17 Deerfield over time with deferred cash payments?

18 A     I don't believe absent Deerfield's consent I'm able to

19 do that.

20 Q     Okay.  So you never offered that?

21 A     I don't believe so.

22 Q     Now if you would turn to Paragraph 21 of your

23 declaration, please.  You have agreed with Deerfield to a $2

24 million dollar expense reimbursement, correct?

25 A     That's correct.

1  Q      And what is the basis on which the company has agreed

2  to the $2 million dollar expense reimbursement?

3  A      It appears to be reasonable.

4  Q      Do you believe it is required by their debt documents?

5  A      I don't recall.  I'd have to check.

6  Q      But your separately seeking it even though it might be

7  required by their debt documents, right?

8  A      Correct.

9  Q      Have they agreed to cap that?

10  A      I believe it's capped at 2 million.

11  Q      Is that -- do they have to prove-up the expenses for

12  that?

13  A      I don't know the answer.

14  Q      Okay.  Do they get that in addition to the 140 million

15  secured claim that you are giving them to bid?

16  A      They get reimbursed on account of that.

17  Q      So, they do?  So, does it become a secured claim?

18  A      I believe it comes out of the cash waterfall.

19  Q      Does it come out as an administrative claim or as a

20  secured claim?

21  A      I believe it's administrative.

22  Q      Okay.  So after they paid that then it would come out

23  of any recovery that the unsecured creditors or

24  administrative creditors, right?

25  A      I believe so.

1  Q     So, you don't think its part of the secured claim?

2  A     I'm not that intimately familiar with how that relates

3  to the secured claim.

4  Q     But you're here to testify that the 2 million is

5  reasonable?

6  A     I am.

7  Q     And on what basis are you testifying it's reasonable?

8  A     Based on my experience with other M&A cases.

9  Q     And how many M&A cases are styled as a credit bid to

10 get an expense reimbursement?

11 A     I don't know the answer.

12 Q     Okay.  So, what is your experience with respect to --

13 A     I've seen it in other --

14 Q     Let me finish my question, sir, and then you can

15 answer.

16       So, in what credit bid scenario do you know a secured

17 lender gets a 2 million or an expense reimbursement?

18 A     I can't think of a specific example sitting here today.

19 Q     And let me ask you, do you think if you don't have them

20 as the stalking horse they're just going to walk away from

21 these assets?

22 A     I can't speak for what Deerfield would do absent being

23 the stalking horse bidder.

24 Q     And did they say absolutely positively under all

25 circumstances if I don't get this 2 million I'm going to walk

1  away from this bid?

2  A     I don't know the answer.

3            MR. GALARDI:  No further questions, Your Honor.

4            THE COURT:  Thank you.

5            Ms. Richenderfer?

6            MS. RICHENDERFER:  No questions, Your Honor.

7            THE COURT:  Redirect?

8            MR. HOGAN:  Thank you, Your Honor.  For the record

9  Al Hogan for the debtors.

10                     REDIRECT EXAMINATION

11 BY MR. HOGAN:

12 Q    Mr. Finger, I just have a few follow-up questions for

13 you taking them in order with respect to the way you were

14 asked.

15      Counsel for the creditor committee asked you about two

16 interested parties that the UCC had proposed.  You said you

17 hadn't reached out to those folks yet.  What is your

18 intention with respect to those two folks?

19 A    I have already spoken to my colleagues in the

20 healthcare practice that are coverage bankers for those two

21 companies.  I understand one of them is in the market as part

22 of the sale process for that specific company.  And the other

23 we contacted the sponsor as in private equity owner of said

24 company and the sponsor declined.  That said, I intend to

25 still follow-up with both.

1  Q      Okay.  Very good.

2         Second, do you recall that there were some questions

3  regarding customer lists that at least one bidder is asking

4  for?  Do you recall those questions?

5  A      Yes.

6  Q      And you said that the debtors were in the process of

7  setting up a clean room to address that request?

8  A      Yes.

9  Q      And I think you said that that would be done soon or

10 immanently.  My question to you is do you have any concern

11 that getting that bidder access to that clean room on the

12 schedule that is currently proposed is any impediment

13 whatsoever to their participation in the sales process?

14 A      No, I don't.

15 Q      Second question, with respect to cure schedules there

16 were some questions about getting the cure schedules

17 completed and getting those to bidders as well.  Do you

18 recall those questions?

19 A      Yes.

20 Q      Based on your understanding of the process of where we

21 are today and where those bidders are do you have any concern

22 that the completion of the cure schedules will somehow impede

23 those bidders ability to participate in the auction in the

24 time frames that we're asking for?

25 A      No.

1  Q      there was some discussion about, from multiple counsel,

2  whether or not there has been consideration of bids that

3  would pay Deerfield less then cash in full.  Do you recall

4  that discussion?

5  A      Yes.

6  Q      Can you just back-up and tell us how you approached

7  bidders throughout this process with respect to the kinds of

8  bids that the debtor would consider and how you would

9  approach those?

10 A      So, we offered to interested parties to acquire

11 individual assets, the whole company or a combination in

12 between.  As part of that to the extent that a certain bidder

13 were interested in an individual asset we intend to evaluate

14 that in the context of the value received on account of all

15 assets.

16       Secondly, to the extent that an interested party is

17 offering non-cash compensation we would consider and did, in

18 fact, take that to Deerfield as our secured creditor to

19 determine whether there is interest in receipt of non-cash

20 compensation.

21 Q      So, you actually jumped ahead of it, but to make sure I

22 understand you actually interfaced with Deerfield regarding

23 potential interest, regarding a bid involving a non-cash

24 take-out of Deerfield.  Is that right?

25 A      Correct.  Through their advisor team.  That is correct.

1  Q    And would you continue to have that approach with

2  respect to Deerfield if any bidder indicates some sort of

3  interest to that respect?

4  A    Yes.  It is continued throughout this process.

5  Q    Okay.  Lastly, counsel for the -- not lastly, but

6  lastly with respect to the questions of counsel for the

7  creditors committee, you were asked if you have a high level

8  of confidence today that there will be another bidder showing

9  up at the auction.  I believe your answer was you're hopeful.

10 A    Correct.

11 Q    Do you recall that testimony?

12 A    Yes.

13 Q    If we extend this process three more weeks is that

14 going to increase your level of confidence that another

15 bidder is going to show-up?

16 A    No, it won't.

17 Q    What is your concern with extending the bidding

18 procedures by the three weeks are more than people are asking

19 for?

20 A    I think the continued risk to the business and the

21 continued cash burn would be a potential deterrent to value.

22 The cash burn, of course, comes out of the waterfall which,

23 therefore, would, by definition, increase what a third-party

24 would need to pay to clear Deerfield's debt.

25 Q    And have you spoken with -- you have been working with

1  the debtors' management team as well in terms of thinking

2  about the required timeframe for getting this bidding process

3  done?

4  A    Yes.

5  Q    As you sit here today is there anybody on the debtors'

6  management team or yourself that would like to have an

7  additional four weeks to market this business?

8  A    No.

9  Q    Counsel for Vatera asked you about an ABL.  Do you

10  recall those questions?

11  A    Yes.

12  Q    Has Vatera come to the debtors' proposing an ABL?

13  A    No.

14  Q    Is there anything prohibiting Vatera from proposing an

15  ABL?

16  A    Not that I'm aware of.

17  Q    Do you think that Vatera has access to the documents

18  that counsel was asking you about a little bit ago?

19  A    I do.

20  Q    But Vatera hasn't come forward so they would like to

21  propose an ABL, is that right?

22  A    That's correct.

23  Q    And if anybody in the world comes forward and wants to

24  talk to you about financing what is your approach going to

25  be?

1  A      We'll evaluate it.

2  Q      Lastly, with respect to the breakup fee you were asked

3  if Deerfield has told you unequivocally that they would walk

4  away from this transaction absent a breakup fee.  I want to

5  talk just a minute about the value of the Deerfield

6  transaction.

7        Why is it important to the debtors to maintain the

8  Deerfield stalking horse bid?

9  A      It provides certainty of an outcome and a floor of

10  value against which potential interested parties can bid.

11  Q      In addition to just taking their collateral what other

12  benefits to the debtors does the Deerfield bid provide?

13  A      They will be paying administrative expenses assuming

14  certain contracts.

15  Q      And do you think if the Deerfield bid goes away there

16  is something other than simply walking away or could the

17  debtors be in a worse position with respect to Deerfield then

18  they are today?

19  A      I believe the debtors would be in a worse position.

20            MR. HOGAN:  Nothing further, Your Honor.

21            MR. MARTIN:  Re-cross?

22            THE COURT:  Yes.

23                    RECROSS EXAMINATION

24  BY MR. MARTIN:

25  Q      Have any of the bidders had access to management

 1 meetings without you being present or someone from your team?

 2 A    I don't believe so.

 3 Q    But Deerfield has access to management, isn't that

 4 correct?

 5 A    I believe they have.

 6 Q    With respect to the -- we talked about cure schedules

 7 for executory contracts.

 8 A    Yes.

 9 Q    By the way, to your knowledge, are there a significant

10 number of executory contracts that need to be considered in

11 this transaction?

12 A    I am not the individual preparing that schedule.

13 Q    Okay.  Under the current scheduled proposed by the

14 debtor I believe the bid deadline is February 10th?

15 A    That's correct.

16 Q    Section 4(g) of the bid procedures, which can be found

17 at Docket Number 67-3 at Page 8 of 18, reads the following:

18        "A bid must identify any and all executory contracts

19 and unexpired leases of the debtors that the potential bidder

20 wishes to be assumed."

21        Can you explain to me how a bidder might be able to put

22 that together by February 10th when it still has not been

23 provided?

24 A    My understanding is that the schedule will be provided

25 shortly and I believe the bidder will have enough time to do

1  that.

2  Q    I am going to refer to the debtors' motion itself,

3  Docket Number 67, at Page 25 of 49.  That reads contract

4  assumption notice:

5       "No fewer than 14 calendar days prior to the sale

6  objection deadline the debtors shall serve a notice of

7  contract assumption on all counter parties to all contracts

8  expected to be designated contracts 14 days prior to sale

9  objection deadline."

10      And if you look elsewhere in the order the sale

11 objection deadline is proposed to be February 7th.  So, if my

12 math is correct that date has passed already that the debtors

13 were supposed to provide an assumption notice.  Is that

14 correct?

15 A    Based on what you described, yes.

16 Q    And you haven't seen a list of contracts to be assumed

17 or cure amounts?

18 A    I have not.

19          MR. MARTIN:  No further questions.

20          THE COURT:  Thank you.

21                   RECROSS EXAMINATION

22 BY MR. GALARDI:

23 Q    Just following up on -- you were asked a question by

24 your counsel that the debtors would be worse off without the

25 floor bid, correct?

1  A      Correct.

2  Q      And you said yes?

3  A      Yes.

4  Q      Okay. And when you said the debtors would be worse off

5  I want to understand that.  Who wouldn't be paid in that

6  circumstance?

7  A      I don't know the answer until I see where value comes

8  out.

9  Q      Okay.  But if they foreclosed on their collateral,

10 let's take the -- have you ever done a UCC foreclosure?

11 A      I have not.

12 Q      Okay. And so you didn't compare this to a UCC

13 foreclosure, correct?

14 A      I did not.

15 Q      Okay.  And let me ask you, do you think that the

16 professional fees would be paid in a UCC foreclosure of your

17 firm?

18 A      I believe potentially not absent their payment.

19 Q      Okay.  So, you would be one of the parties that would

20 be hurt in that circumstance, correct?

21 A      I suppose.

22 Q      And you believe you're providing value to Deerfield by

23 doing that process, correct?

24 A      I don't follow.

25 Q      Do you believe that your efforts to sell the assets are

1  providing value to Deerfield in this process?

2  A    I do.

3  Q    Okay.  And do you believe that Skadden would be paid in

4  a foreclosure?

5  A    Potentially not.

6  Q    Okay.  And do you believe that Skadden's services are

7  providing value to Deerfield in this process?

8  A    I do.

9  Q    Okay.  Now when you considered -- and so do you believe

10 that Deerfield wants to buy these assets?

11 A    I do.

12 Q    And do you believe that it would pay the vendors that

13 it thinks are necessary if it had to foreclose on the assets?

14 A    I believe that is reasonable.

15 Q    Okay.  So, it would still be paid, right?

16 A    Yes.

17 Q    Okay.  Do you think that they would still try to assume

18 or get assignments of the contracts that they want in this

19 transaction if they had to foreclose?

20 A    Potentially.

21 Q    Okay.  So, they won't be any worse off, right?

22 A    Potentially not.

23 Q    So, when you said the debtors will be worse off who is

24 really worse off?

25 A    I think it puts at risk the business itself,

1  potentially employees.

2  Q    Let's talk about the employees.  Do you think Deerfield

3  is going to take -- I think in somebody's declaration, it

4  might have yours, does Deerfield have a management team

5  presently for this business?

6  A    It was not in my declaration.

7  Q    Do you know if Deerfield has a management team for this

8  business?

9  A    I don't.

10  Q    Okay.  Do you know if they have any employees for this

11  business?

12  A    I don't.

13  Q    Do you know if they're intending to retain the

14  management for the go-forward business?

15  A    I don't know what they're specific plans are with

16  regard to the employee team.

17  Q    Okay.  So, you don't know whether employees would be

18  harmed or not harmed. Isn't that correct?

19  A    I don't.

20  Q    Okay.  Now one other question.  In considering the $2

21  million dollar expense reimbursement you're not testifying

22  today on the cash collateral order, correct?

23  A    That is correct.

24  Q    Okay. So, you did not consider, in looking at the

25  expense reimbursement of $2 million dollars, the additional

1  adequate protection payments of $1 million dollars, is that

2  correct?

3  A     I don't follow the question.

4  Q     In determining that the $2 million dollar fee for

5  expense reimbursement was reasonable, in your words, did you

6  consider that in the cash collateral order there's a 500,000

7  fee, we call it a break-up fee or an adequate protection

8  payment, and an extension fee of $500,000 dollars.  Did you

9  consider that when you came to the view that $2 million

10  dollars was reasonable?

11  A     I'm familiar and I recall those were hard-fought

12  negotiations.

13  Q     My question is not that, sir.  My question is did you

14  consider that when you opined before that the $2 million

15  dollar expense reimbursement was reasonable?

16  A     I did not.

17              MR. GALARDI:  Thank you.  No further questions.

18              THE COURT:  Any redirect?

19              MR. HOGAN:  Yes.

20                      REDIRECT EXAMINATION

21  BY MR. HOGAN:

22  Q     Mr. Finger, have you ever seen a pharmaceutical company

23  in bankruptcy flip to a UCC foreclosure sale?

24  A     No.

25  Q     How do you think that would hold together in the

1  market?

2  A     I believe it would be a negative for the business

3  itself.

4          MR. HOGAN:  Nothing further, Judge.

5          THE COURT:  Okay.

6          MR. LANDIS:  Your Honor, excuse me, for the record

7  Adam Landis from Landis Rath & Cobb on behalf of Deerfield.

8  I am not signed in on your sign-in sheet.  We were using the

9  time Your Honor graciously offered before the hearing in one

10  of the outside break rooms when it was time to sign-in.  So,

11  I didn't sign-in.  Mr. Bromley didn't sign-in as well.  He

12  would like to ask a few questions of the witness if he may.

13  There has been a lot of rapid back and forth.

14          THE COURT:  Okay. We're somewhat out of order, but

15  I'll permit and we're going to start another round then.

16          MR. LANDIS:  Thank you, Your Honor.

17          MR. BROMLEY:  Thank you, Your Honor.  James

18  Bromley of Sullivan & Cromwell.  I apologize.  It's not

19  really -- I'm here on behalf --

20          THE COURT:  Sure were to jump in.

21          MR. BROMLEY:  Yeah, I'm here on behalf of

22  Deerfield, so as far as I can tell I'm being shot at from

23  several directions, so I apologize for that.

24                          DIRECT EXAMINATION

25  BY MR. BROMLEY:

1   Q     Mr. Finger, I just have a couple of questions for you.

2         You're not a lawyer, right, Mr. Finger?

3   A     Correct.

4   Q     And so, when you talked about familiarity with various

5   documents, you haven't read those documents as a lawyer,

6   correct?

7   A     Correct.

8   Q     Are you aware of a subordination agreement that exists

9   between Vatera and Deerfield?

10  A     I believe there is an agreement, yes.

11  Q     Okay.  And as a non-lawyer, generally, you understand

12  that subordination agreement means that one party is

13  subordinated in terms of its rights to another?

14  A     Yes.

15  Q     And, generally, as you're sitting here today, you

16  understand that the subordinated party in connection with

17  that subordination agreement is Vatera, vis-à-vis, Deerfield,

18  correct?

19  A     That's correct.

20  Q     Okay.  And so, when you were talking about certain

21  things with Mr. Galardi about the ability to agree to certain

22  things because of Deerfield's ability or right to consent,

23  you understood that the right to consent that Deerfield has

24  exists within those documents, correct, those legal

25  documents, right?

1  A      Yes.

2  Q      So and that as far as you're concerned as a financial

3  professional, you were aware that Deerfield had certain legal

4  rights and was exercising those rights, correct?

5  A      That's correct.

6  Q      Okay.  Now with respect to a UCC foreclosure, I think

7  the first question that Mr. Galardi asked you is do you know

8  what a UCC foreclosure is and I think your answer was no, is

9  that correct?

10 A      I'm familiar with it.

11 Q      But you've never --

12 A      No.

13 Q      -- involved in one?

14 A      No, sir.

15 Q      You don't know how one is conducted?

16 A      No.

17 Q      You don't know whether contracts are available to be

18 assumed in connection with a UCC foreclosure?

19 A      No.

20 Q      You don't know whether or not certain intellectual

21 property rights can be transferred in a UCC foreclosure?

22 A      No.

23 Q      You don't know whether a company can continue to

24 operate during the pendency of a UCC foreclosure?

25 A      I don't.

1  Q      You don't know whether Deerfield's cash collateral

2  would be available to fund the operation of the business

3  during such a foreclosure?

4  A      I don't.

5  Q      Okay.  You don't know whether vendors would be able to

6  be assumed and assumed in connection with a UCC foreclosure?

7  A      I don't.

8  Q      So it's fair to say that in connection with whatever a

9  UCC foreclosure is, you're not an expert and don't know how

10  they would be conducted, fair?

11  A      That's fair.

12  Q      Okay.

13          MR. MARTIN:  Your Honor, I'm not rising the out of

14  order thing.  This is direct, I think, by Mr. Bromley who

15  supports it and it just sounds a lot like cross.

16          THE COURT:  Meaning it sounds leading?

17      (Laughter)

18          MR. MARTIN:  Oh, yes.  I want us to get through

19  the calendar and so, I didn't rise, but I guess I would just

20  like to, with the court's -- if the court is with me, I'd

21  like to caution Mr. Bromley.

22          THE COURT:  I think you should ask non-leading

23  questions.

24          MR. BROMLEY:  Thank you, Your Honor.  And I would

25  note that simply because they're against me doesn't mean that

1 I'm the movant.

2          THE COURT:  That you're with anyone.

3      (Laughter)

4          MR. BROMLEY:  That's absolutely the case, Your

5 Honor.

6 BY MR. BROMLEY:

7 Q    So, okay, Mr. Finger, you're familiar with -- are you

8 familiar with the term financial buyer?

9 A     Yes.

10 Q    And what does that mean?

11 A    Financial buyer, financial sponsor.  One that does not

12 own or operate a strategic asset.

13 Q    And are you familiar with the term strategic buyer?

14 A    I am.

15 Q    And can you tell me what you mean by that?

16 A    A company with operations potentially similar to the

17 debtors or tangentially related sectors.

18 Q    So, let me ask you a question.  Is there, in your

19 experience, a difference between what a strategic buyer and a

20 financial buyer would require of an acquired company?

21 A    Yes.

22 Q    And could you explain that difference?

23 A    I believe that a strategic buyer, depending on what

24 sector they're in and what portfolio they have may require

25 more or less of company's operations but a financial buyer is

1  effectively likely to buy the whole company.

2  Q    And Deerfield is what kind of buyer?

3  A    I believe financial.

4  Q    And the plan proposal that has been put forward for

5  which we're discussing the bidding procedures, is that an

6  acquisition of the entire company?

7  A    Yes.

8  Q    Okay.  And that -- what does that mean in terms of

9  employees?

10  A    So, I don't know Deerfield's plan specifically with

11  respect to the employees; however, I would assume that

12  Deerfield will seek to hire most of the employees?

13  Q    And is that consistent with your experience with

14  financial buyers?

15  A    Yes.

16  Q    And in your experience with financial buyers, what do

17  they generally do with most of the vendor relationships?

18  A    I think they likely assume them.

19  Q    And is that your expectation in this situation?

20  A    It is.

21  Q    And what is your experience in terms of financial

22  buyers with respect to customer relationships?

23  A    I would believe they would like to assume those as

24  well.

25  Q    And is that what you're expecting in the situation out

1  of Deerfield?

2  A    Yes.

3  Q    And if you had a -- is a big pharma company like a GSK

4  or a Merck is that a strategic buyer as an example?

5  A    Yes.

6  Q    And if the strategic buyer of that sort were to arrive

7  do you think there would be a higher or lower chance that

8  they would take the employees of the company?

9  A    I think lower likely because of the synergy

10 opportunity.

11 Q    Do you think it's substantially lower?

12 A    From a probability perspective, yes.

13 Q    Okay.  And rather than repeat all the questions, would

14 that be the same with respect to customers and vendors?

15 A    Vendors, yes; customers, I suppose it depends.

16           MR. BROMLEY:  That's all I have, Your Honor,

17 reserving rights.  Thank you.

18           THE COURT:  Thank you.

19           Did that prompt any questions from anyone?

20           MR. GALARDI:  I hate to say it, it does prompt

21 two.

22           THE COURT:  Mr. Galardi.

23                     CROSS-EXAMINATION

24 BY MR. GALARDI:

25 Q    Mr. Bromley just asked you about the consent word that

1  you used when I was cross-examining you, have you ever read

2  the subordination agreement?

3  A    No.

4  Q    And when you used the word consent when I asked you,

5  did you understand Deerfield had to consent, were you

6  thinking of the subordination agreement or, in general?

7  A    I am aware there's an agreement in place.  I don't

8  follow the question.

9  Q    Well you said because we didn't think Deerfield would

10  consent. Those were your words, or thereabouts.  We don't

11  have a transcript.   And I'm just simply asking when you used

12  those words, was the subordination agreement in your head or

13  was it just generally Deerfield needed to consent?

14  A    I'm not sure.

15  Q    Okay.  Thank you.

16                    CROSS-EXAMINATION

17  BY MR. MARTIN:

18  Q    Mr. Finger, you've asked the question point blank of

19  Deerfield over the last month or so will you take a penny

20  less than the $140 million credit bid amount, and the answer

21  has been no, isn't that correct; in cash, in full, in cash?

22  A    Yes.

23            MR. MARTIN:  Nothing further.

24            THE COURT:  Thank you.  Mr. Finger, you may step

25  down.

1           THE WITNESS:  Thank you.

2       (Witness excused)

3           THE COURT:  We're going to take five minutes and

4   then we'll get to the next witness.

5       (Recess at 3:43 p.m.)

6       (Proceedings resume at 3:57 p.m.)

7           THE CLERK:  Please rise.

8           THE COURT:  Please be seated.

9           Okay.  Mr. Milligan, take the stand, please.

10              PETER MILLIGAN, WITNESS, SWORN

11          THE CLERK:  Please state your full name, spell

12  your last name for the record?

13          THE WITNESS:  It's Peter Milligan; M-I-L-L-I-G-A-

14  N.

15          THE COURT:  Must be missing some people.  Are they

16  just out in the hallway?  Thank you.

17          Mr. Martin.

18          MR. MARTIN:  Thank you, Your Honor.

19                      CROSS-EXAMINATION

20  BY MR. MARTIN:

21  Q    Mr. Milligan, you're aware of the $140 million dollar

22  credit bid?

23  A    Yes, sir.

24  Q    And are you also aware that a portion of that bid, and

25  particularly, $5 million dollars represents unfunded debt?

1  A     I am.

2  Q     Okay.  And just explain how that $5 million dollar

3  piece of the debt occurred?

4  A     Sure. The debt was originally issued at about $150

5  million. We approached Deerfield in the fourth quarter of

6  2018 to renegotiate our loan agreement which required a few

7  accommodations.

8        One was to lower the sales covenant for 2019.  The

9  other -- major changes; the other change was to remove the

10 going concern limitation in the audit that would be -- audit

11 opinion that would be issued in 2019.

12       And as a result of that, we did two things.  On the

13 other side, if you will, the equation was to increase the

14 exit fee.  I believe it was from 2 percent to 4 percent and

15 added $5 million dollars to the outstanding balance.

16 Q     Without any additional cash having been advanced by

17 Deerfield?

18 A     That's correct.

19 Q     And now these two changes, the two covenants you

20 negotiated, what was the sales covenant originally?

21 A     For 2019, it would have been $75 million.

22 Q     And what was it lowered to under the agreement?

23 A     $63.8.

24 Q     I thought you testified --

25 A     I did, and I apologize.  I said $67 this morning, but

1  it was $63.8.

2  Q    Okay.  So from $75 million in sales a year to $63.8

3  million in sales.  And the second item was, I believe you

4  just said the going -- that if there were going concern

5  footnote, that would not be a default.

6  A    Right a going concern opinion would have been a default

7  condition.

8  Q    Andin return for those two things, the company agreed

9  to increase the loan balance by $5 million without additional

10  cash changing hands?

11  A    Yeah, there was a number of things.  That was one.

12  Q    Okay.  You also testified today that the company is

13  currently or sitting on, I'll say, approximately $80 million

14  in book value inventory?

15  A    That's correct.

16  Q    And about $40 million in cash?

17  A    The cash balance today is a little -- about $52

18  million.

19  Q    Okay.  And about $8 million in receivables?

20  A    Approximately.

21  Q    Okay.  88, 52, I get $140 million right there.  The

22  company is also holding about -- well before I get to that.

23  The company also has intellectual property?

24  A    Yes, sir.

25  Q    And I believe you testified today that in your view the

1  intellectual property and the products themselves are the

2  most valuable part of the company's assets?

3  A     I think they are.

4  Q     More valuable than the $50 million in cash?

5  A     Yes.

6  Q     And in addition, but we don't know exactly what the

7  intellectual property is worth, so we've got $140 million of

8  the things we added up, plus an unknown amount for

9  intellectual property.  And, in addition, there's an asset

10 that Deerfield is in a unique place to acquire which is $350

11 million of NOLs, net operating losses.

12 A     Yeah, that's correct.

13 Q     Okay.  And I believe you testified that in your

14 experience you actually ran a tax group for AT&T?

15 A     I was part of it; didn't run it, but I was part of it.

16 Q     All right.  Any -- what's your opinion of the value of

17 $350 million of NOLs?

18 A     Yeah, the way that I would approach valuing that

19 because of the limitations under Section 382 that could be

20 triggered, and a lot of instances which I'm certainly not an

21 expert on, you would have to look at the company's ability o

22 generate $350 million dollars of taxable income to offset

23 those.

24        You would first assume that.  You would take that over

25 a time period, assuming it's x amount of years.  You would

1  put a discount rate on that to account for probability of

2  that happening, and then discount that all back to current

3  value, and then multiply it by the tax rate in effect at the

4  time and that could change, but today in the corporate side,

5  it's 21 percent.

6  Q     Right.  So if you could use all those NOLs, 21 percent

7  times $350 million is $73 million of actual cash savings; of

8  course, as you said, has to be discounted to present value?

9  A     Correct.

10  Q     Thank you.

11        MR. MARTIN:  No further questions.

12        THE WITNESS:  Sure.

13        THE COURT:  Mr. Galardi.

14                    CROSS-EXAMINATION

15  BY MR. GALARDI:

16  Q     The bid is $140 million dollars, correct?

17  A     Correct.

18  Q     Okay.  And did you determine the number $140 million?

19  A     I did not.

20  Q     Who did?

21  A     Understanding of our advisor team that in satisfaction

22  of all the outstanding Deerfield loan that that was the way

23  the number is determined.

24  Q     So is it your testimony, as you sit here today, that if

25  $140 million dollars of cash came in, leave aside assets,

1  $140 million, Deerfield is paid in full, period, end of

2  story, over?

3  A      No.

4  Q      Why not?

5  A      Well this is a question I actually, I'm not totally

6  sure on because I don't know what happens when you're in

7  default, but there's exit fees, and there's potential make

8  wholes that existed outside of the bankruptcy.  I don't know

9  if their existence today.

10  Q     Okay.  And do you know whether those would be secured

11  claims?

12  A      I do not know.

13  Q     Okay.  And has Deerfield reserved the right to assert

14  that their secured claims?

15  A      I don't know that.

16  Q      And do you have an agreement with Deerfield that it

17  will not bid those claims in any auction?

18  A      I don't think we have that.

19  Q      Okay.  So, it's possible that Deerfield may add claims

20  at the auction that we're unaware of as you sit here today?

21  A      I would defer to those who structured the agreement.

22  Q      Okay.  Now in the bid procedures, there's an agreement

23  to pay $2 million dollars of an expense reimbursement,

24  correct?

25  A      In it, yes.

1  Q     Do you understand that to be a secured claim or an

2  unsecured claim?

3  A     I don't know.

4  Q     Okay. So, you don't know whether they can credit bid

5  that?

6  A     I do not.

7  Q     Okay.  And in the cash collateral order, you did -- and

8  note this is not about that.  But in the cash collateral

9  order there are two other fees, $500,000 dollars and another

10 $500,000 dollars. We call them a breakup fee and an extension

11 fee; are you aware of those fees?

12 A     I am.

13 Q     And do you have any understanding that if the cash

14 collateral order is approved, they would be able to bid that

15 million dollars?

16 A     I do not know.

17 Q     Okay.  Now if you don't know, who would, from the

18 company's standpoint?  Not your advisors, who from the

19 company would know?

20 A     Who from the company would know?  I'm not sure.

21 Q     Now on the NOLs, you just went through a list of

22 intellectual property that is some value.  You went through

23 the cash and you went through the receivables.  Is the debtor

24 getting any cash, any value from Deerfield allocated to the

25 NOLs it would acquire?

1   A     The credit bid doesn't distinguish what asset its

2   bidding on, it's bidding on the whole.

3   Q     Are you familiar what a credit bid means?

4   A     Somewhat.

5   Q     Let me -- I'm just testing your understanding.  I'm not

6   asking for a legal question.  Can you credit bid on the NOL?

7   Can somebody credit bid on an NOL?

8   A     I do not know.

9   Q     Did you ask any lawyer about that question?

10  A     No.

11        MR. HOGAN:  Judge, just objection -- we're outside

12  the scope of (indiscernible - counsel away from microphone).

13        MR. GALARDI:  Your Honor, it goes to the bid.  It

14  goes to the bid amount.

15        MR. HOGAN:  (indiscernible)

16        THE COURT:  I'm going to let him ask the question.

17  Overruled.

18        MR. GALARDI:  I think he answered it already, so

19  we're not going to strike it.

20        THE COURT:  Okay.

21  BY MR. GALARDI:

22  Q     You too say in your declaration at paragraph seven that

23  you consider it highly doubtful that any other bid will come

24  in, correct?

25  A     I did.

1  Q      And on what basis do you say that?

2  A      On the basis that we have been looking at alternatives

3  for many cores.

4         On the basis that, even back into 2018, there were

5  conversations with folks to look for alternatives.

6         On the basis that in the summer of spring of 2019, we

7  had a number of parties reach out to us and then followed up

8  with a number of parties who had reached out previously and

9  tried to get what their view of value would be.

10         On the basis that the current bidders or that are in

11  the process today have been in and around the data room for

12  many, many months and in context with that my understanding

13  and my belief is that the Jefferies team has reached out to

14  every possible player.

15         The fact that the process is a very public one and

16  folks would have the understanding that the company, of

17  course, is being auctioned.

18         On the notion that in the context of this process, we

19  have uploaded over 1200 documents to the data room and

20  answered over 900 requests that are serving independent of

21  any request we received from the secured lender.

22  Q      Okay.  So, you just -- now we're going to have to

23  unpack it.  I'm sorry.

24  A      That's okay.

25  Q      Deerfield has not yet determined what contracts to

1  assume or reject, is that correct?

2  A    That is my understanding, yes.

3  Q    Okay.  And how long is Deerfield been doing due

4  diligence on this business?

5  A    They have -- well, they've done due diligence, I'm

6  sure, since their original investment.  With respect to this

7  credit bid, I believe they started doing due diligence

8  probably in the October timeframe.

9  Q    So do you think Deerfield has a very good idea of what

10 contracts the company has, what relationships it has?

11 A    I believe they have a very good understanding of all

12 the material ones, absolutely.

13 Q    Okay.  And, yet, it still has not identified which

14 contracts to assume and which to reject?

15 A    It hasn't identified that to me, for sure.

16 Q    Okay.  And is it your testimony that another buyer can

17 do within ten or -- within a week or two?

18 A    Yeah, the material contracts have been loaded up into

19 the data room for a significant period of time and could they

20 do that due diligence in that period of time, my assumption

21 would be yes.

22 Q    Okay.  Now in paragraph seven I think one of the

23 modifications to your testimony was you had -- it said the

24 thirteen-week budget that governs the debtors' use of cash

25 collateral, the debtors' average weekly net cash flow is

1  approximately negative $1.3 million dollars, correct?

2  A    Correct.

3  Q    That's what you said in your declaration, and that's

4  the statement you corrected or your counsel corrected in the

5  proffer.

6  A    Clarified.

7  Q    Clarify.  Okay. And of that $1.3 per week, how much is

8  associated with professional fees?

9  A    Well on the $1.3 basis or the $1.1?

10 Q    On the $1.1 basis.

11 A    On the $1.1 basis, it's probably about $600,000.

12 Q    Okay.

13        MR. GALARDI:  I have no further questions, Your

14 Honor.

15        THE COURT:  Thank you.

16        Ms. Richenderfer.  Mr. Bromley.

17        MR. BROMLEY:  Do we -- okay --

18        THE COURT:  Yeah before you again.

19        MR. BROMLEY:  Thank you, Your Honor, for

20 clarifying the order.

21                    CROSS-EXAMINATION

22 BY MR. BROMLEY:

23 Q    Mr. Milligan, I just have a couple of questions.

24      When Mr. Martin had asked you about inventory --

25 A    Yes, sir.

1  Q      -- right, I think you mentioned the number $80 million.

2  A      Correct.

3  Q      Is that book value?

4  A      That's book value.

5  Q      Okay.  And what do you mean by book value?

6  A      That essentially is the value that we have acquired the

7  asset for, and then we revalue it according to the accounting

8  rules.  And if you believe that you can use that inventory

9  over a certain period of time then you keep it on the books

10 at that level.  If you don't, then you would write down that

11 inventory to reflect the ability to use it.

12 Q      Now that inventory is comprised of what?

13 A      It's comprised of the API which is the frontend, which

14 is the active pharmaceutical ingredient.  And for the most

15 part, it's that and then some finished goods.

16 Q      So of the $80 million, do you have an estimate as how

17 much is the frontend?

18 A      Yeah, the frontend of that inventory is probably $70

19 million and of that seventy, there's $43 million that we

20 treat as inventory, according to the accounting rules what

21 is, in fact, prepaid commitments that we haven't purchased

22 yet, but they are commitments for inventory and we classify

23 them as inventory.

24 Q      How much of that inventory would you say are regulated

25 goods?

1   A     One hundred percent.

2   Q     And regulated by whom?

3   A     Regulated by the FDA.

4   Q     Do those goods expire, do they have a --

5   A     Yes.

6   Q     They have a life span?

7   A     Yes, each one has a different life span.  It depends on

8   what part of the process you're in.  If you're on the API

9   level, each chemical compound of which four drugs, each one

10  has their own. They each have different expirees.  There are

11  things that companies can do and do to make sure that they

12  can try to extend that.

13        You can test on the product to keep it on stability to

14  invest limited resources in making sure that the chemical is

15  not degrading.  And as a result of that, you may be able to

16  petition the FDA for an extension. Our assumption in that

17  inventory is that inventory from the beginning to end in that

18  full dollar amount is probably salable for, you know, close

19  to ten years.

20  Q     So, when I said the word regulated does that mean that

21  people who would be potential purchasers of that inventory

22  need to be approved in order to do that?

23  A     My understanding is, this is not my area of expertise,

24  but that you need the proper licenses in order to be able to

25  sell pharmaceuticals.

1  Q    Now and have you undertaken any investigation as to how

2  you would sell the inventory in a non-whole company exercise?

3  A    Yes, and we had some success on that in the end of the

4  year where we sold a piece of it to one of our licensing

5  partners.  That sale took place at the end of the year.  It

6  was $9.8 million dollars in cash which is in the numbers that

7  we've talked about.  And it essentially is a sale of some of

8  that prepayment commitment to our license partner in Europe

9  Menarini.

10 Q    Now with respect to the NOLs, there were a number of

11 questions that were asked.  When you were at the tax group at

12 AT&T, were you involved in NOLs?

13 A    I certainly have an understanding of net operating cost

14 calculation, sure.

15 Q    Okay.  And it's true, is it not, that in order to take

16 advantage of NOLs, you have to earn taxable income, I think

17 you said that?

18 A    Yes.

19 Q    Okay.  And the generation of the net operating losses

20 is because it's due to the fact that the company has

21 consistently lost money, correct?

22 A    Correct.

23 Q    Right.  And the projections that the company has are

24 not that the company will make money to access these NOLs,

25 correct?

1   A     The level of NOLs we have forecasted for three years,

2   so over that period of time certainly not.

3   Q     And so in that period of time, over that three-year

4   forecast, what is your forecast of using any of those NOLs?

5   A     Probably a slight amount in 2021.

6   Q     And so that in the third year out is the first year

7   that you can anticipate under current projections that you

8   would have any ability to use the NOLs?

9   A     That's correct.

10  Q     Okay.  And the -- are you aware of the 382 limitations?

11  A     Somewhat.

12  Q     And is it fair to say that the Internal Revenue Code

13  prohibits the sale of NOLs separate and apart from

14  businesses?

15  A     I think that was the essence of those rules.

16  Q     Right. So, you are familiar that 382 was enacted to

17  prevent the trade --

18  A     Trafficking and losses, yes.

19  Q     Right.  So, you're familiar with the fact that in order

20  to utilize NOLs in a transactional setting that there needs

21  to be a purchaser who has the ability to use those NOLs,

22  correct?

23  A     Correct.

24  Q     And you understand that Deerfield is one of those?

25  A     I believe that they are one of the few that could do

1  that, yes.

2  Q      And Vatera is another, correct?

3  A      Correct.

4  Q      And Vatera hasn't made any proposals in order to

5  utilize the NOLs, correct?

6  A      No.

7  Q      Okay.  Indeed, the only thing Vatera has done is

8  threaten to destroy the NOLs, correct?

9  A      I don't know what they've done.

10  Q      Well, I suggest you listen to the argument.

11  A      It may have been too subtle for me.

12  Q      Oh, we're getting to that.  I'm sorry.

13         With respect to the thirteen-week budget, effectively

14  what is happening is the company is losing cash at a million

15  three a week, correct?

16  A      Yeah, I mean I can clarify the million three versus

17  million, one million three is the right number.  And the

18  clarification was that million three was essentially the

19  difference of that.  It's $200,000 per week that we're

20  putting essentially defer to administrative claims because of

21  this process.

22         So, $2.5 million dollars or so over that thirteen-week

23  period, that's the difference between a million and one

24  million three in that million one, as I think I referenced

25  earlier about $500,000 or so of the operating losses.

1  Q     Now have you rolled out the thirteen-week budget beyond
2  what was in your first day declaration?
3  A     No.
4  Q     And do you have -- have you done any preparation in
5  connection with that?
6  A     Significant.
7  Q     Okay.  And what is your expectation for losses beyond
8  the thirteen-weeks?
9  A     Yeah, so for the full year of 2020, our projection that
10 is in the data room which is on a pro forma basis of January
11 1st if we were on our own, if you will, on January 1st.  The
12 model that's in the data room for potential bidders, I
13 believe is $22 million of loss.
14 Q     Twenty-two million of additional loss?
15 A     Of EBITDA, that's not cash flow, although we can, you
16 know, there's a very subtle difference there because it's an
17 analysis reconciliation between the two, but for 2020 those
18 numbers are very close.
19       We've updated that recently and think we're doing a
20 little bit better, so probably minus $20 million dollars for
21 2020.
22 Q     So the cash, the $52 million in cash would be at
23 current estimates by year end down to $32 million?
24 A     Yeah, I mean, yes, on its own, but that is sort of a
25 hypothetical because that assumes there's no restructuring

1  cost.  And if we were not in restructuring it does include

2  interest expense, so it's a hard comparison.

3  Q    Okay.  So when you add in the restructuring cost

4  because I counted I think forty people in this room who I

5  think, let's assume, thirty of them are on your payroll at

6  the moment, the expectation would be that that number from a

7  cash burn perspective, not an EBITDA perspective, would

8  increase, correct?

9  A    That number is the number that I referenced.  We expect

10  total restructuring cost for this business for third-party

11  advisors to be somewhere in the $25 million dollar range and

12  going up.

13  Q    And so, when we take the $52 million, deduct out the

14  twenty of performance related deterioration and deduct out

15  the $25 million of cost and expenses that are anticipated

16  with respect to the restructuring, we're down to a cash

17  position that's in the single digits, correct?

18  A    I believe -- that's correct.

19  Q    And you understand that all of the cash is cash

20  collateral Deerfield, correct?

21  A    I do.

22  Q    Okay.  Thank you.

23  A    You're welcome.

24         MR. BROMLEY:  No further questions for the moment,

25  Your Honor.

1       THE COURT:

2       MR. HOGAN:  I just have a few follow-up questions.

3                       REDIRECT-EXAMINATION

4  BY MR. HOGAN:

5  Q    Mr. Milligan, you remember the discussion about the

6  value of inventory and the value of cash and the value of

7  receivables and the value of IP, do you remember that

8  discussion?

9  A    I do.

10 Q    I don't want to talk about valuation.  I just want to

11 ask you are the documents and the information related to

12 inventories in the data room --

13 A    It is.

14 Q    Cash that's available to bidders in the data room?

15 A    It is.

16 Q    Receivables that's in the data room?

17 A    Yes.

18 Q    IP that's in the data room?

19 A    Yes.

20 Q    Great.  So, we're running a market process right now.

21 We're going to figure out what the value of that is.

22      Second question.  Mr. Galardi asked you about details

23 about what's going to constitute a credit bid, and then he

24 asked you put aside your advisors, who at the company knows

25 this.  So, maybe I missed it.  I hope we're not

1  (indiscernible).  Are you going to go to the auction without

2  your advisors?

3  A     I will not.

4  Q     Okay. So, Skadden and your financial advisors are going

5  to be there in terms of the legal (indiscernible).  You're

6  not a lawyer, are you?

7  A     I am not.

8  Q     Thanks.

9          MR. HOGAN:  Nothing else.

10                    RECROSS EXAMINATION

11  BY MR. MARTIN:

12  Q     Net operating losses have a twenty-year lifespan from

13  generation?

14  A     I think that rule has changed, but I'm not sure.  I

15  thought it changed when the tax law changed, but it's easy to

16  confirm.

17  Q     Do you have any knowledge of whether or not Deerfield

18  has potentially another portfolio company that it could drop

19  into this company with profits?

20  A     I don't know.

21  Q     It would have to be in the same business under the 382

22  rules?

23  A     I'm aware, more aware of the 382 rules outside of

24  bankruptcy.  I know outside of bankruptcy to be able to

25  acquire a company and to sort of stuff a profitable business

1  in there it is certainly much more difficult than that.

2  Q    You testified today that last spring before you had

3  Jefferies or engaged, you had your own inbound unsolicited

4  bids and they were in the $150- to $210 million dollar range,

5  correct?

6  A    That's correct.

7  Q    And they were cash free bids.  In other words, they

8  would leave the cash behind?

9  A    We asked for views of business on sort of a cash free

10  debt free basis.

11  Q    And the cash that you had at that time was $90 million?

12  A    At the end of the second quarter, it was $90 million.

13  Q    So using your 150- to $210 million dollar range would

14  ascribe a value of the company's assets, at least, based on

15  these expressions of interest of $240 million to $300

16  million?

17  A    If taking those LOIs and adding the cash, yes.

18  Q    And now we have a process driven by Deerfield which is

19  ascribing $140 million cash outprice.

20        MR. HOGAN:  Objection, Judge.  Process

21  (indiscernible).

22        THE COURT:  I'm sorry, what?

23        MR. HOGAN:  Objection; process (indiscernible).

24        THE COURT:  Recharacterize your --

25        MR. MARTIN:  Sure.

1  BY MR. MARTIN:

2  Q    We have a process that is seeking to accept a credit

3  bid from Deerfield at $140 million.

4  A    Correct.

5          MR. MARTIN:  I'm going to stop there.

6          THE COURT:  Mr. Galardi.

7                    RECROSS-EXAMINATION

8  BY MR. GALARDI:

9  Q    Very quick because Mr. Bromley asked you a couple of

10  questions.

11      Have you actually done an analysis of whether Vatera

12  could take advantage of the NOLs?

13  A    No.

14  Q    Okay.  So when you testified that you thought it might

15  that was without any foundation, correct?

16  A    No, that was what I was informed by, one of our

17  advisors.  I don't remember who.

18  Q    Okay.  But you don't have any independent knowledge of

19  that?

20  A    No.

21  Q    Thank you.  No further questions.

22  A    You're welcome.

23          THE COURT:  You may step down.

24      (Witness excused)

25          THE COURT:  Do any of the objectors have any

1  evidence to put on?

2          MR. MARTIN:  None from the committee, Your Honor.

3          MR. GALARDI:  No, Your Honor.

4          MS. RICHENDERFER:  No, Your Honor.

5          THE COURT:  Okay.  Thank you.  Then the

6  evidentiary record is closed.

7          I'll hear argument.

8          MR. DRESSEL:  Good afternoon, Your Honor.  Again,

9  Christopher Dressel, Skadden, on behalf of the debtors.

10         Your Honor, as an initial matter, I want to take a

11  minute and just make a few remarks on the purposes and

12  objectives of the sale process.

13         The debtor has filed for bankruptcy after

14  executing restructuring support agreement with Deerfield.

15  We're enthusiastic about the Deerfield bid as a number of

16  attractive elements and offers, a considerable value

17  proposition to an array of constituents, most significantly

18  it is structured as a plan, rather than as a Section 363 sale

19  meaning it has a built-in path out of Chapter 11 for the

20  debtors.

21         By extension that means that administrative

22  claims, priority claims, cure claims and other similar

23  obligations must be satisfied in full which we think sends a

24  positive signal to employees, vendors, customers, and other

25  stakeholders with an ongoing interest in the debtors'

1  future's success.

2            Deerfield could have structured its proposal very

3  differently.  It could have pursued a pure credit bid for all

4  the debtors' assets including all of its remaining cash

5  leaving the company with no funds, be administrative

6  creditors or, otherwise pursue a Chapter 11 plan and no means

7  of disposing of its Chapter 11 cases, other than a structured

8  dismissal or conversion to Chapter 7.  The fact that

9  Deerfield didn't choose this route, I think is significant to

10  the estate and shouldn't be underestimated.

11            Arguably, in these circumstances, the debtors need

12  to continue marketing their assets post-petition.  We could

13  have proceeded straight to plan confirmation.  Nonetheless,

14  it was important to the debtors that they have a reasonable

15  opportunity to find and unlock any upside value above the

16  Deerfield facility.  And for that reason, we insisted, in our

17  prepetition negotiations with Deerfield, that the RSA remain

18  subject to competitive bidding.

19            Negotiations over that point were spirted, to say

20  the least, with a yielded agreement on a marketing timeline

21  and process that we feel confident will yield the highest or,

22  otherwise, best offer for the company.

23            Your Honor, I'm not sure it's useful at this stage

24  to address each of the contentions of the objecting parties

25  point by point, as I think we covered that fairly

1  comprehensively in our reply, but I did want to underscore a

2  few key things.

3          First is the length of the marketing process.  The

4  objecting parties tried to narrow the court's focus solely to

5  the post-petition marketing process ignoring the debtors'

6  prepetition efforts.  I think that's a blanket approach, but

7  even if you accept that frame of reference, our proposed

8  marketing timeline falls comfortably within market norms for

9  a Section 363 process in this industry as the precedence

10 identified in our reply evidence.

11         At the risk of stating the obvious, you can't

12 barely assess the length and adequacy of a post-petition

13 marketing process without considering whether the debtor was

14 subject to a blackout or no shop period prior to approval of

15 bidding procedures.

16         In many situations, the debtor cannot market its

17 assets from the petition until approval of the bidding

18 procedures.  So, the right frame of reference is number of

19 days from entry of the bidding procedures, the bid deadline.

20         In other situations, such as ours, however, the

21 debtor is not subject under such blackout period.  In the

22 latter case, the appropriate measure is the number of days

23 from the petition date to the bid deadline.

24         So while Vatera sent it back that the bidding

25 procedures contemplate only thirteen days of marketing

1   between the bidding procedures and the proposed bid deadline,

2   that's actually a very misleading comparison from our

3   perspective.

4            On top of all of this, the debtors did, in fact,

5   conduct a formal and comprehensive marketing process over a

6   three-month period prior to the petition date.  The details

7   are set out in Mr. Finger's declaration, and I won't belabor

8   them now.

9            The upshot, though, is that as Mr. Finger

10  testifies, the company has thoroughly canvassed the market

11  and has likely interacted with the overwhelming majority, if

12  not all, third-parties that might have a serious interest in

13  acquiring the company.

14           Mr. Finger further testifies that he does not

15  believe that a substantial extension of the bid deadline

16  would facilitate higher or otherwise better bids.

17           In sum, Your Honor, the record demonstrates that

18  the debtors have conducted a robust marketing effort and that

19  the proposed timeline for its potential bidders, ample time

20  to evaluate potential transaction and formulate their bids.

21           THE COURT:  What about the testimony that the

22  customer list and the cure schedules have not been provided

23  yet to bidders?

24           MR. DRESSEL:  Your Honor, with regard to the

25  customer list that raises, I think, concerns about

1  competitively sensitive information and we're working through

2  those issues as expeditiously as possible.

3         As Mr. Finger testified, the bidder that requested

4  it, and it's just one bidder, did not indicate that that

5  would affect disability to bid by the bid deadline.

6         As it relates to the cure schedule, Your Honor,

7  there is some ticking and tying to do on the production of

8  the actual cure document itself, but we believe that bidders

9  have ample visibility into the customers or into the

10  contractual relationships of the company through the

11  voluminous documents that have been posted to the data room.

12         I think as Mr. Milligan indicated, the debtors

13  have responded to extensive due diligence inquiries, over

14  900.  We have, I think he testified, 1,200 documents in the

15  data room and that, I think, covers the majority --

16  substantially all of the company's material contractual

17  relationships.

18         So from a business diligence perspective, we're

19  absolutely confident that bidders have had ample access to

20  the information they need to understand the company's

21  contractual relationships and other business arrangements.

22         THE COURT:  Has the -- I think the testimony was

23  that Deerfield has not yet identified what contracts its

24  going to take, is my recollection correct?

25         MR. DRESSEL:  They've not formally identified

1  that, no.

2           THE COURT:  So how are other bidders supposed to

3  bid against a contract that they don't know what contracts

4  are being taken?

5           MR. DRESSEL:  Each bidder would be requested to

6  indicate in its bid package by the bid deadline which

7  contractual relationships it chooses to take.

8           THE COURT:  Well I understand that, but we've got

9  a floor bid here.  That's what has been told to me that this

10  is a -- sets the floor.  So doesn't it matter what contracts

11  are being taken for the floor?

12           MR. DRESSEL:  I think for purposes of the floor,

13  I'm not sure it does.  Deerfield is taking all of the cash of

14  the company.  And so, it would be paying all cure costs

15  associated with the company but it's not receiving extra

16  credit for that in its bid amount, because it is bidding for

17  all of the cash of the company.  And so which contracts it

18  does or does not take would not affect the valuation of its

19  bid.

20           THE COURT:  I'm not sure I knew that.  So, the bid

21  is inclusive of cash.

22           MR. DRESSEL:  Because it's a stock sale.  So,

23  Deerfield will -- yeah.

24           THE COURT:  Well, okay, fair enough.  Fair enough.

25           So, the current cash positive was $52, $53

1  million, something like that.

2        MR. DRESSEL:  That's correct.

3        THE COURT:  Okay.

4        MR. DRESSEL:  So, I think the key point is

5  Deerfield doesn't get extra credit, so to speak, for payment

6  of cure costs.

7        THE COURT:  It gets $53 million in cash.

8        MR. DRESSEL:  That's right.  And when we compare

9  bids at the auction, we'll do so on an apples to apples

10  basis.  And what I mean more specifically that is when we

11  determine what a bidder needs to bid at the bid deadline in

12  order to be a qualified bid will effectively take the cash

13  consideration offered by that bidder and then we'll add to

14  the company's net cash position, forecast in that cash

15  position as of the closing date.

16        And so, to equalize Deerfield that's taking the

17  cash against third-party bidders, we essentially give the

18  third-party bidders credits for the forecasted cash amount.

19        THE COURT:  Okay.

20        MR. DRESSEL:  Your Honor, second point I wanted to

21  briefly address, the committee and the U.S. Trustee argue

22  that Deerfield should not be permitted to credit bid until

23  the committee's challenge period has expired.

24        The committee and the U.S. Trustee throughout

25  their two papers collectively fail to identify a single case

1  or other authority in support of that proposition which, at

2  any rate, is contrary to Bankruptcy Code Section 502(a) which

3  provides that timely filed claim is allowed unless and until

4  a party in interest objects to it.

5            In the event a committee subsequently commences a

6  challenge and that challenge remains unresolved as of the

7  auction, the court can, of course, fashion an appropriate

8  remedy at that time.  There is no cause to bar the secured

9  lender from credit bidding based solely on and co-aid a

10  future challenge.

11            THE COURT:  Well what do we do, what do we do if

12  we go forward with the auction and then subsequently there's

13  a challenge and it's a successful challenge, what happens?

14            MR. DRESSEL:  I think the case law supports the

15  proposition that Your Honor can fashion an appropriate

16  remedy.  I think there's a K-2 case cited in the Deerfield

17  reply indicates that the court may be able to require the

18  bidder to pay cash. But I think the --

19            THE COURT:  And where's that cash going to come

20  from, how do I know what's going to happen there?

21            MR. DRESSEL:  I think the point is that Your Honor

22  would have the flexibility to determine the appropriate

23  remedy at the time based on all of the considerations.  One

24  possibility is payment of cash.  But I think the overarching

25  point is that this is a future hypothetical.

1           THE COURT:  It's not that hypothetical.  I've got

2   a challenge deadline which we'll get to when we get to the

3   DIP financing, but I'm not inclined, I'll tell you, to

4   shorten that period.

5           So, since I'm not inclined to shorten the period,

6   it's a very real possibility that we could have an issue.

7   And I have seen it addressed before in other situations, but

8   not by a hypothetical you can get cash.

9           So, my question is what's the plan in that event?

10          MR. DRESSEL:  Your Honor, I mean the answers we

11  haven't negotiated with Deerfield a specific plan B in the

12  event there is a successful challenge.  We don't think there

13  will be a successful challenge. But what we do know is that

14  the case law in this district suggests that Your Honor has

15  the ability to fashion an appropriate remedy if and when

16  there is a successful challenge that may include requiring

17  Deerfield to pay cash.  Maybe Deerfield will agree to pay

18  cash.

19          I think those issues, though, can be addressed

20  down the road, if and when that eventuality occurs.

21          THE COURT:  I'm not sure.  I'd like to understand.

22  I think the appropriate time to address it is now in terms of

23  what's going to happen.  I know, at least, in other

24  circumstances that I've seen from other colleagues we know

25  what the end result is going to be and we know we have a

1  solvent entity who's backing the ability to fund that cash

2  obligation.  So that's my question is what's happening here?

3          MR. DRESSEL:  Your Honor, I think the short -- as

4  I indicated, Your Honor, we do not -- we have not

5  specifically negotiated with Deerfield --

6          THE COURT:  That's the answer.

7          MR. DRESSEL:  -- exactly what would happen in that

8  situation.  But I don't think it's -- I think in other

9  situations it's also true that the answer what happens in the

10 event of a future hypothetical challenge is not answered at

11 the time that the bidding procedures are approved, and we

12 don't regard that as an obstacle.

13          THE COURT:  I'm indicating I'm somewhat troubled

14 by that, although I will consider as we go along.

15          MR. DRESSEL:  Your Honor, a third and related set

16 of objections speaks to the criteria for determining

17 qualified bids.  In particular, the requirement that any bid

18 or combination of bid yields sufficient cash to match the

19 then prevailing credit bid amount.

20          Your Honor, as a threshold matter, I would stress

21 that the proposed procedures provide the debtors substantial

22 flexibility to consider different bid structures, as Mr.

23 Finger testified.

24          For example, bidders may bid in the form of a

25 competing plan or a Section 363 asset sale.  They may propose

1  bids for all of the company. They may propose bids for only

2  certain of the company's assets.

3       The requirement that any such bid or combination

4  of bid yields sufficient cash consideration to match the then

5  prevailing credit bid is a necessary and appropriate

6  constraint given Deerfield's status as a secured lender.

7       The committee's response is to say that that may

8  be true for a Section 363 asset sale but it's not true for a

9  plan. Section 1129 affords the debtor the right to provide a

10 secured creditor treatment in the committee's view other than

11 full payment in cash, and the bidding procedures, in this

12 view, should preserve that possibility.

13      Your Honor, I think the short answer is that the

14 Bankruptcy Code also gives the debtor the exclusive right to

15 select among various plan alternatives during the debtors'

16 exclusive period, subject to the right of all parties in

17 interest to seek, to terminate, or modify exclusivity.

18      And the current circumstances, the debtors don't

19 believe that a cram-up plan would be value maximizing.  And

20 the proposed bidding procedures are meant to orient bidders

21 toward the alternatives that the debtors believe are value

22 maximizing under the circumstances.

23      THE COURT:  So how does that -- explain to me how

24 that plays out at the auction?  There were a couple of things

25 in here that I didn't really understand how it plays out at

1  the auction, and this was one of them.

2          MR. DRESSEL:  Yeah.  So the short answer is that

3  any bid, whether it's a Section 363 bid or it's a plan bid

4  must offer sufficient cash consideration that when combined

5  with the debtors' forecast and net cash on hand as of the

6  closing date is sufficient to meet the then prevailing

7  Deerfield, you know, credit bid; in short, to pay Deerfield

8  in full.

9          THE COURT:  And why is the debtor precluding that

10 now instead of waiting to see what actually comes in and

11 making the decision at that point in time exercising its

12 judgment that the cram-up isn't appropriate?

13         MR. DRESSEL:  Because we've already determined

14 what the -- Deerfield already, at this point, has a stalking

15 horse bid for $140 million.  And so, it is effectively a

16 mechanism of determining whether someone has actually

17 submitted an overbid and, therefore, should be admitted to

18 the auction.

19         We're viewing Deerfield as a floor.  And just as

20 we would --

21         THE COURT:  You're viewing them as a floor, but

22 they're not a backup.

23         MR. DRESSEL:  That's correct.

24         THE COURT:  So are they a true floor?

25         MR. DRESSEL:  We absolutely believe that they're a

1  floor.  And we believe that they serve as an excellent floor,

2  I think given what we believe is the robust bid that they've

3  put on the table that we believe will preserve vendor

4  relationships, preserve employee relationships, furnish a

5  path for the debtors out of Chapter 11.  We think they're an

6  excellent floor.

7  THE COURT:  What if somebody else came along and

8  said, you know, I'll do a plan and I'll put in some cash,

9  some significant cash, and then I'll stretch them over a few

10  years.  How do you know at the moment that's not better

11  because you don't know what that additional consideration

12  would be?

13  MR. DRESSEL:  I think, at this juncture, the

14  debtors have determined that a value maximizing path for the

15  debtors is through these set of bidding procedures that we've

16  negotiated with Deerfield and that we have the right to use

17  Deerfield's cash collateral to pursue.  And so, we feel that

18  guiding bidders towards options that conform with these

19  bidding procedures is the best way to maximize value and its

20  consistent with our right as a debtor within its exclusivity

21  period to choose among plan alternatives.  And in exercising

22  that right, we've elected to require that any plan bid

23  provides sufficient cash consideration to pay Deerfield in

24  full.

25  THE COURT:  Okay.

1    MR. DRESSEL:  Your Honor, finally, the objecting

2  parties have objected to the expense reimbursement.  As Your

3  Honor is aware, the expense reimbursement encompasses up to

4  two million in actual fees and expenses incurred by the

5  supporting lenders in connection with the supporting lender

6  transaction.

7    The objecting parties' question whether

8  Deerfield's proposed expense reimbursement satisfies the

9  O'Brien standard, but we suggested that's the wrong question.

10  Deerfield is entitled to payment of its fees and expenses

11  under the prepetition credit agreement and the interim cash

12  collateral, as well as the final cash collateral order,

13  preserved its reimbursement obligation as additional adequate

14  protection during the Chapter 11 cases.

15    As such, we submit that the expense reimbursement

16  may be credit bid by the secured parties at auction and/or

17  collected out of the proceeds of any sale to their collateral

18  to a third-party bidder regardless of whether it satisfies

19  the requirements for an administrative expense under O'Brien.

20    In any event, if O'Brien did apply, we believe

21  that the benefit conferred on the estate by the supporting

22  lender transactions is more than adequate to justify

23  allowance of that amount as an administrative expense.

24    THE COURT:  So that's another aspect I just didn't

25  understand.  Is it an expense reimbursement or is it

1 attorney's fees permitted to be paid under the prepetition

2 credit document?

3          MR. DRESSEL:  I think the underlying source of

4 expense is the same, is fees incurred by Deerfield and its

5 advisors.  Those are compensable either under the cash

6 collateral order or if there are amounts outstanding as of

7 the auction that haven't been reimbursed under the cash

8 collateral order.  They can either be collected or credit bid

9 as expense reimbursement at the auction, but there's no

10 duplication between them.  The underlying source from which

11 the fund, the expenses were generated would be the same.

12          THE COURT:  So why is it being approved as an

13 expense reimbursement if they're entitled to it under their

14 prepetition credit documents?

15          MR. DRESSEL:  I think they want it to be clear

16 that if there are amounts outstanding, as of the auction,

17 that haven't already been -- even though they're entitled to

18 reimbursement under the cash collateral order, there's

19 necessarily kind of a delay in a process associated with

20 them. So, at any given point on the auction date, there may

21 be remaining expenses outstanding.

22          And they want to be clear that on the auction

23 date, which is obviously a pivotal event in the Chapter 11

24 cases that they are able to collect that amount and/or credit

25 bid if they so choose.

1          THE COURT:  Okay.  But isn't that, again, the cart

2    before the horse?  We don't know what the amount of the

3    secured claim is going to be.  This one actually refused

4    confused me and I think it's tied into what the amount of the

5    secured claim is and what they can bid.

6          Are they both bidding as their secured claim,

7    subject to challenge and something we have to worry about

8    what happens if there's a successful challenge or is it an

9    expense reimbursement?

10          Can it be both, can it be the same, both at the

11   same time?  How does that work?

12          MR. DRESSEL:  I think it can be both at the same

13   time, right.  The right to payment of fees and expenses

14   arises from their status as a secured lender entitled to

15   adequate protection.  And what we see in the bidding

16   procedures is that that expense reimbursement amount is,

17   therefore, a secured claim and, therefore, something that

18   Deerfield can credit bid at auction, up to the actual amount

19   outstanding.  It may be less than two million and it must be,

20   you know, reasonable and documented.

21          But whatever amount is out standing is the secured

22   claim under both the prepetition credit agreement, as well as

23   the adequate protection obligations in the cash collateral

24   order.

25          THE COURT:  Assuming no successful challenge?

1        MR. DRESSEL:  Assuming no successful challenge.

2        THE COURT:  And an over-secured position?

3        MR. DRESSEL:  Well I'm not sure I agree with that

4  because it's -- we believe that the payment of expenses is

5  part of adequate protection, so it doesn't --

6        THE COURT:  Yeah, but you only get adequate

7  protection if there's a diminution in value, right?  And so,

8  it's all sort of bound in.  You don't get adequate protection

9  on top of your obligation.  You get it to ensure your

10  obligation doesn't -- isn't diminution.

11        MR. DRESSEL:  Yeah under the cash collateral order

12  they're entitled to payment and fees and expenses as adequate

13  protection for diminution and the value of their collateral.

14        THE COURT:  Right.  Right.  And I haven't yet ever

15  had a fight to determine if, in fact, what that value and

16  whether you -- how you apply your adequate protection

17  payments to your obligation if, you know is there diminution,

18  is there not diminution, et cetera.

19        MR. DRESSEL:  I --

20        THE COURT:  But I guess I'm still not clear

21  exactly how that works.  And, again, I think we have to

22  consider what happens in the event of a successful challenge

23  since the debtor here is bringing this timetable which we can

24  also talk about before the challenge period expires.

25        MR. DRESSEL:  Yeah, I think -- again, I think our

1  position remains that a challenge can be dealt with if and

2  when it is brought.  I don't think that's an unprecedented

3  result --

4            THE COURT:  You're hearing me, right?

5            MR. DRESSEL:  I am hearing you, Your Honor.

6       (Laughter)

7            THE COURT:  Okay.  I just want to make sure

8  because I'm getting the same answer.

9            Okay.  What else do you want to address?

10            MR. DRESSEL:  I'd like to reserve time to respond,

11  but that would conclude my initial presentation.

12            THE COURT:  Okay.  Thank you.

13            Mr. Bromley, do you want to add anything in

14  support?

15            MR. BROMLEY:  I'd like to clarify a few things,

16  Your Honor.

17            THE COURT:  Please.

18            MR. BROMLEY:  First of all -- and then I'll have

19  some remarks, but I think it's important that some

20  misapprehensions be addressed.

21            Let me first talk about the cure schedules and the

22  contract lists because the fact is, Your Honor, we do not,

23  Deerfield, does not have a list of the contracts and does not

24  have a list of the cure schedule.  We don't have cure

25  amounts.  We don't have the contracts.

1        That is not the impression that was given by any

2   of the comments that were made, but we don't have them yet.

3   And as we've been sitting here in court, we've been informed

4   by our colleagues, back in the office that, in part, it's

5   being held up by the debtors because they want to release it

6   all at the same time.

7        But this is not so that everyone can have access

8   to it, but we do not have a list of contracts.  We don't have

9   all that information.

10       THE COURT:  Why isn't that problem?

11       MR. BROMLEY:  Well all I'm saying is the

12   impression that's being given is that we've had it for

13   months.  We don't.

14       THE COURT:  Okay. Fair enough.  And I'm not sure I

15   have that impression but, nonetheless, why isn't that a

16   problem that you don't have them?

17       MR. BROMLEY:  Well because we're being told that

18   it will be delivered imminently.  But let me -- I just want

19   to clarify that and then I'll get to a couple of the other

20   points, right.

21       On the expense reimbursement, Your Honor, this is

22   -- part of this is the confusion is that what we were trying

23   to do is to clarify both for other bidders it the process and

24   for the court what's going on.  And, clearly, we have failed

25   miserably for which I apologize for our involvement in that.

1  But we have a right under our contracts to charge the debtor

2  for legal and other advisory expenses that are incurred in

3  connection with everything that's going on here.

4          When we were negotiating the cash collateral order

5  with the debtors, there was a concern raised about providing

6  the bidders with accurate information.  And the idea that

7  under the cash collateral order that we are entitled to

8  adequate protection, to the extent there's diminution in

9  value, and that it is standard for cash collateral orders and

10  DIP orders to take into account the fees and expenses of the

11  lender or the provider of the cash collateral.

12          What we are trying to do is to make it clear, to

13  the bidders and to the court, again having failed to do so,

14  that we are not double-counting, that we're not looking for a

15  coverage under the cash collateral order for an expense

16  reimbursement and, at the same time, looking for an expense

17  reimbursement that we're entitled to under our documents.

18          We are trying to make it clear; we get one or the

19  other, not both.  And for bidding purposes, we wanted to give

20  a signal to competing bidders what we thought that number

21  would be.  So when they were putting their bid together that

22  they would have an idea of what in addition to our loan

23  amount that's being bid would be necessary in order for them

24  to put in a competing bid, because it's not just what we're

25  putting in.  It's what we're putting in plus whatever expense

1  reimbursement we're entitled to under our loan agreements

2  that increases the size of our loan document or our loan

3  balance.

4         THE COURT:  So, it's not a cap?  It's not an

5  expense reimbursement like a cap like we would normally see

6  in a bid procedure.  This is an estimate of what you think

7  your fees will be under your documents?

8         MR. BROMLEY:  Right.  So that we can give notice,

9  in effect, to the bidders, and we will let them know. We will

10 let the debtors know where we are and the bidders will,

11 therefore, know.  But to give, you know, as a warning this is

12 out there, right.  So that's what we were trying to do.

13 Obviously, we didn't do it well, but I'm trying to explain

14 it.

15        THE COURT:  I got it.

16        MR. BROMLEY:  Okay.  So with those two points of

17 attempted clarification, Your Honor, what I'd like to do is

18 to talk about why the bidding procedures have been

19 established the way that they are from Deerfield's position,

20 right, and, of course, reserving any rights to respond to any

21 of the comments that the committee, Mr. Galardi, or the U.S.

22 trustee may have.

23        We are, you know it's one of these situations

24 where we aren't here because two years ago Deerfield made a

25 decision that it wanted to buy Melinta out of bankruptcy,

1  right. Two years ago when the money was lent, it was also

2  lent in connection with a substantial equity investment with

3  the idea that Melinta would be a ranging successful and that

4  the upside potential for Deerfield, which is a financial

5  investor, not a strategic investor, is that it would make a

6  market recovery on its debt and a homerun on its equity.

7  That's the investment thesis that Deerfield operated under

8  two years ago when it entered into its relationship with

9  Melinta.

10         We don't like the fact that we are here, right.

11 Deerfield is not happy that it has lost its equity

12 investment.  It's not happy that it has to be in a situation

13 where it's defending itself with respect to money that it has

14 lent.  It's not happy that it has to be in a situation where

15 it is the only potential buyer at the moment for this

16 business.  But the process that has led us to this point is

17 one that absolutely highlights the need for speed.

18         The impression is that we have endless time and

19 endless money in order to rescue Melinta and the simple fact

20 is that's not true.  Mr. Milligan testified very clearly that

21 this company, when taking into account the fees and expenses

22 of all of useless people in this room, except for Your Honor,

23 and --

24         THE COURT:  Good catch.

25         MR. BROMLEY:  And with respect to the fact that

1  the company is continuing to lose money on what its business

2  is which is selling drugs, the company is going to be near

3  out of cash, zero near out of cash by the end of the year.

4  And if things get worse, it's going to be worse much faster,

5  right.

6          So, there's a real sense of urgency.  When

7  Deerfield was sitting, talking with the debtors last weekend,

8  the creditors committee, one of the things that we were

9  focusing on was what can be done in order to stabilize this

10  business and how long does that stabilization need to take

11  place.

12          We're talking about a company of 150 or less

13  employees.  The sales force is critical. We spent an hour

14  earlier and it is so important that these people who are out

15  in the field are able to be confident that when they walk in

16  to meet their next client that they know that their car

17  expenses and their hotel and their airfare is being paid and

18  the commissions that they're earning are going to be paid, or

19  they're going to leave, right.

20          We deal with this all the time in Chapter 11

21  cases.  The best people leave first, right.  And the loyal

22  people leave second.  And then everybody else is screwed,

23  quite simply, right.  And we are trying our hardest to avoid

24  that.

25          We put on the table a whole company proposal, a

1  whole company proposal that needs to save this company

2  quickly.  We didn't pick the sales process dates out of thin

3  air.  We worked with the company very closely about when the

4  bid deadline would be appropriate and what time the auction

5  would be appropriate.

6          So and we've had conversations, some constructive,

7  some not so constructive with both Mr. Galardi and Mr. Martin

8  about whether or not there's a way to consensually move it.

9  Maybe there is, but where we are at the moment, Your Honor,

10  is a company in extremist.  And we want that -- and that

11  company is our collateral.

12          So, we have hope on this side of the courtroom and

13  we have already sunk commitment on our side.  We have a

14  secured facility, senior secured.  We have a subordination

15  arrangement with Mr. Galardi's clients.  We are worried that

16  our collateral is being destroyed every single day.  It's

17  being used to fund these cases and we have a real concern

18  about getting this process underway.

19          Now Mr. Dressel talked about the importance of

20  there being a plan, as opposed to a 363 sale that the fact

21  that we are providing for the payment of administrative

22  expenses, priority expenses.  It is easy to imagine this

23  company turns into a liquidation in the worst way and we

24  don't want that to happen because it's terrible for us.  And

25  that's why we've stood up and we want this to work.

1        But, on the other hand, it is also very difficult

2   for us to stand here painted as the villains, right, as if

3   we're stealing, you know, Lindberg's baby.  This isn't the

4   way it works.

5        We've lent this money; we have the right to be

6   repaid.  And when we're talking about the credit bid process,

7   and I do appreciate Your Honor's conundrum that you're

8   pronouncing to us.  The fact is the burden is not on us, it's

9   on them, right.

10       We have the documents.  We're ready to give them

11  to Mr. Martin.  We've sent them just this morning, a markup

12  of the protective order.  I have a zip file with everything

13  he needs ready to go, as soon as we get out of here.  And

14  that information is going to show a very standard market

15  arrangement.

16       And we were not on the board. We don't have any

17  insider status. We were an independent lender.  Deerfield

18  specializes in investment in the healthcare and pharma space,

19  so they are sophisticated people who invest in these things,

20  but we don't have any kind of overhang with respect to

21  Melinta.

22       We came into this as third-parties looking for an

23  equity return and a return on our debt.  So with all due

24  respect, Your Honor -- and we are representing two funds that

25  have substantial resources.  And to the extent that we need

1  to sit down and figure out what will give Your Honor, we will

2  be happy to do that.  And we'll, you know, do that with both

3  the debtors and the committee and Mr. Galardi.

4        But, you know, that's the way these things work.

5  And the fact is even if GSK was coming in and buying this,

6  they wouldn't buy it through GSK.  They'd set up GSK, you

7  know, special, you know, entity and you would need a

8  guarantee from the parent in order to make that company

9  financially viable in your eyes.

10       THE COURT:  Yes, you would.

11       MR. BROMLEY:  So, we're not blind to any of these

12  things.  We're ready to do it on a commercial basis.  But we

13  do believe, right, that when we're talking about this that we

14  shouldn't be walking into the room with the presumption that

15  we've done something wrong.  The only thing we did wrong is

16  invest money in a company that can't pay us back.

17       THE COURT:  I think that's a fair comment.  And I

18  don't hope my questions meant to suggest that Deerfield did

19  anything wrong.

20       My question is we're in, I think what anybody

21  would agree, is a compressed timeframe.  And I have

22  objections with respect to the compressed timeframe, plus

23  some procedural stuff which we'll get to.  But I'm actually

24  looking logistically too at what people are able to do in a

25  given timeframe.

1         And so, it does concern me when I hear that

2  bidders don't have everything one would expect to have,

3  although I have -- the testimony was there was -- you know,

4  there's a significant data room with information in it.  And

5  when I look at the timeline that's been suggested with

6  respect, not only to bids but, quite frankly, sale

7  objections, which just doesn't work; a sale objection next

8  Wednesday to people who don't know -- I haven't even approved

9  these procedures.  They don't know they have to object by

10 next Wednesday.

11        There's some logistical things that simply are

12 troubling to try to fit it all in in the timeframe that the

13 debtors have put in front of me.  So that's what I'm looking

14 at.  And part of it is just logistics and part of it is to

15 ensure that if there is another bidder that can come forward,

16 they have time to do it.

17        And then the other colloquy I had with Mr. Dressel

18 about are the procedures precluding the debtors from

19 considering bids that could be higher and better.   Those are

20 the two bid concerns I have and then I have some questions

21 about some of the procedures.  But those are the two big

22 questions that I'm grappling with.

23        MR. BROMLEY:  So, Your Honor, if I can take them

24 in order, from a logistical perspective, I total understand

25 where you're coming from.  And for that reason, we have been

1  in active conversations with an attempt to come to some sort

2  of agreement to push this out for a reasonable period of time

3  that can satisfy the two competing concerns which is that we

4  have a company that's potentially running away from us, and

5  we want to have the opportunity for competing bids to be out

6  there.

7        And those are competing concerns and they have to

8  be balanced.  So, from my perspective, I think if we had the

9  opportunity to sit in a room, we can try to get over that and

10  get to the conclusion.

11        This is not, I'm not standing here before you,

12  Your Honor, and saying unless that objection deadline stands

13  for Wednesday of next week, Deerfield is withdrawing its

14  proposal, right.  That's not what I'm saying.

15        On the second point -- so we're willing to have

16  that conversation. We truly are.

17        On the other point, Your Honor, about the idea of

18  whether or not there's a cram-up opportunity, right, there

19  are two issues that we're grappling with, right, and you will

20  be addressing the cash collateral order after this which is

21  we're funding this, right.

22        So, we don't have situations in DIP lender world

23  where DIP lenders say, you know what, here you go. Here's our

24  money.  Run the case and figure out how to pay us back,

25  right.  I mean what we have is the most draconian DIP orders

1  imaginable that everything has to be paid with fees x and

2  multipliers y, all in cash, all on the effective date or you

3  know it's all going down, right.

4        And we're balancing the fact that we are using our

5  cash when we consented to the issue, like we -- you know, Mr.

6  Dressel mentioned it, but it was very difficult to reach an

7  agreement with the debtors about how we were going to proceed

8  with a post-petition marketing period, right.

9        It would have been -- you know, we felt -- we were

10 not, you know, party to the bargaining period because once we

11 said we were willing to pay the stalking horse bidder, we

12 didn't hear anything about it, of course, about any potential

13 competing bids, but we negotiated about whether or not how

14 much time we'd be willing to give.

15       The company was going into default.  We had every

16 right to stand on our rights as a secured lender, fully

17 secured and say either foreclose immediately or do a plan

18 immediately.  And so, you know, this is one of those things

19 where I think, you know, we're not giving credit for the fact

20 that we agreed to take this and not say file immediately on

21 January 1 with a plan and a confirmation schedule, and fight

22 on exclusivity and make it all be done by the 28th.

23       We said, okay.  You want this sale process to go

24 forward.  We got to the point we're wiling to do it.  And

25 then we said, but we've got to have -- we got to be paid.  We

1   got to be paid in full.  And so, these are connected, right.

2   Our willingness to consent to the use of our cash collateral

3   is tied directly to the fact that the bidding procedures have

4   to say that we're going to get paid in full.

5          This isn't, you know, I actually think, you know

6   with all due respect to my colleagues and they're doing their

7   best to advocate for their positions, it's a folly to think

8   that we're going to be able to be crammed up.  We can't be

9   crammed up with equity.  There's no one out there who's shown

10  any interest in doing any of this.

11         And, you know, what we're being asked to do is

12  twofold: extend the timeframe where the company is at risk

13  and, therefore, our collateral is at risk and; we want you to

14  agree to be able to have a cram-up come at you.  And the fact

15  of the matter is, is you know auctions are organic exercises.

16  If anyone shows up at the auction and says, you know, here's

17  the best I have, I expect the people are going to come to

18  you, but I don't want to be in a situation where the people

19  have any impression other than what we are entitled to, which

20  is to be paid in cash.

21         You know, we're talking about an industry where

22  these are frontpage news items that this is an international

23  health crisis that antibiotic manufacturers cannot survive

24  because the economics have failed, right. We're dealing with

25  a coronavirus outbreak in Asia and potentially here soon.

1  And what we have is an uneconomic model for the manufacturer,

2  an invention of antibiotics.

3           And it's in that environment that we're going to

4  take, you know, a flier that these two guys want to take.  It

5  just doesn't make any sense, Your Honor.  We're the ones with

6  the risk.  And if this exercise goes on for too long and this

7  company fails, the issue is we're going to be facing a

8  substantial loss on our debt.

9           And what we've done is to try to be, you know try

10  to do the right things.  Let's put this company up for a sale

11  process.  Let's move it fast.  If it's going to work, it's

12  going to work quickly.  That's what Mr. Finger said.  That's

13  what Mr. Milligan said.  And then Mr. Finger said he was

14  hired in September or August.  Well Mr. Milligan said that

15  the company has effectively been on the market since 2018.

16           THE COURT:  I don't think there's any

17  misapprehension that Deerfield is not going to sit by while

18  it gets crammed up.  I don't think there's any concern with

19  respect to that. And I think it's fair that any bidder that's

20  coming in knows that.  They're in for a fight if, in fact,

21  they were to attempt to do that.

22           My question is should I enter an order that

23  prohibits, that prohibits that auction, however remote that

24  option might be.  That's the concern.  I'm making -- I have

25  no basis to have an opinion as to whether or not Deerfield

1  could be crammed up.  I have no basis to know that.

2          MR. BROMLEY:  Well, Your Honor, I mean I think

3  where we are is, you know, there's a fundamental piece of

4  consideration that we've put on the table, right, which is

5  playing itself out in front of Judge Sontchi right now in the

6  Borden case which is whether or not there's consensual cash

7  collateral.

8          That milk truck is in the ditch, right, and it

9  ain't coming out quick.  If we said, as a result of what's

10 going on here we are no longer going to consent to our use of

11 cash collateral and force us to give it to you, then this

12 case would be in the ditch behind them.

13         THE COURT:  It would turn into that, into

14 something people should consider, yeah.

15         UNIDENTIFIED SPEAKER:  I'll be heard on that

16 later, Your Honor.

17         THE COURT:  It's fair and I appreciate the balance

18 that you're making that the Deerfield is permitting use of

19 cash collateral.  Cash collateral is being used under the

20 budget.  I heard the testimony with respect to the negative

21 cash flows and the continued negative cash flows.  Obviously,

22 the professional fees in the case don't help in that

23 perspective.

24         So, I think its fair point that you're making.

25 It's not lost on me.

1          MR. BROMLEY:  So, Your Honor, look, I have, you

2    know, I'm sure I'm anticipating that there will not be

3    agreement with my comments from my colleagues on the right --

4    on my left, you're right.  So, I'll sit down and reserve my

5    rights.  But, you know, we obviously are concerned about the

6    company and we think rightly so.  Thank you.

7          THE COURT:  Thank you.

8          MR. MARTIN:  Thank you, Your Honor.

9          THE COURT:  Mr. Martin.

10         MR. MARTIN:  Warren Martin on behalf of the

11   committee.  Let me start with challenge period.

12         And, by the way, it is a pleasure to deal with Mr.

13   Bromley and we've had great conversations and we have worked

14   toward resolution of issues, and the same goes for the folks

15   at Skadden.

16         However, logistics, just to lay out exactly where

17   we are today, two weeks ago, right about now, right about

18   five o'clock, the committee was formed, and it retained

19   Porzio; it retained Morris James the following day, so

20   thirteen days ago, and it retained its financial advisors on

21   Thursday, so twelve days ago.

22         On Friday, which was the 17th, so eleven days ago

23   now, I delivered a document demand to Mr. Bromley.  There was

24   a request that we sign a protective order.  The debtors sent

25   us one.  We signed it that night.  I'm now eleven days later

1  and we're hearing today you will receive our package very

2  soon.

3          And I trust him and that's very nice but my

4  challenge period is sixty days from the formation of the

5  committee.  I've lost two weeks.  I've got forty-five days

6  left.

7          Logistics, time, process and money.  And I

8  understand just like Mr. Bromley understands those variables.

9  I understand those variables.

10          And for a while, I was stuck on that, and by the

11  way under the cash collateral budget it's about a million

12  dollars a week, 1056 precisely and Mr. Milligan testified to

13  that earlier today and it has changed to 1.3, what that was

14  based on.  But Mr. Milligan has told us that of that $1.1

15  it's $600,000 of professional fees and $500,000 of operating

16  losses.

17          Deerfield and the debtor, together, chose this

18  forum.  The vast majority, if you use the $1.3 million dollar

19  number well then you have -- let me do the math -- what did I

20  say six hundred and five hundred, right.  Then you have $800

21  in professional fees per week and five hundred.

22          Prior to the petition date, I don't know what Mr.

23  Bromley's fees were, but I do know what the debtors are

24  because it's part of the disclosure.  And Skadden's fees, at

25  least, were $6 million in the year prior to the bankruptcy.

1  Restructuring costs for the first thirteen weeks are listed

2  at $8 million, that's a total of fourteen right there of the

3  twenty-five that Mr. Milligan testified to was the cost of

4  this undertaking.  And all of us of little value except for

5  you, Your Honor, like Mr. Bromley said.

6          By the way of that eight million budgeted for

7  professional fees in the first thirteen weeks, the committee

8  professionals get a whopping $272,000 dollars and that, you

9  know, with all the effort, with all the time that's been put

10  in to put together this process and set it to music and

11  recognizing what it would cost.  The committee gets $272,000

12  over that period to look into this, fight for our rights, and

13  do the things that we need to do.

14          I think it's important to ask the question who is

15  Deerfield and who are they not.  Deerfield is not a DIP

16  lender.  There is no new money here.  There is cash on hand

17  that the debtor is using.  Deerfield is a prepetition lender,

18  as best we can tell when we go through their documents, a

19  secured party.

20          Deerfield is also a bidder that with a lot of

21  information I'm sure going right back to that $160 million

22  dollar loan on January 5th, 2018, a lot of information and a

23  lot of due diligence.  Mr. Bromley made it very clear,

24  though, in his discussion with Your Honor that this was not a

25  loan to own.  Deerfield is a lender that wants to get paid.

1    One of our biggest fears is not that we don't get

2  another bidder, but that we don't get two other bidders

3  because a concern, as Your Honor might imagine, bidders don't

4  want to pay a dollar more than they have.  We think there

5  could be very substantial value here, and I'll talk about

6  that a little bit more based on Mr. Milligan's testimony.

7    But the concern is one other bidder shows up and

8  says $141 million and Deerfield says thank you very much.

9  And so, there is no value for unsecureds under that scenario

10  and there is no value for unsecureds whatsoever.  It's a

11  cram-down plan, absolute priority rule, two classes.  If

12  there is no other bidder, Deerfield takes all; unsecured

13  creditors get zero.  That's the plan that they filed.

14    I have one mission, one mission alone is to

15  extract value for unsecured creditors who, by the way, total

16  $188 million dollars -- $33 million of trade, $75 million of

17  Vatera, and somewhere around $80 million of the medicine's

18  company, and some of that is contested.  Not to mention a

19  make-whole premium that Deerfield has not agreed to waive of

20  --

21    THE COURT:  Why should they?

22    MR. MARTIN:  Okay.  That's fine.  Of thirty

23  million --

24    THE COURT:  It's their claim.

25    MR. MARTIN:  Well maybe it's for another day --

1         THE COURT:  Yeah --

2         MR. MARTIN:  -- and I hope that's a discussion.

3         THE COURT:  Yeah, that's for another day.

4         MR. MARTIN:  Yes.

5         THE COURT:  Why should they waive a claim they

6    have?

7         MR. MARTIN:  So, if I include that, we're at two

8    hundred and -- 218 million of unsecured debt that I stand

9    here for that has no value provided.

10        Let's talk about that cash loss, that million

11   dollars a week, most of which -- or million one -- most of

12   which goes to professional fees.  It ends, under this process

13   that's been teed up with either Deerfield being paid full in

14   cash or Deerfield getting the company; those are the two

15   possible solutions, based on this process, if it's not

16   adjusted.

17        Mr. Milligan testified and there was cross that

18   explored the nature of that inventory, but there's $80

19   million in book value inventory, 70 million of which, he

20   said, is salable for 10 years; primarily, active

21   pharmaceutical ingredients.  There's 52 million in cash.

22   There's intellectual property that we don't have a value for

23   and there's 350 million of net-operating losses.

24        There were, as Mr. Milligan testified, offers not

25   even a year ago for the same four products, same business of

1  between 240 and 300 million, if I'm adding the 90 million

2  cash on hand for this company.

3          THE COURT:  But we don't have that today.

4          MR. MARTIN:  We don't have that today, but we

5  think there's substantial value and we need time to explore.

6          Let's talk about the timeline *vis-a-vis*, our

7  challenge period.  So, our challenge period at 60 days would

8  expire on March 14th.  If the schedule were pushed out 30

9  days -- I know we said 45 days in our papers -- but if the

10  schedule were pushed out 30 days, the challenge period and

11  the bid deadline would be coterminous and that would be a

12  sensible solution.

13          One moment, Your Honor.

14      (Pause)

15          MR. MARTIN:  So, about the process and the timing.

16  We heard from Mr. Finger.  No customer names have been

17  provided.  It is interesting that Deerfield upset about that

18  and although I think them not being upset fits into what

19  Mr. Bromley posited to Your Honor, that they're a reluctant

20  owner; they didn't come here to own this, they came here as a

21  lender.  They wanted to make a lot of money on the equity,

22  but they're a reluctant owner.  So, they're going to buy

23  this.  They're going to be there.

24          No customer names.  No cure schedules.  Not even a

25  list of executory contracts have been provided to lenders.

1          Deerfield has had full access to management; other

2   bidders have not.  Mr. Finger was very clear that the only

3   discussions that happened were through him.

4          THE COURT:  But that doesn't suggest they didn't

5   have full access; that just suggested that he was in the

6   room.

7          MR. MARTIN:  Correct.

8          THE COURT:  He had to be in the room.  But there

9   was not testimony that I recall that a bidder asked for a

10  management meeting and didn't get it because Mr. Finger

11  couldn't be in the room.

12         MR. MARTIN:  I'm not suggesting that, Your Honor.

13         THE COURT:  Okay.

14         MR. MARTIN:  I'm just suggesting that the access

15  levels are different when you have a secured lender who is

16  the bidder.

17         THE COURT:  Well, that's always going to be the

18  case, isn't it?

19         MR. MARTIN:  Yes.

20         THE COURT:  Okay.

21         MR. MARTIN:  So, we've been troubled about one of

22  the same things that Your Honor expressed concern about.

23  This is a little bit weird.  We have an auction under this

24  procedure if we go forward with it, where one of the bids is

25  a plan, but it's a plan that isn't confirmed yet and, in

1  fact, who knows if it's confirmable, and we have the bidder

2  proposing that plan not agreeing to serve as the backup

3  bidder.  So, the timing is, I would suggest, in reverse.

4          How do the other bidders know that they're not

5  bidding against a phantom?  They're not a backup bidder and

6  the other bidders -- and none of us knows if that plan that

7  Deerfield is agreeing to take pursuant to, will be confirmed.

8  So, it creates a very strange process.

9          Mr. Dressel talked about exclusivity.  I don't

10  think it's an exclusivity issue because the debtor opened the

11  door.  The debtor created a process where a plan can be a

12  bid.  And if a plan can be a bid, why does it have to be a

13  very specific plan that does nothing other than pay

14  Deerfield, at a base level, 140 million?  Why can't it be 135

15  million and we're term out five or 120 and we'll term out 30?

16          There are many options if you comply with 1129 of

17  the Bankruptcy Code that Deerfield, potentially, could be

18  crammed up.  And, yes, I don't hesitate for a moment to

19  understand that this would be a difficult and uphill process,

20  but, again, the committee with our -- at least as of right

21  now -- with our $272,000, we have nothing for our

22  constituents.

23          THE COURT:  Well, I can solve the $272,000.

24          MR. MARTIN:  Thank you, Your Honor.

25          You're going to hear later about -- much later --

1  but you're going to hear later about the KEIP from my

2  colleague, Ms. Parisi, and we understand and respect the

3  needs and interests of employees, but one of the things that

4  you heard from Mr. Bromley, particularly in his cross-

5  examination of the witnesses, is that, Well, you know, under

6  my bid, I'm not a pharmaceutical company, so I need

7  everybody, and under some of these other bidders, they might

8  just take the products and leave everybody else behind.

9  That's a concern of ours, too, because we need to incent

10 everybody -- everybody, not to just look in Deerfield's

11 direction, but to look to the direction of maximizing value

12 and getting that bid price up.

13          Most bid procedures orders have flexibility in

14 them in terms of what is a qualified bid.  This one has no

15 flexibility.  The only flexibility in there is that if

16 there's four product lines and we have four bidders and they

17 total 139 million, that's not a qualified bid.  There's no

18 ability to make that a qualified bid.  The only ability

19 that's given to the investment banker is to call the people

20 and try to get them up to a qualified bid.

21          But there's no ability to say, You know what?  If

22 we've got four different people and four different product

23 lines and it totals 139, I bet if they're in the same room,

24 they're going to find a way to eclipse that 140.

25          THE COURT:  I think that's a fair comment.  It's

1  something I had a question about, which I would like to hear

2  a response to.

3        (Pause)

4        MR. MARTIN:  Apologies, Your Honor.  I'm just

5  looking over my notes.  I'm trying to be responsive.

6        Do the procedures limit the ability to get

7  competing bids? -- that was one of the questions that Your

8  Honor raised.

9        Our financial advisors think that they do.  Our

10  financial advisors --

11        THE COURT:  Why wasn't he on the stand?  I've got

12  evidence and it was the time to put somebody on the stand.

13  Why didn't I have somebody on the stand?

14        MR. MARTIN:  That's fine, Your Honor.  Strike

15  that.

16        I'm going to stop there.

17        THE COURT:  Okay.  Mr. Galardi?

18        MR. MARTIN:  Just so Mr. Bromley falls out of his

19  chair, we did work with him and he did a very good job of

20  working with us and, unfortunately, we couldn't get to a

21  deal.

22        So, now, I'm coming from the left side -- Your

23  Honor usually sees me from the right -- I will say this.

24        THE COURT:  Actually, I haven't seen you at all --

25        MR. GALARDI:  At all --

1           THE COURT:  -- from the bench.

2           MR. GALARDI:  -- and you know, when I said to you

3    that, I didn't realize it would be six months later and I'd

4    be here in front of you, right?

5           THE COURT:  Uh-huh.

6           MR. GALARDI:  Good to see you, again, Your Honor.

7           First, let's take some of the testimony, because I

8    do think it goes to why a plan alternative is actually a real

9    alternative and we may never have to get there.  The

10   testimony is there's no default under the Deerfield agreement

11   that gives you a reinstatement option.  Second is, 1129

12   allows you to give cash-deferred payments over time to a

13   secured creditor.

14          So, whether you get -- and, again, it's just a

15   matter of what the fight could be -- but if -- look, if

16   you've got $130 million and you're going to term out $10

17   million over a certain period of time and my clients, his

18   clients, other clients get equity, I don't know how the

19   debtor can say in their fiduciary duty, that should be

20   foreclosed today.  And that's what the debtors have done.

21   That should be an option.

22          And Your Honor doesn't have to decide that.  As

23   we've proposed, and what we think is very -- it's just don't

24   preclude that, because if you send the signal it's precluded,

25   you won't get that kind of bid -- why are we even doing that?

1           If you say you can have plans -- plans will be

2   considered -- everybody knows Mr. Bromley has every ability

3   to argue that that's not confirmable.  Mr. Bromley has --

4   and, again, we don't want a Borden milk truck in a ditch --

5   we don't want to have the cash collateral fight.

6           If we have to, we'll have it -- and maybe we have

7   to have it after today if he walks away -- but, again, Your

8   Honor goes back long enough with me to know the secured

9   bidder -- the secured creditor and the bidder or the

10  financier and the bidder has always been something that's

11  been in tension and we're in that tension here, and we're at

12  a bid to use the process -- and I know they don't want to do

13  UCC -- but to use the process, essentially, to get an order

14  to get NOLs that would not be available outside of

15  bankruptcy.

16          And so, if those are available to other bidders or

17  you can do a plan, then it is simply asking for a time to be

18  able to explore those, which, frankly, the debtor did not

19  explore.  No testimony today says that they actually explored

20  that.  All they've said is, Well, Vatera could have done

21  that, but they didn't say they went out and did it, and we

22  won't get to he said/she saids between lawyers, but we could.

23          So, I think the first issue you're asking is:  Why

24  do you foreclose that?

25          If that's the case, I think the debtors are in

1  breach of their fiduciary obligations, because they have to

2  consider higher and better as a fiduciary.  They have to

3  consider alternative plans.

4         Yes, they have exclusivity, and all they're really

5  doing is inviting a fight over -- and we had this

6  conversation with the committee -- we're going to terminate

7  exclusivity.  Why have that fight?  Why have those legal fees

8  right now?

9         Why not just let us be able to bring a bid, don't

10 foreclose it, and let people have a discussion.  We've all

11 been to auctions, just like we've all been to hearings when

12 we go in conference rooms.  Let's have a discussion about

13 whether or not we can get that bid.

14        Second point, I don't know if the bid today is now

15 142 or 140, but the fact of the matter is the explanation was

16 given over here that it was a reasonable break-up fee,

17 expense reimbursement.  Counsel gets up, the brief gets up --

18 well, it's all allowed under the credit agreement.

19        Well, let's believe it's all allowed under the

20 credit agreement.  Your Honor knows credit agreements as

21 well, if not better, than I do.  There's a reasonableness

22 factor in those whether they say pay all fees, and it all has

23 to be with respect to the protection of the collateral, and

24 it doesn't necessarily mean you get to buy your assets and

25 get paid under your credit agreement.  You get to protect

1  your collateral.

2         Now, if they want to argue I get to protect my

3  collateral with both, an adequate protection payment and I

4  get to protect my collateral by credit bidding and I get to

5  protect my collateral by a plan, I think there's an argument

6  that says they don't get all of those fees.  We don't need to

7  have that argument now, but I don't know what the secured bid

8  is.

9         Is it 140?  Is it 142?  Is it going to be after

10  the adequate protection fight, 143?  What's the number?

11         Why that's important to my client is, as

12  everybody's pointed out, we're subordinated, but once they're

13  paid in full, we're not, and so we'd like to know if we can

14  get that recovery.  I agree with Your Honor, they don't have

15  to -- they shouldn't give up a make-whole claim -- that'll be

16  a litigation -- now, nobody's asking, but they've already put

17  that at unsecured; that's not going to get credit bid.

18         But the rest of the claims, we just don't know and

19  I don't know how a bidder knows.  And now, it may not make a

20  difference of one or two or three million, but when we're

21  doing a plan, it's going to make a difference.  What is it

22  that we're going to have to get deferred cash payments over

23  time?

24         And I think they should say, this is it.  And I

25  don't think it's -- and let's say (indiscernible) to get it

1  as a secured claim, they've got to show the value of the

2  collateral is greater than the claim.

3            THE COURT:  Uh-huh.

4            MR. GALARDI:  What we've heard here is nobody

5  believes we're getting over that bid.  Nobody is going get a

6  cash bid.

7            So, frankly, they're not entitled under their

8  document under the Bankruptcy Code to expense reimbursement

9  as a 506 -- under 506.

10           THE COURT:  As a secured creditor.

11           MR. GALARDI:  As a secured creditor.

12           So, they have to go over to 503(b), but I don't

13 know if it's necessary to preserve their collateral because

14 we're giving them adequate protection.  You can't get it both

15 ways.

16           Next thing -- I understand that the

17 professionals -- and the last thing I want to do is throw

18 professionals under the bus -- but let's just take, what is

19 the meaning of a carve-out?  A    carve-out says that if at

20 the end of the day you don't get paid from somebody else's

21 assets, you surcharge their collateral.

22           THE COURT:  Uh-huh.

23           MR. GALARDI:  So, that's 600 a month that's being

24 deferred -- 600 a week -- sorry, I got corrected.

25           Their protection -- Skadden is very good at it,

1  used to do it all the time -- they've got a really good

2  carve-out; they're protected.  So, let's not feel bad for the

3  professionals -- they're getting paid.

4          So, we really only have the five-hundred-a-week

5  cash burn.  That's all that's really going out the door on a

6  loss, and, yes, I understand that's a burden on Deerfield,

7  that's a risk on Deerfield.  So, I'm sympathetic to them

8  saying, Let's not go 45 days, let's not go 60 days.  But if

9  the committee is willing to live with 30 and they get an

10 investigation period, we're certainly willing to live with

11 30, especially if we get the plan scenario in place.

12         What you've also heard -- and we've gotten the

13 threats -- but I guess the question is:  Do they really want

14 to have -- given their own view that the value of the assets

15 is probably not greater than their own collateral -- do they

16 really want to have a cash collateral fight?

17         It doesn't have to show an equity cushion.  I

18 don't know if there's an equity cushion.  The committee may

19 think that there is, but we do know that the process is the

20 process that's going to maximize the value and you can get

21 adequate protection by maximizing the value.

22         And what we've heard here today is one of two

23 things.  They are either going to foreclose on their assets

24 if nobody else comes in -- one of two things -- foreclose on

25 their assets; they will have gotten exactly what they

1  bargained for -- their assets.

2  Second, they'll get a (indiscernible) in the plan

3  and they're going to pick up assets.  We may have a dispute,

4  we may not get to it today.  At least the NOL created in 2019

5  at the end of the year is not their current property.  It may

6  be protection -- adequate protection, but they're picking up

7  assets that nobody can tell me is allocated a purchase price.

8  So, they've got adequate protection.  They've got

9  a deal and so --

10  THE COURT:  Under Swedeland -- I mean, we're not

11  at the DIP, but under Swedeland, they really have adequate

12  protection with a possibility of a use of an NOL if --

13  MR. GALARDI:  Okay.  If that's not, then why do

14  they have to give it up?  They are -- they're giving it up as

15  a general intangible.

16  Then don't give it up.  I'm happy for you not to

17  approve that --

18  THE COURT:  Don't give it up -- what do you mean?

19  MR. GALARDI:  As adequate protection.  Don't give

20  them an adequate protection in the NOLs.

21  I'm going to bet over on this side -- because we

22  looked at the issue -- general intangibles and after-acquired

23  property -- that's what an NOL is -- arguably, under 2008

24  they got it -- under 2018.  2019, generally, it doesn't come

25  into existence until the end of the year.

1        If they want to argue it's an after-acquired and

2   they get it under an adequate protection lien, that's fine.

3   If they want to say, No, that's not adequate protection, then

4   it's an unencumbered value that no unsecured creditor is

5   getting.

6        Now, I'm getting ahead for the NOL motion, but,

7   again, it's what's -- what are you giving them for adequate

8   protection here -- attorneys' fees?  So, we'll wait for cash

9   collateral.

10        On the bid procedures, so our two -- our real

11   objection was simply, one, give us a plan; two, the expense

12   reimbursement is not really a -- if it's a reimbursement,

13   they haven't satisfied 503(b) and if it's as they're now

14   saying, a secured claim, they haven't shown that the value of

15   the collateral exceeds the value of the debt and, therefore,

16   they're not entitled to it under the bankruptcy law.

17        Now, if they want to bid it, then they're now

18   saying, Well, now, the security value is one forty-two.

19   That's not what their bid is.

20        Those are my comments, Your Honor.  I don't know

21   if you have questions.

22        THE COURT:  Not on that, thank you.

23        Ms. Richenderfer?

24        MS. RICHENDERFER:  Thank you, Your Honor.

25        Good evening.

1           THE COURT:  Good evening.

2           MS. RICHENDERFER:  Linda Richenderfer from the

3   Office of the United States Trustee.

4           I just want to emphasize three points, because the

5   devil is in the details -- and this is what we went through

6   in the wage motion -- the devil is in the details:  What are

7   the numbers?  What are the caps?

8           Here, the devil is in the details.  I was

9   surprised to found out just now that two weeks after the

10  committees formed, they still don't have the documents they

11  need to start their due diligence for the challenge period --

12          THE COURT:  Uh-huh.

13          MS. RICHENDERFER:  -- and that they have agreed to

14  a protective order, and now we heard Mr. Bromley saying he's

15  going to send them an NDA to sign.

16          We all know under our Local Rules that you can

17  produce information and it's attorneys' eyes only for a

18  certain period of time.  You can't get your financial

19  advisors to sign on to whatever is necessary.  There are all

20  kinds of other orders that could be entered regarding the

21  ability of committee members to see the information if that's

22  part of the concern, but none of that has been going on.  I'm

23  just astonished to find out two weeks later, the committee

24  still has not had its requests met to start this process.

25          And I do apologize to Your Honor, I have -- I used

1  an incorrect date in my objection.  I used 75 days after

2  formation of committee.  I got the dates wrong.

3              THE COURT:  Okay.

4              MS. RICHENDERFER:  Sixty days, of course, after

5  formation of committee.

6              Data room -- we heard about how much information

7  is in there, how much information is in there.

8              In my prior life I did a lot of litigation and

9  that was the deal -- you just flooded the people with the

10  information.  You produce boxes and boxes and boxes and CDs

11  and DVDs and everything else of information.

12             I don't know how under this time frame, a bidder

13  can come in and figure out who are the customers, what are

14  the essential executory contracts, what's the cure amounts,

15  if they have to go wading through this wealth of information

16  to figure it out.  Again, under their own proposal, the

17  listing of the assumed contracts should have gone out by now.

18             THE COURT:  Uh-huh.

19             MS. RICHENDERFER:  Because one thing we haven't

20  discussed yet is the rights of the counterparties to those

21  contracts to speak up and to object to the cure amounts and

22  to raise issues regarding whether, you know, the adequate

23  protection or -- we haven't even discussed that -- and we're

24  totaling condensing the time period on that.  They don't have

25  the notice.  Bidders coming in don't know where to start.

1          And the last point that I don't think really has

2  been discussed yet is that -- and, again, I've only been

3  doing this for two years in the U.S. Trustee's Office -- but

4  I've yet to see a situation where a lender becomes a credit

5  bidder and they remain part of the consulting party group,

6  and I don't see how that can work in this situation.

7          THE COURT:  I'd also like a response to that.

8          MS. RICHENDERFER:  To me, that just jumped off the

9  page and I don't understand under what circumstances that

10 could possibly fly if we're going to have a clear, complete,

11 transparent process for this, and that was a detail that was

12 very important to me.

13         THE COURT:  Yes, thank you.

14         Mr. Dressel?

15         MR. DRESSEL:  Thank you, Your Honor.

16         Again, Christopher Dressel, on behalf of the

17 debtors.  I'll try to be, you know, brief.

18         Your Honor, the debtors insisted on a post-

19 petition marketing process because we did not feel that the

20 well had run dry on potential -- not because we felt the

21 Deerfield bid was bad -- but because we felt there were

22 potential opportunities to do better than the Deerfield bid.

23         But we want to do that in a responsible way and I

24 think that means two things.  One, we had a choice to make.

25 We could pursue a post-petition marketing process on a

1  consensual basis with Deerfield with consensual use of cash

2  collateral or we could go hostile to Deerfield.  We could

3  look for, you know, shoot-for-the-moon approaches to try to

4  cram-down Deerfield or other hostile plans that Deerfield

5  wouldn't approve of and, therefore, wouldn't permit their use

6  of cash collateral to pursue.

7         Based on what we had seen in the prepetition

8  marketing process, we've seen interest from bidders, you

9  know, in the cash bid in a sale of the company and

10 potentially trying to get to levels that would equal or

11 exceed Deerfield.  We also went out to the market for

12 potential financing sources.  As Mr. Finger testified,

13 unfortunately, that turned out to be a dead end.  We didn't

14 have parties coming forward to say that they wanted to

15 sponsor a plan to cram-down Deerfield.

16        And so, when we looked at our alternatives, we

17 decided that the clear, value-maximizing path was to pursue a

18 robust, post-petition marketing process that was subject to

19 some guardrails that were negotiated with Deerfield, but

20 which had the accompanying benefit of allowing us to use

21 Deerfield's collateral during the case, which is diminishing,

22 due to cash burn and other factors, to pursue a higher and

23 better bid.

24        We think that is a clear win for the estate, is

25 clearly consistent with the debtors' fiduciary duty to

1 maximize value.  But even if you disagree, you know, Mr.

2 Galardi has his right to seek to terminate exclusivity if he

3 thinks there is a better plan out there that would cram up

4 Deerfield or whatever alternative he's envisioning; that's

5 his right, but that's not the debtors' perspective right now

6 and we want to pursue a plan that we think has the highest

7 likelihood of a successful outcome in this case and a lock-in

8 value for junior stakeholders and for the estate as a whole.

9              THE COURT:  But those aren't mutually exclusive.

10             I understand the use of -- the consensual use of

11 cash collateral and I certainly think that Deerfield is

12 entitled to be protected, adequately protected.  They are

13 entitled -- it's not my thought -- they are entitled to be

14 adequately protected for the diminution in the value of the

15 cash collateral that is used in the course of this bankruptcy

16 case and if the collateral, the non-cash collateral

17 diminishes in value, et cetera.

18             So, that places a pressure on a time frame -- I

19 understand that -- and we can talk about the time frame.  But

20 given the compressed time frame, it surprises me, for

21 example, that the committee doesn't have their documents yet

22 to a review.  It surprises me that I've got no list of cure

23 amounts, executory contracts, customers.

24             Given the compressed time frame, that stuff needed

25 to be available so parties would have it and this time frame

1  of the -- set forth in the order about deadlines, et cetera,

2  just not only crams up the Court, it crams up

3  counterparties -- I shouldn't use that word -- it

4  disadvantages others that aren't in this room to be able to

5  participate with respect to their contracts, with respect to

6  their rights because of this contracted time frame.  So, that

7  concerns me.

8        Even if you have a contracted time frame that's

9  mandated by a reasonable use of cash collateral and a

10  reasonable requests for adequate protection -- and some of

11  their requests, I think, are reasonable -- it's the

12  preclusion of the possibility of opportunities for someone

13  else to bid that would be higher or best on any basis.

14        I don't think I've ever approved bid procedures

15  that are this restrictive on what could be a qualified bid

16  and that concerns me.  Even in the context of this case, if

17  we try to limit it, it starts to chip away at the idea of

18  what is a possible bid.

19        In fact, one of the first contested -- major

20  contested hearings I had as a judge, someone came in and

21  said, Your bid protections didn't permit this type of bid.

22  That was exactly the fight I had.  We had a fight over what

23  the bid protections permitted.  So, that has been an issue

24  that I'm attuned to as a judge because it was an attempt to

25  preclude a higher bid.

1           And these are restrictive into the type of bid

2    someone can put, and I think that is divorced from the time

3    frame, understanding that if you need a time frame to do a

4    different type of bid, but I think that is somewhat divorced

5    from the time frame, is the type of bid.

6           MR. DRESSEL:  Yeah.  Understood, Your Honor.

7           Maybe -- so, two responses on the type of bid and

8    then I would like to address the time frame.  So, you know,

9    first of all, I actually don't think it's uncommon for bid

10   procedures to require that competing bidders match the

11   stalking horse bid in cash.

12          More fundamentally, though, Your Honor, I think

13   the important point is that the debtor didn't have sort of an

14   infinite variety of process alternatives it could choose

15   from.  We didn't have the opportunity to put in place any

16   permutation of process that we wanted.  Really, we had to

17   choose between three options, really: (A    ), we could have

18   just gone with the Deerfield bid because --

19          THE COURT:  You could have and then we have a

20   fight over it at confirmation time.

21          MR. DRESSEL:  That's one alternative, and we

22   didn't choose that because we didn't think it was value-

23   maximizing.  The second alternative was to run a post-

24   petition marketing process on terms that were highly

25   negotiated with Deerfield, but at the end of the day, were

1   acceptable to Deerfield and which Deerfield permitted the

2   debtors to follow and to use its cash collateral to pursue.

3   So, that's option two.  And the third option is that we could

4   have pursued a path that was hostile to Deerfield, that

5   sought to cram up Deerfield or impose some other treatment

6   that was unacceptable to Deerfield.

7        And those were the three discrete options that we

8   looked at.  When we reconsidered those options, I think it

9   was clear to us that certainly the third option was not a

10  value-maximizing alternative.

11       Again, if unsecured creditors really think that

12  that's the way to go in this case, they have the right to

13  seek to terminate exclusivity and pursue it, but we would

14  submit that that is not only not value-maximizing but is

15  actively value-destructive in this case.  It's likely to

16  highly destabilize the business and I don't think that it's

17  going to lead to the result that unsecured creditors want.

18       And that brings me -- I think that's a good segue

19  to my comments on the process time frame.  I think, first of

20  all, Your Honor, we have 45 days of post-petition marketing;

21  that's on top of three months of formal prepetition

22  marketing, which, in turn, was preceded by kind of a less-

23  formal period of time in which the company was on the market.

24       We reached out to 77 parties prepetition.  The

25  bidders that are active in the process to date are still in

1  the data room -- have been in the data room for a long time.

2  They've been doing their diligence.  They haven't just

3  started, you know in the process.  In some cases, as I think

4  Mr. Milligan testified in his declaration, we've had bidders

5  who have been active in the data room for something in the

6  order of nine months.  So, there's been an extensive

7  diligence effort.

8          I know the committee made a lot about two specific

9  items that remain outstanding -- the customer list, the

10  contract list.  On the contract tier schedule, we absolutely

11  get it; we know that's a priority and it's a priority for the

12  company to complete imminently.

13          On the customer list, that's one request from one

14  party.  It raises particular sensitivities from antitrust

15  perspective.  We're working through that issue as

16  expeditiously as we possibly can, but there's a lot of

17  thought that needs to go into how to respond to a request

18  like that in a manner that's not only expeditious, but --

19          THE COURT:  So, you need some time to be able to

20  respond to it?

21          MR. DRESSEL:  We're actually very close to

22  responding to it, Your Honor.

23          But the point is, I think, as Mr. Milligan said,

24  we've had something like 900 data requests.  We've responded

25  to the vast majority of them in a prompt manner.

1           THE COURT:  Uh-huh.

2           MR. DRESSEL:  It's not, you know, civil litigation

3  discovery where we just do a data dump; these are thoughtful

4  responses to specific questions that the management team

5  devotes extraordinary resources to tackling.  So, we think,

6  you know, in terms of the length of the process prior to

7  today, it's been extensive and it's been long.

8           I understand that there's some particular concerns

9  about the dates and I think -- and I'm not saying that we

10  have no flexibility to discuss how we can logistically deal

11  with some of the procedural dates that may not work in --

12  from your perspective -- in the revised order that we

13  prepared and submitted a redline on.  We made an effort to

14  try to address some of the dates that don't quite work.

15           THE COURT:  Uh-huh.

16           MR. DRESSEL:  What I would say, though, Your

17  Honor, is that really what you're talking about in that

18  regard is something that's more in the matter of days and

19  certainly isn't in the 30-day time frame that the

20  committee --

21           THE COURT:  It may not be.

22           MR. DRESSEL:  -- is requesting.

23           From our perspective -- and I think the testimony

24  of Mr. Milligan -- is that an extension of this process in

25  the -- of the magnitude of 30 days would be costly to the

1  business, potentially destabilizing.  As Mr. Finger said,

2  it's not likely to result in higher and better bids; if

3  anything, it's likely to suppress bidding further because

4  bidders will look at the climb in cash balances and other

5  circumstances relating to the business.  And from that

6  perspective, Your Honor, we would submit that a timeline, as

7  roughly in the order of that proposed, is the value-

8  maximizing alternative here.

9          I think there were two specific points that Your

10  Honor wanted a response on.  One is how we're dealing with

11  combined bids.

12          THE COURT:  Uh-huh.

13          MR. DRESSEL:  On that, again, Your Honor, the

14  bidding procedures -- although they've been characterized as

15  being extremely rigid -- they actually give the debtor

16  flexibility to consider alternative bids.  But just as a

17  solitary bid for the whole company would be required to

18  overbid the amount of the stalking horse bid, so, too, we've

19  said that any combination of bids taken together must yield

20  cash consideration sufficient to overbid the amount of the

21  stalking horse bid.

22          We think that is very reasonable; in fact, we

23  think if we gave the other message to bidders, that would

24  actually be likely to induce them to bid at a lower amount

25  because they might perceive that they could get into the

1  auction without necessarily putting their best foot forward.

2  So, our perspective is that the way we guide bidders is just

3  to tell them to put their best foot forward, ascribe the most

4  value that they can internally justify for the asset that

5  they're bidding on and then we will do our best at auction to

6  pair up complimentary bids in order to create a sort of

7  combined bid that qualifies for the auction and exceeds the

8  value of the stalking horse bid.

9          THE COURT:  Is that -- okay, so, is that your

10  procedure?  Is that people come in with whatever bid, they're

11  allowed to come to the auction, and either you or they,

12  perhaps, can talk to each other and come up with a bigger

13  bid?

14          MR. DRESSEL:  I don't think it necessarily

15  requires active coordination among the bidders.  I think to

16  put in more concrete terms, this company has four

17  pharmaceutical, you know, products.  For one of the products

18  we've seen some standalone interest.  We've also seen

19  interest in the other three products taken collectively.

20          And so, if on a bid deadline we see one party

21  bidding for the three products -- which we call the

22  "hospital-only products" -- we see another party bidding for

23  the remaining drug -- which we refer to as "Baxdela" -- we

24  would look at the value ascribed by the respective bidders to

25  the assets that they're bidding for, we'd sum those totals

1  together, and we'd see whether the combined total of those

2  bids equals or surpasses the value of the stalking horse.

3         If that's the case, then we would admit both of

4  those bidders into the auction and they'd have an opportunity

5  to continue bidding on the respective asset for which they

6  had, you know, placed a bid.  But it would not require -- it

7  would not impose on those bidders the additional burden of

8  coordinating with one another.

9         THE COURT:  Okay.  So, what if they're

10 collectively $3 million below?  What if they're collectively

11 one thirty-seven, you won't let them in the door?

12        MR. DRESSEL:  I think at some point you have to

13 draw a line.  It would be the same thing with a single bidder

14 that came up just shy of the --

15        THE COURT:  I've never seen an auction that way.

16 I've seen auctions where people just come in with whatever

17 and then you auction it off in lots and you do all that first

18 and then you auction the company as a whole and then you take

19 a look and see what you've got.  And sometimes the debtor

20 coordinates and picks and sometimes the people in the room --

21 the debtors says, Sure, go talk -- and the people in the room

22 come up with a better bid.

23        MR. DRESSEL:  We're trying to allow bids for less

24 than all the assets to compete against the bid for the whole

25 company, but we have to do it in an orderly way.  If we let

1  people bid --

2            THE COURT:  Whatever they want.

3            That's -- I've got a lot of professionals in this

4  room whose job it will be at the auction to figure out apples

5  and oranges and decide.

6            Why are we pre-deciding the issue?  You can't

7  decide that if they're $3 million less, they're 10 million --

8  what if somebody comes in at 50 million?

9            I don't know -- maybe that wouldn't be -- but

10 we're drawing arbitrary lines on what the debtor says is an

11 open process, except it's not in a lot of different

12 circumstances.

13           MR. DRESSEL:  I don't think the line drawn by the

14 stalking horse bid value was an arbitrary line.  I think to

15 have a competitive auction, we have to know that the bidders

16 are willing to bid at a level above the stalking horse;

17 otherwise, there's really no value to the auction because the

18 stalking horse -- we'd open the auction and declare the

19 stalking horse the winner.

20           THE COURT:  There you go.  So, open the auction --

21 and you have everyone else's bids and nobody increases their

22 bids -- and you close the auction.

23           What am I missing?

24           MR. DRESSEL:  That process is preordained if the

25 bidder hasn't bid at a level equal to the stalking horse.

1          THE COURT:  Where you have multiple bidders, it's

2  different.  Where you have multiple bidders, there could be

3  combinations, you could put them together, you can -- I guess

4  I'm missing it, especially since you're telling me you have

5  interests in one asset or one of the debtors' drug lines and

6  then you have interest in the other three.  So, that even

7  tells me that you -- that there may be some combination that

8  could happen here.

9          MR. DRESSEL:  Right now, we don't know the level

10 of that interest --

11         THE COURT:  That's correct.

12         MR. DRESSEL:  -- and there's a critical question.

13 If the level of the interest comes in on an aggregate basis

14 and it exceeds the value of the stalking horse bid, then,

15 absolutely, we want to facilitate those bidders'

16 participation at the auction.

17         If the aggregate level of those bids is less than

18 the value of the stalking horse, then at that point, by

19 definition, the stalking horse is the highest-and-best bid

20 for the company's assets --

21         THE COURT:  By the debtors' definition -- by the

22 debtors' definition, but you haven't explored whether you

23 could create synergies among the companies where that would

24 work.

25         I'm not seeing a downside, quite frankly, to the

1  debtor or to Deerfield -- maybe I'm wrong -- I'm not seeing

2  the downside to permitting legitimate people, legitimate

3  bidders who show their financials, that they can perform on

4  whatever bid their making -- legitimate people in the room,

5  not people who you look at and say, Well, yeah, they're, you

6  know, they're pie-in-the-sky -- legitimate people in the

7  room.

8          MR. DRESSEL:  Your Honor, we hear the point.  I

9  think it might make sense for us to consult briefly with the

10 secured lender on that.

11         THE COURT:  We'll have some time for that.

12         MR. DRESSEL:  I think the other point that Your

13 Honor specifically asked about was consultation parties.

14         THE COURT:  Yes.

15         MR. DRESSEL:  We have indicated that Deerfield is

16 a consultation party, subject to the significant *proviso* that

17 the debtor, in its discretion, may choose not to consult with

18 Deerfield on any issue in which it determines that it would

19 chill bidding.

20         I think as a practical --

21         THE COURT:  How does that not chill bidding right

22 off the bat --

23         MR. DRESSEL:  I think that --

24         THE COURT:  -- if I'm coming in as a third party

25 and I know that unless the debtor decides, in whatever

1  discretion it has, that another bidder gets to decide and

2  make decisions along the way, how is that not chilling?  Why

3  would I even come into that bid auction?

4          MR. DRESSEL:  Your Honor, I think -- again, I

5  think it's another point that we should visit with the

6  secured lenders and I think as a practical matter, given the

7  *proviso* we have, really, the only points on which we would

8  want to consult with Deerfield, given their status as a

9  bidder, would be things like scheduling and, you know, if the

10 date of the auction had to be pushed by a day or logistical

11 matters like that.  So, I think on that one we would like to

12 consult, as well.

13         THE COURT:  I will tell you I have never -- and I

14 have never approved a credit bidder being a consultation

15 party once they have made their bid.

16         MR. DRESSEL:  Understood.

17         THE COURT:  Okay.

18         MR. DRESSEL:  So, those are my remarks, unless

19 Your Honor has any questions.

20         THE COURT:  Let me ask another question -- and

21 that's the backup bid question -- so, Deerfield doesn't want

22 to be a backup bidder, somebody else comes along, everybody

23 else -- every other bidder has to be a backup bidder and

24 everybody else has to leave their bid open for a period of

25 time.

1          So, explain to me two things:  why Deerfield

2    shouldn't have to, other than, this is what we negotiated

3    and, two, what that means with respect to the floor.

4          MR. DRESSEL:  So, Your Honor, again, this was --

5    it was a negotiated point.  I think when we look at what is

6    market for this situation, I think the stalking horse

7    bidder -- particularly a credit bidder -- you know, typically

8    insists on not serving as a backup; I think that provision

9    frequently prevails in this district, as well as in others.

10         And so, when we looked at points where we felt

11   that we could profitably negotiate with Deerfield, we thought

12   this was a kind of market, middle-of-the-road ask from

13   Deerfield's, you know, perspective.  I don't -- I think the

14   issue of -- How does that affect the floor? -- I think those

15   are unrelated.

16         We're looking at the bid as it exists today.  They

17   are subject to a definitive, binding restructuring support

18   agreement with the debtor, and so we -- whether or not

19   they're serving as a backup, I don't think, affects the floor

20   value of their bid.

21         THE COURT:  Okay.  The bid procedures at several

22   places reference the restructuring support agreement and they

23   say, "Except as otherwise provided in the restructuring

24   support agreement."

25         I'd like to know what's in the restructuring

1  support agreement that differs from what's in the bid

2  procedures.

3          MR. DRESSEL:  May I ask if Your Honor is looking

4  at a particular place?

5          THE COURT:  Well, I know I see it in -- on Page 17

6  at romanette (ix), but that's not the only place.

7          MR. DRESSEL:  I actually don't see that particular

8  one, Your Honor, but just to take an example that jumps off

9  the page at me, in the reservation of rights, for example, we

10  say:

11          Except as otherwise provided in the restructuring

12  support agreement, these bidding procedures or the bidding

13  procedures order, we have -- we reserve various rights to,

14  you know, perhaps modify or ameliorate the provisions of the

15  bidding procedures.

16          And to go back, for example, to the backup bidder,

17  the provision in the RSA provides they're not required to be

18  a backup bidder, and so we couldn't modify terms like that.

19  So, I think that would be one example.

20          And I think it goes to the overarching point that

21  this is a process that they're agreeing to facilitate,

22  they're agreeing to be subject to overbids, and so in

23  exchange for that, the guardrails for the process are

24  consistent with those that we negotiated with them and,

25  again, negotiated intensely with them to get the best deal

1  possible we could.

2              THE COURT:  Okay.  I don't have any more

3  questions.

4              MR. DRESSEL:  Thank you, Your Honor.

5              THE COURT:  Mr. Bromley?

6              MR. BROMLEY:  Your Honor, if I may address several

7  of the comments, I think Mr. Dressel was glancing in my

8  direction at several points, and so let me try to clarify a

9  few things.

10             As to the consultation party point, we had tried

11 to convey the message before Mr. Dressel got up, that that

12 was fine, that we would be removed, but the message hadn't

13 gotten fully delivered.

14             THE COURT:  Okay.

15             MR. BROMLEY:  Message now delivered, okay.

16             THE COURT:  Thank you.

17             MR. BROMLEY:  With respect to this construct of

18 considering group bids, right, I actually think that what

19 we've got here, Your Honor, is already a set of statements

20 that make it clear the debtor has -- particularly now that

21 we've clarified that we are not one of the consultation

22 parties for purposes of examining any of these bids --

23 adequate leeway to deal with this, right.

24             So, Section 4, Sub A     --

25             THE COURT:  Uh-huh.

1          MR. BROMLEY:  -- right, what we have is an express

2   statement that says partial bids, right.  It says that the

3   combined transaction exceeds the value of the supporting

4   lender transaction and why either such partial bids either

5   close simultaneously or -- and gives guidance, right, with

6   respect to the reasonable considerations that should be taken

7   into account when considering partial bids, right.

8          If you then look at what is in Paragraph IX, it's

9   the last page -- the last full page of text, the reservation

10  of rights -- it says very clearly that the debtors reserve

11  the right as they may reasonably determine to be in the best

12  interests of their estates in the exercise of their fiduciary

13  duties to: (A   ) determine which bidders are qualified

14  bidders; which bids are qualified bids; determine which

15  qualified bid is the highest or otherwise best -- it goes on

16  for, you know, (A    ) through (G).

17         There are lots of rights that the debtors

18  specifically negotiated with us to be contained within this

19  Paragraph 9, right.  If Your Honor's question is limited to

20  the point of whether or not the combined bids at the moment

21  of the qualification of the qualified bid, right, all those

22  combined bids together --

23         THE COURT:  Uh-huh.

24         MR. BROMLEY:  -- constitute a qualified bid is

25  somehow prohibited by the exact language of 4(a), I think

1   that there's certainly leeway to talk about the timing of the

2   determination of the qualified bid between the submission of

3   the bids and the opening of the auction.

4            Because what we're talking about, Your Honor, is a

5   passage of time -- maybe we build in another day, in which

6   case the debtors have the right with their consultation

7   parties to sit down and determine whether or not exactly what

8   Your Honor has posited is something that's possible.  I think

9   we're talking about a wordsmithing exercise.  The whole idea

10  behind permitting partial bids is, as Your Honor said, to

11  allow them to be cobbled together to make the individual

12  determination -- the individual bids greater than --

13  together, greater than they are individually.

14           That being said, there are competing issues and

15  those competing issues are that prior to the bid-submission

16  deadline, you don't want to chill bidding by going out and

17  saying, Hey, Tom, do you want to hook up with Mary, in terms

18  of putting a bid in, because they both might be willing to

19  put in separate bids that are higher, right?

20           THE COURT:  Agreed.

21           MR. BROMLEY:  So, that's what bidding procedures

22  are generally trying to balance.  I think the issue is

23  building in some cushion between the submission -- the bid

24  deadline and the determination of when the qualified bid is

25  made because we shouldn't be having a useless exercise with

1 respect to an auction, but all of the things that Your Honor

2 is concerned about happening can certainly happen between the

3 time the bids are submitted and between the time -- at that

4 time, and the time in which the debtors and their, you know,

5 consultation parties determine whether or not there's a

6 qualified bid.

7 　　　　　When you look at Paragraph IX, you know, we

8 have -- it's not a full fiduciary out, right; there's certain

9 limitations.  And I think, actually, the opening *proviso* is

10 subsumed within the parentheticals, right, you know, the

11 parentheticals that say, Other than the supporting lenders,

12 you know, in (E), impose additional terms with respect to all

13 potential bidders, other than the supporting lenders; extend

14 the deadlines with the approval of the supporting lenders.

15 　　　　　That's -- those are the type -- those are the

16 things that are built into the RSA.  So, I think this is a

17 lawyer's belt-and-suspenders exercise in which, you know, the

18 existence of the belt obscures the fact that we have the

19 suspenders.  So, we could work on revising that language so

20 that exactly what's in the RSA is communicated clearly to the

21 potential bidders.

22 　　　　　Your Honor, with respect to the backup bidder, I

23 think this is, you know, really a red herring for the

24 following reason.  We are the senior secured lender.  We have

25 liens on all of the assets.  If everything falls apart, we

1  get it.

2          What we don't want to have happen is we've put

3  together a very specific plan-driven exercise and that plan-

4  driven exercise is tied very closely to making sure that the

5  company gets out on time and operates in an environment and

6  in a timeline that fits with all of the things that can be

7  delivered.  This isn't a 363 sale; this is a potentially,

8  substantially deteriorating business.

9          And what the debtors have negotiated is for a

10  period of up to 60 days after the auction is -- or after the

11  sale hearing where we are supporting the business with our

12  cash collateral that those bids -- one or multiple ones --

13  all fail and we could be facing a very substantially

14  different -- a substantially different world at the end of

15  that 60-day period where our plan doesn't work.  That we

16  wouldn't be able to satisfy conditions of feasibility.

17          We are in a situation, however, where we really

18  are the backup owner, because if all of it falls apart, as

19  the senior secured lender and the holder of liens and claims

20  and all the assets of the business, it will fall into our

21  pocket very unhappily in that circumstance.  I think that's

22  the reason, as Mr. Dressel said, that in virtually every -- I

23  don't know of any situation where a credit bid has been made

24  where the backup -- where the credit bidder is the backup

25  bidder because you are, effectively, the backup bidder;

1  you're the recipient of the assets in a worst-case scenario.

2          But we've specifically put together a clear plan

3  process that anticipates this business will be an operating

4  entity --

5          THE COURT:  I think that's a fair point.  I think

6  it's a fair point that it's being done through a plan and

7  that circumstance may change where administrative claims may

8  be greater than you anticipated and that --

9          MR. BROMLEY:  Or the --

10          THE COURT:  -- it's a different scenario.

11          MR. BROMLEY:  Or, you know, we could have a

12  strategic bidder come in and say, You know what?  I don't

13  need any of the --

14          THE COURT:  Yes.

15          MR. BROMLEY:  -- salespeople and then they walk

16  away in 35 or 45 days and we have no salespeople.

17          We can't be forced to close on those

18  circumstances.

19          THE COURT:  I think that's a fair point --

20  although, I do have a credit bidder on another case who's a

21  backup bidder -- but, yes, I think that's a fair point,

22  because this bid is through a plan.

23          MR. BROMLEY:  So, if Your Honor has any other

24  questions, I'm happy to try to address them, but those are my

25  attempt to try to clarify.

1          THE COURT:  Thank you.

2          MR. BROMLEY:  Thank you.

3          MR. MARTIN:  I just want to address that

4   particular issue --

5          THE COURT:  Uh-huh.

6          MR. MARTIN:  -- since it's fresh in our minds.

7          So, one of the things that we're all relying on if

8   this procedure goes forward as proposed is that Deerfield is

9   bidding the full amount of its claim, the full amount of its

10  secured claim and that if that hundred-and-forty-million-

11  dollar number -- and there's some calculations about exactly

12  what it is -- but if that's it, Deerfield is paid in full.

13         And the point I raised before, Your Honor, is it's

14  a little weird because the bid is pursuant to a plan, okay.

15  So, Your Honor raised some concepts that are perhaps fair --

16  administrative claims are way higher, the employees runaway,

17  et cetera -- what if Your Honor decides that a release in

18  favor of Deerfield under the plan or some provision, you

19  know, you're not going to approve and Deerfield decides to

20  pick up their marbles and go home?

21         Well, now, the value tanks.  Deerfield -- they're

22  the secured lender -- we haven't done a cash collateral

23  yet -- but I need a lot of adequate protection, I need to

24  suck up all the assets.  And here we are, this side of the

25  room, with no value when we could have had another bidder --

1   we could have had another bidder with a cash price that would

2   have taken them out in a different way.

3            So, it seems to me you either have to be in or

4   you're out.

5            THE COURT:  It's different when you're in a plan.

6   I mean, you're asking for more time and the company is

7   deteriorating.  That's a different scenario than somebody

8   coming in -- we're closing this within, you know, to all-cash

9   purchasers and we're closing it within a certain period of

10  time.

11           MR. MARTIN:  But it's not a plan, right; it's a

12  bid.

13           THE COURT:  It's a bid through a plan.

14           MR. MARTIN:  It's a bid that I'm going to go

15  confirm a plan later.

16           THE COURT:  It's a bid through a plan.

17           MR. MARTIN:  And they will beat other people,

18  potentially, because they have some currency above the 140

19  million in credit.  So, other people could be bidding cash

20  and they'll bid up -- Oh, I'm overcollateralized now, my fees

21  and expenses are covered, I'm going to bid that up.  They

22  will have additional currency.

23           And we could wind up with a successful Deerfield,

24  when other people with cash that would have taken them out on

25  their secured claim, being left at the table and then the

1    plan doesn't get confirmed.

2              THE COURT:  Well, maybe then you can make an

3    argument that Deerfield's bid isn't the higher and best bid

4    because of the risk.

5              MR. MARTIN:  Fair point.

6              THE COURT:  Maybe you have that argument.

7              Okay.  It's 6:15.

8              Mr. Bromley offered on several occasions to talk

9    about certain aspects.  I'm going to let you all talk.  I

10   think you've heard my concerns, but I'll try to say them

11   again so as you're talking, you have them.

12             I'm concerned about the time constraints in the

13   process for the number of reasons that we talked about,

14   including that those not in this room who have counter-

15   contract rights under this scenario -- and I haven't seen the

16   markup -- don't have enough time to be involved and to

17   protect their rights.

18             And I'm not sure that there is time within a

19   February 20, it looks like -- I don't think I had you on my

20   calendar for February 20, but a February 20 sale date -- I'm

21   not sure there's enough time for parties not in this room to

22   protect their rights and to ensure that those bidders who do

23   not yet have executory contract lists, customer lists, have

24   them.

25             But I am cognizant, and the testimony was, that

1  this debtor is a -- is losing cash, even if it's only 500,000

2  and not a million one or a million three, they're losing cash

3  on a weekly basis.  That cash, at least at the moment, has

4  been represented to us by the debtor is Deerfield's cash

5  collateral, subject to challenge, but that's what we have

6  right now, and they're entitled to adequate protection so

7  that their position is not diminished.

8          So, I think there needs to be some additional

9  time -- not 45 days, and I don't know that it's 30 -- I think

10  the parties need to talk, cognizant of the fact that

11  operationally, the company is losing money, as well as the

12  professional fees.

13          I think the process needs to be opened up so that

14  all types of bids can be considered.  If there's going to be

15  a restraint -- if the debtor is going to come back and say

16  that there still needs to be a restraint on a particular type

17  of bid, I need a better explanation than what I'm getting.

18          I don't see a direct line -- I'm not making any

19  final determination in what I'm saying here -- but I don't

20  see a direct line between the use of cash collateral and not

21  being able to be taken out, crammed up, depending on what it

22  is.  And the risk factors of closing, the risk factors of

23  getting to a plan, the risk factor of not being able to

24  confirm a plan, that all gets factored into, perhaps, what's

25  a highest and best -- and those are real factors -- but I

1  think to canvas the market, we need to permit whatever bids

2  come in, in whatever form.  At the moment, I'm convinced by

3  Mr. Bromley, with respect to the backup bid argument.

4          Okay.  We need to figure out when you can come

5  back and I'd like the parties to talk in the meantime about

6  the other motions, particularly, I'm thinking about the cash

7  collateral and the KEIP.  And I won't say that the objections

8  were kind of "throw it against the wall and see what sticks,"

9  but there were some arguments, which weren't as persuasive as

10 other concerns -- let's put it that way.

11          I think I've said it's Deerfield's cash

12 collateral.  I have to give them adequate protection.

13 There's not an option not to give them adequate protection.

14          I've provided some thought about cash collateral

15 in a ruling that I made in iPic I want to say.

16          Was that your case, Mr. Landis -- no -- was it

17 iPic?

18          MR. LANDIS:  (Indiscernible.)

19          THE COURT:  I'm going to write down what case it

20 was in.  I think it was iPic, the theater chain.  Mr. Dean

21 from Cole Schotz argued for the committee.  And in that case

22 I gave -- I went back to basics -- I went back to the Ames

23 case, I went back to the Swedeland case --  what are we

24 looking at?

25          Swedeland is a really interesting read.  It talks

1  about additional assets, additional liens on additional

2  assets that a lender does not have prepetition, okay.

3         I looked at Ames, which talks about it's not just

4  a business judgment standard.  The Court has to exercise its

5  authority to approve the request.  My discretion is not

6  unbounded, okay, but there are factors that we look at, such

7  as the attempts, as were testified to here, to get other

8  financing.

9         But the debtor does have fiduciary duties and we

10  look at whether the terms of cash collateral improperly

11  leverage the bankruptcy process, empowers, or if its purpose

12  is not so much to benefit the estate, as to benefit a party

13  in interest.

14         I'm not making a judgment here about whether this

15  one is or isn't; I'm just saying, going back to basics,

16  thinking about what has to be done, and I think there are

17  objections to adequate protection that don't fully appreciate

18  that there's not an option not to give cash collateral and it

19  can't be or protect -- adequate protection that can't be too

20  speculative.  And on the other hand, the terms of the cash

21  collateral usage can't be too onerous, either.  I will say

22  that.

23         And with respect to the KEIP, again, take a look

24  at it.  I was a little surprised to see the objection that

25  it's not incentivizing.  It's directly tied to recoveries or

1  it's, I should say, increased value.  Does it mean maybe

2  aspects of it aren't?  And I'd like to understand how the

3  prepetition retention payments mesh with the KEIP.  I ruled

4  on a KEIP recently in Bumble Bee and provided thoughts there.

5        Unfortunately, for all of you, these are

6  transcripts, but -- and they're both recent -- so I think it

7  would be really helpful to focus on where there's a clear

8  issue -- and I think there are -- but let's stay away to the

9  extent we can, from a scattershot approach and focus me on

10  where there's a real issue and we'll get through things

11  faster, I think.

12        Let me ask this:  If terms of the DIP and the

13  KEIP, we have more witnesses, I'm assuming?  I've got

14  declarations, I know.

15        MR. MEISLER:  Your Honor, in fact, one of our

16  witnesses for the KEIP, who's the chairman of the board, I

17  think is -- yep, he's still with us.  If there could be some

18  way where we could get him in tonight --

19        THE COURT:  I'm thinking yes.

20        MR. MEISLER:  -- that would be --

21        THE COURT:  I have someone who traveled.

22        MR. MEISLER:  Yes, he traveled from North

23  Carolina.

24        THE COURT:  Okay.  I think it's fair.

25        Let's get the evidence in with respect to the

1  KEIP.  I'm not going to hear argument tonight, but let's get

2  the evidence in.

3         And my schedule is fairly open this week and next

4  week on a relative scale.  There are a lot of people in the

5  room who I know probably have other commitments, so I would

6  like everyone to take a look at your calendar.

7         Tomorrow, I'm not available -- I have a disclosure

8  statement hearing in another case -- I haven't read it yet.

9  But I'm open Thursday morning.  I'm open all day Friday.  I'm

10  open Monday.  I've got a meeting at 3:00.

11         But if I had to miss it -- could I miss it, Ms.

12  Good, or no?

13      (No verbal response)

14         THE COURT:  Okay.  I prefer not, but -- and I have

15  no idea what I have in Blackhawk, but it can't be anything on

16  Tuesday -- I think Tuesday is pretty open all day.

17         This is unusual.  I've got everything crammed into

18  March.  My March is a disaster, but my February is pretty

19  open.  Almost anything next week works.

20         We can't put this off because we have a process

21  going, so I understand that.  So, I prefer to take it up

22  again this week, if possible, but I will -- we're going to

23  take five minutes.  You all talk.

24         I will hear the witness tonight.

25         Brandon, are you good?

1          THE COURT REPORTER:  Yes.

2          THE COURT:  I'll hear the witness tonight.

3          Do you need more than five minutes?

4          UNIDENTIFIED:  No.

5          THE COURT:  Okay.  And then we're going to call it

6   a night.

7          Do you need 10 minutes?  Do you need to regroup

8   maybe?  Why don't I give you -- I don't know who it is -- why

9   don't I give you 10.  You can regroup, you can talk, the

10  witness can get his or her head in the space and we'll go.

11          We're in recess.

12       (Recess taken at 6:27 p.m.)

13       (Proceedings resumed at 6:51 p.m.)

14          THE COURT OFFICER:  All rise.

15          THE COURT:  Thank you.  Please be seated.

16          Okay.  Counsel, during the break I looked up the

17  iPic transcript.  It's Case 19-11739.  It's the transcript

18  from the September 17th, 2019, hearing; it's Docket Item 294.

19          It gives you recent thoughts.  I had cash

20  collateral/DIP financing issues in two cases at the same

21  time.  I had reason to go back and look at things.

22  Obviously, and as it says in the transcript, it's a case-by-

23  case basis, but nonetheless, you'll get some of my thoughts

24  and specific thoughts on that particular case, but more

25  general thoughts.

1        Okay.

2              MR. MEISLER:  Okay.  Your Honor, for the record,

3    Ron Meisler of Skadden Arps on behalf of the debtors.

4              Your Honor, we caucused amongst the various

5    advisors and what we'd like to do is we would try -- we would

6    like to try to take your time on Thursday and on Friday and

7    see if we can make use of the day tomorrow amongst ourselves

8    to see if we can't settle our disputes.

9              THE COURT:  That makes sense.

10             MR. MARTIN:  On Thursday, actually, we cannot --

11             MR. MEISLER:  Oh, Thursday, you're still --

12             MR. MARTIN:  Yeah.

13             MR. MEISLER:  -- you're still going to figure your

14   schedule out, but if we can use Thursday, right, then we'll

15   use it?

16             MR. MARTIN:  I have a trial on Tuesday in front of

17   Judge Wiles and Thursday all my witnesses are coming in, so I

18   thought we were going to go with Friday, so I didn't try to

19   move them.  Let me just see if I can --

20             THE COURT:  Okay.  You'll let me know.  My day is

21   free on Thursday.  You'll let us know.

22             If Mr. Martin can't be here, then we'll go with

23   Friday and you'll have two days to try to figure it out.

24             MR. MEISLER:  That's right, right.

25             THE COURT:  And the only -- I've got something at

1  9:45 on Thursday morning.  I think that goes away.  I have my

2  2:30 Chapter 7 day that should be short, but we'll be taking

3  a break then.  Other than that, Thursday is free and Friday

4  is wide open.

5          So, let's start -- if we're doing Thursday --

6  excuse me -- if we're doing Thursday, let's start at 10:00.

7          MR. MEISLER:  Terrific, Your Honor.

8          And, Your Honor, just so the Court is aware,

9  unfortunately for me, on Friday I have a family function for

10  a nephew whose bar mitzvah is in Illinois --

11          THE COURT:  Mazel tov.

12          MR. MEISLER:  Thank you.

13          -- and so, therefore, I won't be able to make it

14  on Friday, but between Mr. Dressel, Mr. Hogan, and the --

15          THE COURT:  You are well-covered.

16          MR. MEISLER:  Exactly right.  So, I will not stop

17  the show.

18          THE COURT:  Thank you.

19          MR. MEISLER:  So, Your Honor, with that, we will

20  be in touch with your chambers and we'll sort out finalizing

21  schedules.

22          THE COURT:  Thank you.

23          MR. MEISLER:  Terrific.

24          Your Honor, with that, before I jump into the

25  KEIP, I thought I was at the cusp of settling up with Vatera

1  and their objection to the KEIP --

2            UNIDENTIFIED SPEAKER:  (Indiscernible.)

3            MR. MEISLER:  -- we couldn't get there.

4            Okay.  Unfortunately --

5            THE COURT:  Well, we'll hear the evidence.  I'm

6  not giving up hope that over the next two days you could

7  solve that problem with Vatera.

8            MR. MEISLER:  Your Honor, I share your optimism.

9            THE COURT:  Mr. Galardi agrees it's possible --

10  anything is possible.

11            MR. GALARDI:  Your Honor, I would agree.

12            THE COURT:  Anything is possible.  Uh-huh.

13            MR. GALARDI:  I'll do my best.

14            MR. MEISLER:  Yes.  We have an open line of

15  communication.  Mr. Galardi and I have known each other for a

16  very long time, so that dialogue is moving along smoothly.

17            MR. GALARDI:  (Indiscernible.)

18            MR. MEISLER:  And the same, of course, with

19  Mr. Bromley, and Mr. Martin and I are just getting to know

20  each other, but doing --

21            THE COURT:  I've known Mr. Martin a long time,

22  too.

23            MR. MEISLER:  Terrific.

24            Okay.  So, let's move to KEIP the we're only here,

25  actually, to admit evidence --

1              THE COURT:  Yes.

2              MR. MEISLER:  -- on account of the declaration of

3    David Gill.

4              We have other declarants here -- Mr. Dempsey and

5    Mr. Milligan -- but both will be here whether we resume on

6    Thursday or Friday.  So, in light of the hour, Your Honor, if

7    you prefer, we would delay on working the other two into

8    evidence.

9              THE COURT:  Well, let's start with the first

10   witness.  Let's see where we are, but, yes.

11             MR. MEISLER:  Terrific.

12             THE COURT:  We're going with whom?

13             MR. MEISLER:  Mr. Gill, Your Honor.  It's the

14   chairman of the board.

15             And there is an unfortunate housekeeping matter.

16   When our redacted copy of Mr. Gill's declaration was filed,

17   apparently there may have been something filed that discloses

18   a participant to the KEIP that shouldn't have been disclosed.

19   I'm slightly confused as to what got filed how, because,

20   apparently, in one version it was redacted correctly and in

21   another version it was not redacted correctly.

22             What we'd like to do -- and the U.S. Trustee has

23   told me that filing an errata sheet might not be the right

24   terminology --

25             THE COURT:  Okay.

1          MR. MEISLER:  -- but the concept is that we would

2   like to have the Clerk of the Court withdraw what was filed

3   and we would refile the corrected --

4          THE COURT:  Yes.  You need to get the picture

5   image taken off and put your new one on --

6          MR. MEISLER:  Correct.

7          THE COURT:  -- however they do that -- I don't

8   know -- but that's what you need to happen.

9          MR. MEISLER:  Terrific.

10          And, of course, everyone's rights are reserved to

11   object --

12          THE COURT:  With respect to the motion to file

13   under seal.

14          MR. MEISLER:  Exactly.

15          THE COURT:  Yes?

16          MS. RICHENDERFER:  Yes, Your Honor.  I just wanted

17   to make that clear -- Linda Richenderfer from United States

18   Trustee's Office -- as I pointed out earlier to Mr. Meisler,

19   it is Docket Number 174, where I believe they meant to redact

20   bullet point number two on Page 5 and, instead, redacted what

21   was underneath it.

22          It has been on the docket now since the 24th of

23   January -- I have some concerns about that -- but in light of

24   just getting this --

25          THE COURT:  We'll deal with it.

1          MS. RICHENDERFER:  -- as long as I explained to

2    him that having worked with the Clerk's Office before, there

3    is a process to get this done; it's just not merely asking

4    them, it's just not an errata sheet.  There's a full and

5    complete process.

6          THE COURT:  Yeah, I don't know what that is.

7          MS. RICHENDERFER:  But reserving all of my rights

8    to argue with respect to whether it should be sealed in the

9    first place.

10          THE COURT:  Yes.

11          MR. MEISLER:  Exactly.

12          Your Honor, I readily admit I do not know either

13    what the exact process is, but we will get it down and we

14    will do it right.

15          Okay.  Your Honor, that moves to the matter of

16    substance, which is admitting the declaration of Mr. David

17    Gill into evidence.  Your Honor, Mr. David Gill is chairman

18    of the board and his testimony is in support of the Key

19    Employee Incentive Plan that the Board adopted.

20          Your Honor, I don't want to take up too much time,

21    so if you want me to give some background I will; if not, we

22    could just move right forward and we can, if there's no

23    objection to admitting this into evidence, then we can move

24    right into cross.

25          THE COURT:  We're going to go right to evidence.

1          Is there any objection to the admission of Mr.

2  Gill's declaration?

3          COUNSEL:  No objection, Your Honor.

4          THE COURT:  It's admitted.

5      (Gill Declaration received in evidence)

6          MR. GALARDI:  I'm sorry, Your Honor -- one

7  moment -- we're going to try to shorten the testimony.

8      (Participants confer)

9          MR. MEISLER:  Your Honor, we just cut a little bit

10  of cross time.  Your Honor -- Mr. Galardi has asked, and I

11  readily accept his request -- we would like to proffer

12  testimony for two facts.

13          One -- and this would be the testimony of

14  Mr. David Gill.  I know he knows these facts; he and I have

15  spent many times in board meetings and board calls -- the CEO

16  and the CFO did not receive retention payments.  So, that's

17  point number one.

18          Point number two, at target value -- and I'm not

19  disclosing the number because that was redacted, and, again,

20  that's an issue for another day -- but that target value, the

21  Board believes that there should be a recovery for unsecured

22  creditors.

23          Obviously, Your Honor, there are variables and

24  assumptions in there that the cost of the case would have an

25  impact, but the Board did review something and came to the

1  thoughtful conclusion, based on consultation of advisors,

2  that at the target, there should be a recovery for unsecured

3  creditors.

4          THE COURT:  Okay.

5          MR. GALARDI:  And, Your Honor, just so everybody

6  is following with me, because I know that's not often,

7  Paragraph 15, the second sentence of it is why I want to

8  be -- because it says, "Begin to receive the target

9  value ..." and I just want it to be clear what that meant.

10         Now, there's no guaranties about the amount,

11  but --

12         THE COURT:  Paragraph 15 of what?

13         MR. GALARDI:  I'm sorry, the -- that's their

14  motion.

15         THE COURT:  Of the motion?

16         MR. GALARDI:  Yeah.  I have an unredacted version.

17  It was really Paragraph 15 of the motion, I'm sorry.

18         THE COURT:  Okay.

19         MR. MEISLER:  Okay.  Your Honor, without fewer

20  adieu and not hearing any objection from any of my colleagues

21  to admit Mr. Gill's declaration into evidence, I would ask

22  the Court if Mr. Gill's declaration could be admitted into

23  evidence.

24         THE COURT:  I admitted that.

25         MR. MEISLER:  Thank you, Your Honor.

1          THE COURT:  Any cross?

2          MS. PARISI:  Yes, Your Honor.

3          THE COURT:  Okay.  Mr. Gill, could you take the

4   stand, please.

5          THE CLERK:  Raise your right hand.

6            DAVID GILL, DEBTORS' WITNESS, SWORN

7          THE WITNESS:  I will.

8          THE CLERK:  Please state your full name and spell

9   your last name for the record.

10         THE WITNESS:  David Gill, G-I-L-L.

11         THE CLERK:  All right.  You may be seated.

12         THE COURT:  You can proceed.

13                    CROSS-EXAMINATION

14  BY MS. PARISI:

15  Q    Thank you, Mr. McGill -- Mr. Gill -- excuse me.

16  A    We dropped the M-C a long time ago.

17       (Laughter)

18  BY MS. PARISI:

19  Q    Yes -- apologies.  It's late.

20  Rachel Parisi, again, on behalf of the committee.  Thank you

21  for taking the stand.  Just a couple questions.

22       In your declaration, one of the statements you've made

23  is:

24       "I was involved in structuring the KEIP so as to align

25  with the company's goal to maximize value for the debtors'

1  estates."

2       Correct?

3  A     That's correct.

4  Q     And as part of that evaluation, did you evaluate

5  potential recoveries for Deerfield as a secured creditor?

6  A     No, not in particular.  We had several goals, of

7  course, and our goal was to maximize value in total and then

8  there's obviously some people are secured and some are

9  unsecured and that will take care of itself, but our goals

10 were to incentivize the management team to maximize the value

11 of the sales process.

12 Q     So, for all constituents?

13 A     Absolutely.

14 Q     So, at the -- and I'm going to use these phrases -- so,

15 at the threshold level, unsecured creditors get zero?

16 A     That's my expectation, yes.

17 Q     And at the turning point value, unsecured creditors get

18 zero?

19 A     Most likely.

20 Q     And at the target value, is there any anticipated

21 recovery for unsecureds?

22 A     Yes, they should start to participate before that, yes.

23 Q     Based on what you assessed, is it your belief that

24 payments to key participants at the target value would

25 eclipse any estimated recovery to unsecureds?

1  A     No, I don't think I would agree -- you said at the

2  target value.  My recollection is that the total KEIP

3  payments for that are about two and a half million dollars

4  and I would hope the unsecureds would do better than that.

5  Q     Hope the unsecureds, but you don't have any data that

6  would support that or you did not evaluate any data that

7  would support that?

8  A     You know, it's a math exercise.  I just said I would

9  expect it to be greater than the amount of the KEIP.

10  Q     Our math at the target value would show an estimated

11  recovery to unsecureds at $365,000.

12        Would you disagree with that number?

13             MR. HOGAN:  Objection, Judge.  She's asking him to

14  guess about (indiscernible) and that's not (indiscernible.)

15             MS. PARISI:  I'm just asking if Mr. Gill would

16  disagree with that.

17             THE COURT:  You can answer if you know the answer.

18             THE WITNESS:  I'm not going to fashion a guess.

19  I'd ask that you check your math on the KEIP, because I

20  noticed this morning reading your objections that you had the

21  wrong numbers in there for the KEIP payments.  So, you need

22  to fix that first before you can determine whether your

23  300,000 or whatever it was, is correct.

24  BY MS. PARISI:

25  Q     And I guess without disclosing numbers, because we're

1 | not disclosing numbers, which -- at the threshold level,

2 | turning point, target, or max --

3 | A    I think it was turning point and target; your numbers

4 | didn't agree to ours and yours were higher.

5 | Q    So, at the threshold level the debtors' motion provides

6 | that that would be -- and I'm sorry, I'm bouncing around

7 | between redacted versions and non-redacted versions, so I

8 | apologize -- so, in the motion, the threshold value is stated

9 | as the value of the plan sale to lenders under the debtors'

10 | prepetition credit agreement.

11 |       And you were here for the testimony earlier today; is

12 | that correct?

13 | A    Sure.

14 | Q    So, would that value be 140 million or 142 million or

15 | some other number?

16 | A    The threshold is 140.

17 | Q    One hundred and forty.

18 |       In your involvement in structuring the KEIP, was there

19 | any consideration of measuring the KEIP based on any other

20 | metrics besides what I'll call "transaction value"?

21 | A    No.  I mean, that's the driver.  That's the whole point

22 | of the incentive.

23 | Q    So, there was no consideration whatsoever as to whether

24 | the KEIP should be evaluated based on any potential

25 | distributions to unsecured creditors in the case?

1   A      No.  Again, the goal is to maximize the total value of

2   the assets and the rest will take care of itself, based on

3   who has security and who doesn't.

4   Q      At the threshold level, the prepetition RSA that was

5   negotiated, that, essentially, would be the deal that would

6   have to get to closing in order for the threshold level to be

7   met?

8   A      That's my understanding.

9              MS. PARISI:  I think that's it, Your Honor.

10             THE COURT:  Thank you.

11             MS. PARISI:  Thank you.

12             THE COURT:  Any further cross?

13             MR. GALARDI:  Your Honor, based on what I heard,

14  I'm withdrawing the objection.

15             THE COURT:  Thank you.

16             Ms. Richenderfer, I don't remember if you objected

17  to this, as well.  I think you did.

18             MS. RICHENDERFER:  I did file an objection, but I

19  have no questions for this witness.

20             THE COURT:  Thank you.

21             Any redirect?

22             MR. HOGAN:  No, Judge.

23             THE COURT:  Thank you.

24             THE WITNESS:  Thank you.

25             THE COURT:  Mr. Gill, you may step down.

1       (Witness excused)

2              THE COURT:  Who are the other witnesses?  I know

3   we have Mr. Dempsey's declaration.

4              MR. MEISLER:  Your Honor, we've got Mr. Dempsey as

5   our market expert, as our compensation consultant, and

6   compensation expert, and we also have Mr. Milligan, the chief

7   financial officer, where we're looking for certain parts of

8   his first day declaration in support of the KEIP in a fairly

9   limited fashion.

10             Again, happy to do that tonight, although, in

11  light of the hour, they're available -- Mr. Milligan,

12  unfortunately for him, he's definitely coming along with us.

13             THE COURT:  Right.  But not Mr. Dempsey.

14             Where's he traveling from?

15             MR. MEISLER:  Mr. Dempsey is traveling from the

16  great city of Chicago.

17             THE COURT:  The great city of Chicago.

18             MR. MEISLER:  And Mr. Dempsey is available to

19  travel if we need him, but at the same time, I bet

20  Mr. Dempsey wouldn't be unhappy about being up tonight and

21  being admitted into evidence.

22             THE COURT:  Thoughts on how long his cross is

23  going to take?

24             UNIDENTIFIED:  (Indiscernible), Your Honor, I --

25             THE COURT:  You're gone.

1        MS. PARISI:  I don't think I have any cross for

2   Mr. Dempsey.

3        THE COURT:  Oh.  Ms. Richenderfer, are you going

4   to have cross for Mr. Dempsey?

5        MS. RICHENDERFER:  No, Your Honor.  I think the

6   issue with Mr. Dempsey's declaration is the same as the issue

7   with the motions, to which portions should be sealed, but I

8   have no cross-examination for him.

9        THE COURT:  Okay.

10       MR. MEISLER:  Terrific.

11       THE COURT:  I assume there's no objection to

12  Mr. Dempsey's declaration coming into evidence?

13       MS. PARISI:  No objection.

14       MS. RICHENDERFER:  No objection.

15       THE COURT:  It's admitted.

16     (Dempsey Declaration received in evidence)

17       MR. MEISLER:  Thank you, Your Honor.

18       THE COURT:  Mr. Dempsey, you can remain in the

19  great city of Chicago.

20       MR. DEMPSEY:  Thank you, Your Honor.

21       MR. MEISLER:  Thank you, Your Honor.

22       So, with that, I think we adjourn the KEIP motion.

23       THE COURT:  Mr. Milligan is going to have to be

24  here in any event, I'm assuming.

25       MR. MEISLER:  Unfortunately.

1          THE COURT:  How about how much cross-examination

2    do we have for Mr. Milligan?

3          (Participants confer)

4          MS. RICHENDERFER:  Your Honor, I think there's

5    some confusion.  (Indiscernible), it's from the first day

6    declaration.  I'm not sure, again, as to what portions

7    they're offering for the KEIP.

8          THE COURT:  Okay.  Let's find that out.

9          MR. MEISLER:  Let's see where Mr. Milligan plays a

10   role, because maybe we could do without it.

11         (Participants confer)

12         MR. MEISLER:  So, Your Honor, the reason why we

13   used the Milligan declaration in the first day order is for

14   purposes of supporting the prepetition marketing process.

15   That there was a nearly hundred-day prepetition marketing

16   process.  That is the only reason why we used the Milligan

17   declaration.

18         THE COURT:  Okay.  You're going to use it in

19   connection with the KEIP?

20         MR. MEISLER:  That's right, Your Honor.

21         A very limited basis.  I think it's --

22         THE COURT:  Do we know what paragraphs it is?

23         MR. MEISLER:  I feel like it's Paragraph 114; is

24   that right?

25         I'm hearing it's 105.

1        (Participants confer)

2              MS. RICHENDERFER:  Your Honor, if I may?

3    Paragraph 105 references, at least, (indiscernible)

4    Mr. Milligan's first day declaration.

5              MR. MEISLER:  I'm sorry?

6              MS. RICHENDERFER:  Paragraph 105 references the

7    KEIP.

8              MR. MEISLER:  105 does reference the KEIP, that's

9    correct.

10             And, Your Honor, there is a paragraph that simply

11   goes to the point of the marketing, the period of time of

12   prepetition marketing.  Where exactly that is, I'd have to

13   look.

14             MS. RICHENDERFER:  Your Honor, I have no

15   objection.

16             MR. MEISLER:  And with that, Your Honor, I would

17   close the evidentiary record.

18             THE COURT:  Well, I need to make sure we know

19   what's being put in and if there's going to be any cross.

20             MS. RICHENDERFER:  Your Honor, I actually have no

21   objection to any portion of Mr. Milligan's first day

22   declaration being put into evidence for the KEIP and I have

23   no cross-examination.

24             THE COURT:  Okay.

25             MS. PARISI:  No cross, Your Honor.

1          THE COURT:  Okay.  Then, we're going to put in the

2   declaration, but I would like to know when we reconvene what

3   paragraph.

4          MR. MEISLER:  I have it, Your Honor.

5          THE COURT:  Oh, okay.

6          MR. MEISLER:  56 through 58.

7          THE COURT:  Okay.

8          MS. RICHENDERFER:  No objection, Your Honor.

9          I think this is basically what his declaration

10  also says and what his prior testimony was in bidding

11  procedures.

12          THE COURT:  Okay.

13          MR. MEISLER:  Your Honor, I'm getting the sense

14  that we may, if Your Honor is willing, that maybe we just go

15  forward to push the KEIP forward if that works for Your

16  Honor?

17          THE COURT:  Okay.  Let's hear argument.

18          MR. MEISLER:  It sounds to me like we will be able

19  to quickly get through it.

20          THE COURT:  So, I'm closing the evidentiary

21  record.

22          Does -- the committee has no evidence --

23  affirmative evidence?

24          MS. PARISI:  Correct, Your Honor.

25          THE COURT:  Okay.  And Ms. Richenderfer, no --

1  nothing affirmative to put on?

2              MS. RICHENDERFER:  That's correct, Your Honor.

3              THE COURT:  Thank you.

4              The record is closed.

5              MR. MEISLER:  Okay.  Thank you, Your Honor.

6              I will cede the podium to Ms. Parisi for

7  creditors' committee.

8              THE COURT:  Let's hear the objections, what the

9  remaining objections are.

10             MS. PARISI:  And thank you, Your Honor.  I will

11 make this quite brief.

12             After sitting through today, the committee

13 recognized there are lots of battles to fight in this case,

14 and we did -- while we did propose what we thought were some

15 modest tweaks to the KEIP prior to coming to the hearing that

16 were not accepted, we do generally -- we are generally

17 supportive of the KEIP, in principle, in this case, and so

18 notwithstanding that our -- that what we believe to be our

19 minor tweaks were not accepted, at this time, the committee

20 is going to withdraw its objection.

21             THE COURT:  Thank you.

22             MS. RICHENDERFER:  Your Honor, Linda Richenderfer

23 for the U.S. Trustee's Office.

24             With respect to the KEIP, I believe for the most

25 part my objection was limited to one issue and that is -- if

1  not, this is the only issue I'm going to be pressing

2  forward -- which is the fact that the precedent of making

3  payments, KEIP payments with respect to a deal that's already

4  on the table that's being brought into the Bankruptcy Court

5  is what the U.S. Trustee is concerned with here and it sets a

6  certain precedent.

7          I understand that there's roads to be traveled in

8  order to get to the final deal, but that's always the case no

9  matter what the schedule is of the payment.  You've still got

10 to get through the auction process, the sale process, and you

11 still have to close at the end of the day.  So, that is the

12 concern that my office has with respect to this particular

13 KEIP.

14          THE COURT:  Thank you.

15          MR. MEISLER:  Thank you, Your Honor.

16          A little unknown secret, this tie is my lucky tie

17 and having --

18      (Laughter)

19          THE COURT:  Do you want to pass it off to someone

20 for the next hearing since you're not going to be here?

21      (Laughter)

22          MR. MEISLER:  I think so.  I think I'm going to

23 contribute it to Mr. Dressel.

24          And having Mr. Galardi and Ms. Parisi withdraw

25 their objections all in the course of approximately six and a

1  half minutes is a record for me and I give all credit to my

2  tie.

3          So, Your Honor, I would like to address the U.S.

4  Trustee's objection.  I understand the objection.  Many times

5  in this situation when I have a bid in hand, I don't ask for

6  an award for closing that.

7          This one, though, is different.  This is one, Your

8  Honor, where we have marketed the business for nearly 100

9  days prepetition.  The management team -- I think you heard

10  how many documents are in the data room, you've heard how

11  many questions have been answered -- the management team, and

12  in this instance, with that one data point where each of the

13  CEO and CFO -- and this is public -- that they get an award

14  of $100,000 for closing the transaction.

15          And we hope that they do better than that.  That's

16  what the KEIP is meant to do.  We're incentivizing our

17  management team to do better.

18          But if they close the Deerfield stalking horse

19  bid, what you've seen in this room is a slice of what has

20  gone on, not just with the people in this room who, of

21  course, the creditors' committee is a new entrant, but we

22  have had very difficult negotiations with our secured lender

23  and we arrived at a plan construct which does create things

24  for stakeholders.  We've talked about it -- it pays admin

25  creditors, it pays priority claims, it ensures that employees

1  with priority claims that are no longer with the company,

2  that they will get paid their $13,600, notwithstanding the

3  employee wages motion, because the ones that are not with us,

4  there's all sorts of things where they're not included in the

5  employee wages motion.  They're going to have to file a proof

6  of claim in accordance with the bar date and they're -- under

7  the Deerfield bid, they're going to get $13,650, of course,

8  up to the amount of their claim.

9          Now, the Deerfield stalking horse bid, it's got

10  various covenants to it.  There's risks to closing it, and

11  not only the covenants, but we've got to confirm the plan.

12          Now, I'm sure as we get into auction, Mr. Galardi

13  and Mr. Porzio or Mr. Martin --

14          UNIDENTIFIED:  Mr. Porzio.

15          MR. MEISLER:  You're now a named partner.

16          UNIDENTIFIED:  (Indiscernible.)

17      (Laughter)

18          MR. MEISLER:  I wish.

19          Mr. Martin is going to say, Oh, that's very risky,

20  so maybe we should pick a different bid.

21          Well, we'll get to that, but the core is that

22  there are risks to closing the Deerfield bid and, Your Honor,

23  I think you've recognized -- yes, we looked at Bumble Bee --

24  we looked at lots of other KEIPs and we looked, also, at the

25  Aralez case with Judge Glenn -- the KEIP is supposed to be

1   primarily incentivizing, but the fact that it might have some

2   retentive aspect to it, it doesn't nullify the opportunity or

3   the merit of approving the KEIP as long as it's primarily

4   incentivizing.

5          And we believe that closing on the Deerfield bid

6   has risks and it will be difficult and for that reason, we

7   think it is appropriate that Ms. Sanfilippo and Mr. Milligan

8   be rewarded for doing more than just their job on a day-to-

9   day basis because they've got dozens, if not hundreds of

10  diligence questions that await them from now until the bid

11  deadline.

12         Your Honor, as we go further -- and I don't think

13  anything is objecting any further to awards at the turning

14  point or awards at the target -- but I do want to make a

15  mention that we started thinking about the KEIP in August of

16  2019.  It was in the form of an incentive plan when we didn't

17  know where we were going, but we did start thinking about it.

18         The Board has spent a lot of time with Mr. Dempsey

19  thinking about what would be an appropriate incentive

20  compensation program to motivate the seven participants so

21  that we can drive the best outcome.

22         And so, if we think about a business judgment

23  standard -- and I'm tying that together with 503(c)(3),

24  because I think most courts look at 503(c)(3) and as business

25  judgment standard -- they were well-informed, they spent a

1   lot of time with Mr. Dempsey, they spent a lot of time with

2   counsel -- that would include me.  I have personally seen

3   many, many KEIPs -- not nearly as many as Mr. Dempsey -- and

4   they got advice from the both of us.

5            There was a compensation committee on the Board

6   that debated it, spent a lot of time thinking about how to

7   drive the right behaviors.  The compensation committee then

8   reviewed it and recommended it to the larger board.  The

9   larger board discussed it -- again, this is over a three-

10  month period.  We started the process with John Dempsey in

11  the end of August and we didn't approve it until

12  December 27th and we had multiple meetings to talk about the

13  KEIP and what the KEIP structure should be and where the

14  metrics should be.  And so, when it comes to duty of care,

15  well, they satisfied that, Your Honor.

16           And when it comes to duty of loyalty, there's

17  nobody in the KEIP that was part of the decision-making

18  process.  Ms. Sanfilippo is a member of the Board, but

19  anytime we talked about the KEIP, Ms. Sanfilippo recused

20  herself.  So, Your Honor, since we have no issue of duty of

21  loyalty, Your Honor, I think we clearly satisfy the business

22  judgment standard.

23           Your Honor, if you were to look at -- and I know

24  that some courts do look at a KEIP under the O'Brien

25  standard -- and then you're using a standard that thinks

1   about or analyzes it as an administrative claim.  Your Honor,

2   I think we satisfy that standard, too, because that standard

3   is whether or not it brings value to the estate or is it

4   necessary to preserve the value of the estate -- we think it

5   is.

6          Your Honor, we think that these targets, we think

7   that these awards are motivating the seven KEIP participants

8   who are the most important people to driving values.  We

9   think that by giving them the incentives that Mr. Dempsey and

10  the Board have determined are the appropriate marks, we

11  believe that that is going to drive bidders to get to the

12  auction and drive a better bid.  And if they accomplish that,

13  then they get their rewards.

14         Your Honor, I think also in light of the hour, I

15  am obviously available for questions, but I think I've put on

16  the case that I was looking to put on, even if it's

17  abbreviated; again, just recognizing everyone's time and the

18  hour.

19         THE COURT:  Thank you.

20         MR. MEISLER:  Thank you, Your Honor.

21         THE COURT:  Okay.  Well, I will rule and I will

22  approve the KEIP.

23         The only remaining objection is out of the Office

24  of the United States Trustee -- and I don't say that in a

25  pejorative way, that it's the only one -- but it's the sole

1 remaining objection.  And I think on the facts of this case,

2 it is appropriate to award the KEIP, even in the circumstance

3 where the threshold value for the KEIP is in closing the

4 current deal.

5         Based on the testimony that's been admitted,

6 including the declarations of -- well, the testimony of

7 Mr. Gill, the declaration of Mr. Gill, the declaration of

8 Mr. Dempsey, and the several paragraphs of the Milligan

9 declaration, I think there is a sufficient evidentiary basis

10 to find that under 503(c)(3), the plan is primarily

11 incentivizing and not retentive in nature.

12         It's primarily incentivizing because the metric

13 that is being used is maximization of value and the greater

14 the auction proceeds, whether that comes in terms of a 363

15 sale or through the plan, the greater the incentive.  And the

16 maximization of value is an appropriate incentivizing metric

17 for purposes of this case.  And I will note that the bulk of

18 the payment is payment for going beyond the threshold level.

19         The testimony also was that it will take work to

20 close the current deal on the table and Judge Sontchi, I

21 believe, has held that that is appropriate in a given case,

22 and I find that this is such a case.

23         What was submitted also shows that these seven

24 people do have an ability to affect the outcome of the

25 auction.  They are the people who bidders will look to for

1  information.  So, the metric is something that they can

2  influence and that testimony is unrebutted and that is, to

3  me, an important factor, among all the Dana factors that are

4  out there.

5          The debtors have advice from not only their own

6  counsel; they have Mr. Dempsey's advice.  It is unrebutted.

7  It details, through his experience at Mercer, which is a

8  preeminent compensation firm, that this KEIP was designed to

9  be incentivizing and I so find that it is.

10          So, that concludes that ruling.  It could have

11  been better spoken, but I think it serves the --

12          MR. MEISLER:  Thank you, Your Honor.

13          I would suggest in the redaction, we can revisit

14  that when we reopen the hearing on Thursday or Friday.

15          THE COURT:  That's fine.

16          Ms. Richenderfer, are you going to be here?

17          MS. RICHENDERFER:  Yes, Your Honor.

18          THE COURT:  Okay.  That's fine.

19          Let me also observe that the committee withdrew

20  its objection and said that people need to pick their

21  battles -- I appreciate that -- and I think that is very

22  true.  And whatever battles there need to be had, we will

23  have, but let's pick them appropriately.  Thank you.

24          MR. MEISLER:  Thank you, Your Honor.

25          THE COURT:  Okay.  So, that's going to conclude

1  tonight or what else do we have?

2          Mr. Martin?

3          MR. MEISLER:  Your Honor, I believe, at least from

4  the debtors' perspective, that concludes this evening.  We'll

5  be in touch with chambers and finalize schedules as soon as

6  we coordinate amongst ourselves.

7          I'd turn to --

8          THE COURT:  Anything from anyone else?

9          MR. MARTIN:  Yeah, I just want to -- Thursday is

10  not looking good in terms of moving all these witnesses who

11  are coming in from out of town and Ms. Parisi is on her feet

12  in a sale hearing up in Newark.  So, if we could, we'd like

13  to -- and hope that we can, by the way, use the time

14  nonetheless to come together -- but we'll look towards

15  Friday.

16          MR. MEISLER:  Your Honor, my tie will be around

17  Mr. Dressel's neck and we will proceed on Friday without me.

18          THE COURT:  Okay.  Thank you very much.

19          MS. RICHENDERFER:  Your Honor, what time on

20  Friday?

21          THE COURT:  Let's start at 9:30.

22          MS. RICHENDERFER:  Thank you, Your Honor.

23          MR. MEISLER:  Thank you, Your Honor.

24          THE COURT:  Thank you.  We're adjourned.

25      (Proceedings concluded at 7:30 p.m.)

1                              CERTIFICATE

2

3    I certify that the foregoing is a correct transcript from the

4    electronic sound recording of the proceedings in the above-

5    entitled matter.

6
     /s/Mary Zajaczkowski_____          January 29, 2020
7          Mary Zajaczkowski, CET**D-531

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25