*Solicitation Version*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | **Chapter 11** |
| **MELINTA THERAPEUTICS, INC.,** *et al.*, | **Case No. 19-12748 (LSS)** |
| **Debtors.**[1] | **Jointly Administered** |

## AMENDED DISCLOSURE STATEMENT FOR AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF MELINTA THERAPEUTICS, INC. AND ITS DEBTOR AFFILIATES

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

Joseph O. Larkin (I.D. No. 4883)
Jason M. Liberi (I.D. No. 4425)
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Fax: (302) 651-3001

– and –

Ron E. Meisler
Albert L. Hogan III
Christopher M. Dressel
155 North Wacker Drive
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

MCDERMOTT WILL & EMERY

David R. Hurst (I.D. No. 3743)
The Nemours Building
1007 North Orange Street, 4th Floor
Wilmington, Delaware 19801
Telephone: (302) 485-3900
Fax: (302) 351-8711

*Counsel and Proposed Counsel for Debtors and Debtors in Possession*

Dated: February 25, 2020
         Wilmington, Delaware

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are: Melinta Therapeutics, Inc. (0364); Cempra Pharmaceuticals, Inc. (5814); CEM-102 Pharmaceuticals, Inc. (4262); Melinta Subsidiary Corp. (9437); Rempex Pharmaceuticals, Inc. (6000); and Targanta Therapeutics Corporation (1077). The address of the Debtors' corporate headquarters is 44 Whippany Road, Suite 280, Morristown, New Jersey 07960.

# DISCLAIMER

THIS AMENDED DISCLOSURE STATEMENT (THIS "**DISCLOSURE STATEMENT**") WITH RESPECT TO THE AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF MELINTA THERAPEUTICS, INC. AND ITS DEBTOR AFFILIATES CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE DEBTORS' AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR THE PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSES OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN. THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS WHICH ARE ATTACHED TO, OR INCORPORATED BY REFERENCE IN, THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED IN THIS DISCLOSURE STATEMENT BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAVE BEEN MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT ASSUME AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH IN THIS DISCLOSURE STATEMENT SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETIES BEFORE CASTING A BALLOT. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY ENTITIES DESIRING ANY SUCH ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN WHICH ARE OTHER THAN AS SET FORTH, OR INCONSISTENT WITH, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT, AND THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR OTHER ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS UNDER RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, UNLESS SPECIFICALLY INDICATED OTHERWISE.

PLEASE REFER TO ARTICLE VII OF THIS DISCLOSURE STATEMENT, ENTITLED "RISK FACTORS TO BE CONSIDERED," FOR A DISCUSSION OF CERTAIN FACTORS THAT A CREDITOR VOTING ON THE PLAN SHOULD CONSIDER.

FOR A VOTE ON THE PLAN TO BE COUNTED, THE BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY KURTZMAN CARSON CONSULTANTS LLC ("**KCC**"), THE DEBTORS' CLAIMS, NOTICING, AND SOLICITATION AGENT, NO LATER THAN 4:00 P.M. (EASTERN), ON MARCH 30, 2020. SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES DESCRIBED IN FURTHER DETAIL IN ARTICLE VIII OF THIS DISCLOSURE STATEMENT AND IN THE DISCLOSURE STATEMENT ORDER. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED UNLESS OTHERWISE DETERMINED BY THE DEBTORS IN THEIR SOLE AND ABSOLUTE DISCRETION.

THE CONFIRMATION HEARING WILL COMMENCE ON APRIL 2, 2020, AT 10:00 A.M. (EASTERN), BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, WILMINGTON, DELAWARE 19801. THE DEBTORS MAY CONTINUE THE CONFIRMATION HEARING FROM TIME TO TIME WITHOUT FURTHER NOTICE OTHER THAN AN ADJOURNMENT ANNOUNCED IN OPEN COURT OR A NOTICE OF ADJOURNMENT FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE MASTER SERVICE LIST AND THE ENTITIES WHO HAVE FILED AN OBJECTION TO THE PLAN. THE BANKRUPTCY COURT, IN ITS DISCRETION AND BEFORE THE CONFIRMATION HEARING, MAY PUT IN PLACE ADDITIONAL PROCEDURES GOVERNING THE CONFIRMATION HEARING. THE PLAN MAY BE MODIFIED, IF NECESSARY, PRIOR TO, DURING, OR AS A RESULT OF THE CONFIRMATION HEARING, WITHOUT FURTHER NOTICE TO PARTIES IN INTEREST.

THE PLAN OBJECTION DEADLINE IS MARCH 26, 2020 AT 4:00 P.M. (EASTERN). ALL PLAN OBJECTIONS MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE DEBTORS AND CERTAIN OTHER PARTIES IN INTEREST IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER SO THAT THEY ARE RECEIVED ON OR BEFORE THE PLAN OBJECTION DEADLINE.

THE PLAN, THIS DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT AND EXHIBITS, ONCE FILED, AND OTHER DOCUMENTS AND MATERIALS RELATED THERETO MAY BE OBTAINED BY: (A) ACCESSING THE DEBTORS' RESTRUCTURING WEBSITE AT http://www.kccllc.net/melinta, (B) EMAILING Melintainfo@kccllc.net, (C) CALLING THE DEBTORS' RESTRUCTURING HOTLINE AT (877) 634-7178, WITHIN THE UNITED STATES OR CANADA, OR (424) 236-7224, OUTSIDE OF THE UNITED STATES OR CANADA, OR (D) ACCESSING THE COURT'S WEBSITE AT http://www.deb.uscourts.gov. COPIES OF SUCH DOCUMENTS AND MATERIALS MAY ALSO BE EXAMINED BETWEEN THE HOURS OF 8:00 A.M. AND 4:00 P.M., MONDAY THROUGH FRIDAY, EXCLUDING FEDERAL HOLIDAYS, AT THE OFFICE OF THE CLERK OF THE COURT, 824 NORTH MARKET STREET, 3RD FLOOR, WILMINGTON, DELAWARE 19801.

# TABLE OF CONTENTS

Page

I.    **Introduction** .................................................................................................1
    A.    Overview of Plan and Disclosure Statement ..........................................1
    B.    Summary of Treatment of Claims and Interests Under the Plan ............................2
    C.    GUC Trust...............................................................................7
    D.    Proposed Limited Substantive Consolidation..........................................8
    E.    Treatment of Certain Claims, Releases, and Exculpation with Respect to the Investigation.............................................................10

II.   **Overview of the Company's Operations** ...........................................................11

III.  **The Debtors and Their Business and Capital Structure** ..................................11
    A.    History....................................................................................11
    B.    Medications..............................................................................11
    C.    The Debtors' Employees............................................................14
    D.    The Debtors' Corporate and Capital Structure ....................................14

IV.   **Events Leading to the Chapter 11 Filing** .......................................................18
    A.    Challenging Market Conditions....................................................18
    B.    The MedCo Transaction and the MedCo/Rempex Litigation....................19
    C.    MedCo's Statement Regarding the MedCo/Melinta Litigation...................21
    D.    Covenant Compliance................................................................21
    E.    Consideration of Strategic Alternatives and Marketing Process ................23
    F.    Restructuring Support Agreement .................................................25
    G.    Efforts to Streamline Operations ..................................................26

V.    **The Chapter 11 Cases** ..............................................................................27
    A.    First Day Papers......................................................................27
    B.    Procedural Motions and Professional Retention Applications ...................30
    C.    The Claims Process...................................................................30
    D.    Key Employee Incentive Plan......................................................32
    E.    Bidding Procedures...................................................................32
    F.    Formation of the Committee .......................................................34
    G.    The Restructuring Support Agreement ...........................................34
    H.    Global Settlement Term Sheet .....................................................38

VI.   **Summary of the Plan of Reorganization** .......................................................46
    A.    Administrative Claims and Priority Tax Claims..................................46
    B.    Classification, Treatment, and Voting of Claims and Interests .................49
    C.    Acceptance.............................................................................53
    D.    Means of Implementation of the Plan.............................................54
    E.    Unexpired Leases and Executory Contracts .....................................64
    F.    Procedures for Resolving Disputed Claims and Interests.......................70
    G.    Provisions Governing Distributions...............................................72
    H.    Effect of Plan on Claims and Interests...........................................77

|        | I. | Conditions Precedent | 83 |
|        | J. | Bankruptcy Court Jurisdiction | 85 |
|        | K. | Miscellaneous Provisions | 88 |
| **VII.** | **Risk Factors to Be Considered** | | **92** |
|        | A. | General | 93 |
|        | B. | Forward Looking Statements | 93 |
|        | C. | Certain Other Risks | 94 |
|        | D. | The Plan May Not Be Accepted by Sufficient Holders of Impaired Claims | 116 |
|        | E. | The Global Settlement Term Sheet May Terminate | 117 |
|        | F. | The Bankruptcy Court May Not Confirm the Plan | 117 |
|        | G. | Bankruptcy-Specific Risk Factors That Could Negatively Impact the Debtors' Business | 118 |
|        | H. | Classification and Treatment of Claims and Interests | 120 |
|        | I. | Conditions Precedent to Consummation of the Plan | 121 |
|        | J. | Liquidation Under Chapter 7 | 121 |
| **VIII.** | **Solicitation and Voting Procedures** | | **121** |
|        | A. | Voting Status of Each Class | 121 |
|        | B. | Classes Entitled to Vote | 121 |
|        | C. | Sale-Related Solicitation Matters | 122 |
|        | D. | Voting Procedures | 123 |
| **IX.** | **Statutory Requirements for Confirmation of the Plan** | | **125** |
|        | A. | The Confirmation Hearing | 125 |
|        | B. | Confirmation Standards | 125 |
|        | C. | Liquidation Analysis | 127 |
|        | D. | Financial Feasibility | 127 |
|        | E. | Acceptance by Impaired Classes | 127 |
|        | F. | Confirmation Without Acceptance by All Impaired Classes | 128 |
| **X.** | **Alternatives to Confirmation and Consummation of the Plan** | | **129** |
|        | A. | Continuation of the Chapter 11 Cases | 129 |
|        | B. | Sale of Substantially All of the Debtors' Assets Under Bankruptcy Code Section 363 | 129 |
|        | C. | Alternative Plans of Reorganization | 130 |
|        | D. | Liquidation Under Chapter 7 or Chapter 11 | 130 |
| **XI.** | **U.S. Federal Income Tax Considerations Applicable to the Plan** | | **130** |
|        | A. | Holders of Claims and Interests | 131 |
|        | B. | The Reorganized Debtors | 135 |
|        | C. | Tax Treatment of the GUC Trust | 137 |

**XII.    Plan Supplement** ............................................................................................**139**

**XIII.    Recommendation and Conclusion** ................................................................**139**

## EXHIBITS[2]

| | |
|---|---|
| **Exhibit A** | Amended Joint Chapter 11 Plan of Reorganization of Melinta Therapeutics, Inc. and Its Affiliated Debtors |
| **Exhibit B** | Liquidation Analysis |
| **Exhibit C** | Corporate Structure Chart |
| **Exhibit D** | Disclosure Statement Approval Order |

---

[2]    Each Exhibit is incorporated herein by reference.

## I.    Introduction

### A.    Overview of Plan and Disclosure Statement

On December 27, 2019, Melinta Therapeutics, Inc. ("**Melinta Therapeutics**") and certain of its affiliates, the debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**," or "**Melinta**" or the "**Company**"), each commenced a case (collectively, the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors continue to operate their business and manage their properties as debtors and debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.

The Debtors' proposal for the reorganization of their business is set forth in the *Amended Joint Chapter 11 Plan of Reorganization of Melinta Therapeutics, Inc. and Its Debtor Affiliates*, a copy of which is attached hereto as **Exhibit A** (the "**Plan**").[3]

The Plan sets forth the proposed treatment of Claims against and Interests in the Debtors. It provides for payment in full or other treatment that would result in the unimpairment of Allowed Administrative, Priority Tax, Other Priority Claims, and Other Secured Claims. The treatment of the remaining Claims against the Debtors depends on the outcome Debtors' sales and marketing process (as further described in Article V hereof). In the event that the Supporting Lenders are the Successful Bidder (as defined below), then the Supporting Lenders shall receive 100% of the equity interests in reorganized Melinta Therapeutics (the "**Reorganized Melinta Common Stock**") in full satisfaction of the Secured Prepetition Credit Agreement Claims, Holders of Allowed General Unsecured Claims will receive their Pro Rata Share of any cash distributions from a general unsecured claims trust to be established under the Plan (the "**GUC Trust**"), and all Interests in Melinta Therapeutics shall be cancelled, extinguished, and discharged. In the event that a third party is the Successful Bidder, Holders of Allowed Secured Prepetition Credit Agreement Claims shall receive their Pro Rata Share of the Distributable Cash,[4] until such claims are paid in full in cash, Holders of Allowed General Unsecured Claims shall receive their Pro Rata Share of Distributable Cash, if any, remaining after all Secured Prepetition Credit Agreement Claims have been paid in full in cash, and all Interests in Melinta Therapeutics shall be cancelled, extinguished, and discharged.

This Disclosure Statement contains, among other things, descriptions, and summaries of provisions of the Debtors' proposed Plan, as attached hereto. Certain provisions of the Plan, and thus the description and summaries contained herein, will be the subject of continuing negotiations among the Debtors and various parties. Accordingly, the Debtors reserve the right to modify the

---

[3]    All capitalized terms not otherwise defined shall have the meanings ascribed to them in the Plan.

[4]    "**Distributable Cash**" means all cash held by the Debtors on the Plan Effective Date after consummating the sale to a third-party bidder (including the net cash proceeds of such sale), less amounts required to (a) pay in full all administrative claims (including professional fee claims), priority tax claims, other priority claims, and other secured claims and (b) fund any other cash obligations specified in the Plan.

Plan consistent with Bankruptcy Code section 1127, Rule 3019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and section 12.05 of the Plan.

The Plan provides for an equitable distribution of recoveries to the Debtors' creditors, and the Debtors believe that any alternative to confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code or attempts by another party in interest to file a plan, could result in significant delays, litigation and costs, job loss, and/or lesser recoveries. **For these reasons, the Debtors urge you to return your ballot accepting the Plan.**

> **WHO IS ENTITLED TO VOTE:** Under the Bankruptcy Code, only holders of claims or interests in "impaired" Classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to Bankruptcy Code section 1126(g)). Under Bankruptcy Code section 1124, a class of claims or interests is deemed to be "impaired" unless (a) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

> There are two creditor groups entitled to vote on the Plan whose votes are being solicited: Secured Prepetition Credit Agreement Claims and General Unsecured Claims.

THE PLAN PROVIDES THAT EACH HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTORS (1) THAT VOTES TO ACCEPT THE PLAN; (2) THAT IS CONCLUSIVELY PRESUMED TO ACCEPT THE PLAN; (3) THAT IS DEEMED TO REJECT THE PLAN AND DOES NOT INDICATE THAT IT OPTS TO NOT GRANT THE RELEASES PROVIDED IN THE PLAN; (4) WHOSE VOTE TO ACCEPT OR REJECT THE PLAN WAS SOLICITED BUT WHO DOES NOT VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN AND, FURTHER, DOES NOT INDICATE THAT IT OPTS TO NOT GRANT THE RELEASES PROVIDED IN THE PLAN; OR (5) THAT VOTES TO REJECT THE PLAN AND DOES NOT INDICATE THAT IT OPTS TO NOT GRANT THE RELEASES PROVIDED IN THE PLAN IS DEEMED TO HAVE GRANTED THE RELEASES THEREIN.

### B.    Summary of Treatment of Claims and Interests Under the Plan

The following table summarizes (a) the treatment of Claims and Interests under the Plan, (b) which Classes are impaired by the Plan, (c) which Classes are entitled to vote on the Plan, and (d) the estimated recoveries for holders of Claims and Interests. The table is qualified in its entirety by reference to the full text of the Plan. For a more detailed summary of the terms and provisions of the Plan, see Section V.H—Summary of the Plan of Reorganization below.[5]

---

[5]    All capitalized terms in this table have the same meaning as ascribed to them in Article I of the Plan attached as **Exhibit A**.

The estimated ranges of recoveries set forth in the following table are predicated on numerous assumptions, including that the Supporting Lenders are the Successful Bidder. In addition, in estimating the aggregate amount of General Unsecured Claims (other than any Class 4 General Unsecured Claims of MedCo and Vatera, which are addressed in greater detail below), the Debtors have made various assumptions about the amount of claims that would be subject to Cure in connection with a Transaction (as defined in the Bidding Procedures). These assumptions reflect the Debtors' judgment but not specific input from any potential Transaction counterparty, including the Supporting Lenders. In addition, as the General Bar Date (as defined below) has yet to pass, the Debtors have arrived at these estimated recoveries based on their current estimates of the amount of Claims in each Class.

The following table contemplates two scenarios with respect to Class 4 General Unsecured Claims, which are denominated "Scenario 1" and "Scenario 2," respectively. Both Scenario 1 and Scenario 2 assume that (a) the Supporting Lenders are the Successful Bidder, (b) the provisions of the Global Settlement Term Sheet pursuant to which the Supporting Lenders agreed to waive their General Unsecured Claims against the Debtors and to fund the Initial GUC Trust Funding Amount remain in full force and effect, and (c) there has been no Challenge to the Prepetition Secured Obligations (each as defined in the Final Cash Collateral Order) held by the Supporting Lenders.

Scenario 1 assumes that (a) the provisions of the Global Settlement Term Sheet pursuant to which Vatera (which each Debtor has scheduled as holding a General Unsecured Claim against it in the amount of $77,842,985) and MedCo (which has, in litigation and correspondence, asserted a claim against Melinta Therapeutics in an aggregate amount of at least $91,131,000, as explained in Section IV.B) have each agreed to subordinate their General Unsecured Claims to the extent of the Initial GUC Trust Funding Amount, subject to the terms and conditions of the Global Settlement Term Sheet, remain in full force and effect, and (b) the amount of GUC Trust Distributable Cash is equal to the Initial GUC Trust Funding Amount, less $500,000 in fees and expenses to fund the administration of the GUC Trust.

Scenario 2 assumes that the Global Settlement Term Sheet has terminated as to both Vatera and MedCo (but not as to the Debtors, Deerfield, and the Creditors' Committee), meaning that the agreements of MedCo and Vatera to subordinate their respective General Unsecured Claims are no longer applicable. This scenario could occur, for example, should the Investigator (as defined herein) determine that a colorable claim against any of the Vatera Persons and any of the MedCo Persons exists and will be transferred to the GUC Trust for prosecution. In this case, both Vatera and MedCo would, to the extent their respective General Unsecured Claims are Allowed, share on a Pro Rata basis in all distributions to Holders of Allowed General Unsecured Claims. In this scenario, the Debtors have also assumed that the amount of GUC Trust Distributable Cash is equal to the Initial GUC Trust Funding Amount, less $2,000,000 in fees and expenses to fund the administration of the GUC Trust and to pursue potential litigation against MedCo and Vatera. Because Scenario 2 assumes the prosecution of litigation against MedCo and Vatera, the estimated recoveries for Holders of Allowed General Unsecured Claims in Scenario 2 are subject to all of the uncertainties inherent in litigation. It is possible that Holders of Allowed General Unsecured Claims would realize greater recoveries in Scenario 2 than in Scenario 1, if significant claims against the Vatera Persons and/or the Medco Persons are identified by the Investigator and successfully prosecuted by the GUC Trust. For purposes of the following table, however, the Debtors have assumed that such litigation fails to generate any distributable proceeds.

3

There can be no guarantee that any of these assumed conditions ultimately will or will not be realized, or that the actual amount of Claims in any particular class will be equal to the estimated amounts set forth in the table.

| Class | Claim or Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan |
|---|---|---|---|---|
| 1 | **Other Priority Claims**<br><br>Estimated Total Amount: $750,000<br><br>Projected Recovery: 100% | Except to the extent otherwise agreed by the Reorganized Debtors or the Plan Administrator (as applicable), the Requisite Supporting Lenders (in the event the Supporting Lenders are the Successful Bidder), and the applicable Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Other Priority Claim, each such Holder of an Allowed Other Priority Claim shall (A) be paid in full in Cash on the later of (1) the Effective Date or (2) the first Periodic Distribution Date occurring after the date when an Other Priority Claim becomes payable pursuant to any agreement between the Reorganized Debtors or the Plan Administrator (as applicable) and the Holder of such Other Priority Claim or (B) receive such distribution acceptable to the Requisite Supporting Lenders (in the event the Supporting Lenders are the Successful Bidder) as necessary to unimpair such Other Priority Claim; *provided, however*, that Other Priority Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof. | Unimpaired | Presumed to Accept |
| 2 | **Other Secured Claims**<br><br>Estimated Total Amount: $0–$100,000<br><br>Projected Recovery: 100% | Except to the extent otherwise agreed by the Debtors, the Requisite Supporting Lenders (in the event the Supporting Lenders are the Successful Bidder), and the applicable Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Other Secured Claim, each such Holder of an Allowed Other Secured Claim shall, at the election of the Reorganized Debtors or the Liquidating Debtors (as applicable): (1) be paid in full in Cash in an amount equal to such Allowed Other Secured Claim, on the later of (A) the Effective Date and (B) the date such claim becomes payable in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such claim; or (2) receive such distribution acceptable to the Requisite Supporting Lenders (in the event the Supporting Lenders are the Successful Bidder) as necessary to unimpair such Allowed Other Secured Claim. Nothing in Section 3.02 of the Plan or elsewhere in the Plan shall preclude the Reorganized Debtors or the Plan | Unimpaired | Presumed to Accept |

| Class | Claim or Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan |
|---|---|---|---|---|
| | | Administrator, as applicable, from challenging the validity of any alleged Lien on any asset of the Debtors securing any Other Secured Claim or the value of the property subject to any such alleged Lien (other than the Liens and property securing the Prepetition Credit Agreement Claims). | | |
| 3 | **Secured Prepetition Credit Agreement Claims**<br><br>Estimated Total Amount: $142,426,658<br><br>Projected Recovery: 98% | (A) Except to the extent otherwise agreed by the Debtors and the Requisite Supporting Lenders, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed Secured Prepetition Credit Agreement Claim, on the Initial Distribution Date and each applicable Periodic Distribution Date thereafter, each Holder of an Allowed Secured Prepetition Credit Agreement Claim shall receive: (1) If the Supporting Lenders are the Successful Bidder, the Holder's Pro Rata Share of 100% of the Reorganized Melinta Common Stock; or (2) if a third-party bidder is the Successful Bidder, the Holder's Pro Rata Share of the Distributable Cash, until all Secured Prepetition Credit Agreement Claims are paid in full. (B) On the Effective Date, in return for the distributions set forth in Section 3.02(c)(ii)(A) of the Plan, the Supporting Lenders shall release any and all security interests and Liens, including, without limitation, security interests and liens on any remaining Distributable Cash, Avoidance Actions and/or the proceeds thereof, and other Causes of Action of the Debtors, to the Debtors and/or the Reorganized Debtors. (C) On the Effective Date, in return for the distributions set forth in Section 3.02(c)(ii)(A) of the Plan, all Liens and security interests granted to secure the Prepetition Credit Agreement shall be deemed cancelled and released and shall be of no further force and effect. To the extent that the Prepetition Lenders or the Prepetition Agent have filed or recorded publicly any Liens and/or security interests to secure the Debtors' obligations under the Prepetition Credit Agreement, such party shall take any commercially reasonable steps requested by the Reorganized Debtors or the Plan Administrator (as applicable) that are necessary to cancel and/or extinguish such publicly filed Liens and/or security interests. | Impaired | Entitled to Vote |

| Class | Claim or Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan |
|---|---|---|---|---|
| 4 | **General Unsecured Claims**<br><br>*Scenario 1*<br><br>Estimated Total Amount: $14,000,000[6]<br><br>Projected Recovery: 21%<br><br>*Scenario 2*<br><br>Estimated Total Amount: $187,000,000<br><br>Projected Recovery: 0.8% | Except to the extent otherwise agreed by the Debtors, the Requisite Supporting Lenders (in the event the Supporting Lenders are the Successful Bidder), and the applicable Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive: (A) If the Supporting Lenders are the Successful Bidders, the Holder's Pro Rata Share of the GUC Trust Distributable Cash, if any, subject to the claim subordination provisions set forth in Section 5.04(f) and (g) of the Plan; or (B) if a bidder other than the Supporting Lenders is the Successful Bidder, the Holder's Pro Rata Share of any Distributable Cash remaining after all Allowed Secured Prepetition Credit Agreement Claims have been paid in full in cash. | Impaired | Entitled to Vote |
| 5 | **Intercompany Claims** | On the Effective Date, all Intercompany Claims shall, at the election of the Debtors, with the approval of the Requisite Supporting Lenders (in the event the Supporting Lenders are the Successful Bidder), be either (A) Reinstated or (B) deemed automatically cancelled, released, and extinguished for no consideration; *provided*, *however*, that any Reinstatement of Intercompany Claims pursuant to the immediately preceding clause (A) shall not affect the deemed substantive consolidation of the Estate and Chapter 11 Case of each Debtor for distribution purposes only, pursuant to Section 5.01 of the Plan. | Unimpaired | Presumed to Accept |
| 6 | **Intercompany Interests** | On the Effective Date, all Intercompany Interests shall, at the election of the Debtors, with the approval of the Requisite Supporting Lenders (in the event the Supporting Lenders are the Successful Bidder), be either (A) Reinstated or (B) | Unimpaired | Presumed to Accept |

---

[6]    As noted above, Scenario 1 assumes that the amount of GUC Trust Distributable Cash is equal to the Initial GUC Trust Funding Amount less $500,000 in fees and expenses to fund the administration of the GUC Trust. In that scenario, an estimated $14,000,000 in Allowed General Unsecured Claims would share on a Pro Rata basis in $3,000,000 in GUC Trust Distributable Cash. As described in Section V.H below, Vatera and MedCo are entitled, pursuant to the Global Settlement Term Sheet, to their respective Pro Rata shares of all GUC Trust Distributable Cash in excess of $3.5 million. Thus, all GUC Trust Distributable Cash in excess of $3.5 million would be shared Pro Rata among an estimated $187 million in Class 4 General Unsecured Claims.

| Class | Claim or Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan |
|---|---|---|---|---|
| | | deemed automatically cancelled, released, and extinguished for no consideration; *provided*, *however*, that any Reinstatement of Intercompany Claims pursuant to the immediately preceding clause (A) shall not affect the deemed substantive consolidation of the Estate and Chapter 11 Case of each Debtor for distribution purposes only, pursuant to Section 5.01 of the Plan. | | |
| 7 | **Section 510(b) Claims and Recharacterized Claims** | On the Effective Date, each Section 510(b) and each Recharacterized Claim shall be cancelled, extinguished, and discharged, and the Holder thereof shall not receive or retain any property under the Plan on account of such claim. | Impaired | Deemed to Reject |
| 8 | **Interests in Melinta Therapeutics** | On the Effective Date, Allowed Interests in Melinta Therapeutics, including Old Melinta Securities, shall be deemed automatically cancelled, released, discharged, and extinguished without further action by the Reorganized Debtors or the Plan Administrator (as applicable), and the Holders thereof shall not receive or retain any property under the Plan on account of such interest. | Impaired | Deemed to Reject |

### C.    GUC Trust

On February 7, 2020, the Debtors, the Committee, Vatera, the Supporting Lenders, and MedCo (collectively, the "**Settlement Parties**") accepted and agreed to a settlement (the "**Settlement**"), memorialized in that certain Global Settlement Term Sheet dated as of the same date (the "**Global Settlement Term Sheet**") and filed at Docket No. 275. The key terms of the Global Settlement Term Sheet are described in detail in Section V.H below.[7]

Pursuant to the Plan and the Global Settlement Term Sheet, in the event that the Supporting Lenders are the Successful Bidder at the Auction, on the effective date of the Supporting Lender Transaction (the "**Supporting Lender Transaction Effective Date**"), if applicable, the Debtors shall establish the GUC Trust, which will be funded with $3.5 million (the "**Initial GUC Trust Funding Amount**") and shall receive certain Avoidance Actions and commercial tort claims. The GUC Trust will be administered by a trustee (the "**GUC Trustee**") and overseen by a committee comprised of three members of the Committee (as defined below) (the "**GUC Trust Oversight Committee**"). In the event that the Supporting Lenders are the Successful Bidder at the Auction, Holders of Allowed Class 4 General Unsecured Claims shall receive their Pro Rata Share of any distributions or recoveries from the GUC Trust, except that Vatera and MedCo have agreed to subordinate their Claims to those of other Holders of General Unsecured Claims with respect to

---

[7]    Capitalized terms used in this Section I.C and Section I.E and not defined herein or in the Plan shall have the meaning ascribed to them in the Global Settlement Term Sheet.

the first $3.5 million distributed by the GUC Trust, subject to various terms and conditions summarized in Section V.H below.

### D.     Proposed Limited Substantive Consolidation

As set forth in Section 5.01 of the Plan, the Plan contemplates and is predicated upon the deemed substantive consolidation of the Estate and Chapter 11 Case of each Debtor with the Estate and Chapter 11 Case of each other Debtor for distribution purposes only. Accordingly, on the Effective Date, each Claim filed or to be filed against any Debtor shall be deemed filed only against Melinta Therapeutics and shall be deemed a single Claim against and a single obligation of Melinta Therapeutics for distribution purposes only. This deemed substantive consolidation of the Estate and Chapter 11 Case of each Debtor for distribution purposes means that the specific Debtor against which a creditor holds or asserts a Claim will have no effect on the distribution (if any) provided to such creditor under the Plan. Thus, by way of illustration, each Holder of an Allowed General Unsecured Claim against any Debtor will receive its Pro Rata Share of (x) any distributions or recoveries from the GUC Trust (in the event of a Supporting Lender Transaction) or (y) the Distributable Cash remaining after all Secured Prepetition Credit Agreement Claims have been paid in full, in each case regardless of the specific Debtor entity against which such Holder holds an Allowed General Unsecured Claim.

As noted, the Plan provides for the deemed substantive consolidation of the Estate and Chapter 11 Case of each Debtor for distribution purposes only, and not for other purposes, such as tabulating votes to accept and reject the Plan. Accordingly, the Debtors will tabulate each Ballot as a vote to accept or reject the Plan only as to the specific Debtor or Debtors against which the voting creditor holds an Allowed Claim.

Absent the consent of affected creditors, the Debtors will bear the burden at the Confirmation Hearing of establishing a *prima facie* case for the deemed substantive consolidation of their respective Estates and Chapter 11 Cases contemplated by Section 5.01 of the Plan. Accordingly, the Debtors will, to the extent necessary, adduce evidence at the Confirmation Hearing to justify the deemed substantive consolidation contemplated by Section 5.01 in accordance with the standards established by applicable case law. Such evidence may include, without limitation, evidence indicating that: (a) creditors have dealt with the Debtors as a single, consolidated enterprise, both before and after the Petition Date (as evidenced by, among other things, the fact that the vast majority of the Debtors' ordinary-course liabilities are paid through Melinta Subsidiary Corp., without the generation of corresponding intercompany claims), and (b) separating the Debtors' assets and liabilities by Debtor entity would be infeasible and detrimental to creditors.

As set forth in the *Omnibus Reply of Debtors in Support of Debtors' Disclosure Statement* [Docket No. 304], the Debtors believe that there are sufficient factual and legal bases for the proposed limited substantive consolidation. At the Confirmation Hearing, the Debtors will as necessary introduce argument and evidence concerning the following factors, among others, in support of the Plan's limited substantive consolidation provision:

- As set forth in the First-Day Declaration, the Debtors operate on a consolidated basis;

- Debtor Melinta Subsidiary Corp. ("**Melinta Subsidiary**"), as the only Debtor entity that maintains bank accounts, processes all of the Debtors' disbursements, including disbursements on account of employee obligations, customer program obligations, and trade vendor obligations;

- As set forth in the Schedules and Statements, the Debtors do not record intercompany payables and receivables in the ordinary course of business;

- The Debtors do not have any intercompany agreements;

- Efforts to deconsolidate the Debtors' respective assets and liabilities would substantially burden the estate and divert management and professional resources that are more profitably directed elsewhere, all without meaningfully affecting the distributions received by any class; and

- The Vatera Loan Agreement indicates that Vatera dealt with the Debtors as a consolidated enterprise and did not rely on the separateness of the various Debtor entities because, among other things, (a) the Vatera Loan Agreement explicitly permits the Debtor entities to merge into one another, provided parent Melinta Therapeutics survives such merger; (b) the financial covenants under the Vatera Loan Agreement are tested on a consolidated basis; and (c) the Vatera Loan Agreement does not require the Debtors to provide financial statements on a non-consolidated basis.

As set forth in *Vatera Healthcare Partners LLC's (A) Objection and Reservation of Rights With Respect to the Debtors' Motion for an Order (I) Approving Adequacy of Debtors' Disclosure Statement, (II) Approving Solicitation and Notice Procedures With Respect to Confirmation of Debtors' Proposed Plan of Reorganization, (III) Approving Form of Various Ballots and Notices in Connection Therewith, and (IV) Scheduling Certain Dates With Respect Thereto, and (B) Preliminary Objection to Plan Confirmation* [Docket No. 291], Vatera has indicated that, in the event that the Global Settlement Term Sheet terminates (either entirely, or with respect to Vatera) prior to the Confirmation Hearing, Vatera will oppose substantive consolidation as being prohibited by applicable law. In support of this argument, Vatera has indicated that it may rely on (among other things) the following allegations:

- The Schedules and Statements show distinct transactions at each Debtor and support that creditors dealt with each Debtor on an individual basis and not as a single economic unit;

- The Schedules and Statements also attribute certain assets, such as tax attributes and intellectual property, to specific Debtor entities;

- The Debtors have historically filed tax returns on an entity-by-entity basis;

- Certain entities, including Vatera and Deerfield, have claims against multiple Debtor entities;

- Section 5.04 of the Plan, which provides that the Debtors shall continue to exist after the Effective Date as separate entities belies the Debtors' request for substantive consolidation; and

- The Debtors assets and liabilities are not so entangled that substantive consolidation is necessary or appropriate to prevent harm to creditors.

For the avoidance of doubt, the Debtors do not endorse the allegations of Vatera described in the preceding paragraph, nor does Vatera endorse the Debtors' contentions set forth above. Nothing in this Section I.D shall prejudice or limit in any way any legal or factual argument or claim that either the Debtors or Vatera may advance with respect to the Plan's proposed substantive consolidation provisions at the Confirmation Hearing if the Global Settlement Term Sheet has terminated as to Vatera.

**E.      Treatment of Certain Claims, Releases, and Exculpation with Respect to the Investigation**

Pursuant to the Global Settlement Term Sheet, the Debtors are conducting an investigation of any actual and potential claims and causes of action against the Debtors' present and former directors and officers ("**D&Os**"), Vatera and the other Vatera Persons, and MedCo and the other MedCo Persons (the "**Investigation**"), all of whom are Released Persons under the Plan. Aron Schwartz, an independent member of the Debtors' board of directors (with the assistance of McDermott Will & Emery LLP), is conducting the Investigation with respect to the D&Os and the Vatera Persons; the Debtors may delegate the Investigation of the MedCo Persons to such board members or committees, officers, and/or counsel as the Debtors deem appropriate. (The applicable person or persons responsible for conducting each applicable Investigation is referred to herein as the "**Investigator**.")

The purpose of the Investigation is to (i) identify whether there exist any colorable claims of the Debtors that may be pursued against the subjects of the Investigation and (ii) determine the treatment and disposition of any such colorable claims. In determining the treatment and disposition of any such colorable claim, the Investigator may consider, among other things, the cost and expense of pursuing such colorable claim, the Investigator's assessment of the likelihood of success on the merits, the likely complexity of any litigation involving such colorable claim, and the consideration that has been or will be provided by the applicable Investigation subject. The consideration provided by each of the Settlement Parties pursuant to the Global Settlement Term Sheet is described in Section V.H. below.

The Global Settlement Term Sheet requires that the Investigator identify any colorable claim that will be transferred to the GUC Trust by no later than 5:00 p.m. (Eastern) on March 12, 2020. In the event that the Investigator determines that a colorable claim against any of the D&Os, the Vatera Persons, or the MedCo Persons exists and will be transferred to the GUC Trust, such persons will not be released under the Plan, and the Debtors will amend the Plan accordingly.

## II.      Overview of the Company's Operations

Melinta is a biopharmaceutical company focused on developing and commercializing differentiated antibiotics. The Debtors' mission is to stem the public health threat posed by bacterial resistance to antibiotics through the research and creation of products for serious gram-positive and gram-negative types of bacterial infections. Melinta currently has four medications in its antibiotic portfolio, which are sold under the brand names Baxdela®, Vabomere®, Orbactiv®, and Minocin® for injection.

## III.     The Debtors and Their Business and Capital Structure

### A.      History

Melinta was formed as a private company in October 2000 and began operating as a clinical-stage pharmaceutical company, focused on developing differentiated antibiotics for the acute care and community settings to meet critical medical needs in the treatment of bacterial infectious diseases. Melinta received regulatory approval for its first drug, Baxdela, in June 2017.

In November 2017, the entity then known as Melinta Therapeutics, Inc. completed a reverse merger with Cempra Inc. ("**Cempra**"), a publicly traded clinical-stage pharmaceutical company focused on developing anti-infectives. In connection with the merger transaction, the common equity of old Melinta Therapeutics, Inc. was exchanged for the common stock of Cempra, which was publicly listed on the Nasdaq. Also, in connection with the merger transaction, Cempra was renamed Melinta Therapeutics, Inc., and the former Melinta Therapeutics, Inc. was renamed Melinta Subsidiary Corp. As a result of the merger, Melinta acquired a portfolio of development-stage drug medications from Cempra, including solithromycin and fusidic acid. Melinta has since divested fusidic acid and solithromycin, in light of difficulties developing and commercializing these medications.

On January 5, 2018, Melinta acquired the Infectious Disease Business ("**IDB**" and the purchase of the IDB by Melinta, the "**MedCo Transaction**") from The Medicines Company ("**MedCo**") for consideration including, among other things: (a) $165 million in cash and $50 million in Melinta Therapeutics common equity at closing of the MedCo Transaction, (b) $25 million to be paid on each of the 12- and 18-month anniversaries of the closing of the MedCo Transaction, (c) certain royalty payments, based on tiered net sales of the acquired medications in certain jurisdictions, and (d) the assumption of certain liabilities owed to legacy shareholders of certain IDB-related entities and inventory-related liabilities. Under the MedCo Transaction, Melinta acquired certain assets related to the IDB, which included the rights to Vabomere, Orbactiv, and Minocin for injection (including MedCo's interest in certain of MedCo's IDB-related subsidiaries).

### B.      Medications

As noted, the Debtors' medication portfolio comprises four commercial-stage antibiotics (collectively, the "**Medications**"). As set forth in greater detail in the Debtors' Critical Vendor Motion [Docket No. 12], the Debtors do not own or operate (or plan to own or operate) manufacturing facilities for the production of any of their Medications. Instead, the Debtors work with third-party contract manufacturers to provide the Debtors' required raw materials, active

pharmaceutical ingredients, and finished medications. The Company manages its manufacturing contractors through a combination of internal resources and third-party consultants.

### 1. Baxdela® (delafloxacin)

Baxdela was approved by the FDA in June 2017 and is a novel fluoroquinolone monotherapy that exhibits activity against both gram-positive and gram-negative[8] pathogens.

Baxdela was initially approved for the treatment of adult patients with acute bacterial skin or skin structure infections ("**ABSSSI**"). Baxdela can be used in either an IV or oral formulation and has broad spectrum activity, including methicillin-resistant staphylococcus aureaus ("**MRSA**"). Baxdela was launched commercially to treat adult patients with ABSSSI in early 2018.

Baxdela is a Qualified Infection Disease Product under the 2012 Generating Antibiotics Incentives Now Act (the "**GAIN Act**"). As a result, the marketing exclusivity period granted by the FDA to Baxdela was ten years, as opposed to five. In the second quarter of 2019, the Company submitted a supplemental New Drug Application ("**sNDA**") for Baxdela, for the treatment of adult patients with community-acquired bacterial pneumonia caused by designated pathogens. On October 24, 2019, the Company announced that the sNDA had been approved by the FDA, after an expedited review period.

The Debtors license patents and patent applications related to certain components and technology for the manufacture of Baxdela. The Company also has developed and patented additional components and technologies related to Baxdela. As a result, the Debtors' intellectual property portfolio for Baxdela includes patents and pending United States patent applications and corresponding national or regional counterpart patents or applications.

The Company has partnered with leading multinational pharmaceutical firms for the marketing and distribution of Baxdela in territories outside of the United States, including Menarini IFR SrL ("**Menarini**") for Europe and Asia-Pacific (excluding Japan), Eurofarma Laboratórios S.A. ("**Eurofarma**") for Central and South America, and with Hikma Pharmaceuticals for certain territories in the Middle East and North Africa. On December 16, 2019, the European Commission approved delafloxacin (marketed under the trade name Quofenix) for the treatment of ABSSSI. Additionally, delafloxacin was also approved in certain countries in South America in 2018–2019.

As discussed in greater detail below, as part of the Company's strategic review process, the Debtors recently determined to suspend their efforts to promote Baxdela in retail settings in the United States.

---

[8]    The terms "gram-positive" and "gram-negative" are used to differentiate between different types of bacteria. The terms "gram-positive" and "gram-negative" refer to a given bacteria's reaction to the gram stain procedure. Generally, gram-negative pathogens or bacteria are more resistant to antibiotics.

### 2.    Vabomere® (meropenem and vaborbactam)

Vabomere is an intravenous antibiotic that is a fixed-dose combination of meropenem, a well-established carbapenem, and vaborbactam, a novel beta-lactamase inhibitor that inhibits certain types of resistance mechanisms used by gram-negative bacteria. Vabomere has received FDA approval for treatment of adult patients with complicated urinary tract infections. Vabomere was specifically developed to address KPC-producing carbapenemases in gram-negative bacteria, which is the most common cause of carbapenemase resistance in the United States. Carbapenemase-resistant Enterobacteriaceae ("**CRE**") are classified by the United States Centers for Disease Control ("**CDC**") as an urgent antimicrobial resistance threat and by the World Health Organization ("**WHO**") as a critical priority.

Vabomere is also a designated Qualified Infection Disease Product and with its approval by the FDA, Vabomere was also deemed eligible for a ten-year marketing exclusivity period under the GAIN Act. The Company has developed and patented additional components and technologies related to Vabomere and the Debtors' intellectual property portfolio for Vabomere includes patents and pending United States patent applications and corresponding national or regional counterpart patents or applications.

The Company has partnered with Menarini IFR SrL to market Vabomere in Europe and Asia-Pacific (excluding Japan). On November 20, 2018, the European Commission approved Vabomere for use in adult patients with complicated intra-abdominal and complicated urinary tract infections, hospital-acquired pneumonia including ventilator associated pneumonia, bacteraemia that occurs in association with any of these infections, and infections due to aerobic gram-negative organisms where treatment options are limited. The Company continues the launch of Vabomere with a sales force that interacts primarily within the hospital space with infectious disease and critical care physicians, microbiologists, and clinical pharmacists.

### 3.    Orbactiv® (oritavancin)

Orbactiv is a long-acting lipoglycopeptide IV antibiotic that allows single-dose infusion for the treatment of adult patients with ABSSSI caused or suspected to be caused by susceptible gram-positive bacteria, including MRSA. Orbactiv provides an alternative to hospital admission or multiple days of therapy in the outpatient setting given the entire course of therapy is administered as a single-dose infusion.

In contrast to the current standard of care (six to ten days of IV therapy), single-dose ABSSSI therapy with Orbactiv increases patient convenience, ensures patient adherence with a single dose course of treatment, and allows for treatment in alternative, lower-cost care settings (*i.e.*, outside of the hospital).

Orbactiv is a Qualified Infection Disease Product and consequently, the FDA granted Orbactiv a ten-year marketing exclusivity period. The Debtors license patents and patent applications related to certain components and technology related to Orbactiv. The Company also has developed and patented additional components related to Orbactiv and the Orbactiv intellectual property portfolio includes patents and pending United States patent applications and

corresponding national or regional counterpart patents or applications. The Company markets Orbactiv through its hospital and sales force infrastructure.

### 4.    Minocin® (minocycline) for Injection

Minocin for injection is an IV antibiotic of the tetracycline class with broad-spectrum activity against gram-positive and gram-negative pathogens. A new formulation was launched in 2015, which improved tolerability and convenience in administration, owing to a smaller required infusion volume.

Minocin for injection is one of the few agents approved for the treatment of Acinetobacter infections, which are commonly seen in critically ill patients. Acinetobacter is listed as a critical priority pathogen by the WHO and carbapenem-resistant Acinetobacter is categorized as an urgent threat by the CDC.

### C.    The Debtors' Employees

As of the Petition Date, the Debtors had 200 employees, all of whom work full time. The Debtors pay salaries to 195 of these employees and pay hourly wages to five employees. All employees are employed by Debtor Melinta Subsidiary Corp. The Debtors' employees serve a number of roles: 11 work in the Debtors' scientific and drug development group, 21 work in medical and regulatory affairs, 113 work in the salesforce (the "**Sales Employees**"), four work in quality assurance, four work to improve and manage the supply chain, 17 work on the commercial team, 24 work in general and administrative functions, and six perform executive functions. The Debtors' Sales Employees work from home when they are not in the field. The Debtors' other employees generally work out of one of the Debtors' two corporate offices in Morristown, New Jersey and Lincolnshire, Illinois. The Debtors do not have any unionized employees.

### D.    The Debtors' Corporate and Capital Structure

Melinta Therapeutics owns 100% of the outstanding equity interests in each of the other Debtors. A corporate organization chart depicting the ownership structure of the Debtors and their non-Debtor affiliates is attached hereto as **Exhibit C**.

As of the Petition Date, the aggregate, outstanding principal amount of the Debtors' long-term funded indebtedness was approximately $213.3 million, consisting of: (a) approximately $133.3 million in outstanding principal amount of senior secured loans under the Deerfield Facility Agreement (as defined herein); and (b) $80 million in outstanding principal amount of subordinated convertible loans under the Vatera Loan Agreement (as defined herein).

### 1.    The Deerfield Facility

On January 5, 2018, in connection with the MedCo Transaction, Melinta Therapeutics, as borrower, and the other Debtors, as guarantors, entered into a Facility Agreement (as amended by

the 2019 Deerfield Facility Amendment,[9] and as further amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Deerfield Facility Agreement**" and the credit facility thereunder, the "**Deerfield Facility**") with Cortland Capital Market Services LLC as agent (the "**Deerfield Facility Agent**") and certain affiliates of Deerfield Management Company, L.P. as lenders (collectively, "**Deerfield**" and together with the Deerfield Facility Agent, the "**Prepetition Secured Parties**"). The Debtors' obligations under the Deerfield Facility Agreement are secured by liens on substantially all of the Debtors' tangible and intangible assets, other than certain customary excluded property. This collateral includes the stock owned by Melinta Therapeutics in the Debtor subsidiaries.

The Deerfield Facility Agreement provides for a credit facility of up to $200 million. In connection with the closing of the MedCo Transaction, Deerfield made an initial disbursement of approximately $147 million. The proceeds of this initial disbursement were used to extinguish certain then-existing debt, fund the up-front cash purchase price for the MedCo Transaction, and provide working capital. In addition to the initial disbursement, the Deerfield Facility Agreement also provides for $50 million in subsequent disbursement commitments. The subsequent disbursement commitments are available through January 4, 2020, but are subject to the Company's satisfaction of certain conditions precedent, including, most significantly, the Company's achievement of annualized net sales of at least $75 million over the two preceding fiscal quarters.

The loans under the Deerfield Facility bear cash-pay interest at 11.75% and mature on January 5, 2024. The loans are subject to a three-year "no-call" period (*i.e.*, through January 5, 2021) and, thereafter, may be prepaid, subject to a specified prepayment fee. The prepayment fee is calculated as a percentage of the annual interest expense on the loans being prepaid.[10] In addition, the Deerfield Facility Agreement requires the Company to pay as an "exit fee" an amount in cash equal to 4% of any loans paid, repaid, redeemed, or prepaid at any time (including as a result of the Company's bankruptcy).[11]

The Deerfield Facility Agreement permits Deerfield to convert up to $74 million in principal amount of the loans thereunder into shares of the Company's common stock at a minimum conversion price equal to 95% of the lesser of (a) the closing price of the Company's common stock on the trading day prior to the conversion and (b) the average volume-weighted price of the Company's common stock on the three trading days preceding the conversion, subject in each case to a floor of $5.15 per share. Deerfield converted approximately $14.5 million of loans

---

[9]  The "**2019 Deerfield Facility Amendment**" is that certain First Amendment dated as of January 14, 2019, entered into in connection with the Debtors' entry into the Vatera Loan Agreement (as defined below). The 2019 Deerfield Facility Amendment amended the Deerfield Facility Agreement to permit the Debtors' entry into the Vatera Loan Agreement, the funding of the initial disbursements thereunder, and the related issuance of equity to the Vatera Parties (as defined below). In addition, the 2019 Deerfield Facility Amendment amended certain covenants in the Deerfield Facility Agreement. Finally, as a result of the 2019 Deerfield Facility Amendment, Deerfield is permitted to convert up to $74 million in loans under the Deerfield Facility into shares of Melinta Therapeutics' common stock.

[10]  The specified percentage is 75% for the period January 6, 2021, to January 5, 2022; 50% for the period January 6, 2022, to January 5, 2023, and 25% after January 5, 2023.

[11]  This exit fee was initially 2%, but was increased to 4% as part of the 2019 Deerfield Facility Amendment.

into shares of common stock in calendar year 2019, thus reducing the outstanding principal amount of the loans from approximately $147.8 million to $133.3 million.

In connection with entry into the Deerfield Facility Agreement, the Company issued to Deerfield seven-year warrants to purchase 758,573 shares of Melinta Therapeutics' common stock at an exercise price of $82.50.

The Deerfield Facility Agreement, as amended, imposes numerous affirmative, negative, and financial covenants on the Company, including the following:

- the Company must realize net revenue from product sales of at least $63.75 million for the year ending December 31, 2019;

- the Company's audited financial statements for 2019 and thereafter must not contain a "going-concern" qualification; and

- the Company must maintain a minimum cash balance of $40 million through March 31, 2020, and a minimum cash balance of $25 million thereafter.

### 2.    The Vatera Loan Agreement

On November 6, 2018, Melinta entered into a commitment letter with Vatera pursuant to which Vatera committed to purchase shares of the Company's common stock for an aggregate purchase price of up to $75 million. On November 19, 2018, Melinta and Vatera entered into a definitive purchase agreement with respect to such purchase. On December 16, 2018, counsel to Vatera informed counsel to the Company that Vatera believed it did not appear that the conditions to closing under the purchase agreement would be satisfied at the time of the proposed closing of the issuance. Vatera subsequently proposed a restructured transaction involving up to $135 million of senior subordinated convertible loans.[12]

On December 31, 2018, Melinta Therapeutics, as borrower, and the other Debtors, as guarantors, entered into a senior subordinated convertible loan agreement (as amended, supplemented, or otherwise modified from time to time, the "**Vatera Loan Agreement**" and the facility governed thereby, the "**Vatera Facility**") with Vatera Healthcare Partners LLC ("**Vatera**") and Oikos Investment Partners LLC (formerly known as Vatera Investment Partners LLC) ("**Oikos**"[13] and, together with Vatera, the "**Vatera Parties**"). The obligations under the Vatera Loan Agreement are unsecured and are subordinated in right of payment to the obligations under the Deerfield Facility Agreement.

---

[12]    Additional information concerning the background of the Vatera Loan Agreement (as defined below), including the equity commitment letter and equity purchase letter described in this paragraph, is set forth in the Company's revised definitive proxy statement dated as of January 29, 2019, which is accessible on the Company's investor relations website at the following address: http://ir.melinta.com/sec-filings/sec-filing/defr14a/0001193125-19-019504.

[13]    As described below, no funding commitments held by Oikos under the Vatera Facility were ever drawn and they expired on October 31, 2019; however, under the terms of the Vatera Loan Agreement, Oikos has certain consent rights with respect to amendments and waivers of the Vatera Loan Agreement.

At its inception, the Vatera Loan Agreement provided for up to $135 million in convertible loans. The Company made an initial borrowing of $75 million on February 22, 2019, and, simultaneously, Deerfield was deemed to have funded an additional $5 million in convertible loans. The remaining $60 million in commitments under the Vatera Loan Agreement were originally available in two subsequent disbursements. The first subsequent disbursement of $25 million was available to be drawn after March 31, 2019, but on or prior to June 30, 2019; the second subsequent disbursement of up to $35 million was available to be drawn after June 30, 2019, but on or prior to July 10, 2019.

The funding of each disbursement under the Vatera Loan Agreement was subject to the satisfaction (or waiver) of various conditions precedent, including, without limitation: the absence of a default or event of default under the Vatera Loan Agreement or the Deerfield Facility Agreement and no such default or event of default being reasonably expected to occur.

The Company and the Vatera Parties amended the Vatera Loan Agreement in June 2019 to, among other things, extend the period during which the Company could borrow the remaining unfunded commitments through October 31, 2019. In exchange, the amount of the unfunded commitments was reduced from $60 million to $27 million. The amendment also removed the condition precedent to borrowing the remaining commitments that no default be reasonably expected to occur under the Deerfield Facility Agreement; however, the amendment did not remove the conditions to funding that no default be reasonably expected to occur under the Vatera Loan Agreement or that no default had actually occurred under either the Deerfield Facility Agreement or the Vatera Loan Agreement.

The loans under the Vatera Facility are convertible (at Vatera's option) into either common stock of the Company or preferred stock of the Company. Such preferred stock is non-participating, non-voting stock with no dividend rights, but with a liquidation preference equal to the amount of the Vatera Facility converted into preferred equity.

The Vatera Facility bears interest at 5% per year, payable 50% in cash and 50% in kind. The Vatera Facility has a 1% exit fee on funded amounts that are repaid or converted and a 3% exit fee on amounts that are unfunded, payable upon repayment in full or conversion in full of the Vatera Facility. The obligations under the Vatera Facility mature on January 6, 2025. As of the Petition Date, the outstanding principal amount of the loans under the Vatera Facility was approximately $80 million.

The Vatera Loan Agreement imposes numerous affirmative, negative, and financial covenants on the Debtors. The financial covenants imposed by the Vatera Loan Agreement are substantially comparable to those set forth in the Deerfield Facility Agreement, except that the financial covenants in the Vatera Loan Agreement are approximately 10% less restrictive than the corollary covenants in the Deerfield Facility Agreement.

### 3.      Equity

Melinta Therapeutics has a single series of equity, namely, its common stock, outstanding. As of November 6, 2019, there were 13,750,691 outstanding shares of Melinta Therapeutics' common stock. The common stock trades publicly on the Nasdaq under the ticker symbol

"MLNT." On December 26, 2019, the last trading day prior to the Petition Date, Melinta Therapeutics' common stock closed at $1.49 per share. In addition to the warrants issued to Deerfield, as of December 31, 2018, the Company also has approximately 8,108 warrants that expire in December 2024, with an exercise price of $166.50. As of the Petition Date, all of Melinta Therapeutics' warrants are out of the money.

On May 21, 2018, Melinta Therapeutics commenced an underwritten public offering of shares of its common stock that closed on May 29, 2018. The public offering of 22,000,000 shares of common stock, and a related sale of 2,640,000 shares to the Melinta Therapeutics' underwriters, resulted in gross proceeds of approximately $123,200,000, before deducting underwriting discounts and commissions and expenses paid, as stated in a prospectus supplement filed by the Company on May 25, 2018, and an exhibit to a Form 8-K filed by the Company on May 29, 2018. As stated in a press release filed with the SEC on May 21, 2018, and in an exhibit to a Form 8-K filed by the Company on May 29, 2018, certain directors, executive officers, shareholders and shareholder affiliates had indicated a non-binding interest in purchasing up to $50,000,000 of common stock in connection with this public offering. In that regard, the largest purchases of equity were on account of Vatera and its affiliates. Specifically, and as stated in a Schedule 13D/A filed on May 31, 2018, Vatera purchased from the underwriters 7,500,000 shares of common stock for an aggregate purchase price of $37,500,000, or $5.00 per share, and Vatera affiliate VHPM Holdings LLC purchased from the underwriters 378,500 shares of common stock for an aggregate purchase price of $1,892,500, or $5.00 per share

## IV.    Events Leading to the Chapter 11 Filing

### A.    Challenging Market Conditions

The market for antibiotics has faced significant financial-related challenges in recent years. The costs associated with bringing an antibiotic medicine to market can total hundreds of millions of dollars, and physicians are often reluctant to prescribe novel antibiotics for fear that over-prescription of such medicines will cause the targeted pathogens to develop antibiotic resistance. As such, prescribers will often use potentially less effective, and often more toxic, generic antibiotics to preserve the effectiveness of the novel agent. And, when new antibiotics are prescribed, they generally do not command high prices or high reimbursement rates, in part due the pricing expectations set by lower-cost generic antibiotics. Given the high cost of bringing antibiotics to the market and the limited returns, most large drug manufacturers have left the antibiotics industry over the last several years. Other smaller, antibiotic-specific firms have dissolved or sought chapter 11 protection. This industry-wide strain has caused a contraction in antibiotics producers' access to the capital markets.

Like many antibiotics companies, the Company's financial position has become increasingly strained in recent quarters. The Company's efforts to develop and commercialize its approved Medications have been costly, and the Company has borrowed substantial debt to continue to fund these efforts. For this reason, and in light of the financial covenants contained in the documents governing the Company's funded indebtedness, slow revenue growth in the antibiotic sector placed the Company in financial difficulty.

In response to this, the Company undertook significant operational and strategic initiatives in order to grow revenue, manage costs, and preserve liquidity. In order to reduce its operating expenditures, for example, the Company undertook a 20% workforce reduction in the fourth quarter of 2018, and wound down its research and discovery functions. In addition, the Company undertook various initiatives to raise interest regarding the state of the antibiotic industry.

In the first quarter of 2019, the Company executed several new strategic commercial initiatives aimed at increasing sales of its antibiotic portfolio. These commercial initiatives included the engagement of a contract sales organization to sell Baxdela in a retail setting, changes in the Company's commercial leadership team, amending the Company's existing compensation plan for sales representatives, enhanced patient support and sampling programs, and evolving the Company's targeting strategy for retail sales. The Company also interfaced with a number of potential long-term or high-volume buyers, including the United States Biomedical Advanced Research and Development Authority. While the Company made progress with these potential buyers, the parties were ultimately unable to reach agreement on the terms of a transaction.

The Company's Medications have failed to generate levels of revenue necessary to cover its costs. As a result, the Company has incurred substantial losses from operations each year since its inception. This combination of slow sales growth, high up-front development costs, substantial distribution costs, and significant debt has strained the Company's balance sheet, leaving the Company with insufficient liquidity and access to capital to successfully execute its go-forward business plan, absent a financial restructuring.

### B.    The MedCo Transaction and the MedCo/Rempex Litigation

These challenges have been amplified by significant ongoing litigation comprising two related lawsuits in the Delaware Court of Chancery stemming from the MedCo Transaction. In a lawsuit filed in the Delaware Court of Chancery in March 2019 (the "**MedCo/Rempex Litigation**"), MedCo and Fortis Advisors, LLC ("**Fortis**") (as designated representative of the former shareholders of Rempex Pharmaceuticals, Inc. ("**Rempex**")) assert that the Company wrongly withheld aggregate payment of $80 million comprising deferred purchase price obligations and assumed liabilities due in connection with the MedCo Transaction. This asserted liability comprises two components. First, MedCo has asserted in the MedCo/Rempex Litigation and correspondence that Melinta refused to pay $25 million in deferred purchase price on each of the 12- and 18-month anniversaries of the closing date of the MedCo Transaction (*i.e.*, January 7, 2019, and July 7, 2019, respectively). Second, MedCo asserts that Melinta wrongly failed to satisfy an assumed liability under the purchase and sale agreement governing the MedCo Transaction (the "**MedCo PSA**")— MedCo's obligation to make a $30 million "milestone" payment to the shareholders of Rempex (a company MedCo acquired in 2013 and subsequently sold to Melinta in the MedCo Transaction) upon the European Commission's approval (at the recommendation of the European Medicines Agency[14]) of Vabomere. Fortis also asserted a direct claim against Melinta in respect of the same obligation, arguing that it is entitled to enforce the milestone payment as an asserted third-party beneficiary of the MedCo PSA; as discussed below, this claim has been dismissed.

---

[14]    The European Medicines Agency is the European Union's counterpart to the United States FDA.

Melinta does not deny that it withheld these payments. It contends, however, in a lawsuit it filed in the Delaware Court of Chancery in December 2018 (the "**MedCo/Melinta Litigation**") that it is entitled to set off against these obligations in light of significant affirmative claims it asserts in the MedCo/Melinta Litigation against MedCo for breach of contract and fraud relating to the MedCo Transaction. In particular, Melinta asserts that certain of MedCo's representations and warranties in the MedCo PSA—including that MedCo operated its IDB business in the ordinary course prior to closing, that financial statements provided to Melinta were prepared in accordance with GAAP, and that MedCo was not in default under any material contracts—were knowingly false. Melinta claims at least $80 million in damages on account of these misrepresentations and asserts that it is entitled to set off these damages against the $50 million in deferred purchase price and the $30 million milestone payment otherwise due under the MedCo PSA.

The Delaware Chancery Court scheduled a hearing in September 2019 to consider various pleadings-stage motions in the MedCo/Rempex Litigation and MedCo/Melinta Litigation, including, most significantly, MedCo's motion for judgment on the pleadings in respect of its claim against Melinta for failing to pay the $30 million milestone payment under the MedCo PSA and MedCo's motion to dismiss the MedCo/Melinta Litigation. Given Melinta's financial circumstances, Melinta requested that MedCo agree to adjourn the September 2019 hearing to permit the parties time to discuss the potential for a consensual restructuring. MedCo agreed and, as a result, all matters between Melinta and MedCo that were previously scheduled for hearing in September 2019 were adjourned to a date to be determined. Fortis did not agree to adjourn the hearing; consequently, certain matters involving Fortis—including Fortis's motion for judgment on the pleadings in respect of its claims against MedCo and Melinta's motion to dismiss Fortis's claim against Melinta—went forward, with the court dismissing Fortis's claim against Melinta and granting Fortis's motion for judgment on the pleadings in respect of its claims against MedCo, finding MedCo responsible for the milestone payment at issue.

Irrespective of the legal merits of the parties' competing positions in the MedCo/Rempex Litigation, the fact remains that the MedCo Transaction has proven far less valuable than projected at the time of the transaction, and the IDB assets Melinta acquired from MedCo have significantly underperformed projections furnished by MedCo. Melinta believes that the projections furnished by MedCo in connection with the acquisition of the IDB business—which constitutes three of the four Medications in Melinta's portfolio—were unduly optimistic and were predicated on materially incorrect assumptions. By way of illustration, MedCo's projections assumed that a new formulation for Orbactiv would be launched in 2019. In reality, MedCo had not yet initiated the patient study necessary to obtain FDA approval of the new formulation, making it impossible to launch the new formulation on the timeline MedCo's projections suggested. Similarly, MedCo's projections assumed significant sales of Vabomere for infections caused by pathogens that are not among the indications for which Vabomere has been approved. These projections, prepared by MedCo, regarding the anticipated performance of the IDB, informed the parties' determinations as to the amount of purchase consideration the Debtors paid for the IDB. The underperformance of the IDB assets relative to MedCo's projections and the Company's borrowing associated with the MedCo Transaction, are critical drivers of the Debtors' current financial predicament. As discussed below, MedCo disputes Melinta's view and reserves all rights with respect to these issues.

### C.    MedCo's Statement Regarding the MedCo/Melinta Litigation

The MedCo/Melinta Litigation arises from MedCo's alleged breach of certain representations and warranties in the MedCo PSA, pursuant to which Melinta acquired MedCo's IDB business. In connection with the lawsuit, Melinta is seeking indemnification under the MedCo PSA. Melinta notified MedCo that it would not be paying a $30 million milestone payment to the former owners of the IDB business (the "**Vabomere Milestone Payment**"), or the two $25 million deferred payments due to MedCo under the MedCo PSA, because Melinta believes it has the right to set-off such payments against its claimed damages in its lawsuit. MedCo has contested Melinta's indemnification and right of set-off assertions.

On April 23, 2019, Melinta filed an amended complaint containing additional allegations to support its purported claims against MedCo. MedCo then filed a motion to dismiss Melinta's amended complaint on May 3, 2019, and its opening brief in support of that motion on June 10, 2019. Melinta filed its answering brief in opposition to MedCo's motion to dismiss on August 2, 2019, and MedCo filed its reply brief in further support of its motion on September 6, 2019.  The parties agreed to postpone oral argument on its motion to dismiss Melinta's amended complaint from September 19, 2019, to January 8, 2020.  MedCo believes Melinta's claims are without merit.

MedCo's claims in the MedCo/Melinta Litigation arise out of what MedCo believes are Melinta's numerous breaches of the MedCo PSA.  One of these claims for breach of contract is subject to ongoing litigation: Fortis filed a complaint in the Court of Chancery of the State of Delaware against Melinta and MedCo, at case number 2019-0236-KSJM, regarding the non-payment of fees.  On April 18, 2019, MedCo filed a crossclaim against Melinta, alleging breach of contract and requesting that the Court order Melinta to fulfill its obligations under the MedCo PSA and comply with its payment obligation. MedCo has, in litigation and correspondence, asserted a claim against Melinta Therapeutics in an aggregate amount of at least $91,131,000, consisting of, among other things, the following allegations:

- The $30 million Vabomere Milestone Payment, plus related fees, damages, and expenses.  The Vabomere Milestone Payment is subject to ongoing litigation.

- Melinta has failed to make the First and Second Deferred Payments, totaling $50,000,000, which, under Section 2.6(a)(iii) of the MedCo PSA, were due on January 7, 2019, and July 8, 2019, respectively.

- Melinta has failed to make various other payments or take required action related to, among other things, royalties, sales, and services, totaling approximately $11,131,000.

For the avoidance of doubt, the preceding statement of MedCo describes MedCo's position with respect to the matters described herein, is not endorsed by the Debtors, and is without prejudice to any and all rights of the Debtors.

### D.    Covenant Compliance

In light of the foregoing challenges and despite its substantial and significant efforts to increase revenue and net sales, the Company has struggled to comply with its financial covenants. Following slow 2018 results, the Company determined in late 2018 that it would likely require

covenant relief from Deerfield, particularly in respect of the "going-concern" covenant. At this time, in addition to the operational initiatives described herein, the Company began to explore financial options, which ultimately culminated in the Company's entry into the Vatera Loan Agreement and the 2019 Deerfield Facility Amendment.

Despite the Company's substantial and significant efforts to increase revenue and net sales noted above, in its May 2019 earnings release, the Company cautioned investors that its previous full year 2019 revenue guidance issued in early March 2019 (approximately $65 million of net product sales) should no longer be relied upon. The Company stated in its Form 10-Q filed on May 10, 2019, that it would pursue the additional $60 million available under the Vatera Facility and a working capital revolver of up to $20 million, and also explore options to modify the terms of certain liabilities to increase the Company's liquidity over the next 12 to 18 months. However, the Company also cautioned in the Form 10-Q that it was not certain that it would be able to satisfy the conditions precedent to access the additional funding under the Vatera Loan Agreement, including, among others, that the Company certify that it did not reasonably expect to breach any covenants under the Deerfield Facility Agreement. In particular, the Company noted that it believed there was risk in meeting the minimum sales covenant for 2019 under the terms of the Deerfield Facility ($63.75 million of net product sales).

During this time and over the course of 2019, the Company also entered into discussions with and responded to numerous inbound proposals from parties interested in strategic transactions with the Company. The Company pursued these proposals diligently, but was ultimately unable to finalize a transaction that would have been acceptable to its key stakeholders. Similarly, the Company engaged in discussions with MedCo concerning a potential settlement of the MedCo litigation, but these discussions were not successful.

In light of these developments, the Company commenced discussions with Deerfield and the Vatera Parties during the second quarter of 2019 with the twin objectives of (a) accessing additional borrowings under the Vatera Loan Agreement and (b) obtaining covenant relief under both facilities. Deerfield was amenable to granting the Company the covenant relief the Company requested—including relaxing the minimum-sales covenant and suspending the requirement that the Company's audited financial statements for fiscal years 2019 and 2020 contain no "going-concern" qualification. Deerfield conditioned these agreements, however, on (i) the Vatera Parties' agreement to analogous amendments to the corollary minimum-sales and "going-concern" covenants under the Vatera Loan Agreement and (ii) the funding of $60 million in subsequent disbursements under the Vatera Loan Agreement. Accordingly, the Company requested that the Vatera Parties agree to amend the minimum-sales and going-concern covenants in the Vatera Loan Agreement. In June 2019, the Company issued a borrowing notice to the Vatera Parties for $25 million (representing the first tranche of the unfunded commitments then available under the Vatera Loan Agreement). Oikos responded with a letter from counsel questioning the Company's satisfaction of the conditions precedent to the requested borrowing and emphasizing that the Vatera Parties would not consider waiving or otherwise relaxing such conditions. Despite further negotiations between the Company and the Vatera Parties, no agreement was reached to advance the full $60 million in subsequent disbursements under the Vatera Loan Agreement, thus also negating Deerfield's agreement to modify the relevant covenants in the Deerfield Facility Agreement. In a Form 8-K filed by the Company on July 1, 2019, the Company announced that it

had determined that the Company would not be able to meet the conditions to draw additional funding under the Vatera Loan Agreement by June 30, 2019.

As a result of the Company's inability to satisfy and the Vatera Parties' unwillingness to relax the conditions precedent under the Vatera Loan Agreement to allow the Company to access the full $60 million in unfunded commitments then available under the Vatera Loan Agreement, the Company negotiated a limited amendment of the Vatera Loan Agreement under which (among other things) the Vatera Parties agreed to extend the availability period of the unfunded commitments from July 10, 2019, to October 31, 2019, in exchange for the Company's agreement to reduce the amount of unfunded commitments from $60 million to $27 million. The Vatera Parties also agreed, pursuant to that amendment, to eliminate the condition precedent to borrowing the unfunded commitments that the Company not reasonably expect a default or event of default to occur under the Deerfield Facility Agreement. The amendment did not, however, eliminate the condition precedent that the Company not reasonably expect a default or event of default to occur under the Vatera Loan Agreement itself. Because the Company was reasonably likely to default on the Vatera Loan Agreement—namely, the Company anticipated a "going-concern" qualification in its audited financial statements for fiscal year 2019—the Company did not satisfy the conditions precedent for borrowing the unfunded commitments under the Vatera Loan Agreement and, accordingly, those commitments expired on October 31, 2019.

Following the failure to obtain the full $60 million of funding under the Vatera Facility at the end of June 2019, the Company considered and pursued numerous strategic alternatives, which included accessing additional capital through the debt and equity markets.[15] Despite evaluating several potential new-money transactions, the Company was ultimately unable to agree to the terms of either a debt or equity transaction that would provide the Company sufficient capital on acceptable terms.

During the third quarter of 2019, given the Company's failure to obtain additional liquidity or meaningful covenant relief from its lenders, the Debtors concluded that they likely may breach one or more of the covenants in their loan facilities by the first quarter of 2020, leading to an event of default under the Deerfield Facility. For example, the Debtors expect that their audited financial statements for fiscal year 2019 likely will contain a "going concern" qualification.

### E.    Consideration of Strategic Alternatives and Marketing Process

By the third quarter of 2019, the Company was facing a confluence of factors—diminishing liquidity, lack of access to additional capital, potential near- to- medium-term covenant defaults, and a potential near-term judgment in the MedCo/Rempex Litigation—that threatened the Company's ability to remain in compliance with the covenants set forth in the Deerfield Facility Agreement and the Vatera Loan Agreement. In view of these circumstances, the Company determined that a more comprehensive restructuring solution might be required and, accordingly, launched a review of strategic alternatives. Thus, over an approximately four-month period, the Company, assisted by its professional advisors, canvassed and evaluated a wide array of potential restructuring alternatives, including a sale of all or a portion of the Company's business, third-

---

[15]    The Company also underwent significant management changes during this time, including the resignation of its Chief Executive Officer, John Johnson.

party financing alternatives, a "standalone" restructuring of the Company's balance sheet, and various permutations of the foregoing. The Company considered both in- and out-of-court implementation alternatives.

### 1.    Third-Party Marketing Process

The Company and Jefferies[16] launched a formal marketing process in mid-September.[17] The marketing process solicited indications of interest for both potential buyers and parties interested in providing financing to the Debtors. The Company and Jefferies contacted or were contacted by 77 parties with respect to a sale transaction, including 48 potential strategic buyers and 29 financial buyers.[18]

Of the 77 potential bidders with whom the Debtors and Jefferies had contact, 30 executed NDAs and were provided access to a dataroom containing confidential information regarding the Debtors, their business, and the Debtors' assets. Of these 30 parties who had access to the dataroom, 18 expressed further interest in participating in a transaction and had further discussions with the Debtors, Jefferies, and Skadden, regarding potential transactions.

The Debtors and Jefferies established October 24, 2019, as a deadline for submission of initial indications of interest from potential transaction counterparties.[19] On October 24, 2019, the Debtors received three indications of interest from interested parties, each of which proposed a purchase of the Debtors' assets. Following the October 24 deadline, one additional party provided an indication of interest for the Company's assets.[20] The Debtors and their advisors worked with the parties submitting the indications of interest to refine and progress the offers set forth therein. This process involved numerous management meetings, telephonic and in-person conversations, and responses to extensive diligence requests. A number of parties contacted by the Company and Jefferies (including multiple parties who submitted an indication of interest) have indicated that

---

[16]    The Company's restructuring advisors are Skadden, Arps, Slate, Meagher & Flom LLP ("**Skadden**") and McDermott Will & Emery as legal counsel, Jefferies LLC ("**Jefferies**") as investment banker and financial advisor, and Portage Point Partners, LLC. The Company retained Jefferies in the third quarter of 2019.

[17]    Preliminary feedback from potential buyers indicated that the majority of potential buyers were interested in purchasing the Company's hospital assets (Vabomere, Orbactiv, and Minocin for injection) in connection with a potential transaction. For this reason, the Company and Jefferies began a "Baxdela-only" marketing process, during which they contacted 33 strategic and financial parties with respect to a transaction involving only Baxdela. The Company invited potential bidders to submit offers for various combinations of assets, including bids for only the hospital assets.

[18]    The Company and Jefferies also reached out to 47 potential capital providers, with six signing non-disclosure agreements ("**NDAs**") and gaining access to the Company's virtual dataroom established in connection with the sales and marketing process. None of these potential capital providers submitted an indication of interest (as defined below).

[19]    The Debtors had initially set an earlier deadline for indications of interest, but extended this deadline to accommodate potential bidders' timelines.

[20]    Consistent with their overarching objective of achieving the higher or otherwise best transaction offer possible, the Debtors and Jefferies decided against rigid enforcement of the indication of interest deadline and instead elected to continue engaging with certain parties who expressed interests in a transaction.

*(cont'd)*

they remain interested in a transaction with the Company, but that they require additional time to be fully prepared to transact.

### 2. Discussions with Stakeholders

As the third-party marketing effort progressed, the Company engaged in dialogue with its principal stakeholders concerning the Company's strategic review process and stakeholders' interest in participating in one or more transaction alternatives. The Company executed non-disclosure agreements with Deerfield, Oikos, Vatera, and MedCo; *provided* each party information on the progress of the Debtors' marketing-efforts and the indications of interest submitted by bidders; and afforded certain such parties access to the Debtors' virtual dataroom for purposes of evaluating a potential transaction.

Among other efforts, the Debtors attempted to solicit Oikos' and/or Vatera's interest in sponsoring an in- or out-of-court restructuring transaction. The Company met with Oikos and its advisors in early September 2019 to discuss the Company's circumstances and present an illustrative term sheet for an Oikos-sponsored recapitalization transaction. Oikos responded several days later, declining to participate in any such transaction and further disclaiming any direct debt or equity stake in the Company. In mid-October 2019,[21] the Company met telephonically with Vatera and presented a similar illustrative term sheet. The Company has continued to respond to due-diligence and other inquiries from Vatera and its advisors. In addition, several weeks before the Petition Date, Vatera informed the Company that it had identified an investor that it believes may be willing to provide capital to refinance the Deerfield Facility. The Company promptly executed a non-disclosure agreement with, and provided dataroom access to, that investor.

Similarly, in an effort to broker a consensual accord and thereby limit the time and expense associated with potential litigation in a chapter 11 proceeding, the Company developed, and presented to Deerfield, Vatera, and MedCo, an illustrative framework for a consensual restructuring transaction. Given differing views among the various constituents in the Debtors' capital structure, the Debtors were unable to achieve the level of consensus required to implement this proposal.

### F. Restructuring Support Agreement

In the weeks following the deadline for the submission of initial indications of interest, the Company and its advisors reviewed the indications of interest, discussed other transaction alternatives, and considered the benefits and challenges associated with each proposal and each bidder's diligence and timing requirements. In light of these considerations and the challenges facing the Debtors, the Debtors determined that the value-maximizing option was to pursue the transaction proposed by Deerfield.

Thus, on December 27, 2019, the Debtors and Deerfield, in its capacity as holders of 100% of the claims under the Deerfield Facility, entered into a Restructuring Support Agreement (the

---

[21] Although the Company requested that Vatera execute an NDA in early September, Vatera declined to do so until mid-October.

"**Restructuring Support Agreement**" or the "**RSA**"). Pursuant to the Restructuring Support Agreement, the Debtors have filed this Disclosure Statement and the accompanying Plan. The Plan reflects the terms of the Restructuring Support Agreement and provides for the consummation of the transactions set forth therein (the "**Supporting Lender Transaction**"),[22] including the exchange of $140 million of claims under the Deerfield Facility for 100% of the equity in the reorganized debtors.

Among other things, the Restructuring Support Agreement provides that the Prepetition Secured Parties will support the Debtors' restructuring efforts as set forth in the Restructuring Support Agreement and consent to the Debtors' use of cash collateral. In exchange, the Debtors will generally seek approval of a chapter 11 plan of reorganization and complete their restructuring efforts in accordance with the terms and milestones contained in the Restructuring Support Agreement and otherwise comply with the requirements set forth in the Restructuring Support Agreement.

While the Restructuring Support Agreement provides an actionable path to reorganization, the Debtors' goal from the outset of these Chapter 11 Cases is to maximize the value of their assets for the benefit of all stakeholders. To this end, and as contemplated by the Restructuring Support Agreement, the Debtors are seeking entry of an order (the "**Bidding Procedures Order**") approving the bidding and sale procedures related to the sale of the Debtors' assets (the "**Bidding Procedures**"). This process represents a continuation of the Debtors' prepetition marketing process, as described more fully herein, with the Supporting Lenders effectively serving as a stalking-horse bidder. As set forth in detail in the Bidding Procedures, the Debtors will consider alternative proposals structured as either a plan of reorganization (a "**Plan Sale**") or a sale pursuant to section 363 of the Bankruptcy Code (a "**Section 363 Asset Sale**").[23] Upon receipt of the bids, the Debtors (in consultation with the Consultation Parties (as defined in the Bidding Procedures Order)) will review all transaction proposals and determine whether to proceed with the Supporting Lender Transaction, or to pursue a third-party bid. In the event that the transaction is structured as a Section 363 Asset Sale, the Debtors will prosecute a liquidating plan, with the proceeds of such Transaction being distributed to creditors in accordance therewith. In the event that the Debtors elect not to pursue the Supporting Lender Transaction, the Supporting Lenders will be entitled to an Expense Reimbursement, as set forth in the Bidding Procedures Order.

### G.    Efforts to Streamline Operations

In the months leading up to the Petition Date, the Company undertook a review of its operational footprint, with the simultaneous goals of preserving liquidity and maximizing the value of the Debtors' assets for the benefit of stakeholders, and maintaining sufficient liquidity to continue their operations and fund their reorganization efforts. This review focused on streamlining the business and carefully managing liquidity.

---

[22]    For the avoidance of doubt, (a) the Supporting Lender Transaction is a Plan Sale for purposes of the Plan and (b) an Overbid (as defined in the Bidding Procedures) consummated by the Supporting Lenders as the Successful Bidder at the Auction is a "Supporting Lender Transaction."

[23]    A Section 363 Asset Sale or a Plan Sale, as applicable, are referred to as a "**Transaction**."

While increased sales of Baxdela and Vabomere have driven growth in the Company's top-line revenue, the ongoing sale and promotion of the Medications has been costly in part because the Company has historically promoted its Medications in both hospital and retail settings, with distinct sales teams and support infrastructure for each. Through the process of marketing its assets, the Company received substantial third-party interest in Vabomere, Orbactiv, and Minocin. While the Company received interest in the Baxdela medication itself, no parties expressed an actionable interest in the Company's sales and marketing infrastructure supporting Baxdela.

For this reason, the Company decided to suspend the United States sales and marketing operations with respect to Baxdela. This wind-down process involved the elimination of approximately 35 positions in the Debtors' Baxdela sales force, as well as approximately 26 other positions throughout the organization. The Debtors announced this reduction-in-force on December 12, 2019, and provided the effected employees 60 days' notice of termination in compliance with the Company's obligations under applicable WARN statutes.

## V.    The Chapter 11 Cases

### A.    First Day Papers

Each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on December 27, 2019. Recognizing that any interruption of the Debtors' business, even for a short period, could negatively impact customer and vendor relationships and the Debtors' goodwill, revenue, and profits, which would be detrimental to the value of the Debtors' estates, the Debtors filed certain first day motions authorizing the Debtors to continue operating their businesses in the ordinary course. The first day motions sought to stabilize the Debtors' operations and were designed to facilitate a smooth transition into chapter 11 and ease the strain on the Debtors' business as a consequence of the filing of the Chapter 11 Cases. The following summary highlights certain of the first day orders.

### 1.    Cash Collateral Motion [Docket No. 16]

By interim order entered on January 2, 2020 [Docket No. 77] (the "**Interim Cash Collateral Order**"), the Bankruptcy Court authorized the Debtors to use cash collateral on an interim basis, granted adequate protection to the Prepetition Secured Parties, and granted other related relief. In addition, the Interim Cash Collateral Order contains certain milestones for filing, soliciting acceptance of, confirming, and consummating a chapter 11 plan, as well as certain milestones related to the Debtors' ongoing sales and marketing process. The Interim Cash Collateral Order also contains stipulations regarding the validity and priority of the Prepetition Secured Parties claims and liens, adequate protection for the Prepetition Secured Parties, and termination rights in favor of the Prepetition Secured Parties.

The Debtors sought entry of an order approving the relief sought in the Cash Collateral Motion on a final basis [Docket No. 188] (the "**Final Cash Collateral Order**") at a hearing on January 28, 2020. Prior to the hearing, the Debtors received objections to the Final Cash Collateral Order from Vatera [Docket No. 126], the Committee (as defined below) [Docket No. 137], and the U.S. Trustee (as defined below) [Docket No. 148]. In response, the Debtors filed an omnibus reply in support of the relief sought in the Final Cash Collateral Order [Docket No. 168]. The

Debtors and the objecting parties were initially unable to reach a resolution of issues with respect to the proposed Final Cash Collateral Order and the hearing to consider the Final Cash Collateral Order was continued to February 7.

In advance of the February 7 hearing to consider the Final Cash Collateral Order, the Settlement Parties negotiated a consensual resolution to the objections thereto, embodied in the Global Settlement Term Sheet. That consensual resolution was memorialized in a revised proposed Final Cash Collateral Order [Docket No. 273] filed by the Debtors. On February 11, 2020, the Bankruptcy Court entered the Final Cash Collateral Order as modified in accordance with the terms of the Global Settlement Term Sheet [Docket No. 279]. The modifications to the Final Cash Collateral Order negotiated in connection with the Global Settlement Term Sheet are described in Section V.H below.

### 2. Cash Management Motion [Docket No. 14]

The Bankruptcy Court authorized the Debtors to continue using their cash management systems and their respective bank accounts and business forms by an order entered on December 30, 2019 [Docket No. 55].

### 3. Wages and Benefits Motion [Docket No. 11]

By interim order entered on December 30, 2019 [Docket No. 52], the Bankruptcy Court authorized the Debtors to pay prepetition wages, compensation, and amounts associated with employee-benefit programs and continue such programs in the ordinary course (the "**Interim Wages Order**").

The Debtors sought entry of a final order approving the relief sought in the Wages and Benefits Motion (the "**Final Wages Order**") at a hearing held January 28, 2020. Prior to the hearing, the Debtors received objections to the Final Wages Order from the U.S. Trustee [Docket No. 144], and the Committee [Docket No. 146]. As reflected in the Debtors' supplemental statement regarding the Wages and Benefits Motion [Docket No. 191], the Debtors were able to consensually resolve the Committee's objection in advance of the January 28 hearing by, among other things, agreeing to defer to a later date the Debtors' request to pay certain sales commission plan payments to the Baxdela sales employees.

At the January 28 hearing, the Bankruptcy Court approved the Wages and Benefits Motion on a final basis, and requested that the Debtors revise the proposed Final Wages Order to reflect the Bankruptcy Court's comments on the record. On January 30, the Bankruptcy Court entered the Final Wages Order, as so modified [Docket No. 229].

### 4. Insurance Motion [Docket No. 8]

By interim order entered on December 30, 2019 [Docket No. 50], the Bankruptcy Court authorized the Debtors to maintain various insurance policies, including, among other things, premise liability, business automobile liability, workers'-compensation liability, worldwide transit liability, products liability, product recall liability, cyber liability, and directors and officers liability.

The Debtors sought approval of the relief sought in the Insurance Motion on a final basis [Docket No. 184] (the "**Final Insurance Order**") at the hearing on January 28, 2020. Consideration of the Final Insurance Order was ultimately adjourned to the continued hearing held on February 7, 2020. The Bankruptcy Court entered the Final Insurance Order on February 7 [Docket No. 262].

### 5.    Taxes Motion [Docket No. 9]

By interim order entered on December 30, 2019 [Docket No. 51] and final order entered on January 30, 2020 [Docket No. 223], the Bankruptcy Court authorized the Debtors to pay certain prepetition fees and taxes to various federal, state, county, and city taxing and licensing authorities.

### 6.    Utilities Motion [Docket No. 10]

By interim order entered on January 2, 2020 [Docket No. 71] and final order entered on January 30, 2020 [Docket No. 226], the Bankruptcy Court established procedures for determining adequate assurance of payment for future utility services.

### 7.    Critical Vendor Motion [Docket No. 12]

By interim order entered on December 30, 2019 [Docket No. 53] and final order entered on January 30, 2020 [Docket No. 225], the Bankruptcy Court authorized the Debtors' payment of the prepetition claims of certain critical vendors.

### 8.    Customer Programs Motion [Docket No. 13]

By interim order entered on December 30, 2019 [Docket No. 54] and final order entered on January 30, 2020 [Docket No. 224], the Bankruptcy Court authorized the Debtors to continue certain customer programs in the ordinary course of business and to perform and honor all prepetition obligations thereunder.

### 9.    NOL Motion [Docket No. 15]

By interim order entered on January 2, 2020 [Docket No. 72], the Bankruptcy Court authorized certain notice and hearing procedures for trading in, or claims of worthlessness with respect to, equity securities in the Debtors.

The Debtors sought approval of the relief sought in the NOL Motion on a final basis [Docket No. 189] (the "**Final NOL Order**") at the hearing on January 28, 2020. In advance of the hearing, Vatera objected to entry of the Final NOL Order [Docket No. 129]. The Debtors subsequently filed a reply in support of the relief sought in the Final NOL Order [Docket No. 162]. Consideration of the Final NOL Order was ultimately adjourned to the continued hearing held on February 7, 2020. As a result of the Settlement Parties' negotiation of the Global Settlement Term Sheet prior to the continued hearing, Vatera agreed to withdraw its objection, and the Bankruptcy Court entered the Final NOL Order on February 7 [Docket No. 260].

B.    **Procedural Motions and Professional Retention Applications**

The Debtors filed several procedural motions that are standard in chapter 11 cases of similar size and complexity, as well as applications to retain the various professionals who will be assisting the Debtors during the Chapter 11 Cases.

1.    **Administrative Motions: Motion for Joint Administration [Docket No. 5], Motion to File Consolidated List of Creditors [Docket No. 6], and Application to Retain Claims and Noticing Agent [Docket No. 7]**

To facilitate a smooth and efficient administration of the Chapter 11 Cases and to reduce the administrative burden associated therewith, by an order entered on December 30, 2019, the Bankruptcy Court authorized joint administration of the Debtors' cases for procedural purposes only [Docket No. 48]. By an interim order entered on January 2, 2020 [Docket No. 76] and a final order entered on February 7, 2020 [Docket No. 264], the Bankruptcy Court authorized the Debtors to file consolidated lists of creditors and to file under seal the portions of such creditor lists, the Schedules and Statements, and any related affidavits of service containing certain employee-related information. The Bankruptcy Court further authorized the retention of KCC as claims and noticing agent by an order entered on December 30, 2019 [Docket No. 49].

2.    **Applications for Retention of Professionals**

The Bankruptcy Court has approved the Debtors' retention of certain Professionals to represent and assist the Debtors in connection with the Chapter 11 Cases. These Professionals include, among others: (a) Skadden as counsel for the Debtors (order entered February 7, 2020) [Docket No. 255]; (b) Cole Schotz P.C. as co-counsel for the Debtors (order entered February 7, 2020) [Docket No. 259];[24] (c) KCC as administrative agent for the Debtors (order granted January 27, 2020) [Docket No. 186]; (d) Portage Point Partners, LLC ("**Portage Point**") as financial advisor to the Debtors (order entered February 7, 2020) [Docket No. 257]; and (e) Jefferies as investment banker to the Debtors (order entered February 7, 2020) [Docket No. 258].

The Bankruptcy Court has also authorized the Debtors to retain certain professionals utilized by the Debtors in the ordinary course of business prior to the Petition Date (order entered February 11, 2020) [Docket No. 278]. Further, the Bankruptcy Court has authorized the interim compensation and reimbursement of professional expenses during these cases (order granted February 7, 2020) [Docket No. 256].

C.    **The Claims Process**

1.    **Schedules and Statements**

On January 27, 2020, the Bankruptcy Court entered an order extending the Debtors' deadline to file their Schedules of Assets and Liabilities (as amended, the "**Schedules**") and

---

[24]    The Debtors propose to employ McDermott, Will & Emery as co-counsel as of January 13, 2020, through the remainder of these Chapter 11 Cases, subject to approval by the Bankruptcy Court. On February 13, 2020, Cole Schotz P.C. filed a notice of substitution of counsel [Docket No. 283], in which it withdrew its appearance as counsel to the Debtors and McDermott, Will & Emery was substituted as proposed co-counsel to the Debtors.

Statements of Financial Affairs (as amended, the "**Statements**," and together with the Schedules, the "**Schedules and Statements**") to February 21, 2020 [Docket No. 185]. The Debtors filed their Schedules and Statements on February 4, 2020 [Docket Nos. 234–45]. On February 21, 2020, the Debtors filed amended Schedules and Statements [Docket Nos. 320–330].

The Schedules provide certain information pertaining to the Claims. Interested parties may review the Schedules and Statements at the office of the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801 or online at http://www.kccllc.net/melinta.

## 2.    Bar Date Order

On January 30, 2020, the Bankruptcy Court entered an order [Docket No. 227] (the "**Bar Date Order**") requiring all persons or entities, except any governmental unit and persons and entities holding or wishing to assert certain types of claims against the Debtors described in paragraph 6 of the Bar Date Order, that wish to assert claims against the Debtors' estates, including claims under Bankruptcy Code section 503(b)(9), or any person with an alleged claim or expense claimed to have arisen prior to the Petition Date, to file a proof of claim ("**Proof of Claim**") against the Debtors in the Chapter 11 Cases by no later than March 9, 2020, at 5:00 p.m. (Eastern) (the "**General Bar Date**"). Any governmental unit seeking to file a claim against the Debtors is required to do so by no later than June 24, 2020, at 5:00 p.m. (Eastern) (the "**Governmental Bar Date**"). Persons and entities holding or wishing to assert certain claims against the Debtors described in paragraph 6 of the Bar Date Order are not required to file a Proof of Claim form. A notice of the bar dates was served on February 3, 2020 [Docket No. 231].

In the event that the Debtors amend the Schedules and Statements to change the amount, nature, classification, or characterization of a claim, or to schedule a new claim, the affected claimant shall be permitted to dispute the amount, nature, classification, or characterization of the scheduled claim by filing a Proof of Claim form with respect to the scheduled claim so that the Proof of Claim form is actually received by KCC on or before the later of (a) the General Bar Date or Governmental Bar Date, whichever is applicable, or (b) 21 days from the date notice is served alerting the affected creditor of the amendment to the Schedules and Statements, or be barred from filing such Claim.

If the Debtors reject any Executory Contract or Unexpired Lease under Bankruptcy Code section 365, each person or entity (including, without limitation, each individual, partnership, joint venture, corporation, limited liability company, estate, and trust) holding or asserting a claim for any rejection damages arising from the rejection of any unexpired lease or executory contract of a Debtor (an "**Agreement**") during the Chapter 11 Cases must file a Proof of Claim form so that it is actually received by KCC on or before the later of (a) 30 days after the effective date of rejection of such Agreement as provided by an order of this Court or pursuant to a notice under procedures approved by this Court, (b) any date set by another order of this Court, or (c) the General Bar Date or the Governmental Bar Date, whichever is applicable.

D.      **Key Employee Incentive Plan**

On January 3, 2020, the Debtors filed a motion to implement a key employee incentive plan [Docket No. 93] (the "**KEIP**"). The KEIP is designed to incentivize seven key members of the Debtors' management team (the "**KEIP Participants**") to drive a competitive marketing process and maximize value for all stakeholders. Payouts under the KEIP are aligned with the value ultimately achieved in any transaction, thereby tying the KEIP Participants' compensation to the success of any transaction.

On January 21, 2020, Vatera and the Committee each filed objections to the KEIP [Docket Nos. 130, 134]. The U.S. Trustee filed its objection to the KEIP the following day [Docket No. 145]. In response, the Debtors filed an omnibus reply [Docket No. 170] and the declaration of Mr. David Gill [Docket No. 173] in support of the KEIP. On February 5, 2020, the Court entered an order approving the KEIP [Docket No. 246].

E.      **Bidding Procedures**[25]

As described in Section IV.E above, the Debtors, with the assistance of their advisors, conducted a substantial and lengthy sales and marketing process for either a Section 363 Asset Sale or a Plan Sale. The Debtors and Jefferies contacted numerous parties, held multiple meetings with potentially interested parties, and responded to a significant number of diligence requests from bidders.

In furtherance of this process, and as contemplated by the Restructuring Support Agreement, the Debtors filed on December 30, 2019, a motion seeking, among other things, (a) approval of the Debtors proposed bidding procedures, and (b) seeking approval of a Section 363 Asset Sale or, in the alternative, (c) seeking approval of the Debtors' assumption of the RSA [Docket No. 67] (the "**Bidding Procedures Motion**").

On January 28, 2020, the Court held a hearing to consider the Bidding Procedures Motion. Prior to the hearing, the Debtors received objections from Vatera [Docket No. 127], the Committee [Docket No. 136], and the U.S. Trustee [Docket No. 147]. In support of the relief requested in the Bidding Procedures Motion, the Debtors filed an omnibus reply in support thereof [Docket No. 163], as well as the declarations of Jeffrey Finger [Docket No. 164] and Peter Milligan [Docket No. 165]. The parties were unable to reach a consensual resolution of their issues at the January 28 hearing, which was ultimately continued to February 7, 2020.

In advance of the February 7 hearing, the Settlement Parties negotiated a consensual resolution to the objections to the Bidding Procedures Motion, embodied in the Global Settlement Term Sheet. Such consensual resolution was memorialized in a revised proposed Bidding Procedures Order [Docket No. 273] filed by the Debtors that, among other things, (i) extends the Transaction process by approximately three weeks and the time for determining Qualified Bids by an additional business day; (ii) clarifies the qualification of partial bids by providing that (A) if the Debtors receive partial bids, the Debtors are to consider the aggregate value of the highest partial

---

[25]   Capitalized terms used but not defined in this section shall have the meaning ascribed to them in the Bidding Procedures Order.

bids, and (B) provides that the Debtors can consider and evaluate bids for any individual drug asset (an "**IDA**"); (iii) permits the Debtors to qualify any Plan-Sale bid that satisfies the confirmation requirements set forth in Bankruptcy Code section 1129; (iv) allows the Debtors, in consultation with the Consultation Parties, to permit an otherwise non-Qualified Bidder to participate in the Auction as a Competing Bidder, if the Debtors, in consultation with the Consultation Parties, believe in good faith that doing so will increase the potential for the submission of higher or otherwise better Bids; (v) lowers the minimum bid increment to $500,000 for IDA bids; (vi) expands the parties permitted to attend the Auction; and (vii) removes the Prepetition Agent as a consultation party.

On February 11, 2020, the Court entered the Bidding Procedures Order [Docket No. 280] approving, among other things, the Bidding Procedures as modified in accordance with the terms of the Global Settlement Term Sheet.

### 1.    Overview of the Bidding Procedures

The Bidding Procedures and the Bidding Procedures Order set out the following key terms of the postpetition sales and marketing process:

- The requirements for qualified bids, including requirements related to the closing deadline, the minimum amount of bids, requirements related to financing, deposit requirements, and requirements related to documentation of bids;

- The location, time, and conduct of the auction;

- The provision of an expense reimbursement of up to $2 million in favor of the Supporting Lenders in the event the Supporting Lenders are not the winning bid in the Debtors' sales and marketing process (such winning bidder, the "**Successful Bidder**");

- Procedures relating to the assumption (in the event of a Plan Sale) or assumption of assignment (in the event of a Section 363 Asset Sale) of certain executory contracts and unexpired leases; and

- Provisions relating to the Supporting Lenders' ability to credit bid the Prepetition Secured Obligations.

The Bidding Procedures Motion explains that, in the event that a party other than the Supporting Lenders are the Successful Bidder and propose a Section 363 Asset Sale, the Debtors will seek entry of an order authorizing the Section 363 Asset Sale at the RSA/Sale Hearing. In the event that the Supporting Lenders are the Successful Bidder, the Debtors will seek Court authority to assume the RSA, and will pursue the transactions contemplated thereby.

### 2.    Key Dates and Deadlines

The key dates for the Transaction process are as follows:

| February 27, 2020, at 4:00 p.m. (Eastern) | Deadline for Initial Objections (the "**Sale Objection Deadline**"[26]) |
|---|---|
| March 2, 2020, at 4:00 p.m. (Eastern) | Bid Deadline—Due Date for Bids and Deposits |
| March 6, 2020, at 9:00 a.m. (Eastern) | Auction |
| March 9, 2020, at 4:00 p.m. (Eastern) | Sale Objection Response Deadline |
| March 10, 2020, at 4:00 p.m. (Eastern) | Supplemental Limited Sale Objection Deadline (objections limited to identity of Successful Bidder, changes to the Form Purchase Agreement, and adequate assurance of future performance by a Successful Bidder other than the Supporting Lenders) |
| March 12, 2020, at 4:00 p.m. (Eastern) | Supplemental Limited Sale Objection Response Deadline |
| March 13, 2020, at 9:30 a.m. (Eastern) | RSA/Sale Hearing |

As a result of the extended timeline for the Transaction process negotiated as part of the Global Settlement Term Sheet, the Debtors will begin soliciting votes to accept or reject the Plan in accordance with the Solicitation Procedures prior to the Bid Deadline and Auction. The Debtors will supplement this Disclosure Statement, the Plan, and the Solicitation Packages as necessary and as soon as reasonably practicable after the Successful Bidder is determined. Further details on the specific procedures for the solicitation of votes to accept or reject the Plan in accordance with the foregoing are provided in Section VIII.C—Sale-Related Solicitation Matters.

**F.      Formation of the Committee**

On January 14, 2020, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed an official committee of unsecured creditors [Docket No. 104] (the "**Committee**").

**G.      The Restructuring Support Agreement**

Following extensive, good-faith negotiations, the Debtors and the Supporting Lenders agreed to the terms of the Restructuring Support Agreement, which was executed on December

---

[26]   This objection deadline applies to all objections to the Bidding Procedures Motion and the sale of the Assets to a Successful Bidder, with the exception of objections solely related to the identity of the Successful Bidder, any changes to the Form Purchase Agreement, and adequate assurance of future performance by the Successful Bidder.

27, 2019. As noted, the Restructuring Support Agreement contemplates the Supporting Lenders' acquisition of 100% of the Reorganized Melinta Common Stock under a Plan, while permitting the Debtors to continue soliciting other Transaction proposals in accordance with the Bidding Procedures. Upon the Debtors' assumption of the Restructuring Support Agreement, the Debtors' marketing process will terminate, and the Debtors will be obligated, in accordance with the terms of the Restructuring Support Agreement, to pursue the Supporting Lender Transaction.

The Restructuring Support Agreement contains various representations, warranties, covenants, and closing conditions. The following is a summary of the key terms of the Restructuring Support Agreement related to the Chapter 11 Cases:[27]

| | |
|---|---|
| Obligations of the Supporting Lenders<br><br>*Article III* | Subject in each case to the terms of the RSA, the Supporting Lenders have agreed to, among other things:<br><br>• Negotiate all Definitive Documents in good faith, reasonably agree to extensions of the Milestones to the extent required to accommodate this Court's calendar, and comply with their obligations under the RSA;<br><br>• Provide notice to the Company of certain events or conditions that are material to the Supporting Lender Transaction;<br><br>• Vote their claims in favor of the Plan, not change such votes, and not object to or oppose the Plan; and<br><br>• Negotiate in good faith with the Debtors regarding any impediments to the consummation of the Plan.<br><br>Moreover, subject in each case to the terms of the RSA, the Supporting Lenders have agreed to not, among other things:<br><br>• Object to or oppose the Company's actions and pleadings filed in accordance with the RSA and in furtherance of the Restructuring; or<br><br>• Take certain other actions that would be inconsistent with the terms of the RSA. |
| Obligations of the Debtors<br><br>*Article IV* | Subject in each case to the terms of the RSA, the Debtors have agreed to, among other things: |

---

[27] Capitalized terms used in this paragraph shall have the meaning ascribed to them in the Restructuring Support Agreement. The summary contained herein is subject in its entirety to the terms and provisions of the Restructuring Support Agreement or other documents referenced therein, and in the event of any inconsistency between this summary and the terms and provisions in the Restructuring Support Agreement, the terms and provisions of the Restructuring Support Agreement shall control.

|  | · Use commercially reasonable efforts to approve the Plan, support the Supporting Lender Transactions, comply with the RSA and comply with the Milestones; |
|  | · Provide advance copies of the Definitive Documents and certain other papers and negotiate with respect to such documents in good faith with the Supporting Lenders; |
|  | · Pursue entry of and comply with the terms of the Cash Collateral Order; |
|  | · Pay all Transaction Expenses; |
|  | · Provide notice to the Supporting Lenders of certain events or conditions that are material to the Supporting Lender Transaction; and |
|  | · Negotiate in good faith with the Debtors regarding any impediments to the consummation of the Plan. |
|  | Moreover, subject in each case to the terms of the RSA, the Debtors have agreed to not, among other things: |
|  | · Object to or oppose implementation of the Supporting Lender Transactions; |
|  | · Except for in accordance with the Bidding Procedures, solicit, propose, or pursue any Alternative Transaction; |
|  | · Seek to amend or modify the Definitive Documentation; or |
|  | · Take certain other actions that would be inconsistent with the terms of the RSA. |
| Fees Related to the Supporting Lender Transaction<br><br>*Section 10.13* | The Debtors shall pay (a) one Business Day prior to the Petition Date, (b) subject to the Cash Collateral Orders, including the payment procedures set forth therein, on the Effective Date and (c) otherwise in accordance with the terms of any applicable fee letters and court orders during the pendency of the Chapter 11 Cases, all accrued and unpaid fees, costs and expenses of the Supporting Lenders in connection with the Restructuring (*provided that* the amount paid pursuant to (a) above shall be agreed by the Debtors and the Supporting Lenders and shall be less than the total amount of accrued and unpaid expenses owing to the Supporting Lenders as of such date), including, without limitation, the fees, costs and expenses of (i) Sullivan & Cromwell LLP, (ii) Houlihan Lokey Capital, Inc., (iii) Landis Rath, (iv) any other professionals that may be retained by the Supporting Lenders in connection with the Restructuring and (v) counsel for the Prepetition Agent. |

| | |
|---|---|
| Mutual Termination<br><br>*Section 9.1(a)* | The RSA and the obligations thereunder may be terminated by mutual written consent to terminate the RSA among the Company and the Requisite Supporting Lenders. |
| Supporting Lender Termination Events<br><br>*Section 9.1(b)* | The RSA provides that, subject to the terms thereof, the Supporting Lender may terminate upon three Business Days' notice from the Supporting Lenders to the Debtors any time after and during the continuance of, among other events, the following:<br><br>• Certain breaches of representations of the covenants, agreements or representations or warranties in the RSA by the Debtors;<br><br>• Payments by the Debtors out of the ordinary course of business and inconsistent with the Budget, subject to Permitted Variances;<br><br>• Dismissal or conversion of the Chapter 11 Cases or denial of Confirmation Order;<br><br>• The Debtors' failure to comply with the Milestones; or<br><br>• A challenge by the Debtors to the validity, perfection, or priority of the Supporting Lenders' claims. |
| Debtor Termination Events<br><br>*Section 9.1(d)* | The RSA provides that, subject to the terms thereof, the Debtors may terminate upon three Business Days' notice from the Debtors to the Supporting Lenders any time after and during the continuance of, among other events, the following:<br><br>• Certain breaches of representations of the covenants, agreements or representations or warranties in the RSA by the Supporting Lenders;<br><br>• Failure of the Supporting Lenders to provide an extension of the Milestones as required to accommodate this Court's calendar;<br><br>• If, at any time, Deerfield fails to collectively hold or control 66.67% or more of the aggregate principal amount of the Prepetition Credit Agreement Claims; or<br><br>• The filing by the Supporting Lenders of any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with the RSA. |
| Milestones | The RSA provides for the following Milestones:<br><br>• On or before the date that is 21 days after the Petition Date, a Chapter 11 plan of reorganization (the "**Acceptable Plan**") and related disclosure statement (the |

"**Disclosure Statement**"), in each case, in form and substance satisfactory to the Prepetition Lenders in their sole and absolute discretion, will be filed;

- On or before the date that is 30 days after the Petition Date, a hearing to approve the Bidding Procedures will have occurred;

- On or before the date that is 31 days after the Petition Date, an order approving the Bidding Procedures will have been entered;

- On or before the date that is 56 days after the Petition Date, a hearing to approve the Disclosure Statement will have occurred;

- On or before the date that is 57 days after the Petition Date, an order confirming the Disclosure Statement will have been entered;

- On or before the date that is 70 days after the Petition Date, the Auction shall have been held or the Debtors shall have publicly announced, in accordance with the Bidding Procedures, that the Auction was cancelled.

- On or before the date that is 90 days after the Petition Date, a confirmation hearing to approve the Acceptable Plan will have occurred;

- On or before the date that is 91 days after the Petition Date, a confirmation order of the Acceptable Plan will have been entered (the "**Confirmation Order**"); and

- As promptly as possible after entry of the Confirmation Order but not later than 106 days after the Petition Date, the Acceptable Plan will become effective.

### H.    Global Settlement Term Sheet

Following extensive, good-faith negotiations, the Settlement Parties accepted and agreed to the Settlement memorialized in that certain Global Settlement Term Sheet dated as of February 7, 2020 [Docket No. 275]. The Global Settlement Term Sheet contemplates a framework for a consensual resolution to the Chapter 11 Cases in the scenario in which Deerfield is the Successful Bidder and the Supporting Lender Transaction closes, and, accordingly, its terms are incorporated in this Disclosure Statement and the Plan. The following is a summary of the key terms of the Global Settlement Term Sheet:[28]

---

[28]    Capitalized terms used in this paragraph and not defined herein or in the Plan shall have the meaning ascribed to them in the Global Settlement Term Sheet. The summary contained herein is subject in its entirety to the terms

*(cont'd)*

| Investigation | The Debtors will conduct an investigation and analysis of actual and potential claims and causes of action of the Debtors that might be asserted against (i) the Debtors' present and former directors and officers ("**D&Os**"), (ii) Vatera and the other Vatera Persons, and (iii) MedCo and the other MedCo Persons (the "**Investigation**"). The Investigation with respect to the persons identified in clauses (i) and (ii) of the preceding sentence shall be conducted by independent director Aron Schwartz (the "**Independent Director**"), with the advice and assistance of McDermott Will & Emery LLP; the Debtors may delegate the Investigation with respect to the MedCo Persons to such board members or committees, officers, and/or counsel as they deem appropriate. The applicable person or persons responsible for conducting each applicable Investigation is referred to as the "**Investigator**." The Investigation shall be conducted in accordance with the following terms and conditions: |
|---|---|
| | • The applicable Investigator will establish reasonable and good-faith protocols governing scope and procedures of the Investigation for the purpose of identifying whether there exist any colorable claims (or, in the case of MedCo, any additional colorable claims) of the Debtors that may be pursued against the D&Os or the Vatera Persons (the "**Colorable Claims**"). For the avoidance of doubt, claims and causes of action previously asserted by the Debtors against MedCo in pending litigation are considered "Colorable Claims" for purposes of the Global Settlement Term Sheet; *provided* that MedCo disputes whether any such claims are colorable and MedCo shall not be deemed, by virtue of its participation in the Settlement or otherwise, to waive any rights, defenses, or other legal entitlements with respect to any such claims, nor shall MedCo's participation in the Settlement be deemed to constitute a waiver, admission against interest, or otherwise adversely affect MedCo with respect to any such claims. |
| | • The Investigator shall determine, in his sole discretion, but in consultation with the Committee, the treatment and disposition of any Colorable |

and provisions of the Global Settlement Term Sheet or other documents referenced therein, and in the event of any inconsistency between this summary and the terms and provisions in the Global Settlement Term Sheet, the terms and provisions of the Global Settlement Term Sheet shall control.

Claims, which may include, but is not limited to, not prosecuting such Colorable Claim in light of the factors described below, settling any such Colorable Claim with the party that would be subject to litigation, or contributing the Colorable Claim to a litigation trust or similar vehicle pursuant to the Plan for prosecution. In making such determination, the Investigator shall consider, among other things, the cost and expense of pursuing the Colorable Claim, the Investigator's assessment of the likelihood of success on the merits, the likely complexity of any litigation involving the Colorable Claim, the interests of creditors, and the consideration that has been or will be provided pursuant to the Settlement by the party that would be subject to litigation and its support of the Plan if Deerfield is determined by the Court to be the Successful Bidder.

- In the event that the Investigator determines that a Colorable Claim exists and will be transferred to the GUC Trust for prosecution, that Colorable Claim shall be identified to the party subject to such Claim no later than 5:00 p.m. (New York Time) on March 12, 2020 (the "**Investigation Deadline**"), and the party with respect to which the Colorable Claim is identified may: (a) raise any and all objections to the Plan, including the release and exculpation provisions of such Plan, and the Deerfield Transaction, (b) seek expedited discovery, and (c) seek a seven-day adjournment of the hearing to approve the Deerfield Transaction or confirm the Plan.

- The Investigator shall reasonably communicate and consult with the Committee and/or Porzio, Bromberg & Newman, P.C., in connection with the Investigator's analysis and findings in connection with performing his duties in respect of the Investigation, subject to such limitations as are necessary or advisable to preserve confidentiality and privilege.

- Vatera and MedCo will use commercially reasonable efforts to cooperate in assisting the Debtors and Committee in their investigations and analyses of the respective claims, counterclaims, or possible causes of action in favor or against either

| | |
|---|---|
| | one of them during the period of time prior to the Investigation Deadline. |
| Vatera Claims | On the Supporting Lender Transaction Effective Date:<br><br>• Deerfield shall waive its right under the Subordination Agreement to payover of distributions under the Plan to Vatera;<br><br>• Subject to the Investigation and Court approval of the releases and exculpations in favor of the Vatera Persons pursuant to the Plan (as revised in accordance with the Global Settlement Term Sheet), Vatera shall (i) subordinate to the first $3.5 million distributed to unsecured creditors from the GUC Trust, so long as the GUC Trust expends no more than $2 million in professional fees, and (ii) thereafter share pro rata with other unsecured creditors to the extent of Vatera's allowed unsecured claims; and<br><br>• The Committee's rights to object to Vatera's unsecured claim shall be preserved. However, any such objection must be filed on or before March 12, 2020, or it shall be waived. |
| MedCo Claims | On the Supporting Lender Transaction Effective Date:<br><br>• Subject to the Investigation and Court approval of the releases and exculpations in favor of the MedCo Persons pursuant to the Plan (as revised in accordance with the Global Settlement Term Sheet), MedCo shall (i) subordinate to the first $3.5 million distributed to unsecured creditors from the GUC Trust, so long as the GUC Trust expends no more than $2 million in professional fees, and (ii) thereafter share pro rata with other unsecured creditors to the extent of MedCo's allowed unsecured claims.<br><br>• The Committee's rights to object to MedCo's unsecured claim shall be preserved. However, any such objection must be filed on or before March 12, 2020, or it shall be waived.<br><br>• On or promptly following the Effective Date, the Debtors and MedCo shall dismiss with prejudice all claims pending against one another and their current and former directors and officers, to the extent applicable. Notwithstanding the foregoing, |

41

| | |
|---|---|
| | the dismissal shall not impair MedCo's ability to assert and liquidate a prepetition general unsecured claim against the Debtors only with respect to any such pending claims, subject to the terms of the subordination set forth in the Global Settlement Term Sheet. |
| Plan Releases and Exculpations | Subject to the Investigation, on the Supporting Lender Transaction Effective Date, the D&Os, the MedCo Persons, and the Vatera Persons shall be released and exculpated pursuant to the Plan. The Global Settlement Term Sheet requires certain changes to the Plan's release and exculpation provisions and related definitions, which have been incorporated into the Plan as amended. |
| Formation and Funding of GUC Trust | On the Supporting Lender Transaction Effective Date: <ul><li>A general unsecured claims trust (the "**GUC Trust**") shall be formed pursuant to the Plan, and managed by three current members of the unsecured creditors committee (collectively, the "**Oversight Committee**");</li><li>The GUC Trust shall be funded with $3.5 million in cash (the "**Initial Funding Amount**"); provided that:</li></ul> – The GUC Trust may expend up to a maximum of $2 million in professional fees in costs of administration, wind down, and pursuing claims and assets without requiring any input from any party outside of the Oversight Committee; <br><br>– To the extent that the GUC Trust, by and through a decision of its Oversight Committee, wishes to spend in excess of $2 million in the exercise of its fiduciary responsibilities, any such expenditure will be subject to the advice and consent of Vatera and MedCo, not to be unreasonably withheld; <br><br>– If the GUC trust spends funds over and above the $2 million threshold, without the advice or consent of Vatera and MedCo, but makes recoveries that restore the balance to the $3.5 million initial funding level (the "**Recovery**"), then the subordination which Vatera and the MedCo have agreed to with respect to the first $3.5 million in distributions, shall not apply to the portion of the Recovery representing a |

|  | replenishment of any professional fees expended in excess of the $2 million threshold; and |
|  | • Avoidance Actions and commercial tort claims of the Debtors shall be transferred to the GUC Trust; *provided*, *however*, that (a) Avoidance Actions and commercial tort claims against (i) employees, (ii) other parties with which the Reorganized Debtors expect to have a continuing relationship after the Supporting Lender Transaction Effective Date, (iii) the Released Parties (as amended in accordance with the Global Settlement Term Sheet), (iv) any person that, directly or indirectly, controls, is controlled by, or is under common control with, any of the persons described in the foregoing clauses (i) through (iii) and (b) commercial tort claims relating to any claim against a Debtor that is not discharged upon the Supporting Lender Transaction Effective Date shall, in each case to the extent not otherwise released pursuant to the Plan, be retained by the Reorganized Debtors and not transferred to the GUC Trust. |
| Waiver of Deerfield Unsecured Claims | On the Supporting Lender Transaction Effective Date, Deerfield shall waive all unsecured claims against the Debtors. |
| Settlement of Challenges | On the Supporting Lender Transaction Effective Date, the Committee, Vatera, and MedCo shall waive all Challenges (as defined the Interim and Final Cash Collateral Orders). Prior to the Supporting Lender Transaction Effective Date: |
|  | • The Challenge period shall be tolled for the period commencing on Court approval of the Final Cash Collateral Order, and ending upon the earlier of (a) the Supporting Lender Transaction Effective Date and (b) termination of the RSA (the "**Tolling Period**"); |
|  | • During the Tolling Period only, the Committee shall not continue any investigation it may have commenced into potential Challenges and no Committee Professional Fees that accrue during the Tolling Period in connection with any such investigation may be funded from the $50,000 investigations budget; and |
|  | • The Committee, Vatera, and MedCo shall (as applicable) withdraw, and, subject to such parties' rights reserved under the Global Settlement Term |

| | |
|---|---|
| | Sheet, shall not file, refile or support in any way, any objection to Deerfield's credit bid as set forth in Section I.A. of the Bidding Procedures, and agree for the purposes of any auction and the sale process that Deerfield's prepetition secured claim (excluding, for the avoidance of doubt, postpetition interest and other adequate protection obligations) is $142,426,658. Notwithstanding the foregoing, the Committee, MedCo, and Vatera reserve all rights to (i) challenge any increase in Deerfield's secured claim based on the inclusion of default postpetition interest and (ii) dispute any Invoiced Fees (as defined in the Cash Collateral Order) in accordance with paragraph 9 of the Cash Collateral Order; *provided*, *however*, that all parties will work in good faith to resolve any such disputes prior to the commencement of any auction. |
| Withdrawal of Pending Objections | In consideration of the various terms and conditions of the Global Settlement Term Sheet, Vatera shall withdraw with prejudice all of its pending objections as of the date thereof, including its objections to entry of the Final NOL Order, the Final Cash Collateral Order, and the Bidding Procedures. The Global Term Sheet requires certain modifications to the Final Cash Collateral Order and the Bidding Procedures, which modifications were incorporated and are reflected in such orders as entered by the Bankruptcy Court. |
| Support for Sale Process, Disclosure Statement, and Plan | The proposed Disclosure Statement and Plan have been modified to implement the terms of the Global Settlement Term Sheet. The Committee, Vatera, and MedCo agree to support and not object to the Court's approval of the Deerfield Transaction (if Deerfield is approved by the Court as the Successful Bidder). Notwithstanding the foregoing, to the extent another Qualified Bid is received in accordance with the Bidding Procedures, the Committee Vatera, and MedCo reserve all rights to challenge whether the Deerfield Transaction is the highest or otherwise best. The Debtors will work in good faith with the Committee, Vatera, and MedCo to modify the Disclosure Statement to address any objections that the Committee, Vatera, or MedCo has with respect thereto or to preserve those objections in the event that the Supporting Lender Transaction Effective Date does not occur. |
| | The Debtors, Deerfield, and the Committee agree that MedCo and Vatera may file objections or reservations of rights with respect to the Plan and the Deerfield Transaction on or before |

| | |
|---|---|
| | the applicable objection deadlines during the pendency of the Investigation. |
| Approval | The Global Settlement Term Sheet requires that the Settlement incorporated therein be filed on the docket and the Settlement Parties shall each affirm on the record its agreement to the Settlement at the February 7 hearing. The Global Settlement Term Sheet was filed at Docket No. 275 and each of the Settlement Parties affirmed their agreement at the February 7 hearing. In the event of conflict between the Global Settlement Term Sheet and any entered order of the Court, the Court order shall control. |
| Termination and Reservation of Rights | The Settlement (other than the withdrawal of objections to the Final Cash Collateral Order) shall terminate and shall be of no force or effect if:<br><br>• The RSA terminates prior to the Supporting Lender Transaction Effective Date;<br><br>• The applicable Investigator identifies (in consultation with the Committee) a Colorable Claim to be transferred to the GUC Trust, but only with respect to such party that is listed as being subject to such Colorable Claim;<br><br>• The Debtors, the Committee, or Deerfield files or assert any (a) new claims or actions relating to the Chapter 11 Cases (other than actions against Vatera to specifically enforce the Subordination Agreement) against or (b) objection to the unsecured claims of Vatera or MedCo, but only with respect to Vatera or MedCo, as applicable;<br><br>• The Court does not approve the release provisions of the Plan as modified by the terms of this Settlement; *provided, however*, that the Court's refusal to approve the exculpation of the MedCo Persons or the Vatera Persons shall not entitle MedCo or Vatera to terminate this Settlement; or<br><br>• The Court (a) declines to enter the Final NOL Order, (b) declines to enter the Final Cash Collateral Order or Bidding Procedures Order (in each case as modified as set forth in the Global Settlement Term Sheet) or (c) requires changes to the Final NOL Order, Final Cash Collateral Order and the Bidding Procedures Order that are not consented to by each of Deerfield, the Debtors, |

|   | Vatera, and the Committee, such consent not to be unreasonably withheld, delayed or conditioned. Each of the foregoing orders were entered by the Court in a form acceptable to the foregoing parties. |
|---|---|
|   | If (a) the Debtors modify the release provisions of the Plan, or the Court conditions confirmation of the Plan or approval of the Disclosure Statement on modifications of such provisions, in each case in a manner that adversely affects any of the parties to the Settlement; (b) an Investigator determines to alter any party's treatment under this Settlement; or (c) the Plan or order confirming the Plan is otherwise inconsistent with the Global Settlement Term Sheet in a manner adverse to any party to the Settlement, then such party that is adversely affected may terminate the Settlement solely as to itself upon written notice to the other parties. |
|   | Upon termination, except as otherwise stated in the Global Settlement Term Sheet, all parties' rights (or the terminating party's rights, as applicable) with respect to the matters comprising the Settlement shall be fully preserved without prejudice and the compromises embodied in the Settlement, and the negotiations leading up to its entry, shall not be admissible as evidence in accordance with Federal Rule of Evidence 408. |

## VI.    Summary of the Plan of Reorganization

This Article of the Disclosure Statement summarizes the Plan, a copy of which is attached hereto as **Exhibit A**. This summary is qualified in its entirety by reference to the Plan.

### A.    Administrative Claims and Priority Tax Claims

#### 1.    Administrative Claims

Except to the extent that the Reorganized Debtors or the Plan Administrator, as applicable, the Requisite Supporting Lenders (in the event the Supporting Lenders are the Successful Bidder), and a Holder of an Allowed Administrative Claim agree to a less favorable treatment, a Holder of an Allowed Administrative Claim (other than a Professional Claim, which shall be subject to Section 2.02 of the Plan) shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Claim either (i) on the later of (A) the Initial Distribution Date or (B) the first Periodic Distribution Date occurring after the later of (1) 30 days after the date when the Administrative Claim becomes an Allowed Administrative Claim; or (2) 30 days after the date when the Administrative Claim becomes payable pursuant to any agreement between the Reorganized Debtors or the Plan Administrator, as applicable, and the Holder of the Administrative Claim; or (ii) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in the ordinary course

46

of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim or (b) such distribution acceptable to the Requisite Supporting Lenders as necessary to unimpair such Allowed Administrative Claim; *provided, however*, that other than the Holder of (w) a Professional Claim, (x) an Administrative Claim Allowed by a Final Order of the Bankruptcy Court on or before the Effective Date, (y) an Administrative Claim that is not Disputed and arose in the ordinary course of business and was paid or is to be paid in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim, or (z) an Administrative Claim arising under chapter 123 of title 28 of the United States Code, the Holder of any Administrative Claim shall have filed a proof of Claim form no later than the Administrative Claim Bar Date and such Claim shall have become an Allowed Claim. Except as otherwise provided in the Plan and as set forth in Section 2.02 of the Plan, all requests for payment of an Administrative Claim must be filed, in substantially the form of the Administrative Claim Request Form contained in the Plan Supplement, with the Claims and Solicitation Agent and served on counsel for the Reorganized Debtors or the Plan Administrator (as applicable), no later than the Administrative Claim Bar Date. Any request for payment of an Administrative Claim pursuant to Section 2.01 of the Plan that is not timely filed and served shall be Disallowed automatically without the need for any objection from the Reorganized Debtors or the Plan Administrator (as applicable). The Reorganized Debtors or the Plan Administrator (as applicable) may settle any Administrative Claim without further Bankruptcy Court approval. In the event that the Reorganized Debtors or the Plan Administrator (as applicable) object to an Administrative Claim and there is no settlement, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.

### 2. Professional Claims

(a) *Final Fee Applications.* Notwithstanding any other order of the Bankruptcy Court to the contrary, all final requests for payment of Professional Claims must be filed no later than 45 days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior orders of the Bankruptcy Court, the Allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

(b) *Payment of Interim Amounts*. Subject to any applicable Holdback Amount, on the Effective Date, the Reorganized Debtors or the Plan Administrator (as applicable) shall pay all amounts owing to Professionals for all outstanding amounts billed relating to prior periods through the Effective Date as to which no objection has been filed. No later than two days prior to the Effective Date, the Professionals shall estimate fees and expenses due for periods that have not or will not have been billed as of the Effective Date and shall deliver such estimate to the Fee Notice Parties (as defined in the Interim Compensation Order). As soon as reasonably practicable after the Effective Date, a Professional seeking payment for estimated amounts as of the Effective Date shall submit a detailed invoice covering such period to the Fee Notice Parties. Each Fee Notice Party will have 15 days after service of the invoice to review the invoice and object to the requested fees and expenses in accordance with the procedures set forth in the Interim Compensation Order. Upon expiration of such 15-day objection period, each Professional may file with the Bankruptcy Court a certificate of no objection or a certificate of partial objection, whichever is applicable, after which the Reorganized Debtors or the Plan Administrator (as

applicable) shall pay such Professional from the Holdback Escrow Account an amount equal to 80% and 100% respectively of the invoiced fees and expenses not subject to an objection.

(c)     *Holdback Escrow Account.* On the Effective Date, the Reorganized Debtors or the Plan Administrator (as applicable) shall fund the Holdback Escrow Account with Cash equal to the aggregate Holdback Amount for all Professionals. The Reorganized Debtors or the Plan Administrator (as applicable) shall hold the Holdback Escrow Account in trust for all Professionals with respect to whom fees have been held back pursuant to the Interim Compensation Order. Such funds shall not be considered property of the Debtors, the Reorganized Debtors, the Liquidating Debtors, or the Estates. Following any payments from the Holdback Escrow Account as set forth in Section 2.02(b) of the Plan, the remaining amount of Professional Claims owing to the Professionals shall be paid to such Professionals by the Reorganized Debtors or the Plan Administrator (as applicable) from the Holdback Escrow Account when such Claims are finally Allowed by the Bankruptcy Court. When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall become Distributable Cash in the event of a Section 363 Asset Sale, or shall vest in the Reorganized Debtors, in the event of a Plan Sale.

(d)     *Post-Effective Date Retention*. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after the Effective Date shall terminate, and the Reorganized Debtors or the Plan Administrator (as applicable) shall be permitted to employ and pay Professionals in their discretion (including the fees and expenses incurred by professionals in preparing, reviewing, prosecuting, defending, or addressing any issues with respect to final fee applications).

### 3.     Priority Tax Claims

Except to the extent that the Reorganized Debtors or the Plan Administrator, as applicable, the Requisite Supporting Lenders (in the event the Supporting Lenders are the Successful Bidder) and a Holder of an Allowed Priority Tax Claim agree to a less favorable treatment, on the later of (a) the Initial Distribution Date or (b) the first Periodic Distribution Date occurring after the later of (i) 30 days after the date when a Priority Tax Claim becomes an Allowed Priority Tax Claim or (ii) 30 days after the date when a Priority Tax Claim becomes payable pursuant to any agreement between the Reorganized Debtors or the Plan Administrator (as applicable) and the Holder of such Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Priority Tax Claim, one of the following treatments on account of such Claim: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (2) Cash in a lesser amount agreed to by the Reorganized Debtors or the Plan Administrator (as applicable) and such Holder; *provided, however*, that the parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date, (3) at the sole option of the Debtors, Cash in the aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of not more than five years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, or (4) such distribution acceptable to the Requisite Supporting Lenders as necessary to unimpair such claims. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in

Cash in accordance with the terms of any agreement between the Reorganized Debtors or the Plan Administrator (as applicable), the Holder of such Claim and the Requisite Supporting Lenders (in the event that the Supporting Lenders are the Successful Bidder), or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

**B.      Classification, Treatment, and Voting of Claims and Interests**

**1.      Classification of Claims and Interests**

The Plan, though proposed jointly, constitutes a separate plan for each of the Debtors for voting purposes and, except as set forth in Section 5.01 of the Plan, does not constitute a substantive consolidation of the Debtors' Estates. Therefore, all Claims against and Interests in a particular Debtor are placed in the Classes set forth below with respect to such Debtor. Classes that are not applicable as to a particular Debtor shall be eliminated as set forth more fully in Section 4.03 of the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth in Article II of the Plan.

A Claim or Interest is placed in a particular Class for all purposes, including voting, Confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided, however*, that a Claim or Interest is placed in a particular Class for the purpose of voting on the Plan and, to the extent applicable, receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

Claims and Interests are divided into the numbered Classes set forth below:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Secured Prepetition Credit Agreement Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Unimpaired | Presumed to Accept |
| 6 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 7 | Section 510(b) Claims and Recharacterized Claims | Impaired | Deemed to Reject |
| 8 | Interests in Melinta Therapeutics | Impaired | Deemed to Reject |

**2.      Treatment and Voting of Claims and Interests**

(a)      *Class 1 – Other Priority Claims.*

49

(i)    *Classification*. Class 1 consists of all Other Priority Claims.

(ii)    *Treatment.* Except to the extent otherwise agreed by the Reorganized Debtors or the Plan Administrator (as applicable), the Requisite Supporting Lenders (in the event the Supporting Lenders are the Successful Bidder), and the applicable Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Other Priority Claim, each such Holder of an Allowed Other Priority Claim shall (A) be paid in full in Cash on the later of (1) the Effective Date or (2) the first Periodic Distribution Date occurring after the date when an Other Priority Claim becomes payable pursuant to any agreement between the Reorganized Debtors or the Plan Administrator (as applicable) and the Holder of such Other Priority Claim or (B) receive such distribution acceptable to the Requisite Supporting Lenders (in the event the Supporting Lenders are the Successful Bidder) as necessary to unimpair such Other Priority Claim; *provided, however*, that Other Priority Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

(iii)    *Voting*. Class 1 is Unimpaired, and Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan.

(b)    *Class 2 – Other Secured Claims.*

(i)    *Classification*. Class 2 consists of all Other Secured Claims.

(ii)    *Treatment*. Except to the extent otherwise agreed by the Debtors, the Requisite Supporting Lenders (in the event the Supporting Lenders are the Successful Bidder), and the applicable Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Other Secured Claim, each such Holder of an Allowed Other Secured Claim shall, at the election of the Reorganized Debtors or the Liquidating Debtors (as applicable):

(A)    be paid in full in Cash in an amount equal to such Allowed Other Secured Claim, on the later of (A) the Effective Date and (B) the date such claim becomes payable in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such claim; or

(B)    receive such distribution acceptable to the Requisite Supporting Lenders (in the event the Supporting Lenders are the Successful Bidder) as necessary to unimpair such Allowed Other Secured Claim.

Nothing in Section 3.02 of the Plan or elsewhere in the Plan shall preclude the Reorganized Debtors or the Plan Administrator, as applicable, from challenging the validity of any alleged Lien on any asset of the Debtors securing any Other Secured Claim or the value of the property subject to any such alleged Lien (other than the Liens and property securing the Prepetition Credit Agreement Claims).

(iii)    *Voting*. Class 2 is Unimpaired, and Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan.

(c)    *Class 3 – Secured Prepetition Credit Agreement Claims.*

(i)    *Classification.* Class 3 consists of all Secured Prepetition Credit Agreement Claims.

(ii)    *Treatment.*

(A)    Except to the extent otherwise agreed by the Debtors and the Requisite Supporting Lenders, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed Secured Prepetition Credit Agreement Claim, on the Initial Distribution Date and each applicable Periodic Distribution Date thereafter, each Holder of an Allowed Secured Prepetition Credit Agreement Claim shall receive:

(1)    If the Supporting Lenders are the Successful Bidders, the Holder's Pro Rata Share of 100% of the Reorganized Melinta Common Stock; or

(2)    If a third-party bidder is the Successful Bidder, the Holder's Pro Rata Share of the Distributable Cash, until all Secured Prepetition Credit Agreement Claims are paid in full.

(B)    On the Effective Date, in return for the distributions set forth in Section 3.02(c)(ii)(A) of the Plan, the Supporting Lenders shall release any and all security interests and Liens, including, without limitation, security interests and liens on any remaining Distributable Cash, Avoidance Actions and/or the proceeds thereof, and other Causes of Action of the Debtors, to the Debtors and/or the Reorganized Debtors.

(C)    On the Effective Date, in return for the distributions set forth in Section 3.02(c)(ii)(A) of the Plan, all Liens and security interests granted to secure the Prepetition Credit Agreement shall be deemed cancelled and released and shall be of no further force and effect. To the extent that the Prepetition Lenders or the Prepetition Agent have filed or recorded publicly any Liens and/or security interests to secure the Debtors' obligations under the Prepetition Credit Agreement, such party shall take any commercially reasonable steps requested by the Reorganized Debtors or the Plan Administrator (as applicable) that are necessary to cancel and/or extinguish such publicly filed Liens and/or security interests.

(iii)    *Voting.* Class 3 is Impaired, and Holders of Allowed Secured Prepetition Credit Agreement Claims are entitled to vote to accept or reject the Plan.

(d)    *Class 4 – General Unsecured Claims.*

(i)    *Classification*. Class 4 consists of all General Unsecured Claims.

(ii)    *Treatment*. Except to the extent otherwise agreed by the Debtors, the Requisite Supporting Lenders (in the event the Supporting Lenders are the Successful Bidder), and the applicable Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive:

(A)     If the Supporting Lenders are the Successful Bidders, the Holder's Pro Rata Share of the GUC Trust Distributable Cash, if any, subject to the claim subordination provisions set forth in Section 5.04(f) and (g) of the Plan; or

(B)     If a bidder other than the Supporting Lenders is the Successful Bidder, the Holder's Pro Rata Share of any Distributable Cash remaining after all Allowed Secured Prepetition Credit Agreement Claims have been paid in full in cash.

(iii)     *Voting*. Class 4 is Impaired, and Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

(e)     *Class 5 – Intercompany Claims.*

(i)     *Classification*. Class 5 consists of all Intercompany Claims.

(ii)     *Treatment*. On the Effective Date, all Intercompany Claims shall, at the election of the Debtors, with the approval of the Requisite Supporting Lenders (in the event the Supporting Lenders are the Successful Bidder), be either (A) Reinstated or (B) deemed automatically cancelled, released, and extinguished for no consideration; *provided*, *however*, that any Reinstatement of Intercompany Claims pursuant to the immediately preceding clause (A) shall not affect the deemed substantive consolidation of the Estate and Chapter 11 Case of each Debtor for distribution purposes only, pursuant to Section 5.01 of the Plan.

(iii)     *Voting*. Class 5 is Unimpaired, and Holders of Intercompany Interests are conclusively presumed to have accepted the Plan.

(f)     *Class 6 – Intercompany Interests.*

(i)     *Classification*. Class 6 consists of all Intercompany Interests.

(ii)     *Treatment*. On the Effective Date, all Intercompany Interests shall, at the election of the Debtors, with the approval of the Requisite Supporting Lenders (in the event the Supporting Lenders are the Successful Bidder), be either (A) Reinstated or (B) deemed automatically cancelled, released, and extinguished for no consideration; *provided*, *however*, that any Reinstatement of Intercompany Claims pursuant to the immediately preceding clause (A) shall not affect the deemed substantive consolidation of the Estate and Chapter 11 Case of each Debtor for distribution purposes only, pursuant to Section 5.01 of the Plan.

(iii)     *Voting*. Class 6 is Unimpaired, and Holders of Intercompany Interests are conclusively presumed to have accepted the Plan.

(g)     *Class 7 – Section 510(b) Claims and Recharacterized Claims.*

(i)     *Classification*. Class 7 consists of all Section 510(b) Claims and Recharacterized Claims.

(ii)     *Allowance*. Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order.

(iii)    *Treatment*. On the Effective Date, each Section 510(b) and each Recharacterized Claim shall be cancelled, extinguished, and discharged, and the Holder thereof shall not receive or retain any property under the Plan on account of such claim.

(iv)    *Voting*. Class 7 is Impaired, and Holders of Allowed Section 510(b) Claims and Recharacterized Claims are deemed to have rejected the Plan.

(h)    *Class 8 – Interests in Melinta Therapeutics.*

(i)    *Classification*. Class 8 consists of all Interests in Melinta Therapeutics.

(ii)    *Treatment*. On the Effective Date, Allowed Interests in Melinta Therapeutics, including Old Melinta Securities, shall be deemed automatically cancelled, released, discharged, and extinguished without further action by the Reorganized Debtors or the Plan Administrator (as applicable), and the Holders thereof shall not receive or retain any property under the Plan on account of such interest.

(iii)    *Voting*. Class 8 is Impaired, and Holders of Allowed Interests in Melinta Therapeutics are deemed to have rejected the Plan.

## C.    Acceptance

### 1.    Classes Entitled to Vote

Classes 3 and 4 are Impaired and are entitled to vote to accept or reject the Plan. By operation of law, Classes 1, 2, 5, and 6 are Unimpaired and are conclusively presumed to have accepted the Plan and, therefore, are not entitled to vote. By operation of law, Classes 7 and 8 deemed to have rejected the Plan and are not entitled to vote.

### 2.    Acceptance by Impaired Classes

An Impaired Class of Claims shall have accepted the Plan if (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

### 3.    Elimination of Classes

To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018 as of the date of commencement of the Confirmation Hearing for all Debtors or with respect to any particular Debtor shall be deemed to have been deleted from the Plan for all Debtors or for such particular Debtor, as applicable, for purposes of (a) voting to accept or reject the Plan and (b) determining whether it has accepted or rejected the Plan under section 1129(a)(8) of the Bankruptcy Code.

### 4. Deemed Acceptance if No Votes Cast

If no Holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the Holders of such Claims in such Class.

### 5. Cramdown

To the extent necessary, the Debtors shall request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify, amend, or withdraw the Plan, with respect to all Debtors or any individual Debtor or group of Debtors, to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

### D. Means of Implementation of the Plan

### 1. Substantive Consolidation

The Plan contemplates and is predicated upon the deemed substantive consolidation of the Estate and Chapter 11 Case of each Debtor with the Estate and Chapter 11 Case of each other Debtor for distribution purposes only. On the Effective Date, each Claim filed or to be filed against any Debtor shall be deemed filed only against Melinta Therapeutics and shall be deemed a single Claim against and a single obligation of Melinta Therapeutics for distribution purposes only and the claims register shall be updated accordingly. This limited substantive consolidation effected pursuant to Section 5.01 of the Plan shall not otherwise affect the rights of any Holder of any Claim, or affect the obligations of any Debtor with respect to such Claim.

### 2. General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan, including the claim subordination provisions set forth in Section 5.04(f) thereof, shall constitute a good-faith compromise and settlement of all Claims, Interests, or Causes of Action that (a) are subject to compromise and settlement, or discharge, pursuant to the terms of the Plan; (b) have been released pursuant to Section 9.04 of the Plan; (c) have been released pursuant to Section 9.05 of the Plan; (d) are subject to exculpation pursuant to Section 9.06 of the Plan; or (e) are otherwise stayed or terminated pursuant to the terms of the Plan.

### 3. Plan Funding

Distributions under the Plan will be funded from the following sources:

        (a)      Distributable Cash, if applicable;

        (b)      the GUC Trust Distributable Cash, if applicable; and

        (c)      after all Disputed Claims have been finally Allowed or Disallowed, the amount of Disputed Claims Reserve Excess Balance.

4.      **Plan Sale**

In the event that the Debtors effectuate a Plan Sale, the following provisions will govern implementation of the Plan.

(a)      *Creditors' Oversight Committee.* In the event of a Plan Sale other than the Supporting Lender Transaction, a Creditors' Oversight Committee comprised of one representative of the Supporting Lenders and one representative chosen by the Committee shall be formed on the Effective Date, and the Reorganized Debtors shall seek the consent (not to be unreasonably withheld) of each member of the Creditors Oversight Committee prior to (i) filing objections to, or motions to subordinate or recharacterize, material Claims, (ii) settling, compromising, withdrawing, or litigating to judgment such objections or motions, or (iii) filing any material causes of action on behalf of the estates; *provided* that the representative of the Supporting Lenders may, in its sole discretion, resign from the Creditors' Oversight Committee at any time.

(b)      *Reorganized Melinta Common Stock.*

(i)      Reorganized Melinta Therapeutics shall authorize and issue the Reorganized Melinta Common Stock to the Plan Sale Purchaser. Distribution of Reorganized Melinta Common Stock under the Plan shall constitute the issuance of 100% of the Reorganized Melinta Common Stock, and such stock shall be deemed issued on the Effective Date. Any issuance of Reorganized Melinta Common Stock by Reorganized Melinta Therapeutics, options for the purchase thereof, or other equity awards, if any, providing for the issuance of Reorganized Melinta Common Stock, is authorized without the need for any further corporate action or further action of the Reorganized Debtors.

(ii)      On and after the Effective Date, Reorganized Melinta Therapeutics will be a private company, and the governance of the Reorganized Debtors, and all documents or agreements relating thereto, shall be determined by the Plan Sale Purchaser in its sole discretion and described and included in the Plan Supplement.

(iii)      Any shares, membership units, or functional equivalent thereof, as applicable, of Reorganized Melinta Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

(iv)      As of the Effective Date: (A) any Reorganized Melinta Common Stock will not be registered under the Securities Act, listed on a national securities exchange, or quoted in the over-the-counter marketplace; (B) Reorganized Melinta Therapeutics and the other Reorganized Debtors will not be reporting companies under the Securities Act; (C) Reorganized Melinta Therapeutics and the other Reorganized Debtors will not be required to, and will not, file reports or other information with the Securities and Exchange Commission or any other person or agency; and (D) Reorganized Melinta Therapeutics and the other Reorganized Debtors will not be required to file monthly operating reports with the Bankruptcy Court after the Effective Date.

(c)      *Continued Corporate Existence.* The Debtors shall continue to exist after the Effective Date as separate entities, the Reorganized Debtors, with all the powers of

corporations under applicable law in the jurisdictions in which the Debtors have been formed, and pursuant to their certificates of formation and bylaws or other organizational documents in effect prior to the Effective Date, except to the extent such certificates of formation and bylaws or other organization documents are amended and restated by the Plan (including the Plan Supplement), or by the Reorganized Debtors.

(d)      *Good-Faith Transaction Structuring*. The Debtors shall work in good faith with the Plan Sale Purchaser to structure the Plan Sale and related transaction to the maximum extent possible in a tax-efficient and cost-effective manner for the benefit of the Plan Sale Purchaser, so long as such tax structuring is not materially adverse to the Debtors.

(e)      *GUC Trust*. Upon the occurrence of the Supporting Lender Transaction Effective Date, if applicable, the GUC Trust will be established for the benefit of Holders of Allowed General Unsecured Claims, pursuant to documentation, including the Liquidation Trust Agreement approved by the Debtors, the GUC Trustee, and the GUC Trust Oversight Committee, in consultation with Vatera and MedCo, for the primary purpose of holding and administering the GUC Trust Assets, and distributing the GUC Trust Distributable Cash (if any) pursuant to the Plan, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the trust. On the Supporting Lender Transaction Effective Date, the Initial GUC Trust Funding Amount will be transferred by the Debtors or the Supporting Lenders on behalf of the Reorganized Debtors to the GUC Trust. The GUC Trust will be controlled and administered by the GUC Trustee, subject to the oversight and direction of the GUC Trust Oversight Committee. The Debtors and the Reorganized Debtors shall have no direct or indirect control, influence, or authority over the GUC Trust, the GUC Trustee, or the GUC Trust Oversight Committee or any of their respective decisions. The GUC Trust shall be a legally separate and distinct Entity from the Debtors and/or the Reorganized Debtors. In no event shall the GUC Trust be deemed a successor of either the Debtors or the Reorganized Debtors.

On the Supporting Lender Transaction Effective Date, if applicable, all GUC Trust Causes of Action shall vest in the GUC Trust. Any recovery from the GUC Trust Causes of Action shall constitute GUC Trust Assets. Notwithstanding anything to the contrary in the Plan, the GUC Trustee, subject to the oversight and direction of the GUC Trust Oversight Committee. shall have the exclusive control over all aspects of the GUC Trust Causes of Action that vest in the GUC Trust, including the investigation, prosecution, and disposition of same, in accordance with the terms of the GUC Trust Agreement, and the Reorganized Debtors shall have no rights, powers, or duties with respect to any aspect of any of the GUC Trust Causes of Action that vest in the GUC Trust.

It is intended that the GUC Trust qualify as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d). In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (*i.e.*, a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The GUC Trust will be structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties

(including the GUC Trustee and holders of beneficial interests in the GUC Trust,[29]) are required to treat for U.S. federal income tax purposes the GUC Trust as a grantor trust of which such holders of beneficial interests are the owners and grantors. The GUC Trustee shall be appointed in such instance pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to handle all of the GUC Trust's tax matters, including, without limitation, the filing of all tax returns, and the handling of tax audits and proceedings, of the GUC Trust. Notwithstanding the forgoing, the GUC Trustee may make an election under Treasury Regulations Section 1.468B-9(c)(2)(ii) to treat the GUC Trust (or any portion thereof) as a disputed ownership fund. The GUC Trustee shall be responsible for filing information on behalf of the GUC Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) or as a disputed ownership fund.

(f)     *Claim Subordination Matters.*

(i)     *Vatera Claims*. On the Supporting Lender Transaction Effective Date, if applicable, subject to Section 5.04(g) of the Plan and the inclusion of the Vatera Persons as Released Parties under the Plan, the Vatera Claims shall be automatically subordinated to all other Allowed Class 4 General Unsecured Claims solely in respect of the first $3,500,000 of GUC Trust Distributable Cash distributed to Holders of Allowed Class 4 General Unsecured Claims, and any GUC Trust Distributable Cash that would otherwise be distributed to the Vatera Lenders on account of any Vatera Claim shall, solely to the extent of such subordination, be paid to Holders of other Allowed Class 4 General Unsecured Claims on a pro rata basis. For the avoidance of doubt, the Vatera Lenders shall, to the extent of any Allowed Class 4 General Unsecured Claims they hold, be entitled to receive their Pro Rata Share of any other GUC Trust Assets, including additional GUC Trust Distributable Cash distributed to Holders of Allowed Class 4 General Unsecured Claims after $3,500,000 of GUC Trust Distributable Cash has been distributed and shall not be subordinated to any General Unsecured Claims with respect to any distributions made after the first $3,500,000 of GUC Trust Distributable Cash distributed to Holders of Allowed Class 4 General Unsecured Claims.

(ii)     *MedCo Claims*. On the Supporting Lender Transaction Effective Date, if applicable, subject to Section 5.04(g) of the Plan and the inclusion of the MedCo Persons as Released Parties under the Plan, any Class 4 General Unsecured Claims held by MedCo shall be automatically subordinated to all other Allowed Class 4 General Unsecured Claims solely in respect of the first $3,500,000 of GUC Trust Distributable Cash distributed to Holders of Allowed Class 4 General Unsecured Claims, and any GUC Trust Distributable Cash that would otherwise be distributed to MedCo on account of any Class 4 General Unsecured Claim shall, solely to the extent of such subordination, be paid to Holders of other Allowed Class 4 General Unsecured Claims on a pro rata basis. For the avoidance of doubt, MedCo shall, to the extent of any Allowed Class 4 General Unsecured Claims it holds, be entitled to receive its Pro Rata Share of any other GUC Trust Assets, including any additional GUC Trust Distributable Cash distributed to Holders of Allowed Class 4 General Unsecured Claims after $3,500,000 of GUC Trust Distributable Cash has been distributed and shall not be subordinated to any General Unsecured

---

[29]    The Debtors intend to engage with the applicable Settlement Parties prior to the Confirmation Hearing concerning how beneficial interests in the GUC Trust will be evidenced and held.

Claims with respect to any distributions made after the first $3,500,000 of GUC Trust Distributable Cash distributed to Holders of Allowed Class 4 General Unsecured Claims.

(iii)    *Prepetition Lender Claims*. On the Supporting Lender Transaction Effective Date, if applicable, and conditioned upon none of the Creditors' Committee, the MedCo Persons, or the Vatera Persons having commenced a Challenge (as defined in the Cash Collateral Order), at any time the following shall occur:

(A)    The Committee, Vatera, and MedCo shall irrevocably and unconditionally release and waive any Challenge (as such term is defined in the Cash Collateral Order) relating in any way to the Prepetition Lenders, the Prepetition Agent, the Prepetition Credit Documents, or the Prepetition Credit Agreement Claims and such Claims shall be deemed Allowed;

(B)    The Prepetition Lenders and the Prepetition Agent shall irrevocably and unconditionally waive any Class 4 General Unsecured Claims against the Debtors, and waive and release any right to any distributions on account of such Claims; and

(C)    The Prepetition Lenders and the Prepetition Agent shall waive the right to enforce any "pay-over" or "turn-over" provision of the Subordination Agreement against the Vatera Lenders with respect to any distribution made to any Vatera Lenders on account of any Allowed Class 4 General Unsecured Claim.

(g)    *GUC Trust Expenditures.*

(i)    The GUC Trust may expend up to a maximum of $2,000,000 in professional fees in costs of administration, wind down, and pursuing claims and assets without requiring any input from any party outside of the GUC Trust Oversight Committee;

(ii)    To the extent that the GUC Trust, by and through a decision of the GUC Trust Oversight Committee, wishes to spend in excess of $2,000,000 in the exercise of its fiduciary responsibilities, any such expenditure will be subject to the advice and prior written consent of Vatera and MedCo, not to be unreasonably withheld; and

(iii)    If the GUC Trust spends funds over and above the $2,000,000 threshold, without the advice and prior written consent of Vatera and MedCo, but makes recoveries that restore the balance to the level of the Initial GUC Trust Funding Amount (the "**Recovery**"), then the subordination to which Vatera and the MedCo have agreed with respect to the Initial GUC Trust Funding Amount (as set forth in Sections 5.04(f)(i) and 5.04(f)(ii) of the Plan), shall not apply to the portion of the Recovery representing a replenishment of any professional fees expended in excess of the $2,000,000 threshold.

### 5.    Section 363 Sale

In the event that the Debtors effectuate a Section 363 Asset Sale, the following provisions will govern implementation of the Plan.

(a)     *Compliance with the Asset Purchase Agreement.* Notwithstanding anything in the Plan to the contrary, nothing herein shall eliminate any post-closing obligations of the Debtors or the Section 363 Asset Purchaser under the Asset Purchase Agreement, if any.

(b)     *Plan Administrator.*

(i)     *Appointment of Plan Administrator*. From and after the Effective Date, an Entity to be designated by the Debtors shall serve as the Plan Administrator pursuant to the Plan Administrator Agreement and the Plan, until the resignation or discharge and the appointment of a successor Plan Administrator in accordance with the Plan Administrator Agreement and the Plan. The Debtors shall file, as part of the Plan Supplement, a notice providing the information set forth in sections 1129(a)(4) and (5) of the Bankruptcy Code with respect to the Entity who the Debtors have selected as Plan Administrator. The appointment of the Plan Administrator shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date. The Plan Administrator shall have and perform all of the duties, responsibilities, rights, and obligations set forth in the Plan and the Plan Administrator Agreement.

(ii)     *The Plan Administrator Agreement*. Prior to or on the Effective Date, the Debtors shall execute a Plan Administrator Agreement in substantially the same form as set forth in the Plan Supplement. Any nonmaterial modifications to the Plan Administrator Agreement made by the Debtors prior to the Effective Date are hereby ratified. The Plan Administrator Agreement will, subject to consultation with the Requisite Supporting Lenders, contain provisions permitting the amendment or modification of the Plan Administrator Agreement as necessary to implement the provisions of the Plan.

(iii)     *Rights, Powers, and Duties of the Debtors and the Plan Administrator*. Following the Effective Date, the Debtors shall retain and have all the rights, powers, and duties necessary to carry out their responsibilities under the Plan and the Plan Administrator Agreement. The Plan Administrator shall seek to preserve and protect all applicable privileges of the Debtors, as applicable, including any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral). Such rights, powers, and duties, which shall be exercisable by the Plan Administrator on behalf of the Liquidating Debtors and the Estates pursuant to the Plan and the Plan Administrator Agreement, shall include, among others, (A) making distributions to Holders of Allowed Claims and Interests as provided for in the Plan, (B) administering, reconciling, and resolving Administrative Claims, Professional Claims, Priority Tax Claims, Other Priority Claims, and General Unsecured Claims, (C) filing tax returns and paying taxes, (D) administering the Debtors' 401(k) benefit plans, and (E) dissolving the Debtors.

(iv)     *Compensation of the Plan Administrator*. The Plan Administrator shall be compensated from the Wind-Down Reserve pursuant to the terms of the Plan Administrator Agreement. Any professionals retained by the Plan Administrator shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the Wind-Down Reserve. The payment of the fees and expenses of the Plan Administrator and its retained professionals shall be made in the ordinary course of business in accordance with the Wind-Down Budget and shall not be subject to the approval of the Bankruptcy Court; *provided,*

*however*, that any disputes related to such fees and expenses shall be brought before the Bankruptcy Court.

(v)     *Indemnification*. Following the Effective Date, the Liquidating Debtors shall indemnify and hold harmless (A) the Plan Administrator (in its capacity as such and as officer and director of the Debtors), (B) such individuals that may serve as officers and directors of the Liquidating Debtors following the Effective Date, if any, and (C) any professionals retained by the Plan Administrator (collectively, the "**Indemnified Parties**"), from and against and with respect to any and all liabilities, losses, damages, claims, costs, and expenses, including, but not limited to, attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such Indemnified Party's willful misconduct, willful violation of the Plan or any order of the Bankruptcy Court, or gross negligence, with respect to the Liquidating Debtors or the implementation or administration of the Plan or the Plan Administrator Agreement. To the extent an Indemnified Party asserts a claim for indemnification as provided above, the legal fees and related costs incurred by counsel to the Plan Administrator in monitoring and participating in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such Indemnified Party (and such Indemnified Party undertakes to repay such amounts if it ultimately shall be determined that such Indemnified Party is not entitled to be indemnified therefore) out of the Wind-Down Reserve or any insurance purchased using the Wind-Down Reserve. The indemnification provisions of the Plan Administrator Agreement shall remain available to and be binding upon any former Plan Administrator or the estate of any decedent of the Plan Administrator and shall survive the termination of the Plan Administrator Agreement.

(vi)     *Exculpation*. Following the Effective Date, the organizational documents of the Liquidating Debtors shall provide for the exculpation of the Plan Administrator to the fullest extent permitted by applicable law, other than for acts or omissions resulting from such Indemnified Party's willful misconduct, willful violation of the Plan or any order of the Bankruptcy Court, or gross negligence.

(vii)     *Insurance*. The Plan Administrator shall be authorized to obtain and pay for out of the Wind-Down Reserve, in accordance with the Wind-Down Budget, all reasonably necessary insurance coverage for itself, its agents, representatives, employees or independent contractors, and the Liquidating Debtors, including, but not limited to, coverage with respect to (A) any property that is or may in the future become the property of the Liquidating Debtors or their Estates following the Effective Date and (B) the liabilities, duties, and obligations of the Plan Administrator and its agents, representatives, employees, or independent contractors under the Plan Administrator Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may remain in effect for a reasonable period of time as determined by the Plan Administrator after the termination of the Plan Administrator Agreement.

(c)     *Merger and Dissolution of the Reorganized Debtors*.

Immediately following the occurrence of the Effective Date, (i) the respective boards of directors of the Liquidating Debtors shall be terminated and the members of the boards of directors of the Debtors shall be deemed to have resigned and (ii) the Liquidating Debtors shall continue to

exist after the Effective Date in accordance with the laws of the State of Delaware and pursuant to their respective certificates of incorporation, bylaws, articles of formation, operating agreements, and other organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended under the Plan, for the limited purposes of liquidating all of the assets of the Estates and making distributions in accordance with the Plan.

On the Effective Date, and without further order of the Bankruptcy Court, each of the Subsidiary Debtors shall be deemed merged with and into Melinta Therapeutics, without the necessity of any other or further actions to be taken by or on behalf of the Liquidating Debtors or payments to be made in connection therewith; *provided, however,* that the Liquidating Debtors or the Plan Administrator, on behalf of the Liquidating Debtors, may execute and file documents and take all other actions as they deem appropriate relating to the foregoing corporate actions under the laws of the State of Delaware and, in such event, all applicable regulatory or governmental agencies shall take all steps necessary to allow and effect the prompt merger of the Debtors as provided herein, without the payment of any fee, tax, or charge and without the need for the filing of reports or certificates.

Moreover, on and after the first day following the Effective Date, Melinta Therapeutics and the Subsidiary Debtors (i) shall be deemed to have withdrawn their business operations from any state in which they were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, and (ii) shall not be liable in any manner to any taxing or other authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

(d)      *Accounts and Reserves*.

(i)      *Wind-Down Reserve.* On or before the Effective Date, the Debtors or the Liquidating Debtors (as applicable) shall create and fund the Wind-Down Reserve in Cash in the amount of the Wind-Down Budget. No payments to the Plan Administrator and its professionals shall be made from any source other than the Wind-Down Reserve. The Plan Administrator shall segregate and shall not commingle the Cash held in the Wind-Down Reserve.

(ii)      *Other Reserves and Modifications to Reserves*. Subject to and in accordance with the provisions of the Plan Administrator Agreement and the Wind-Down Budget, the Plan Administrator may establish and administer any other necessary reserves that may be required under the Plan or the Plan Administrator Agreement. Notwithstanding anything to the contrary contained in the Plan, the Plan Administrator may make transfers of money between the reserves established under the Plan to satisfy Claims and other obligations solely in accordance with the Plan and the Wind-Down Budget.

(e)      *Consent Rights of Supporting Lenders.* Unless and until all Secured Prepetition Credit Agreement Claims have been paid in full in Cash, the following matters shall be subject to the prior consent (not to be unreasonably withheld, conditioned, or delayed) of the Supporting Lenders: (i) the identity of the Plan Administrator; (ii) the form and substance of the Plan Administrator Agreement; (iii) the Wind-Down Budget; (iv) the settlement of, or agreement to Allow, any Administrative Claim pursuant to Section 2.01 of the Plan; (v) the Debtors' election

to pay an Allowed Priority Tax Claim in installment payments over a period of not more than five years after the Petition Date pursuant to Bankruptcy Code section 1129(a)(9)(C); and (vi) the administration of Claims against the Debtors pursuant to Section 7.02 of the Plan.

6.      **Cancellation of Prepetition Credit Agreement, Vatera Facility, and Interests**

Except as otherwise provided in the Plan, on and after the Effective Date, all notes, instruments, certificates, agreements, mortgages, security documents, and other documents evidencing Claims or Interests, including the Prepetition Credit Agreement Claims, the Vatera Claims, and Interests in Melinta Therapeutics, shall be deemed canceled and surrendered without any need for further action or approval of the Bankruptcy Court or any Holder or other person and the obligations of the Debtors, as applicable, thereunder or in any way related thereto shall be deemed satisfied in full, and the Supporting Lenders and the Vatera Lenders shall be released from all duties thereunder; *provided* that, notwithstanding Confirmation or consummation of the Plan, any such agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of: (i) allowing such Holders to receive distributions under the Plan; (ii) allowing such Holders to enforce their rights, claims, and interests *vis-à-vis* any parties other than the Debtors or the Reorganized Debtors or the Liquidating Debtors (as applicable); (iii) allowing the Prepetition Lenders and the Vatera Lenders to make the distributions in accordance with the Plan (if any), as applicable; (iv) preserving any rights of the Prepetition Lenders and the Vatera Lenders to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders under the relevant credit agreement, including any rights to priority of payment and/or to exercise charging liens; (v) allowing such Holders to enforce any obligations owed to each of them under the Plan; (vi) allowing the Supporting Lenders and the Vatera Lenders to exercise rights and obligations relating to the interests of the Holders under the relevant credit agreements; (vii) allowing such Holders to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including for the purpose of, but not limited to, enforcing the respective obligations owed to such parties under the Plan; and (viii) permitting such Holders to perform any functions that are necessary to effectuate the foregoing; *provided, further*, that except as provided herein, the preceding proviso shall not affect the settlement and release of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, as applicable.

7.      **Disputed Claims Reserve**

On or before the Initial Distribution Date, the Distribution Agent shall create the Disputed Claims Reserve. On each Distribution Date, the Distribution Agent shall fund the Disputed Claims Reserve in Cash, in the amount of the Disputed Claims Reserve Amount. No payments made on account of Disputed General Unsecured Claims that become Allowed General Unsecured Claims after the Effective Date shall be made from any source other than the Disputed Claims Reserve. After all Disputed Claims are Allowed or Disallowed and the Allowed amounts of such Claims are paid their respective Pro Rata Share by the Distribution Agent, any remaining Cash in the Disputed Claims Reserve shall become Distributable Cash.

### 8.    Exemption from Certain Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall be directed to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 9.    Employee Matters

(a)    *Employment Agreements*. The Debtors shall assume or reject employment, severance (change in control), retirement, indemnification, or other agreements with their pre-Effective Date managers, officers, and employees in accordance with the provisions of Article VI of the Plan and the applicable provisions of the Restructuring Support Agreement (including, without limitation, Section 7.4 thereof, which governs certain employee matters in connection with a Supporting Lender Transaction). The Reorganized Debtors may enter into new employment arrangements, retention agreements, and/or change in control agreements with the Debtors' officers who continue to be employed after the Effective Date, subject to the applicable provisions of the Restructuring Support Agreement.

(b)    *Other Incentive Plans and Employee Benefits*. Unless otherwise specified in the Plan or the Restructuring Support Agreement (including, without limitation, Section 7.4 thereof, which governs certain employee matters in connection with a Supporting Lender Transaction), and except in connection and consistent with Section 5.09(a) of the Plan, on and after the Effective Date, the Reorganized Debtors shall have the sole discretion to (i) amend, adopt, assume, and/or honor, in the ordinary course of business or as otherwise provided in the Plan, any contracts, agreements, policies, programs, and plans assumed pursuant to Article VI of the Plan for, among other things, compensation, pursuant to the terms thereof or of the Plan, including any incentive plan, retention plan, 401(k) plan, healthcare benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation benefits, life insurance, and accidental death and dismemberment insurance for the managers, officers, and employees of the Debtors who served in such capacity from and after the Petition Date, and (ii) honor, in the ordinary course of business and in accordance with the applicable policies of the Debtors, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date.

(c)    *Commitments Under Restructuring Support Agreement*. For the avoidance of doubt, nothing in Section 5.09 of the Plan is intended, or shall be construed, to limit or modify the covenants of the Supporting Lenders pursuant to Section 7.4 of the Restructuring Support Agreement, all of which shall continue in full force and effect in accordance with their terms.

### 10. Preservation of Causes of Action

In accordance with section 1123(b)(3) of the Bankruptcy Code, in the event of a Plan Sale, the Reorganized Debtors shall, and in the event of a Section 363 Asset Sale, the Liquidating Debtors and their Estates shall, retain all of the Debtors' Causes of Action other than any Causes of Action that are acquired assets under any Asset Purchase Agreement or released pursuant to the terms of the Plan or an order of the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, or acquired by the Section 363 Asset Purchaser or otherwise released pursuant to the Asset Purchase Agreement, the Debtors expressly reserve all of their Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or consummation of the Plan. For the avoidance of doubt, upon the occurrence of the Supporting Lender Transaction Effective Date, if applicable, the GUC Trust Causes of Action shall vest in the GUC Trust, and all remaining Causes of Action, including the Excluded Causes of Action, other than those Causes of Action released pursuant to the terms of the Plan or an order of the Bankruptcy Court, shall vest in the Reorganized Debtors.

### 11. Insured Claims

Notwithstanding anything to the contrary contained herein, to the extent any Insurance Contract(s) provides coverage with respect to any General Unsecured Claim, the Holder of such Claim shall (i) be paid in accordance with the terms of any applicable Insurance Contract(s), and (ii) if applicable, receive the treatment provided for in the Plan for Allowed General Unsecured Claims to the extent the applicable Insurance Contract(s) does not provide coverage with respect to any portion of the Claim.

### E. Unexpired Leases and Executory Contracts

#### 1. Assumption and Rejection in Case of Plan Sale to the Supporting Lenders

If the Supporting Lenders are the Successful Bidder, the terms and provisions of Article VI of the Plan shall be subject to the Restructuring Support Agreement and the Bidding Procedures Order, and to the extent Article VI of the Plan conflicts with any of the foregoing, the foregoing shall govern.

#### 2. Executory Contracts and Unexpired Leases to Be Rejected

Upon the occurrence of the Effective Date, each Executory Contract and Unexpired Lease shall be deemed rejected in accordance with, and subject to, sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (i) is listed on the Schedule of Assumed Executory Contracts contained in the Plan Supplement; (ii) has been previously assumed by the Debtors by Final Order of the Bankruptcy Court or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to assume pending as of the Effective Date; or (iv) is an Insurance Contract. The Confirmation

Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Counterparties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases subject to compliance with the requirements herein.

       (a)    *Preexisting Obligations to Debtors.* Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors and the Plan Administrator expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

       (b)    *Rejection Damages Claim Procedures.* Unless otherwise provided by a Bankruptcy Court order, any proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be filed with the Claims and Solicitation Agent no later than 30 days after the later of the Effective Date, the effective date of rejection, or the date notice of such rejection is transmitted by the Reorganized Debtors or the Plan Administrator, as applicable, to the counterparty to such Executory Contract or Unexpired Lease. Any proofs of Claim arising from the rejection of Executory Contracts and Unexpired Leases that are not timely filed shall be Disallowed automatically and forever barred, estopped, and enjoined from assertion and shall not be enforceable against the Reorganized Debtors or the Liquidating Debtors (as applicable), without the need for any further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied and released, notwithstanding anything in the Schedules or a proof of Claim to the contrary. All Allowed Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims.

       (c)    *Reservation of Rights.* Notwithstanding anything to the contrary herein, prior to the Effective Date, the Debtors may amend their decision with respect to the rejection of any Executory Contract or Unexpired Lease.

### 3.    Executory Contracts and Unexpired Leases to Be Assumed

Upon the occurrence of the Effective Date, each Executory Contract that (i) is listed on the Schedule of Assumed Executory Contracts and Unexpired Leases contained in the Plan Supplement; (ii) has been previously assumed by the Debtors by Final Order of the Bankruptcy Court or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to assume pending as of the Effective Date; or (iv) is an Insurance Contract, shall be deemed assumed, in accordance with, and subject to, sections 105, 365 and 1123 of the Bankruptcy Code as of the Effective Date.

The Confirmation Order will constitute an order of the Bankruptcy Court approving such assumptions pursuant to sections 105, 365 and 1123 of the Bankruptcy Code as of the Effective Date. To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtors' or Liquidating Debtors' (as applicable) assumption of such Executory Contract or Unexpired Lease, then such provision shall be deemed modified such that the transactions contemplated by the Plan will not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Each Executory Contract or Unexpired Lease assumed pursuant to Article VI of the Plan will revest in and be fully enforceable by the Reorganized Debtors and the Plan Administrator (if applicable), except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

(a)    *Modifications, Etc.* Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or are rejected or repudiated pursuant to the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

(b)    *Proofs of Claim Based on Assumed Contracts or Leases*. Any and all proofs of Claim based on Executory Contracts and Unexpired Leases that have been assumed or assumed and assigned in the Chapter 11 Cases, including under the Plan, except proofs of Claim asserting Cure Amounts, pursuant to the order approving such assumption or assumption and assignment, including the Sale Order and the Confirmation Order, shall be deemed Disallowed and expunged from the Claims register as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)    *Cure Proceedings and Payments*. With respect to each of the Executory Contracts and Unexpired Leases assumed under the Plan, the Reorganized Debtors or the Liquidating Debtors (as applicable) shall designate a proposed Cure Amount, and the assumption of such Executory Contract or Unexpired Lease shall be conditioned upon the disposition of all issues with respect to the Cure Amount. Except as otherwise set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, the Cure Amount with respect to each of the Executory Contracts and Unexpired Leases assumed under the Plan is designated by the Debtors as zero dollars, subject to the determination of a different Cure Amount pursuant to the procedures set forth herein (including Section 6.03(e) of the Plan) and in the Cure Notices. Except with respect to Executory Contracts and Unexpired Leases for which the Cure Amount is zero dollars, or for which the Cure Amount is in dispute, the Cure Amount shall be satisfied by the Reorganized Debtors or the Liquidating Debtors (as applicable), if any, by payment of the Cure

Amount in Cash within 30 days following the occurrence of the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as may be ordered by the Bankruptcy Court or agreed upon by the parties to the applicable Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

Any provisions or terms of the Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by payment of the Cure Amount, or by an agreed-upon waiver of the Cure Amount. If there is a dispute regarding such Cure Amount, the ability of the Reorganized Debtors or the Liquidating Debtors (as applicable) to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the Cure Amount shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption, or as may be agreed upon by the Reorganized Debtors or the Liquidating Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease; *provided, however*, that the Reorganized Debtors or the Liquidating Debtors (as applicable) shall have the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease after entry of a Final Order determining the Cure Amount or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cure Amount, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption, as applicable.

(d)    *Cure Notice*. No later than seven days before the Confirmation Hearing, the Debtors shall serve upon counterparties to such Executory Contracts and Unexpired Leases a Cure Notice (except for such counterparties that received a Cure Notice pursuant to the Bidding Procedures Motion and the Bidding Procedures Order) that will (i) notify the counterparty of the proposed assumption of the applicable Executory Contract or Unexpired Lease, (ii) list the applicable Cure Amount, if any, set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, (iii) describe the procedures for filing objections to the proposed assumption of the applicable Executory Contract or Unexpired Lease, (iv) describe the procedures for filing objections to the proposed Cure Amount of the applicable Executory Contract or Unexpired Lease, and (v) explain the process by which related disputes will be resolved by the Bankruptcy Court. If no objection is timely received, (A) the non-Debtor party to the assumed Executory Contract or Unexpired Lease shall be deemed to have consented to the assumption of the applicable Executory Contract or Unexpired Lease and shall be forever barred from asserting any objection with regard to such assumption, and (B) the proposed Cure Amount shall be controlling, notwithstanding anything to the contrary in any applicable Executory Contract, Unexpired Lease, or other document as of the date of the filing of the Plan, and the non-Debtor party to an applicable Executory Contract or Unexpired Lease shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting, collecting, or seeking to collect any additional amounts relating thereto against the Debtors or the Reorganized Debtors or the Liquidating Debtors (as applicable), or the property of any of them.

(e)     *Cure Objections*. If a proper and timely objection to the Cure Notice or proposed Cure Amount was filed by the Cure Objection Deadline, the Cure Amount shall be equal to (i) the amount agreed to between the Reorganized Debtors or the Liquidating Debtors (as applicable) and the applicable counterparty or (ii) to the extent the Debtors or Reorganized Debtors or the Liquidating Debtors (as applicable) and counterparty do not reach an agreement regarding any Cure Amount or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure Amount and any related issues. Objections, if any, to the proposed assumption and/or Cure Amount must be in writing, filed with the Bankruptcy Court, and served in hard-copy form on the parties identified in the Cure Notice so that they are actually received by the Cure Objection Deadline. For the avoidance of doubt, nothing in the Plan or in the Confirmation Order shall extend the time by which counterparties to Executory Contracts or Unexpired Leases who received Cure Notices pursuant to the Bidding Procedures Order or the Bidding Procedures Motion were required to object to the assumption or assumption and assignment of the applicable Executory Contract or Unexpired Lease.

(f)     *Hearing with Respect to Objections*. If an objection to the proposed assumption of an Executory Contract or Unexpired Lease and/or to the proposed Cure Amount thereof is timely filed and received in accordance with the procedures set forth in Section 6.03(e) of the Plan, and the parties do not reach a consensual resolution of such objection, and if a hearing was not previously conducted pursuant to the Bidding Procedures Motion and the Bidding Procedures Order, a hearing with respect to such objection shall be held at such time scheduled by the Bankruptcy Court or the Reorganized Debtors or the Liquidating Debtors (as applicable). Objections to the proposed Cure Amount or assumption of an Executory Contract or Unexpired Lease will not be treated as objections to Confirmation of the Plan.

(g)     *Reservation of Rights*. Notwithstanding anything to the contrary herein, subject to the terms of the Restructuring Support Agreement, Bidding Procedures Order, and Sale Order, prior to the Effective Date, the Debtors may amend their decision with respect to the assumption of any Executory Contract or Unexpired Lease and provide a new notice amending the information provided in the applicable notice. In the case of an Executory Contract or Unexpired Lease designated for assumption that is the subject of a Cure Amount objection that has not been resolved prior to the Effective Date, the Reorganized Debtors or the Liquidating Debtors (as applicable) may designate such Executory Contract or Unexpired Lease for rejection at any time prior to the payment of the Cure Amount, as set forth in Section 6.03(c) of the Plan.

## 4.     General Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors, the Reorganized Debtors or the Liquidating Debtors (as applicable), or any of their Affiliates, has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Reorganized Debtors or the Liquidating Debtors (as applicable) shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

5.    **Insurance Contracts**

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, any bar date order or notice or claim objection order, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction or release, or requires a party to opt in to any releases, or any provision that sets a reserve): (a) all Insurance Contracts shall continue in effect after the Effective Date pursuant to their respective terms and conditions and shall be treated as if assumed by the Reorganized Debtors or the Liquidating Debtors (as applicable), and subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute both approval of such assumption pursuant to sections 105 and 365 of the Bankruptcy Code and a finding by the Bankruptcy Court that such assumption is in the best interests of the Estates; (b) all rights and obligations of the Debtors under any Insurance Contracts shall automatically become vested in the Reorganized Debtors or the Liquidating Debtors (as applicable), unaltered and without necessity for further approvals or orders and nothing shall alter the legal, equitable or contractual rights, obligations and defenses of the Debtors and the Insurers under the Insurance Contracts or modify the coverage provided thereunder or the terms and conditions thereof except that on and after the Effective Date, the Reorganized Debtors or the Liquidating Debtors (as applicable) shall become and remain liable for all of the Debtors' obligations under the Insurance Contracts regardless of whether such obligations arise before or after the Effective Date and without the need or requirement for any Insurer to file a proof of Claim or Administrative Claim (for the avoidance of doubt, the Reorganized Debtors or the Liquidating Debtors (as applicable) shall retain the right, if any, to challenge any amounts owed under the Insurance Contracts in accordance with their terms); and (c) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article IX of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Court, solely to permit: (I) claimants with valid workers' compensation claims or direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (II) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (C) all costs in relation to each of the foregoing; and (III) the Insurers to cancel any Insurance Contracts, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Contracts.

The Reorganized Debtors or the Liquidating Debtors (as applicable) shall be deemed to have assumed all D&O Policies providing coverage for those insureds currently covered by such policies for the remaining term of such policies, including, without limitation, the six-year tail coverage purchased prior to the Petition Date, and confirmation of the Plan shall not discharge, impair or otherwise modify the D&O Policies or any obligations assumed by the deemed assumption thereof. For the avoidance of doubt, all D&O Policies have been prefunded and will not require any additional premiums on or after the Effective Date, and shall provide coverage for the insureds for the remaining term of such policies in respect of any claims, demands, suits, Causes of Action, or proceedings against such insureds in at least the scope and amount as currently maintained by the Debtors. Nothing in the Plan shall be deemed to impair any Entity's

claim, if any, to proceeds of the D&O Policies or the priority of payment on such claim, if any, under the D&O Policies.

### F.    Procedures for Resolving Disputed Claims and Interests

#### 1.    Determination of Claims and Interests

After the Effective Date, the Reorganized Debtors or the Liquidating Debtors (as applicable) shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action retained pursuant to Section 5.10 of the Plan, except with respect to any Claim or Interest deemed Allowed under the Plan.

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest. All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise, shall be binding on all parties. For the avoidance of doubt, any Claim determined and liquidated pursuant to (a) an order of the Bankruptcy Court or (b) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination or any revision, modification, or amendment thereof as to which the time to appeal or seek review or rehearing has expired and no appeal or petition for review or rehearing was filed or, if filed, remains pending) shall be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with the Plan.

Nothing contained in Section 7.01 of the Plan shall constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors, the Reorganized Debtors, or the Liquidating Debtors (as applicable), or any other party-in-interest may have against any Entity in connection with or arising out of any Claim, including any rights under section 157(b) of title 28 of the United States Code.

#### 2.    Claims Administration Responsibility

Subject to either (a) approval of the Creditors' Oversight Committee as set forth in Section 5.04(a) of the Plan (if applicable) or (b) the Plan Administrator Agreement (if applicable), after the Effective Date, the Reorganized Debtors or the Liquidating Debtors (as applicable) shall retain responsibility for (i) administering, disputing, objecting to, compromising, or otherwise resolving all Claims against and Interests in the Debtors including, (1) filing, withdrawing, or litigating to judgment objections to Claims or Interests, (2) settling or compromising any Disputed Claim or Disputed Interest without any further notice to or action, order, or approval by the Bankruptcy Court, and (3) administering and adjusting the Claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court and (ii) making distributions (if any) with respect to all Claims and Interests.

### 3.    Objections to Claims

Any objections to Claims (other than Administrative Claims) shall be served and filed on or before the Claims Objection Deadline (or such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors or the Liquidating Debtors (as applicable) without further notice to parties-in-interest). Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Reorganized Debtors or the Liquidating Debtors (as applicable) effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the extent counsel for a Holder of a Claim or Interest is unknown, by first-class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto (or at the last known addresses of such Holder if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address); or (c) by first-class mail, postage prepaid, on any counsel that has appeared on behalf of the Holder of the Claim in the Chapter 11 Cases and has not withdrawn such appearance. In the event that the Committee has not objected to the Claims of MedCo or the Vatera Lenders on or before March 12, 2020, any rights that the Committee, the Creditors' Oversight Committee, and the GUC Trust has to object to such claims are forever waived and released.

### 4.    Disallowance of Claims

Except as otherwise agreed, any and all proofs of Claim filed after the applicable deadline for filing such proofs of Claim shall be deemed Disallowed and expunged as of the Effective Date without any further notice to, or action, order, or approval of the Bankruptcy Court, and Holders of such Claims shall not receive any distributions on account of such Claims, unless any such late proof of Claim is deemed timely filed by a Final Order of the Bankruptcy Court.

Nothing herein shall in any way alter, impair, or abridge the legal effect of the Bar Date Order, or the rights of the Debtors, the Reorganized Debtors or the Liquidating Debtors (as applicable), or other parties-in-interest to object to Claims on the grounds that they are time barred or otherwise subject to disallowance or modification. Nothing in the Plan shall preclude amendments to timely filed proofs of Claim to the extent permitted by applicable law.

All Claims of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors or the Liquidating Debtors (as applicable) allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be Disallowed if (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors or the Liquidating Debtors (as applicable), on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code, and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

### 5.    Estimation of Claims

Before the Effective Date, the Debtors and, after the Effective Date, the Reorganized Debtors or the Liquidating Debtors (as applicable), may (but are not required to) at any time request that the Bankruptcy Court estimate a Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan, without prejudice to the Holder of such Claim's right to request that estimation should be for the purpose of determining the Allowed amount of such Claim, and the Reorganized Debtors or the Liquidating Debtors (as applicable) may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. All estimation procedures set forth in the Plan shall be applied in accordance with section 502(c) of the Bankruptcy Code. Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Plan or the Bankruptcy Court.

### 6.    No Interest on Disputed Claims

Unless otherwise specifically provided for in the Plan or as otherwise required by section 506(b) of the Bankruptcy Code, postpetition interest shall not accrue or be paid on Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest. Additionally, and without limiting the foregoing, unless otherwise specifically provided for in the Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made, when and if such Disputed Claim becomes an Allowed Claim.

### 7.    Amendments to Claims

On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or the Reorganized Debtors or the Liquidating Debtors (as applicable), and, to the extent such authorization is not received, any such new or amended Claim filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

### G.    Provisions Governing Distributions

### 1.    Time of Distribution

Except as otherwise provided for herein or ordered by the Bankruptcy Court, distributions under the Plan shall be made on the later of (a) the Initial Distribution Date or (b) on the first Periodic Distribution Date occurring after the later of (i) 30 days after the date when a Claim is Allowed or (ii) 30 days after the date when a Claim becomes payable pursuant to any agreement

between the Debtors or the Reorganized Debtors or the Liquidating Debtors (as applicable), as applicable, and the Holder of such Claim; *provided, however*, that the Reorganized Debtors or the Liquidating Debtors (as applicable) may, in their sole discretion, make one-time distributions on a date that is not a Periodic Distribution Date.

### 2.    Currency

Except as otherwise provided in the Plan or Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of the Effective Date at 4:00 p.m. prevailing Eastern Time, mid-range spot rate of exchange for the applicable currency as published in the next *The Wall Street Journal* following the Effective Date.

### 3.    Distribution Agent

The Distribution Agent shall make all distributions required under the Plan, subject to the terms and provisions of the Plan. No Distribution Agent shall be required to give any bond or surety or other security for the performance of its duties. The Distribution Agent shall be authorized and directed to rely upon the Debtors' books and records and, as applicable, the Reorganized Debtors' or the Liquidating Debtors' (as applicable) representatives and professionals in determining Allowed Claims not entitled to distributions under the Plan in accordance with the terms and conditions of the Plan. The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan. If the Distribution Agent is an Entity other than the Reorganized Debtors, such Entity shall be paid its reasonable fees and expenses, including the reasonable fees and expenses of its attorneys or other professionals.

### 4.    Claims Administered by Servicers

In the case of Holders of Claims governed by an agreement and administered by a Servicer, the respective Servicer shall be deemed to be the Holder of such Claims for purposes of distributions to be made under the Plan. The Distribution Agent shall make all distributions on account of such Claims to the Servicers or as directed by the Servicers, in the Servicers' sole discretion. Each Servicer shall, at its option, hold or direct such distributions for the beneficial Holders of such Allowed Claims, as applicable; *provided, however*, that the Servicer shall retain all rights under its respective agreement in connection with delivery of distributions to the beneficial Holders of such Allowed Claims, including rights on account of its charging lien; *provided, further, however*, that the Reorganized Debtors' or the Liquidating Debtors' (as applicable) obligations to make distributions pursuant to the Plan shall be deemed satisfied upon delivery of distributions to each Servicer or the Entity or Entities designated by the Servicers. The Servicers shall not be required to give any bond, surety, or other security for the performance of their duties with respect to such distributions.

5.       **Distributions on Claims Allowed After the Effective Date**

(a)       *No Distributions Pending Allowance*. Except as ordered by the Bankruptcy Court, no payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim.

(b)       *Special Rules for Distributions to Holders of Disputed General Unsecured Claims*. Notwithstanding any provision to the contrary in the Plan, and except as otherwise agreed by the relevant parties, except as ordered by the Bankruptcy Court, no partial payments and no partial distributions shall be made with respect to a Disputed General Unsecured Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. All distributions made pursuant to the Plan on account of a Disputed General Unsecured Claim that is later deemed an Allowed Claim by the Bankruptcy Court shall be made together with any other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed General Unsecured Claims included in the applicable Class; *provided, however*, that no interest shall be paid on account of such Allowed Claims unless required under applicable bankruptcy law.

(c)       *Disputed Claims Reserve*. The Reorganized Debtors or the Liquidating Debtors (as applicable) (including the Plan Administrator, if applicable) shall establish and administer the Disputed Claims Reserve. Each Holder of a Disputed General Unsecured Claim that becomes an Allowed General Unsecured Claim after the Effective Date shall receive the treatment set forth in the Plan. On each Periodic Distribution Date, all amounts in the Disputed Claims Reserve on account of a Disputed General Unsecured Claim that has become Disallowed in whole or in part (or has been Allowed in an amount less than its Provisionally Allowed amount) shall be redistributed ratably among the Holders of Allowed General Unsecured Claims.

6.       **Delivery of Distributions**

(a)       *Record Date for Distributions*. On the Distribution Record Date, the Claims register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those record Holders listed on the Claims register as of the close of business on the Distribution Record Date. The Prepetition Agent shall have no obligation to recognize any transfer of any Prepetition Credit Agreement Claims occurring after the close of business on the Distribution Record Date and shall instead be entitled to recognize and deal for all purposes under the Plan with only those Holders of record as of the close of business on the Distribution Record Date.

(b)       *Cash Distributions*. Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Distribution Agent, except that Cash payments made to foreign creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

(c)     *Address for Distributions*. Distributions to Holders of Allowed Claims shall be made by the Distribution Agent or the appropriate Servicer (i) at the addresses set forth on the proofs of Claim filed by such Holders of Claims (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or if the Debtors or the Distribution Agent have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related proof of Claim, (iii) at the addresses reflected in the Schedules if no proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address, or (iv) in the case of a Holder of a Claim whose Claim is governed by an agreement and administered by a Servicer, at the addresses contained in the official records of such Servicer. The Debtors, the Reorganized Debtors or the Liquidating Debtors (as applicable), and the Distribution Agent shall not incur any liability whatsoever on account of any distributions under the Plan.

(d)     *Undeliverable Distributions*. If any distribution to a Holder of a Claim is returned as undeliverable, no further distributions to such Holder of such Claim shall be made unless and until the Distribution Agent or the appropriate Servicer is notified of the then-current address of such Holder of the Claim, at which time all missed distributions shall be made to such Holder of the Claim without interest on the next Periodic Distribution Date. Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors or the Liquidating Debtors (as applicable) until such distributions are claimed.

(e)     *Reversion*. Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after such distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revert to and vest in the Reorganized Debtors or the Liquidating Debtors (as applicable) free of any restrictions thereon. Upon vesting, the Claim of any Holder or successor to such Holder with respect to such property shall be cancelled and forever barred, notwithstanding federal or state escheat, abandoned, or unclaimed property laws to the contrary. The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Distribution Agent made pursuant to any indenture or any other instrument evidencing a Claim or an Interest (but only with respect to the initial distribution by the Servicer to Holders that are entitled to be recognized under the relevant indenture or any other instrument evidencing a Claim or an Interest and not with respect to Entities to whom those recognized Holders distribute), notwithstanding any provision in such indenture or other instrument evidencing a Claim or an Interest to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property law.

(f)     *De Minimis Distributions*. Notwithstanding any other provision of the Plan to the contrary, the Distribution Agent shall not be required to make a distribution on account of an Allowed Claim if (i) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date in question is or has a value less than $50.00; *provided, however*, that the Distribution Agent shall make, or cause to be made, a distribution on a Periodic Distribution Date of less than $50.00 if the Distribution Agent expects that such Periodic Distribution Date shall be the final Periodic Distribution Date; or (ii) the amount to be distributed to the specific Holder of the Allowed Claim on the particular Periodic Distribution Date does not both (x) constitute a final distribution to such Holder and (y) have a value of at least $50.00.

### 7.    Claims Paid or Payable by Third Parties

The Claims and Solicitation Agent shall reduce in full a Claim to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Distribution Agent without any further notice to or action, order, or approval of the Bankruptcy Court. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Distribution Agent on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution under the Plan to the Reorganized Debtors or the Liquidating Debtors (as applicable), to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

### 8.    Setoffs

Except as otherwise expressly provided for in the Plan, the Reorganized Debtors or the Liquidating Debtors (as applicable), pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the Reorganized Debtors or the Liquidating Debtors (as applicable), may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided, however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release the Reorganized Debtors or the Liquidating Debtors (as applicable) of any such Claims, rights, and Causes of Action that the Reorganized Debtors or the Liquidating Debtors, as applicable, may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Reorganized Debtors or the Liquidating Debtors, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to Bankruptcy Code section 553 or otherwise; *provided*, *however*, that the limitation on the right of setoff set forth in this sentence shall not apply to any right of setoff of any MedCo Person.

### 9.    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

### H.    Effect of Plan on Claims and Interests

### 1.    Vesting of Assets

Except as otherwise explicitly provided in the Plan, including Section 5.04(e), as of the Effective Date, the property of each Debtors' Estate, if any, shall revest in the applicable Reorganized Debtors or the Liquidating Debtors (as applicable) which, as Debtors, owned such property or interest in property as of the Effective Date, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests. As of and following the Effective Date, the Reorganized Debtors or the Liquidating Debtors (as applicable) may operate their business and use, acquire, and dispose of property and settle and compromise Claims, Interests, or Causes of Action without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. For the avoidance of doubt, upon the occurrence of the Supporting Lender Transaction Effective Date, the Excluded Causes of Action shall revest in the applicable Reorganized Debtors pursuant to Section 9.01 of the Plan (or, if applicable, be released pursuant to Section 9.04 of the Plan).

### 2.    Discharge of the Debtors

In the event of a Plan Sale, pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Plan or the Confirmation Order, and effective as of the Effective Date: (a) the distributions and rights that are provided in the Plan, if any, and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Causes of Action, whether known or unknown, including any interest accrued on such Claims from and after the Petition Date, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, rights, and Interests, including, but not limited to, Claims and Interests that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a proof of Claim or Interest based upon such Claim, debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed under section 502 of the Bankruptcy Code, or (iii) the Holder of such a Claim, right, or Interest accepted the Plan; (b) the Plan shall bind all Holders of Claims and Interests notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, or the Liquidating Debtors (as applicable), their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Interests in the Debtors, subject to the occurrence of the Effective Date.

### 3.    Compromise and Settlement

Pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various (a) Claims or Interests and (b) Causes of Action that the Debtors have against other Entities up to the Effective Date. After the Effective Date, any such right shall pass to the Reorganized Debtors or the Liquidating Debtors (as applicable) as contemplated in Section 9.01 of the Plan, without the need for further approval of the Bankruptcy Court. Pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan or any distribution to be made on account of an Allowed Claim, the provisions of the Plan shall constitute a good-faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest.

### 4.    Debtors Release

**As of the Effective Date, except for the rights, if any, that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties,[30] in all capacities, will be deemed forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Reorganized Debtors, the Estates, all affiliates or subsidiaries managed or controlled by the foregoing, and each of their predecessors, successors and assigns, subsidiaries, and affiliates, and all of their respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, and such persons' respective heirs, executors, estates, servants, and nominees, from any and all Claims, Interests, or Causes of Action whatsoever, including any derivative Claims asserted or that could have been asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, at law, in equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising from, in whole or in part, directly or indirectly, in any manner whatsoever, the Debtors, the assets, liabilities, operations, or business of the Debtors, the Restructuring (as defined in the Restructuring Support Agreement), the Chapter 11 Cases, the purchase, transfer, sale, or rescission of the purchase or sale of any**

---

[30]    The Plan defines "**Released Parties**" as, collectively (a) (i) the Debtors; (ii) the Supporting Lenders; and (iii) the Prepetition Agent; and (b) effective solely upon the Supporting Lender Transaction Effective Date (i) the Vatera Persons and (ii) the MedCo Persons; (c) with respect to each of the foregoing entities in clauses (a) and (b) (but subject, in the case of clause (b), to the occurrence of the Supporting Lender Transaction Effective Date), each of their current and former affiliates; and (d) with respect to each of the foregoing entities in clauses (a) through (c) (but subject, in the case of clause (b), to the occurrence of the Supporting Lender Transaction Effective Date), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, and all of their respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such persons' respective heirs, executors, estates, servants, and nominees.

security of the Debtors or the Reorganized Debtors, the making of any loan to the Debtors or the Reorganized Debtors, any royalty arrangement with any Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan, the Term Sheet, the Restructuring Support Agreement, the Definitive Documents, or any related agreements, instruments, or other documents, or the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that nothing in the Plan shall be construed to release the Released Parties from willful misconduct or actual fraud as determined by a Final Order; *provided*, *further*, that, on or promptly following the Effective Date, the Debtors and MedCo shall dismiss with prejudice all claims pending against one another and their current and former directors and officers and all Claims asserted by the Debtors in any pending litigation against MedCo (and their current and former directors and officers, to the extent applicable) shall be released; *provided*, *further* that the dismissal shall not impair MedCo's ability to assert and liquidate a prepetition general unsecured claim, solely against the Debtors, with respect to any such pending claims, subject to the terms of the subordination set forth in Section 5.04 of the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or the Reorganized Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property, released pursuant to the Debtor Release.

5.    **Third-Party Release**

As of the Effective Date, the Releasing Parties[31] conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release (and each entity so

---

[31]    The Plan defines "**Releasing Parties**" as, collectively (a) (i) the Debtors; (ii) the Supporting Lenders; and (iii) the Prepetition Agent; (b) effective solely upon the Supporting Lender Transaction Effective Date, (i) the Vatera Persons and (ii) the MedCo Persons; (c) with respect to each of the foregoing parties under (a) and (b) (but subject, in the case of clause (b), to the occurrence of the Supporting Lender Transaction Effective Date), each of their current and former affiliates; (d) with respect to each of the foregoing entities in clauses (a) through (c) (but subject, in the case of clause (b), to the occurrence of the Supporting Lender Transaction Effective Date), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, and all of their respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such persons' respective heirs, executors, estates, servants, and nominees; and (e) without limiting the foregoing, each holder of a Claim

*(cont'd)*

discharged and released shall be deemed discharged and released by the Releasing Parties) the Released Parties, in all capacities, and their respective property from any and all Claims, Interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, any Claims or causes of action asserted on behalf of any Holder of any Claim or any Interest or that any Holder of a Claim or an Interest would have been legally entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, at law, in equity, or otherwise, that such Releasing Party would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising prior to the Effective Date from, in whole or in part, directly or indirectly, in any manner whatsoever, the Debtors, the assets, liabilities, operations, or business of the Debtors, the Restructuring (as defined in the Restructuring Support Agreement), the Chapter 11 Cases, or the Restructuring Support Agreement, the purchase, sale, transfer, or rescission of any debt, security, asset, right, or interest of the Debtors or the Reorganized Debtors, the making of any loan to the Debtors or the Reorganized Debtors, any royalty arrangement with any Debtor, the subject matter of, or the transactions or events giving rise to, any Claim against or Interest in the Debtors that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the negotiation, formulation, or preparation of the Restructuring documents or related agreements, instruments, or other documents, including the Plan, the Term Sheet, the Restructuring Support Agreement, the Definitive Documents (as defined in the Restructuring Support Agreement), or any related agreements or instruments, or the solicitation of votes with respect to the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that nothing in the Plan shall be construed to release the Released Parties from any claims based upon willful misconduct or intentional fraud as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of claims released by the Third-Party Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property released pursuant to the Third-Party Release.

---

against or Interest in the Debtors (i) that voted to accept the Plan; (ii) that is conclusively presumed to accept the Plan; (iii) that is deemed to reject the Plan and did not indicate that they opt to not grant the releases provided in the Plan; (iv) whose vote to accept or reject the Plan was solicited but who does not vote either to accept or to reject the Plan and, further, did not indicate that he, she, or it, opts to not grant the releases provided in the Plan; or (v) that voted to reject the Plan and did not indicate that he, she, or it opts to not grant the releases provided in the Plan. For the avoidance of doubt, the Releasing Parties shall not include the Excluded Releasing Parties.

*(cont'd)*

### 6.    Exculpation and Limitation of Liability

To the maximum extent permitted by applicable law, no Exculpated Party[32] will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the Restructuring (as defined in the Restructuring Support Agreement), the Disclosure Statement, the Restructuring Support Agreement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the Debtors' sales and marketing process, the Bidding Procedures, the Bidding Procedures Motion, and the Bidding Procedures Order; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing, except for fraud or willful misconduct, as determined by a Final Order. This exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

### 7.    Injunction

(a)    Upon entry of the Confirmation Order, all Holders of Claims and Interests and other persons, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan and the Restructuring (as defined in the Restructuring Support Agreement) in relation to any Claim extinguished, discharged, or released pursuant to the Plan.

(b)    Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a Holder of a Claim against or Interest in a Debtor, all Entities that have held, hold, or may hold Claims against or Interests in the Debtors whether or not such parties have voted to accept or reject the Plan and other parties-in-interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and causes of action that will be or are extinguished, discharged, or released pursuant to the Plan, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including,

---

[32]    The Plan defines "**Exculpated Parties**" as, collectively (a)(i) the Debtors; (ii) the Supporting Lenders; (iii) the Prepetition Agent; and (iv) the Committee and each of its members, solely in their capacities as such; (b) effective solely upon the Supporting Lender Transaction Effective Date, (i) the Vatera Persons; and (ii) the MedCo Persons; and (c) with respect to each of the foregoing entities in clauses (a) and (b) (but subject, in the case of clause (b), to the occurrence of the Supporting Lender Transaction Effective Date), each of their current and former affiliates; and (d) with respect to each of the foregoing entities in clauses (a) through (c) (but subject, in the case of clause (b), to the occurrence of the Supporting Lender Transaction Effective Date), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, and all of their respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such persons' respective heirs, executors, estates, servants, and nominees.

without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

(c)    The injunctions in the Plan shall extend to any successors of the Debtors and the Reorganized Debtors or the Liquidating Debtors (as applicable) and their respective property and interests in property.

## 8.    Subordination Rights

(a)    Except as otherwise provided in the Plan (including Section 5.04(f) thereof), the allowance, classification, and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. All Claims and all rights and claims between or among Holders of Claims relating in any manner whatsoever to distributions on account of Claims or Interests, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable, shall be deemed satisfied by the distributions under the Plan to Holders of Claims having such subordination rights, such subordination rights shall be deemed waived, released and terminated as of the Effective Date, and all Holders shall be permanently enjoined from enforcing such rights, if any. Except as otherwise specifically provided for in the Plan, distributions to the various Classes of Claims under the Plan shall not be subject to levy, garnishment, attachment, or like legal process by any Holder of a Claim by reason of any subordination rights or otherwise, so that each Holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.

(b)    Except as otherwise provided in the Plan, the right of the Reorganized Debtors or the Liquidating Debtors (as applicable) to seek subordination of any Claim or Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or Interest at any time shall be modified to reflect such subordination. Unless the Plan or the Confirmation Order otherwise provide, no distributions shall be made on account of a Claim subordinated pursuant to Section 9.08(b) of the Plan unless ordered by the Bankruptcy Court.

## 9.    Protection Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code, no Governmental Unit shall discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit,

charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, the Reorganized Debtors or the Liquidating Debtors (as applicable), or another Entity with whom the Reorganized Debtors or the Liquidating Debtors (as applicable) have been associated, solely because the Reorganized Debtors or the Liquidating Debtors (as applicable) have been debtors under chapter 11, have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or have not paid a debt that is settled and released in the Chapter 11 Cases.

### 10.    Release of Liens

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors or the Liquidating Debtors (as applicable) and their successors and assigns.

### 11.    Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as non-contingent or (b) the relevant Holder of a Claim has filed a contingent proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

## I.    Conditions Precedent

### 1.    Conditions Precedent to the Confirmation Order

The following are conditions precedent to the Confirmation of the Plan, each of which may be satisfied or waived in accordance with Section 10.03 of the Plan:

(a)    in the event of a Section 363 Asset Sale, the Sale Order shall be entered and shall be a Final Order;

(b)    in the event that the Supporting Lenders are the Successful Bidder:

(i)    the Restructuring Support Agreement shall have been approved by the Bankruptcy Court and such approval shall not have been stayed or modified and the Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect in accordance with its terms;

(ii)    the Bankruptcy Court shall have entered the order approving the Disclosure Statement consistent with the Restructuring Support Agreement, and reasonably acceptable to the Requisite Supporting Lenders;

(iii)    the Restructuring Expenses due and payable as of the date of Confirmation shall have been paid pursuant to the Restructuring Support Agreement and the Term Sheet (as defined in the Restructuring Support Agreement); and

(iv)    the Debtors' use of cash collateral pursuant to the Cash Collateral Order shall not have terminated, and the Supporting Lenders shall not have delivered a notice of the occurrence of a Termination Event (as defined in the Cash Collateral Order) to the Debtors; and

(c)    the Cash Collateral Order shall remain in full force and effect.

## 2.    Conditions Precedent to the Effective Date of the Plan

The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Section 10.03 of the Plan:

(a)    all conditions precedent to Confirmation set forth in Section 10.01 of the Plan shall have been and shall remain satisfied or shall have been waived in accordance with Section 10.03 of the Plan;

(b)    in the event that the Supporting Lenders are the Successful Bidder,

(i)    all conditions to the obligations of the Supporting Lenders, to the obligations of the Debtors, and to the obligations of both the Supporting Lenders and the Debtors set forth in Article VIII of the Restructuring Support Agreement shall have been either satisfied or waived in accordance with the terms of the Restructuring Support Agreement and shall remain either satisfied or waived, as applicable;

(ii)    the Confirmation Order shall be consistent with the Restructuring Support Agreement and reasonably acceptable to the Requisite Supporting Lenders; and

(iii)    the Restructuring Expenses due and payable as of the date of the Effective Date shall have been paid pursuant to the Restructuring Support Agreement and the Term Sheet (as defined in the Restructuring Support Agreement); and

(c)    the Confirmation Order shall remain in full force and effect and shall be a Final Order;

(d)    in the event of a Section 363 Asset Sale, the Bankruptcy Court shall have entered the Sale Order, and such order shall be a Final Order;

(e)    all authorizations, consents, certifications, approvals, rulings, no action letters, opinions or other documents, or actions required by any law, regulation, or order to be received or to occur in order to implement the Plan on the Effective Date shall have been obtained or shall have occurred unless failure to do so will not have a material adverse effect on the Reorganized Debtors or the Liquidating Debtors (as applicable); and

(f)      all statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

### 3.      Waiver of Conditions Precedent

The conditions set forth in Section 10.01 or Section 10.02 of the Plan may be waived, in whole or in part, by the Debtors, with the written consent of the Requisite Supporting Lenders (in the event the Supporting Lenders are the Successful Bidder), which consent, for the avoidance of doubt, may be granted or withheld in their sole discretion.

### 4.      Notice of Effective Date

The Reorganized Debtors or the Liquidating Debtors (as applicable) shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in Section 10.02 of the Plan have been satisfied or waived pursuant to Section 10.03 of the Plan.

### 5.      Effect of Non-Occurrence of Conditions to Consummation

If, prior to consummation of the Plan, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of the Debtors or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

### J.      Bankruptcy Court Jurisdiction

### 1.      Retention of Jurisdiction

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan (without prejudice to the rights, if any, of any party in interest to seek to withdraw the bankruptcy reference pursuant to 28 U.S.C. § 157(d) and related law with respect to any issue or proceeding subject to mandatory or discretionary withdrawal), including jurisdiction to:

(a)      resolve any matters related to Executory Contracts and Unexpired Leases, including: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable, and to hear and determine, and, if necessary, liquidate any Claims arising therefrom including Cure Amounts pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed (or assumed and assigned); (iii) the Reorganized Debtors' or the Liquidating Debtors' (as applicable) amendment, modification, or supplement after the Effective Date, pursuant to Article VI of the Plan, of the lists of Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) or rejected or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory, expired or terminated;

(b)　　adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases or the Plan, or that were the subject of proceedings before the Bankruptcy Court, prior to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;

(c)　　ensure that distributions to Holders of Allowed Claims and Interests are accomplished as provided herein and adjudicate any and all disputes arising from or relating to distributions under the Plan;

(d)　　allow in whole or in part, disallow in whole or in part, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including hearing and determining any and all objections to the allowance or estimation of Claims or Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and the resolution of request for payment of any Administrative Claim;

(e)　　issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan or any Section 363 Asset Sale;

(f)　　determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the Asset Purchase Agreement, the Sale Order (if applicable), or, subject to any applicable forum selection clause, any contract, instrument, release, or other document created in connection with the Plan, the Disclosure Statement or any Section 363 Asset Sale;

(g)　　enter and implement such orders as may be appropriate if the Confirmation Order or the Sale Order (if applicable) is for any reason stayed, revoked, modified, and/or vacated;

(h)　　enter and implement such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan or the Asset Purchase Agreement and all contracts, instruments, releases, and other agreements and documents created in connection with the Plan, the Plan Supplement, the Disclosure Statement, any Asset Purchase Agreement, and any Section 363 Asset Sale;

(i)　　enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code, including the Sale Order (if applicable);

(j)　　consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order and the Sale Order (if applicable);

(k)　　hear and determine all applications for allowance of compensation and reimbursement of expenses of Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(l)    determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code;

(m)    adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(n)    hear and determine all disputes involving the existence, nature, scope, or enforcement of the exculpations, injunctions and releases granted in connection with and under the Plan, including under Article IX of the Plan;

(o)    hear any applications with respect to any Professional Claims;

(p)    enforce the injunction, release, and exculpation provisions set forth in the Plan, including in Article IX of the Plan;

(q)    resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with consummation of the Plan or any Section 363 Asset Sale, including the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the Asset Purchase Agreement, and the Sale Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan or any Section 363 Asset Sale or any disputes arising in connection with any Entity's obligations incurred in connection with the Plan or any Section 363 Asset Sale;

(r)    hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of their Estates, wherever located;

(s)    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(t)    grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

(u)    enter a Final Decree closing the Chapter 11 Cases;

(v)    hear any other matter not inconsistent with the Bankruptcy Code; and

(w)    enforce all orders previously entered by the Bankruptcy Court.

From the Confirmation Date through the Effective Date, the Bankruptcy Court shall retain jurisdiction with respect to each of the foregoing items and all other matters that were subject to its jurisdiction prior to the Confirmation Date. Nothing contained herein shall be construed to increase, decrease, or otherwise modify the independence, sovereignty, or jurisdiction of the Bankruptcy Court.

### K.       Miscellaneous Provisions

#### 1.       Binding Effect

Upon the Effective Date, the Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all current and former Holders of Claims, all current and former Holders of Interests, and all other parties-in-interest and their respective heirs, successors, and assigns.

#### 2.       Payment of Statutory Fees

All fees payable pursuant to section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date. The Reorganized Debtors or the Liquidating Debtors (as applicable) shall continue to pay fees pursuant to section 1930 of title 28 of the United States Code until the Chapter 11 Cases are closed by entry of the Final Decree. Furthermore, following entry of the Confirmation Order, the Reorganized Debtors or the Liquidating Debtors (as applicable) shall continue to file quarterly reports in compliance with Bankruptcy Rule 2015(a)(5); *provided, however*, that such reports shall not purport to be prepared in accordance with GAAP, may not be construed as reports filed under the Securities Exchange Act, and may not be relied upon by any party for any purpose except as set forth in Bankruptcy Rule 2015(a)(5).

#### 3.       Restructuring Expenses

Subject to the Cash Collateral Order, including the payment procedures set forth therein, on the Effective Date, and otherwise in accordance with the terms of any applicable fee letters and court orders during the pendency of the Chapter 11 Cases, the Reorganized Debtors shall pay in full in Cash all outstanding Restructuring Expenses not previously paid pursuant to an order of the Bankruptcy Court in accordance with the terms of the applicable engagement letters entered into or acknowledged by the Debtors or other applicable arrangements, without the need for any application or notice to or approval by the Bankruptcy Court. Restructuring Expenses invoiced after the Effective Date, covering the period prior to or on the Effective Date, shall be paid promptly by the Reorganized Debtors following receipt of invoices therefor and the terms of the applicable documents giving rise to such rights; *provided, however*, that the Debtors or the Reorganized Debtors, as applicable, reserve their right to dispute the reasonableness of any such Restructuring Expenses, and any such dispute that is not consensually resolved among the parties shall be resolved by the Bankruptcy Court. For the avoidance of doubt, Restructuring Expenses include, without limitation, the fees, costs and expenses of (i) Sullivan & Cromwell LLP, (ii) Houlihan Lokey Capital, Inc., (iii) Landis Rath & Cobb LLP, (iv) any other professionals that may be retained by the Supporting Lenders in connection with the Restructuring, and (v) for the Prepetition Agent, Holland & Knight LLP and any local counsel the Prepetition Agent deems necessary. The Debtors shall also enter into ordinary and customary fee letters with the foregoing professionals and fund the retainers and other amounts required thereunder as a condition precedent to the effectiveness of the Restructuring Support Agreement.

### 4.    Statutory Committee Dissolution

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve, and members thereof shall be released from all rights and duties from or related to the Chapter 11 Cases; *provided, however*, that the Committee will stay in existence solely for the limited purpose of filing and prosecuting final fee applications.

### 5.    Modification and Amendment

Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan, subject to any applicable consent rights set forth herein, whether such modification is material or immaterial, prior to Confirmation, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan) and any consent rights as set forth herein, the Debtors expressly reserve their respective rights to revoke or withdraw or to alter, amend, or modify the Plan with respect to each Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan after Confirmation, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

### 6.    Confirmation of Plan

The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtors reserve the right to amend the Plan to any extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

### 7.    Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Reorganized Debtors or the Liquidating Debtors (as applicable) and Holders of Claims receiving distributions pursuant to the Plan and all other parties-in-interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provision and intent of the Plan.

### 8.    Revocation, Withdrawal, Non-Consummation

(a)    *Right to Revoke or Withdraw*. The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date and file subsequent chapter 11 plans.

(b)    *Effect of Withdrawal, Revocation, or Non-Consummation*. If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the

Effective Date does not occur, then the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain Claims or Class of Claims or the allocation of the distributions to be made under the Plan), the assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be null and void in all respects. In such event, nothing contained herein or in the Disclosure Statement, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any Claims, Interests, or Causes of Action by or against the Debtors or any other Entity, to prejudice in any manner the rights and defenses of the Debtors, the Holder of a Claim or Interest, or any Entity in any further proceedings involving the Debtors, or to constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## 9.    Notices

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the parties below shall be served as follows:

If to the Debtors or the Reorganized Debtors or the Liquidating Debtors (as applicable):

Melinta Therapeutics, Inc.
44 Whippany Road, Suite 280
Morristown, New Jersey 07960
Attn:   Jennifer Sanfilippo

With a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
155 North Wacker Drive
Chicago, Illinois 60606
Attn:   Ron E. Meisler
        Albert L. Hogan III
        Christopher M. Dressel

– and –

Skadden, Arps, Slate, Meagher & Flom LLP
920 N. King Street
Wilmington, Delaware 19801
Attn:   Joseph O. Larkin
        Jason M. Liberi

– and –

McDermott Will & Emery

> The Nemours Building
> 1007 North Orange Street, 4th Floor
> Wilmington, Delaware 19801
> Attn:    David R. Hurst

If to the Office of the United States Trustee:

> Office of the United States Trustee
> 844 North King Street
> Room 2207, Lockbox 35
> Wilmington, Delaware 19801
> Attn:   Linda Richenderfer

### 10.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### 11.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control). Corporate governance matters shall be governed by the laws of the state of incorporation, formation, or functional equivalent thereof, as applicable, of the applicable Debtor or Reorganized Debtor.

### 12.    Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 13.    Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall

constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors, and (c) non-severable and mutually dependent.

### 14.    No Waiver or Estoppel

Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert its Claim or Interest should be Allowed in a certain amount, in a certain priority, be secured, or not be subordinated by virtue of an agreement made with the Debtors and/or their counsel or any other party, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court.

### 15.    Conflicts

In the event that the provisions of the Disclosure Statement and the provisions of the Plan conflict, the terms of the Plan shall govern. In the event the provisions of the Plan and the Sale Order conflict with respect to any Section 363 Asset Sale, the Sale Order shall govern. In the event that the provisions of the Plan and the provisions of the Confirmation Order conflict, the terms of the Confirmation Order shall govern.

### 16.    Closing of Chapter 11 Cases

Prior to the Effective Date, the Debtors shall file a motion seeking entry of an order closing as of the Effective Date each of the Debtors' Chapter 11 Cases other than the case of Melinta Therapeutics. From and after the Effective Date, Melinta Therapeutics shall be entitled to change its name to [•] or any similar name and the caption of its Chapter 11 Case shall be adjusted accordingly upon the filing of notice of such corporate name change on the Bankruptcy Court's docket. The Reorganized Debtors or the Liquidating Debtors, as applicable, shall be entitled to appoint Melinta Therapeutics to prosecute claims and defenses and through the Distribution Agent, make distributions, and attend to other winddown affairs on behalf of each of the other prior Debtors as if such Debtors' Estates continued to exist solely for that purpose. The Reorganized Debtors or the Liquidating Debtors, as applicable, shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case of Melinta Therapeutics.

## VII.    Risk Factors to Be Considered

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED AND ENTITLED TO VOTE SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

As noted above, there can be no guarantee that the assumptions, estimates, and projections underlying the Plan will continue to be accurate or valid at any time after the date hereof. This section of this Disclosure Statement explains that there are certain risk factors that each voting Holder of a Claim should consider in determining whether to vote to accept or reject the Plan. Accordingly, each Holder of a Claim who is entitled to vote on the Plan should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

A.    **General**

The Plan sets forth the means for satisfying the Claims against and Interests in each of the Debtors. Certain Claims are not expected to be paid in full. Nevertheless, the reorganization of the Debtors' business and operations under the proposed Plan avoids the potentially adverse impact of the likely increased delays and costs associated with a chapter 7 liquidation of the Debtors. The Plan has been proposed after a careful consideration of all reasonable restructuring alternatives. Despite the risks inherent in the Plan, as described herein, the Debtors believe that the Plan is in the best interests of creditors when compared to all reasonable alternatives.

B.    **Forward Looking Statements**

1.    **Books and Records**

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the Debtors relied on financial data derived from its books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects, in all material respects, the financial results of the Debtors, the Debtors are unable to warrant or represent that the financial information contained in the Plan and attached hereto is without inaccuracies.

2.    **Financial Projections**

Except for historical information, this Disclosure Statement may be deemed to contain "forward-looking" statements. The Company is including this cautionary statement for the express purpose of availing itself of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995.

There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or amount of Claims in the various Classes that might be allowed. The Company cautions each reader of this Disclosure Statement to carefully consider those factors set forth above and the acknowledgements contained in the "Risk Factors" section of this Disclosure Statement. Such factors have, in some instances, affected and in the future could affect the ability of the Company to achieve its projected results and may cause actual results to differ materially from those expressed in the Plan. The Company undertakes no obligation to update any forward-looking statements in this Disclosure Statement.

### C.    Certain Other Risks

#### 1.    Tax Considerations

United States federal income tax considerations relevant to the Plan, including certain tax risks, are set forth in Article XII. You are urged to consider such analysis carefully.

#### 2.    Employee Uncertainty

As a result of the Chapter 11 Cases, the Debtors' employees are facing uncertainty. The Debtors' continued operations depends in part on the Company's continued ability to attract, retain and motivate highly qualified management, clinical, and scientific personnel. The Debtors are highly dependent upon their senior management and scientific staff. The competition for qualified personnel in the biotechnology and pharmaceuticals field is intense and the Company may not be able to attract and retain quality personnel on acceptable terms given the competition for such personnel among biotechnology, pharmaceutical and other companies.

In addition, the Company is in the early stages of operating its commercial organization. If the Company is unable to maintain a direct sales force in the U.S. to promote its products, the commercial opportunity for its products may be diminished, and the ability to generate sufficient sales to fund its operations during these Chapter 11 Cases may be in jeopardy.

A material erosion of the Debtors' workforce during the Chapter 11 Cases could have a material adverse effect on the Debtors' ability to effect a sale transaction during the Chapter 11 Cases.

#### 3.    Healthcare and Other Regulations

If the Debtors fail to comply with healthcare and other regulations, the Debtors could face substantial enforcement actions, including civil and criminal penalties, and their business, operations and financial condition could be adversely affected. As a developer of pharmaceuticals, even though the Debtors do not intend to make referrals of healthcare services or bill directly to Medicare, Medicaid or other third-party payors, certain federal and state healthcare laws and regulations pertaining to fraud and abuse, false claims, and patients' privacy rights are and will be applicable to the Debtors' business. The Company could be subject to healthcare fraud and abuse laws and patient privacy laws of both the federal government and the states in which it conducts its business.

If the Debtors' operations are found to be in violation of certain laws or governmental regulations, the Debtors may be subject to penalties, including civil and criminal penalties, damages, fines, and the curtailment of their operations. Although compliance programs can mitigate the risk of investigation and prosecution for violations of these laws, the risks cannot be entirely eliminated.

#### 4.    Operating History Risks

Prior to the Debtors' commercial launch of Baxdela and their acquisition of Vabomere, Orbactiv and Minocin for injection from MedCo in the first quarter of 2018, the Debtors'

operations were limited to financing and staffing the Company, conducting discovery and product research and development activities, and engaging in commercial launch preparation activities. Given that the Debtors have had less than two years of commercial sales through December 31, 2019, the ability to predict the Debtors' future performance may not be as accurate as it could be if the Debtors had a history of successfully developing and commercializing pharmaceutical products. Given the Debtors' limited operating history and relatively recent product launches, it is difficult to predict future revenues and working capital needs and, to the extent the Debtors encounter lower-than-expected sales or unforeseen expenses, difficulties, complications, delays, and other known and unknown factors in achieving business objectives, the Debtors may face difficulties in addressing these issues and their liquidity requirements. Further, given the Debtors' limited operating history, the Debtors may incur significant costs in maintaining their salesforce, which costs may prove unnecessary or excessive if product sales do not meet expectations. The Debtors' likelihood of success must be evaluated in light of such challenges and variables and the Debtors may not be successful in their sales efforts or may incur greater costs than expected, both of which would materially and adversely affect the Debtors' business, results of operations, or financial condition.

### 5.    Commercialization Risks

In the first quarter of 2018, the Debtors acquired Vabomere, Orbactiv and Minocin for injection from MedCo. MedCo launched Orbactiv in the United States in the third quarter of 2014, launched the new formulation of Minocin for injection in the United States in 2015 and launched Vabomere in the United States in the fourth quarter of 2017. Commercial launches and continued commercial efforts for this number of products in such a short period of time has and will continue to require significant efforts from Melinta and the devotion of substantial resources as the Company continues to establish and maintain the infrastructure necessary to continue to commercialize these products, or any product line extensions, or products in development.

The Debtors' ability to successfully commercialize their medications will depend on their ability to: (i) train, deploy and manage a qualified sales force to market and sell the medications; (ii) secure formulary approvals at the Debtors' hospital customers; (iii) have third parties manufacture and release the products in sufficient quantities; (iv) implement and maintain agreements with wholesalers, distributors, and group purchasing organizations; (v) receive adequate levels of coverage and reimbursement for these products from governments and third-party payors; and (vi) develop and execute effective marketing and sales strategies and programs for the medications.

The Debtors expect that the revenues from these products will represent a significant portion of their revenues in the future. As a result, if the Debtors are unable to successfully commercialize these products and products in development, the Debtors' business, results of operations, and financial condition likely would be materially harmed.

Additionally, the Debtors' ability to successfully commercialize their products will be dependent on whether market conditions or government requirements affect the Debtors' ability to receive adequate pricing for any particular product. Pricing may be substantially dependent on the Debtors' ability to obtain reimbursement from third-party payors, both in the United States and in foreign countries. Outside the United States, certain countries, including a number of European

Union ("**E.U.**") members, set prices and reimbursement for pharmaceutical products, or medicinal products as they are commonly referred to in the E.U., with limited participation from those marketing the products. The Debtors cannot be sure that any prices and reimbursement will be acceptable to their strategic commercial partners. If the regulatory authorities in these foreign jurisdictions set prices or reimbursement that are not commercially attractive for the Debtors' strategic commercial partners, the Debtors' revenues from milestones and/or sales-based royalties paid by their partners, and the potential profitability of their product candidates, in those countries would be negatively affected. Further, through contractual or other arrangements, the price the Debtors may be able to obtain in foreign countries may be dependent on the price they can achieve in the United States.

<h3 align="center">6.    Market Acceptance</h3>

It cannot be assured that the Debtors' products (including any additional approved indications) or any of the Debtors' product candidates that may be approved in the future will gain market acceptance among physicians, patients, healthcare payors and the medical community. Efforts to educate the medical community and third-party payors on the benefits of the Debtors' products and product candidates may require significant resources and may not be successful. The degree of market acceptance for the Debtors' products will depend on a number of factors, including:

- the effectiveness of such products as compared to other products pertaining to their respective indications;

- the effectiveness of such products as compared to other products considered as the standard of care;

- the prevalence and severity of adverse side effects;

- the acceptance by physicians and payors of each product as a safe and effective treatment;

- the limitations or warnings contained in a product's FDA approved labeling;

- the market price and patient out-of-pocket costs of the product relative to other treatment options, including any generics;

- the relative convenience and ease of administration;

- the willingness by clinicians to stop using current treatments and adopt a new treatment;

- any restrictions on healthcare providers' prescribing of, and patient access to, products due to a risk evaluation mitigation strategy;

- the Debtors' ability to recruit and retain a sales force, if necessary;

- the effectiveness of the Debtors' or any third-party partner's sales force and marketing efforts;

- the Debtors' ability to forecast demand and maintain sufficient supplies of the Debtors' drug products;

- the Debtors' ability to manufacture or obtain commercial quantities of the Debtors' drug products;

- the strength of the Debtors' sales and marketing and distribution support;

- the ability of the Debtors' sales organization to reach the necessary prescribers and accounts on a timely basis;

- the effectiveness of the Debtors' marketing and advertising campaigns;

- product availability and the Debtors' ability to deliver their products on a timely basis;

- the extent to which bacteria develop resistance to any antibiotic product candidate that the Debtors' develop, thereby limiting its efficacy in treating or managing infections;

- the Debtors' ability to establish and maintain pricing sufficient to realize a meaningful return on investment;

- acceptance on hospital formularies (which may limit sales activities in those hospitals);

- whether the product is designated under physician treatment guidelines as a first-line therapy or as a second- or third-line therapy for particular infections;

- the availability of adequate reimbursement by third parties, such as insurance companies and other healthcare payors, and/or by government healthcare programs, including Medicare and Medicaid;

- adverse publicity about a product or favorable publicity about competitive products; and

- potential product recalls.

### 7.      Market Opportunity Risks

The potential market opportunities for the Debtors' Medications, additional indications or uses for the Debtors' Medications, and any product candidates are difficult to estimate. The Debtors' estimates of the potential market opportunities are predicated on many assumptions, including industry knowledge and publications, third-party research reports and other surveys. While the Debtors believe that their internal assumptions are reasonable, these assumptions involve the exercise of significant judgment on the part of the Debtors' management, and are inherently uncertain. If any of the assumptions proves to be inaccurate, the actual markets for the Debtors' products and candidates could be smaller than their estimates of the potential market opportunities.

In addition, the Debtors' estimates regarding the timing and amount of acceptance of any product (including any line extension) or product candidate, and the pricing the Debtors are able to receive for any product or product candidate may prove incorrect. Further, the Debtors' plans for commercialization of any product candidate may not materialize in the time or manner they anticipate and may be adversely impacted by any required warnings in the product labeling, any perceived safety or efficacy concerns, competitive products entering or already in the market, or the actions of their competitors. Finally, the Debtors may underestimate the demand for a product,

which could lead to lack of commercial quantities when needed and result in market backlash against the product. Any of these occurrences could have a material adverse effect on the Debtors' plans for commercialization of and the generation of any revenue from any product or product candidate.

### 8.    Competitive Risks

The Debtors face competition from established pharmaceutical and biotechnology companies, as well as from academic institutions, government agencies and private and public research institutions, which may in the future develop products to treat ABSSSI, community acquired bacterial pneumonia, complicated urinary tract infections or other diseases or conditions that their products and product candidates target. In many cases, however, the Debtors believe that competition often will be determined by antibiotic class and any limitations of that antibiotic class in general, and the antibiotic treating a particular disease or population.

In particular, there are a variety of available therapies marketed for the treatment of ABSSSI. Some of these products are branded and subject to patent protection, and others are available on a generic basis. Many of these approved products are well established therapies and are widely accepted by physicians, patients and hospital decision-makers. Vancomycin, for instance, which is sold in a relatively inexpensive generic form, has been widely used for over 50 years, is the most frequently used IV antibiotic, and the Debtors believe, based on their market research, is prescribed to approximately two-thirds of all hospitalized ABSSSI patients. Insurers and other third-party payers may encourage the use of generic products. There are also a number of products in clinical development by third parties to treat ABSSSI.

If any of these product candidates or any other products developed by the Debtors' competitors are more effective, safer, more convenient or less costly than the Debtors' products, or would otherwise render their products obsolete or non-competitive, the Debtors' anticipated revenues from their products could be adversely affected.

The Debtors expect that their ability to compete effectively will depend upon, among other things, their ability to:

- successfully and rapidly complete clinical trials and obtain all required regulatory approvals in a timely and cost-effective manner;
- maintain patent protection for and otherwise prevent the introduction of generics;
- attract and retain key personnel;
- build an adequate sales and marketing infrastructure; and
- obtain adequate reimbursement from third-party payors.

### 9.    Commercialization Risk

Developing pharmaceutical products, conducting clinical trials, obtaining regulatory approval, establishing manufacturing capabilities, marketing approved products, and adhering to post-marketing regulatory requirements and commitments is expensive. To aid in these efforts, the Debtors have established significant commercial relationships to market Baxdela outside the United States, including with Eurofarma and Menarini, and have entered into a commercial agreement for Vabomere, Orbactiv and Minocin for injection in Europe with Menarini. The

Debtors intend to continue to enter into sales and marketing arrangements with third parties for international sales, and to develop and maintain their own sales force in the United States. The Debtors may also establish additional collaborations, licensing agreements, or alternative arrangements for the commercialization of their Medications, as well as for the development and commercialization of product candidates and research programs, including funding potentially other products and indications. If the Debtors are unable to maintain their existing arrangements or enter into any new such arrangements on acceptable terms, if at all, they may be unable to effectively market and sell their products in their target markets.

If the Debtors partner with a third party for development and commercialization of a product candidate, the Debtors can expect to relinquish some or all of the control over the future success of that product candidate to the third party. The Debtors' collaboration partner may not devote sufficient resources to the commercialization of the Debtors' product candidates or may otherwise fail in commercialization. The terms of any collaboration or other arrangement that the Debtors establish may not be favorable to the Debtors. In addition, any collaboration that the Debtors enter into may be unsuccessful in the development and commercialization of their product candidates. In some cases, the Debtors may be responsible for continuing clinical development of a partnered product candidate or research program, and the payment the Debtors receive from their collaboration partner may be insufficient to cover the cost of this development.

### 10.    Reimbursement Rates

There will be no commercially viable market for the Debtors' products or any future approved products without reimbursement from third-party payors. If payor coverage is restricted or the level of reimbursement is below the Debtors' expectations, the Debtors' revenue and gross margins will be adversely affected.

Third-party payors, such as government or private healthcare insurers, carefully review and increasingly question the coverage of, and challenge the prices charged for, drugs. Reimbursement rates from private health insurance companies vary depending on the company, the insurance plan and other factors. A current trend in the U.S. healthcare industry is toward cost containment. Large public and private payors, managed care organizations, group purchasing organizations and similar organizations are exerting increasing influence on decisions regarding the use of, and reimbursement levels for, particular treatments. Such third-party payors, including Medicare, are questioning the coverage of, and increasingly challenging the prices charged for, medical products and services, and many third-party payors limit coverage of or reimbursement for newly approved healthcare products. In particular, third-party payors may limit the covered indications. Cost-control initiatives that affect the Debtors' commercial market could decrease the price they might establish for products, which would result in product revenues being lower than anticipated. If the prices for the Debtors' products decrease or if governmental and other third-party payors do not provide adequate coverage and reimbursement levels, the Debtors' revenue and prospects for profitability will suffer. Further, the availability of numerous generic antibiotics at lower prices than branded antibiotics may also substantially reduce the likelihood of reimbursement for such products.

Specifically, in both the United States and some foreign jurisdictions, there have been a number of legislative and regulatory proposals to change the healthcare system in ways that could

affect the Debtors' ability to sell their products profitably. In the United States, the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, also called the Medicare Modernization Act ("**MMA**"), changed the way Medicare covers and pays for pharmaceutical products. The legislation expanded Medicare coverage for drug purchases by the elderly and introduced a new reimbursement methodology based on average sales prices for physician-administered drugs. In addition, this legislation provided authority for limiting the number of drugs that will be covered in any therapeutic class. As a result of this legislation and the expansion of federal coverage of drug products, the Debtors expect that there will be additional pressure to contain and reduce costs. These cost reduction initiatives and other provisions of this legislation could decrease the coverage and price that the Debtors receive for any approved products and could seriously harm their business. While the MMA applies only to drug benefits for Medicare beneficiaries, private payors often follow Medicare coverage policies and payment limitations in setting their own reimbursement rates, and any reduction in reimbursement that results from the MMA may result in a similar reduction in payments from private payors. In March 2010, the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Affordability Reconciliation Act (collectively, "**ACA**"), became law in the United States. The goal of ACA is to reduce the cost of healthcare and substantially change the way healthcare is financed by both governmental and private insurers. While the Debtors cannot predict what ultimate impact on federal reimbursement policies this legislation will have in general or on their business specifically, the ACA may result in downward pressure on pharmaceutical reimbursement, which could negatively affect market acceptance of future products. Members of the U.S. Congress and some state legislatures had sought to overturn at least portions of the legislation including those on the mandatory purchase of insurance. However, on June 28, 2012, the United States Supreme Court upheld the constitutionality of these provisions. Members of the U.S. Congress have since proposed a number of legislative initiatives, including repeal of all or portions of the ACA. Additionally, the Department of Health and Human Services is considering a number of proposals that, if adopted, could dramatically change the way the government, and eventually private payors, cover and reimburse prescription drugs. The Debtors' cannot predict the outcome or impact of current proposals or whether new proposals will be made or adopted, when they may be adopted, or what impact they may have if they are adopted.

Reimbursement systems in international markets vary significantly by country and by region, and reimbursement approvals must be obtained on a country-by-country basis. Reimbursement in the European Union must be negotiated on a country-by-country basis and in many countries the product cannot be commercially launched until reimbursement is approved. The negotiation process in some countries can exceed 12 months.

## 11.    Inventory Risks

Accurate product planning is necessary to ensure that the Debtors maintain optimal inventory levels for any of their products or any future approved products. Significant differences between the Debtors' estimates and judgments and future actual demand for any of their products or any future approved products and the shelf life of inventory may result in the Company maintaining significant excess inventory. This risk is particularly heightened because the Debtors' manufacturing lead time varies by product (and for some products this lead time can exceed two years) and they have limited historical sales performance for their products and as such, may not successfully predict product revenues over the near or long term. If the Debtors maintain excess

inventory, this will harm liquidity and the Debtors may be required to recognize significant charges for excess inventories, which could have a material adverse effect on their financial condition and results of operations. The Debtors' ability to maintain optimal inventory levels also depends on the performance of third-party contract manufacturers. If the Debtors' manufacturers are unsuccessful in either obtaining raw materials, if they are unable to release inventory on a timely and consistent basis, if they fail to maintain an adequate level of product inventory, if inventory is destroyed or damaged, or if their inventory reaches its expiration date, the Debtors could have a material adverse effect on their business, financial condition, results of operations, and cash flows.

## 12.    Supply Chain Risks

The Debtors do not currently have or plan to build the infrastructure or capability internally to manufacture the Medications or product candidates. Instead, the Debtors rely upon and expect to continue to rely upon third parties, most of which are single source, for the manufacture and supply of the active pharmaceutical ingredients ("**API**") contained in the Debtors' Medications, as well as the preparation of finished Medications and their packaging.

The Debtors' contract manufacturers must maintain a compliance status that is acceptable to the FDA and foreign regulatory authorities. In addition, pharmaceutical manufacturing facilities are continuously subject to inspection by the FDA and foreign regulatory authorities, before and after product approval. Due to the complexity of the processes used to manufacture pharmaceutical products and product candidates, any potential third-party manufacturer may be unable to continue to pass or initially pass federal, state, or international regulatory inspections in a cost-effective manner or at all.

Although the Debtors do not control the day-to-day operations of their contract manufacturers, they are responsible for ensuring that the Debtors' Medications are manufactured in accordance with applicable regulatory requirements. If a third-party manufacturer with whom the Debtors contract is unable to comply with manufacturing regulations, the Debtors may be subject to fines, incur unanticipated compliance expenses, experience a recall or seizure of their Medications, experience total or partial suspension of production, and/or enforcement actions, including injunctions, and criminal or civil prosecution. These possible sanctions would adversely affect the Debtors in these Chapter 11 Cases.

In addition, the Debtors' reliance on foreign suppliers poses risks due to possible shipping delays, import restrictions, and foreign regulatory regimes.

The Debtors also could experience manufacturing delays if their third-party manufacturers give greater priority to the supply of other products over the Debtors' Medications or otherwise do not satisfactorily perform according to the terms of agreements with the Debtors. If any supplier of API or finished drug product for the Medications experiences any significant difficulties in its respective manufacturing processes, does not comply with the terms of the agreement with the Debtors or does not devote sufficient time, energy and care to providing the Debtors' manufacturing needs, the Debtors could experience significant interruptions in the supply of API, which could prevent or delay the Debtors' commercialization and/or sales activities. Finally, any manufacturing facility is at risk of natural or man-made disaster, which could significantly reduce

the Debtors' clinical and commercial supplies of their Medications, particularly given the single-source nature of the Debtors' manufacturing and supply model.

These risks could impact the ability of the Debtors to effect a sale transaction during these Chapter 11 Cases.

### 13. Milestone and Royalty Payments

The Debtors are party to various agreements pursuant to which they are obligated to make milestone payments or pay royalties in connection with the development and commercialization of their product candidates or sales of their marketed products. The timing of achievement of these milestones and the corresponding milestone payments, or the amount of royalty payments, is subject to factors which are difficult to predict and many of which are beyond the Debtors' control. The Debtors may become obligated to make a milestone or other payment at a time when they do not have sufficient funds to make such payment, or at a time that would otherwise require the use of funds needed to continue to operate the Debtors' business, which could delay clinical trials, curtail operations, necessitate a scaling back of sales and marketing efforts or cause the Debtors to seek funds to meet these obligations on unfavorable terms. If the Debtors are unable to make any payment when due or if they fail to use commercially reasonable efforts to achieve certain development and commercialization milestones within the timeframes required by certain of these agreements, the other party may have the right to terminate the agreement and all of the Debtors' rights to develop and commercialize product candidates using the applicable technology.

### 14. Product Side Effects and Other Health Risks

If Melinta or another party identifies undesirable or unacceptable side effects caused by the Debtors' approved products: (i) regulatory authorities may require the addition of labeling statements, specific warnings, a contraindication or field alerts to physicians and pharmacies; (ii) Melinta may be required to change the way the product is administered, conduct additional clinical trials or change the labeling of the product; (iii) Melinta may be subject to limitations on how it may promote the product; (iv) regulatory authorities may require Melinta to take its approved product off the market; (v) Melinta may be subject to litigation or product liability claims; (iv) Melinta's reputation may suffer; (vii) relationships with Melinta's licensing partners may be harmed; and (viii) sales of the product may decrease significantly or fail to gain market acceptance.

### 15. Product Liability Risk

The Debtors face potential product liability exposure, and, if claims brought against the Company are successful, the Debtors could incur substantial additional liabilities. The use of the Debtors' product candidates in clinical trials and the sale of marketed products exposed the Company to product liability claims. Currently, the Debtors are not aware of any anticipated product liability claims with respect to their products or product candidates. In the future, an individual may bring a liability claim against the Debtors if one of the Medications causes, or merely appears to have caused, an injury. If the Debtors cannot successfully defend the Company against the product liability claim, it may incur substantial liabilities.

The Debtors currently have product liability insurance coverage for the commercial sale of the Medications which is subject to industry-standard terms, conditions and exclusions. The Debtors' current insurance coverage may prove insufficient to cover any liability claims brought against the Company. In addition, because of the increasing costs of insurance coverage, the Debtors may not be able to maintain insurance coverage at a reasonable cost or obtain insurance coverage that will be adequate to satisfy liabilities that may arise.

### 16.    Off-Label Use of the Products

The Debtors will incur significant liability if it is determined that the Company promoted any "off-label" use of the Medications. Physicians are permitted to prescribe drug products and medical devices for uses that are not described in the product's labeling and that differ from those approved by the FDA or other applicable regulatory agencies. Such "off-label" uses are common across medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDA and other regulatory agencies do restrict communications on the subject of off-label use. Companies are not permitted to promote drugs or medical devices for off-label uses. Accordingly, the Debtors did not permit promotion of the Medications for any indication, population, or use not described in such product's label. The FDA and other regulatory and enforcement authorities actively enforce laws and regulations prohibiting promotion of off-label uses and the promotion of products for which marketing approval has not been obtained. A company that is found to have promoted off-label uses will be subject to significant liability, including civil and administrative remedies as well as criminal sanctions.

Notwithstanding the regulatory restrictions on off-label promotion, the FDA and other regulatory authorities allow companies to engage in truthful, non-misleading, and nonpromotional scientific exchange concerning their products. The Debtors intended to engage in medical education activities and communicate with healthcare providers in compliance with all applicable laws, regulatory guidance and industry best practices. Although the Debtors believe the Company put in place a robust compliance program, which is designed to ensure that all such activities were performed in a legal and compliant manner, the Debtors cannot be certain that their program addressed all areas of potential exposure and the risks in this area cannot be entirely eliminated.

### 17.    Bacterial Resistance to the Debtors' Products

Bacteria develop resistance to antibiotics over time due to the genetic mutation of the bacteria. Many current and previous antibiotics have suffered reduced efficacy over time due to the development of resistance to such drugs. It is probable that, over time, bacteria will also develop resistance to the Debtors' products and drug candidates. If resistance were to develop rapidly to the Debtors' products or drug candidates, this would reduce the commercial potential for the Debtors' business.

### 18.    Healthcare Reform

The U.S. government and other governments have shown significant interest in pursuing continued healthcare reform. Any government-adopted reform measures could adversely impact the pricing of healthcare products and services in the United States or internationally and the amount of reimbursement available from governmental agencies or other third party payors. The

continuing efforts of the U.S. and foreign governments, insurance companies, managed care organizations and other payors of healthcare services to contain or reduce healthcare costs may adversely affect the Debtors' ability to set prices for their products which the Debtors believe are fair, and the Debtors' ability to generate revenues and achieve and maintain profitability.

New laws, regulations and judicial decisions, or new interpretations of existing laws, regulations and decisions, that relate to healthcare availability, methods of delivery or payment for products and services, or sales, marketing or pricing, may limit the Debtors' potential revenue, and the Debtors may need to revise their research and development programs. The pricing and reimbursement environment may change in the future and become more challenging due to several reasons, including policies advanced by the current executive administration in the United States, new healthcare legislation or fiscal challenges faced by government health administration authorities. Specifically, in both the United States and some foreign jurisdictions, there have been a number of legislative and regulatory proposals to change the healthcare system in ways that could affect the Debtors' ability to sell products profitably.

### 19.    FDA Regulation

The Debtors are subject, both directly and indirectly, to the adverse impact of existing and potential future government regulation of their operations and markets. The Debtors' medications are, and any future approved product candidates will be, subject to regulation by the FDA and equivalent foreign regulatory authorities. These regulations govern a wide variety of product related activities, from quality management, design and development to labeling, manufacturing, promotion, sales and distribution. If the Debtors or any of their suppliers or distributors fail to comply with the FDA and other applicable regulatory requirements, or are perceived to potentially have failed to comply, the Debtors may face, among other things, warning letters; adverse publicity affecting both them and their customers; investigations or notices of non-compliance, fines, injunctions, and civil penalties; import or export restrictions; partial suspensions or total shutdown of production facilities or the imposition of operating restrictions; increased difficulty in obtaining required FDA clearances or approvals or foreign equivalents; seizures or recalls of their products or those of their customers; or the inability to sell such products. Any such regulatory actions could disrupt the Debtors' business and operations, lead to significant remedial costs, and have a material adverse impact on the Debtors' financial position and results of operations.

Additionally, the FDA may impose significant restrictions on a product's indicated uses or marketing or impose ongoing requirements for potentially costly post-approval studies or post-market surveillance. In addition, the FDA and other U.S. and foreign regulatory agencies regulate the Debtors' products and impose ongoing requirements governing the manufacturing, labeling, packaging, storage, distribution, safety surveillance, advertising, promotion, record keeping and reporting of safety and other post-market information. The holder of an approved new drug application is subject to obligations to monitor and report adverse events and instances of the failure of a product to meet the specifications in the new drug application. Application holders must submit new or supplemental applications and obtain FDA approval for certain changes to the approved product, product labeling or manufacturing process. Application holders must also submit advertising and other promotional material to the FDA and report on ongoing clinical trials. Legal requirements have also been enacted to require disclosure of clinical trial results on publicly available databases.

Manufacturers of drug products and their facilities are subject to continual review and periodic inspections by the FDA and other regulatory authorities for compliance with current Good Manufacturing Practices regulations. In addition, manufacturers must comply with regulations promulgated by the FDA and other regulatory agencies, such as the Consumer Product Safety Commission, that govern packaging, labeling, and country of origin markings. If the Debtors or a regulatory agency discovers previously unknown issues or deficiencies with a product, such as adverse events of unanticipated severity or frequency, issues with a product's packaging or labeling, or problems with the facility where a product is manufactured, a regulatory agency may impose penalties, corrective measures, and/or implement restrictions on that product, the manufacturing facility or the Debtors, including requiring recall or withdrawal of the product from the market or suspension of manufacturing, requiring new warnings or other labeling changes to limit use of the drug, requiring that the Debtors conduct additional clinical trials, imposing new monitoring requirements, or requiring that the Debtors establish risk evaluation and mitigation strategies. Moreover, because the Debtors' inputs and products cross borders, they are subject to duties, fees, and taxes that can be amended or altered by government actors, affecting the prices of the Debtors' products in ways that could be material. Action, or inaction, by government authorities at or concerning border points of entry and exit also can cause supply chain delays, including the suspension or detention of goods. And deficiencies or errors by the Company or its employees or agents with respect to importing and exporting obligations and declarations, including with respect to the classifications, descriptions, valuations, and origins of goods, can result in additional duties, fees, and penalties. Advertising and promotional materials must comply with FDA and other regulatory agency rules in addition to other applicable federal and state laws and regulations. The distribution of product samples to physicians must comply with the requirements of the Prescription Drug Marketing Act. The packaging of products is subject to regulations, including under the Poison Packaging and Prevention Act. Government pricing and rebate programs must comply with statutory and regulatory requirements. The Debtors' products that are made available to authorized users of the Federal Supply Schedule of the General Services Administration are subject to additional requirements, including manufacture or origin. Finally, many of the Debtors' activities are also potentially subject to federal and state consumer protection, false advertising, and unfair competition laws. If the Debtors or their third-party collaborators fail to comply with applicable regulatory requirements, a regulatory agency may: (i) conduct an investigation into the Debtors' practices and any alleged violation of law; (ii) issue warning letters or untitled letters asserting that the Debtors are in violation of the law; (iii) seek an injunction or impose civil or criminal penalties or monetary fines; (iv) suspend or withdraw regulatory approval; (v) suspend any ongoing clinical trials; (vi) refuse to approve pending applications or supplements to applications filed by the Debtors; (vii) suspend or impose restrictions on operations, including costly new manufacturing requirements; (viii) seize or detain products or refuse to permit the import or export of products; (ix) require the Debtors to initiate a product recall; or (x) refuse to allow the Debtors to enter into supply contracts, including government contracts.

The occurrence or investigation of any event or penalty described above may force the Debtors to expend significant amounts of time and resources, and may significantly inhibit the Debtors ability to bring to market or continue to market their products and generate revenues. Similar regulations apply in foreign jurisdictions.

### 20. Foreign Regulation

With respect to the Debtors' products or product candidates which are approved outside the United States, the Debtors have entered into and will likely enter into additional agreements with third parties to commercialize such products outside the United States. The Debtors are, and expect that they will be, subject to additional risks related to entering into or maintaining these international business relationships, including:

- different regulatory requirements for drug approvals in foreign countries;

- differing U.S. and foreign drug import and export rules;

- reduced protection for intellectual property rights in foreign countries;

- unexpected changes in tariffs, trade barriers and regulatory requirements;

- different reimbursement systems;

- economic weakness, including inflation, or political instability in particular foreign economies and markets;

- compliance with tax, employment, immigration and labor laws for employees living or traveling abroad;

- foreign taxes, including withholding of payroll taxes;

- foreign currency fluctuations, which could result in increased operating expenses and reduced revenues, and other obligations incident to doing business in another country;

- workforce uncertainty in countries where labor unrest is more common than in the United States;

- production shortages resulting from any events affecting raw material supply or manufacturing capabilities abroad;

- potential liability resulting from development work conducted by these distributors; and

- business interruptions resulting from geopolitical actions, including war and terrorism, or natural disasters.

### 21. Europe's General Data Protection Regulation

In May 2018, a new privacy regime, the General Data Protection Regulation ("**GDPR**"), took effect and is binding across all member states of the European Economic Area ("**EEA**"). The GDPR increases the Debtors' obligations with respect to clinical trials, the transmission of safety data and other activities conducted in the EEA by expanding the definition of personal data and requiring changes to informed consent practices and more detailed notices. The GDPR also increases the Debtors' responsibility and liability in relation to personal data that they process, and the Debtors may be required to put in place additional mechanisms to ensure compliance with the new E.U. data protection rules. It also imposes substantial fines for breaches of data protection requirements, which can be up to four percent of global turnover or 20 million Euros, whichever

106

is greater, and it also confers a private right of action on data subjects for breaches of data protection requirements. Compliance with these obligations will be a rigorous and time-intensive process that may increase the Debtors' cost of doing business, and the failure to comply with these laws could subject the Debtors to significant fines.

If the Debtors or their vendors fail to comply with the GDPR, or if the legal mechanisms the Debtors or their vendors rely upon to allow for the transfer of personal data from the EEA or Switzerland to the U.S. (or other countries not considered by the European Commission to provide an adequate level of data protection) are not considered adequate, the Debtors could be subject to government enforcement actions and significant penalties against them, and their business could be adversely impacted if their ability to transfer personal data outside of the EEA or Switzerland is restricted, which could adversely impact the Debtors' operating results. In addition, data protection authorities of the different E.U. Member States may interpret the GDPR differently, and guidance on implementation and compliance practices are often updated or otherwise revised, which adds to the complexity of processing personal data in the E.U. and transfer of such data outside the EEA. In addition, the privacy and data security landscape in the E.U. Member States continues to remain in flux as the final decision on UK's withdrawal from the E.U. may require organizations to revisit the way they transfer personal data from and to the UK from the E.U.

Although there are legal mechanisms to allow for the transfer of personal data from the EEA to the US, a decision of the European Court of Justice in the Schrems case (Case C-362/14 Maximillian Schrems v. Data Protection Commissioner) that invalidated the safe harbor framework has increased uncertainty around compliance with E.U. privacy law requirements. As a result of the decision, it was no longer possible to rely on the safe harbor certification as a legal basis for the transfer of personal data from the E.U. to entities in the US. On February 29, 2016, however, the European Commission announced an agreement with the United States Department of Commerce (DOC) to replace the invalidated Safe Harbor framework with a new E.U.-US "Privacy Shield." On July 12, 2016, the European Commission adopted a decision on the adequacy of the protection provided by the Privacy Shield; however, this decision has been subsequently challenged. If the Privacy Shield is ultimately invalidated, it will no longer be possible to rely on the Privacy Shield certification to support transfer of personal data from the E.U. to entities in the US. Adherence to the Privacy Shield is not mandatory and US-based companies are permitted to rely either on their adherence to the Privacy Shield or on the other authorized means and procedures to transfer personal data provided by the GDPR. However, a decision rendering the Privacy Shield invalid may give rise to further insecurity concerning appropriate means for US companies to comply with the GDPR and related data privacy obligations in the E.U.

## 22.     Failure to Obtain Necessary Regulatory Clearances or Approval

All of the Debtors' proposed and existing products are subject to regulation in the U.S. by the FDA and/or other domestic and international governmental, public health agencies, regulatory bodies or non-governmental organizations. In particular, the Debtors are subject to strict governmental controls on the development, manufacture, labeling, distribution and marketing of their products and product candidates. The process of obtaining required approvals or clearances varies according to the nature of and uses for, a specific product or product candidate. These processes can involve lengthy and detailed laboratory testing, human clinical trials, sampling activities, and other costly, time-consuming procedures. The submission of an application to a

regulatory authority does not guarantee that the authority will grant an approval or clearance for a product or product candidate. Each authority may impose its own requirements and can delay or refuse to grant approval or clearance, even though a product or product candidate has been approved in another country.

The time taken to obtain approval varies depending on the nature of the application and may result in the passage of a significant period of time from the date of submission of the application. Delays in the approval or clearance processes increase the risk that the Debtors will not succeed in introducing or selling the subject products or product candidates, and the Debtors may be required to abandon a proposed product or product candidate after devoting substantial time and resources to its development.

Changes in domestic and foreign government regulations could increase the Debtors' costs and could require the Debtors to undergo additional trials or procedures, or could make it impractical or impossible for the Debtors to market their products for certain uses, in certain markets, or at all.

Changes in government regulations may adversely affect the Debtors' financial condition and results of operations because the Debtors may have to incur additional expenses if they are required to change or implement new testing, manufacturing and control procedures. If the Debtors are required to devote resources to develop such new procedures, the Debtors may not have sufficient resources to devote to research and development, marketing, or other activities that are critical to their business.

### 23.    Environmental, Health and Safety, and Other Regulations

The Debtors are subject to numerous environmental, health and safety laws and regulations, including those governing laboratory procedures and the handling, use, storage, treatment, release and disposal of, and exposure to, hazardous materials and wastes. From time to time the Debtors operations involve and may, in the future, involve the use of hazardous and flammable materials, including chemicals and biological materials, and may also produce hazardous waste products. Even if the Debtors contract with third parties for the disposal of these materials and wastes, the Debtors cannot eliminate the risk of contamination or injury from these materials. In the event of contamination or injury resulting from the Debtors' handling, use, storage, treatment, release, or disposal of hazardous materials, the Debtors could be held liable for any resulting damages, and any liability, which in certain cases could be joint and several, could exceed the Debtors' resources. The Debtors also could incur significant costs, civil or criminal fines, penalties, or other sanctions for failure to comply with such laws and regulations. In addition, the Debtors may incur substantial costs in order to comply with current or future environmental health and safety laws and regulations, which have tended to become more stringent over time.

Although the Debtors maintain workers' compensation insurance to cover for costs and expenses they may incur due to injuries to the Debtors' employees resulting from hazardous materials, this insurance may not provide adequate coverage against potential liabilities. The Debtors do not maintain insurance for environmental liability or toxic tort claims.

### 24.    Employee Misconduct

Although the Debtors have adopted a Code of Conduct, it is not always possible to identify and deter misconduct by employees, agents, contractors, and consultants, and the precautions the Debtors take to detect and prevent this activity may not be effective in controlling unknown or unmanaged risks or losses or in protecting the Debtors from governmental investigations or other actions or lawsuits stemming from a failure to comply with applicable laws and regulations, including, without limitation, in the areas of healthcare, trade restrictions and sanctions, environmental, competition, intellectual property, privacy, anti-bribery, fraud and abuse, pricing, insider trading and employment. In particular, sales, marketing and business arrangements in the healthcare industry are subject to extensive laws and regulations intended to prevent fraud, misconduct, kickbacks, self-dealing and other abusive practices. These laws and regulations may restrict or prohibit a wide range of pricing, discounting, marketing and promotion, sales commission, customer incentive programs and other business arrangements. Misconduct by the Debtors' employees, agents, contractors, and consultants could also involve the improper use of information obtained in the course of clinical trials. Misconduct by employees, agents, contractors, and consultants could violate such laws or regulations and any such improper actions could subject the Debtors to civil or criminal investigations, and monetary and injunctive penalties, and could adversely impact the Debtors' ability to conduct business, operating results, and reputation.

Additionally, as is common in the biotechnology and pharmaceutical industries, the Debtors employ individuals who were previously employed at other biotechnology or pharmaceutical companies, including their competitors or potential competitors. The Debtors may be subject to claims that these employees, or the Debtors, have inadvertently or otherwise used or disclosed trade secrets or other proprietary information of their former employers. Litigation may be necessary to defend against these claims. Such claims may lead to material costs for the Debtors, or an inability to protect or use valuable intellectual property rights, which could adversely affect the Debtors' business, financial condition, results of operations, and prospects.

### 25.    Continuation of Certain Licenses

The Debtors rely on certain licenses to certain patent rights and proprietary technology from third parties that are important or necessary to the development of the Debtors' technology and products.

(a)    *Baxdela*. The Debtors' license agreement with Wakunaga Pharmaceutical Co., Ltd. provides the Debtors with a worldwide exclusive license to develop and sell Baxdela. In particular, the Debtors obtained an exclusive license to certain patents, patent applications and proprietary information, including patents and proprietary information owned by AbbVie Inc. and licensed to Wakunaga, covering the composition of matter to Baxdela, its manufacturing process, salt forms, pharmaceutical compositions containing Baxdela, methods of using Baxdela, and other proprietary information. The Debtors' license agreement with Wakunaga further grants them non-exclusive rights to other patents and applications. The license requires the Debtors to make certain milestone and royalty payments to Wakunaga. If the Debtors are unable to make any of these required payments under the license agreement, or if they do not use commercially reasonable efforts to achieve certain development and commercialization milestones for Baxdela within the timeframes required by the license agreement, the Debtors' rights to

develop and commercialize Baxdela could be terminated. In addition, Wakunaga may terminate the license agreement on a product-by-product and country-by-country basis based upon the Debtors' material breach of the license agreement if not cured within 90 days from written notice of breach. If the Debtors' license agreement with Wakunaga were terminated, the Debtors would lose their rights to develop and commercialize Baxdela, and would have to grant Wakunaga a perpetual, non-royalty bearing, exclusive license to their proprietary information reasonably necessary to commercialize Baxdela. Loss of their license agreement would materially and adversely affect the Debtors' business, results of operations, and future prospects.

(b)     *Orbactiv*. The Debtors are a party to a license agreement with Eli Lilly and Company ("**Eli Lilly**"). Under the terms of the agreement, the Debtors have exclusive worldwide rights to patents and other intellectual property related to Orbactiv and other compounds claimed in the licensed patent rights. The Debtors are required to make payments to Eli Lilly upon reaching specified regulatory and sales milestones. In addition, the Debtors are obligated to pay royalties based on net sales of products containing Orbactiv or the other compounds in any jurisdiction in which the Debtors hold license rights to a valid patent. The royalty rate due to Eli Lilly on sales increases as annual sales of these products increase. The Debtors are obligated to use commercially reasonable efforts to maintain regulatory approval for Orbactiv in the United States and to commercialize Orbactiv in the United States. If the Debtors breach that obligation, Eli Lilly may terminate the Debtors' license in the United States, license rights to Orbactiv could revert to Eli Lilly and the Debtors would lose their rights to develop and commercialize Orbactiv. The license rights under the agreement remain in force, on a country-by-country basis, until there is no valid patent in such country and the Debtors' obligation to pay royalties ceases in that country. Either party may terminate the agreement upon an uncured material breach by the other party. In addition, either party may terminate the agreement upon the other party's insolvency or bankruptcy.

(c)     In addition, disputes may arise regarding intellectual property subject to a licensing agreement, including:

- the scope of rights granted under the license agreement and other interpretation-related issues;

- the extent to which the Debtors' technology and processes infringe on or misappropriate the intellectual property of the licensor that is not subject to the licensing agreement;

- the sublicensing of patent and other rights under the license agreement;

- the Debtors' diligence obligations under the license agreement and what activities satisfy those diligence obligations;

- the payment of royalty fees, milestones or other costs under the license agreements; and

- the priority of invention of patented technology.

110

If disputes over intellectual property that the Debtors have licensed prevent or impair their ability to maintain current licensing arrangements on acceptable terms, the Debtors may be unable to successfully develop and commercialize the affected product candidates.

In addition, the agreements under which the Debtors currently license intellectual property or technology from third parties are complex, and certain provisions in such agreements may be susceptible to multiple interpretations. The resolution of any contract interpretation disagreement that may arise could narrow what the Debtors believe to be the scope of their rights to the relevant intellectual property or technology, or increase what the Debtors believe to be their financial or other obligation under the relevant agreement, either of which could have a material adverse effect on the Debtors' business, financial condition, results of operations, and prospects.

### 26.    Intellectual Property Risks

The Debtors' commercial success will depend in part on their ability to obtain additional patents and protect their existing patent position as well as their ability to maintain adequate protection of other intellectual property for current and any future products in the United States and other countries. If the Debtors do not adequately protect their intellectual property, competitors may be able to use the Debtors' technologies and erode or negate any competitive advantage the Debtors may have, which could harm the Debtors' business and ability to achieve profitability. The patent positions of pharmaceutical companies are highly uncertain. The legal principles applicable to patents are in transition due to changing court precedent and legislative action and the Debtors cannot be assured that the historical legal standards surrounding questions of validity will continue to be applied or that current defenses relating to issued patents in these fields will be sufficient in the future. Changes in patent laws in the United States such as the America Invents Act of 2011 may affect the scope, strength and enforceability of the Debtors' patent rights or the nature of proceedings which may be brought by the Debtors related to their patent rights. In addition, the laws of some foreign countries do not protect the Debtors' proprietary rights to the same extent as the laws of the United States, and the Debtors may encounter significant problems in protecting proprietary rights in these countries. The Debtors will be able to protect proprietary rights from unauthorized use by third parties only to the extent that proprietary technologies and future products are covered by valid and enforceable patents or are effectively maintained as trade secrets.

These risks include the possibility that:

- the patent applications that the Debtors licensed or have filed on their own may fail to result in issued patents in the United States or in foreign countries;

- patents issued or licensed to the Debtors or their partners may be challenged, discovered to have been issued on the basis of insufficient or incorrect information and/or held to be invalid or unenforceable;

- the scope of any patent protection may be too narrow to exclude other competitors from developing or designing around these patents;

- the Debtors or their licensors were not the first to make the inventions covered by each of their issued patents and pending patent applications;

- the Debtors or their licensors were not the first to file patent applications for these inventions;

- the Debtors may fail to comply with procedural, documentary, fee payment and other similar provisions during the patent application process, which can result in abandonment or lapse of the patent or patent application, resulting in partial or complete loss of patent rights;

- future product candidates may not be patentable;

- others will claim rights or ownership with regard to patents and other proprietary rights which the Debtors hold or license;

- delays in development, testing, clinical trials and regulatory review may reduce the period of time during which the Debtors could market the Debtors' product candidates under patent protection; and

- the Debtors may fail to timely apply for patents on the Debtors' technologies, products or product candidates.

While the Debtors apply for patents covering both their technologies, products, and potential products, as the Debtors deem appropriate, many biopharmaceutical companies and university and research institutions already have filed patent applications or have received patents in the Debtors' areas of product development. These entities' applications, patents and other intellectual property rights may conflict with patent applications to which the Debtors have rights and could prevent the Debtors from obtaining patents or could call into question the validity of any of the Debtors' patents, if issued, or could otherwise adversely affect the Debtors' ability to develop, manufacture or commercialize antibiotic candidates. In addition, if third parties file patent applications in the technologies that also claim technology to which the Debtors have rights, they may have to participate in interference, derivation or other proceedings with the U.S. Patent and Trademark Office ("**USPTO**") or applicable foreign patent regulatory authorities, as applicable, to determine the Debtors' rights in the invention, which may be time-consuming and expensive. Moreover, issued patents may be challenged during post-grant proceedings brought by a third party or the USPTO, or in foreign countries, or in the courts. These proceedings may result in loss of patent claims or adverse changes to the scope of the claims. Patent applications may also be challenged during pre-grant proceedings. If the Debtors are unsuccessful in defending any such opposition, only part of such patent would issue or the patent might not issue at all.

If the Debtors or their licensors or partners fail to obtain and maintain patent protection for their products and product candidates, or proprietary technologies and their uses, companies may be dissuaded from collaborating with the Debtors. In such event, the Debtors' ability to commercialize their products and product candidates may be threatened, the Debtors could lose their competitive advantage and the competition the Debtors face could increase, all of which could adversely affect their business, financial condition, results of operations, and prospects.

## 27.    Intellectual Property Litigation

The Debtors' commercial success depends, in part, on them not infringing the patents and proprietary rights of other parties and not breaching any collaboration or other agreements they

have entered into with regard to their technologies, products and product candidates. Numerous third-party U.S. and non-U.S. issued patents and pending applications exist in the areas of antibacterial treatment, including compounds, formulations, treatment methods and synthetic processes that may be applied towards the synthesis of antibiotics. Although no legal action has been commenced or threatened against the Debtors by a third party for infringing intellectual property rights, the Debtors cannot provide assurances that the Debtors or their partners will be free to manufacture or market the product candidates as planned, or that the Debtors or their licensors' and partners' patents will not be opposed or litigated by third parties.

There is a substantial amount of litigation involving intellectual property in the biopharmaceutical industry generally. If a third party asserts that the Debtors infringe its patents or other proprietary rights, the Debtors could face a number of risks that could adversely affect their business, financial condition, results of operations, and prospects, including: (i) infringement and other intellectual property claims, which would be costly and time consuming to defend, whether or not the Debtors are ultimately successful, which in turn could delay the regulatory approval process, consume the Debtors' capital and divert management's attention from the business; (ii) substantial damages for past infringement, which the Debtors may have to pay if a court determines that their products, product candidates or technologies infringe a competitor's patent or other proprietary rights; (iii) a court prohibiting the Debtors from selling or licensing technologies, products or future products unless the third party licenses its patents or other proprietary rights to the Debtors on commercially reasonable terms, which it is not required to do; (iv) if a license is available from a third party, the Debtors may have to pay substantial royalties or lump sum payments or grant cross licenses to their patents or other proprietary rights to obtain that license; and (v) redesigning the Debtors products or product candidates so they do not infringe, which may not be possible or may require substantial monetary expenditures and time.

Although the Debtors are not currently party to any legal proceedings asserting infringement of third-party intellectual property, in the future, third parties may file claims asserting that the Debtors' technologies, processes or products infringe on their intellectual property. The Debtors cannot predict whether third parties will assert these claims against them or their partners or against the licensors of technology licensed to the Debtors, or whether those claims will harm the Debtors' business. In addition, the outcome of intellectual property litigation is subject to uncertainties that cannot be adequately quantified in advance. If the Debtors or their partners were to face infringement claims or challenges by third parties relating to their product candidates, an adverse outcome could subject the Debtors to significant liabilities to such third parties, and force the Debtors or their partners to curtail or cease the development of some or all of their products and product candidates, which could adversely affect the Debtors' business, financial condition, results of operations, and prospects.

Additionally, competitors may infringe the Debtors' patents or the patents of the Debtors' licensors. To counter infringement or unauthorized use, the Debtors may file infringement claims, which can be expensive and time-consuming. Moreover, there can be no assurance that the Debtors will have sufficient financial or other resources to file and pursue such infringement claims, which typically last for years before they are concluded. The legal systems of certain countries, particularly certain developing countries, do not favor the enforcement of patents and other intellectual property protection, particularly those relating to biopharmaceuticals, which could

make it difficult for the Debtors to stop the infringement of their patents or marketing of competing products in violation of their proprietary rights generally.

In addition, in an infringement proceeding, a court may decide that a patent of the Debtors or their licensors is not valid or is unenforceable, or may refuse to stop the other party from using the technology at issue on the grounds that the Debtors' patents, or those of their licensors, do not cover the technology in question. An adverse result in any litigation or defense proceedings could put one or more of the Debtors' patents, or those of their licensors, at risk of being invalidated, held unenforceable or interpreted narrowly and could put the Debtors' patent applications, or those of their licensors, at risk of not issuing. Moreover, the Debtors may not be able to prevent, alone or with their licensors, misappropriation of their proprietary rights, particularly in countries where the laws may not protect those rights as fully as in the United States. Furthermore, because of the substantial amount of discovery required in connection with intellectual property litigation, there is a risk that some of the Debtors' confidential information could be compromised by disclosure during this type of litigation. The occurrence of any of the above could adversely affect the Debtors' business, financial condition, results of operations, and prospects.

### 28.    Intellectual Property Confidentiality

The Debtors rely on trade secrets, know-how and continuing technological advancement to develop and maintain their competitive position. To protect this competitive position, the Debtors regularly enter into confidentiality and proprietary information agreements with third parties, including employees, independent contractors, suppliers and collaborators. The Debtors cannot, however, ensure that these protective arrangements will be honored by third parties, and the Debtors may not have adequate remedies if these arrangements are breached. In addition, enforcement of claims that a third party has illegally obtained and is using trade secrets, know-how and technological advancements is expensive, time consuming and uncertain. Non-U.S. courts are sometimes less willing than U.S. courts to protect this information. Moreover, the Debtors' trade secrets, know-how and technological advancements may otherwise become known or be independently developed by competitors in a manner providing the Debtors with no practical recourse against the competing parties. If any such events were to occur, they could adversely affect the Debtors' business, financial condition, results of operations, and prospects.

### 29.    BARDA Agreement

In February 2014, the Debtors' subsidiary, Rempex Pharmaceuticals, Inc., entered into a cost-sharing agreement with the U.S. Biomedical Advanced Research and Development Authority ("**BARDA**") to support the development of Vabomere, which includes provisions that reflect the government's substantial rights and remedies, many of which are not typically found in commercial contracts. These rights and remedies include powers of the government to claim rights to data, including intellectual property rights, developed under such contracts under certain circumstances. The government may also impose U.S. manufacturing requirements for products that embody inventions conceived or first reduced to practice under such contracts. The Debtors may not have the right to prohibit the U.S. government from using certain technologies funded by the government and developed by the Debtors related to Vabomere, and the Debtors may not be able to prohibit third-party companies, including their competitors, from using those technologies in providing products and services to the U.S. government. The U.S. government generally takes

the position that it has the right to royalty-free use of technologies that are developed under U.S. government contracts. Failure to comply with provisions within the BARDA contract may make it costlier and difficult for the Debtors to successfully conduct their business.

### 30.    Trademark Registration in Certain Markets

The Debtors have obtained trademark registrations with the USPTO for their marks, including "MELINTA," "MELINTA THERAPEUTICS," "MELINTA THE ANTIBIOTICS COMPANY" and "BAXDELA" for use in connection with the Debtors' goods and services, and have filed a U.S. application for a BAXDELA logo mark. The Debtors also have filed and anticipate filing foreign trademark applications for the same marks for goods and services outside the United States, and have obtained registrations for some trademarks in jurisdictions outside the United States. The registrations will be subject to use and maintenance requirements. The Debtors may not register all of their trademarks in all of their potential markets, and it is also possible that there are names or symbols other than the foregoing that may be protectable marks for which the Debtors have not sought registration, and failure to secure those registrations could adversely affect the Debtors' business. The Debtors cannot provide assurance that opposition or cancellation proceedings will not be filed against their trademarks or that their trademarks would survive such proceedings.

As a result of the transaction with MedCo, the Debtors have acquired trademarks and trademark applications filed with the USPTO or other jurisdictions for additional marks, including "ORBACTIV," "TARGANTA," and "VABOMERE," for use in connection with the Debtors' goods and services. The Debtors have also acquired a license to the "MINOCIN" mark. The ORBACTIV and VABOMERE marks, and two VABOMERE logo marks, have matured to registration in the United States. The Debtors have also filed applications for an ORBACTIV logo mark. The Debtors also have filed and anticipate filing foreign trademark applications for the same marks for goods and services outside the United States, and have obtained registrations for some trademarks in jurisdictions outside the United States. The registrations will be subject to use and maintenance requirements. The Debtors may not register all of their trademarks in all of their potential markets, and it is also possible that there are names or symbols other than the foregoing that may be protectable marks for which the Debtors have not sought registration, and failure to secure those registrations could adversely affect the Debtors' business. The Debtors cannot provide assurance that opposition or cancellation proceedings will not be filed against their trademarks or that their trademarks would survive such proceedings.

Any of the Debtors' existing or future trademark applications in the United States and any other jurisdictions where the Debtors may file may not be allowed for registration, and registered trademarks may not be obtained, maintained or enforced. During trademark registration proceedings, the Debtors may receive rejections. Although the Debtors are given an opportunity to respond to those rejections, the Debtors may be unable to overcome such rejections. In addition, in the USPTO and in comparable agencies in many foreign jurisdictions, third parties are given an opportunity to oppose pending trademark applications and to seek to cancel registered trademarks. Opposition or cancellation proceedings may be filed against the Debtors' trademarks, and the Debtors' trademarks may not survive such proceedings.

### 31.    Patent Protection and Trade Secrets

New laws, regulations and judicial decisions, or new interpretations of existing laws, regulations and decisions, that relate to healthcare availability, methods of delivery or payment for products and services, or sales, marketing or pricing, may limit the Debtors' potential revenue, and the Debtors may need to revise the Debtors' research and development programs. The pricing and reimbursement environment may change in the future and become more challenging due to several reasons, including policies advanced by the current executive administration in the United States, new healthcare legislation or fiscal challenges faced by government health administration authorities. Specifically, in both the United States and some foreign jurisdictions, there have been a number of legislative and regulatory proposals to change the healthcare system in ways that could affect the Debtors' ability to sell products profitably.

### 32.    Cybersecurity and Security Breaches

Despite the implementation of security measures, Melinta's internal computer systems and those of its partners and other contractors and consultants are vulnerable to damage or disruption from computer viruses, software bugs, unauthorized access, natural disasters, terrorism, war, and telecommunication, equipment and electrical failures. While Melinta has not, to its knowledge, experienced any significant system failure or accident to date, if such an event were to occur and cause interruptions in its operations, it could result in a material disruption of its programs or operations. For example, the loss of clinical trial data from completed or ongoing clinical trials for any of its product candidates could result in delays in its regulatory approval efforts, expose the Debtors to liability under certain data privacy lapses, and significantly increase its costs to recover or reproduce the data. To the extent that any disruption or security breach results in a loss of or damage to its data or applications, or inappropriate disclosure or theft of confidential or proprietary information, Melinta could incur liability and its competitive position could be compromised.

Additionally, the Debtors rely significantly on the Debtors' information technology to effectively manage and maintain the Debtors' clinical records, internal infrastructure systems and internal reports. Any failure, inadequacy or interruption of that infrastructure or security lapse of that technology, including cybersecurity incidents, could harm the Debtors' ability to operate their business effectively. Cybersecurity attacks in particular are evolving and include, but are not limited to, malicious software, attempts to gain unauthorized access to data and other electronic security breaches that could lead to disruptions in systems, misappropriation of the Debtors' confidential or otherwise protected information and corruption of data. While the Debtors' existing insurance for cybersecurity risks will help limit their losses, a breach in security, unauthorized access resulting in misappropriation, theft, or sabotage with respect to the Debtors' proprietary and confidential information, including research or clinical data, could require significant capital investments to remediate and could adversely affect the Debtors' business, financial condition and results of operations.

### D.    The Plan May Not Be Accepted by Sufficient Holders of Impaired Claims

The Plan is subject to a vote of Holders of Impaired Claims in Voting Classes and to confirmation by the Bankruptcy Court. Article IX hereof summarizes the numerous requirements

for confirmation of the Plan, including that the Plan be accepted by at least one Class of Impaired Claims. There can be no assurance that the requisite acceptances to confirm the Plan will be obtained. Thus, while the Debtors believe the Plan is confirmable under the standards set forth in Bankruptcy Code section 1129, there is no guarantee that the Plan will be accepted by the requisite Classes entitled to vote on the Plan.

### E.    The Global Settlement Term Sheet May Terminate

As set forth in greater detail in Section V.H herein, the Settlement Parties' obligations under the Global Settlement Term Sheet are subject to various conditions and termination rights in favor of the Settlement Parties. In the event any of these conditions are not met or these termination events occur, including with respect to any individual Settlement Party, the Debtors may fail to realize the benefits of the Settlement, and certain of the Settlement Parties' obligations to support the Plan and the Supporting Lender Transaction will terminate. This could lead to significant litigation with respect to both the Plan and the Supporting Lender Transaction.

Additionally, the Global Settlement Term Sheet may terminate solely with respect to MedCo and/or Vatera if, among other things, the applicable Investigator determines that a colorable claim against any of the MedCo Persons or any of the Vatera Persons exists and that such claim will be transferred to the GUC Trust for prosecution. As described in Section V.H hereof, the applicable Investigator will consider various prudential factors in determining whether a colorable claim against a MedCo Person or a Vatera Person should be transferred to the GUC Trust for prosecution, including the cost and expense of pursuing a claim, the Investigator's assessment of the likelihood of success on the merits, the likely complexity of any litigation involving the claim, the interests of creditors, and the consideration provided by such person under the Global Settlement Term Sheet. In this regard, the Investigator's determination to transfer a colorable claim against a Medco Person or a Vatera Person to the GUC Trust for prosecution will, among other things, reflect the Investigator's judgment that the anticipated value of such claim exceeds the value of the consideration provided by such person under the Global Settlement Term Sheet. As such, the transfer a colorable claim to the GUC Trust for prosecution may ultimately enhance recoveries for Holders of Allowed General Unsecured Claims. On the other hand, litigation is inherently uncertain, and the Investigator's determination that a claim against a MedCo Person and/or a Vatera Person should be transferred to the GUC Trust for prosecution does not guarantee that such claim will be successfully prosecuted or otherwise yield any significant distributable proceeds. Thus, it is possible that the transfer a claim against a MedCo Person and/or a Vatera Person to the GUC Trust for prosecution would ultimately reduce, potentially significantly, recoveries for other Holders of Allowed General Unsecured Claims.

### F.    The Bankruptcy Court May Not Confirm the Plan

Even if all voting Impaired Classes vote in favor of the Plan, and even if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cramdown" (discussed in more detail in Section IX.F herein) are met, the Bankruptcy Court, which, as a court of equity, has substantial discretion concerning Plan confirmation, and may choose not to confirm the Plan. Bankruptcy Code section 1129 requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, and that the value of distributions to dissenting Holders of Claims and Interests will not

117

be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, see *infra* Section X.D. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Plan may also be subject to objections by parties-in-interest. Specifically, Vatera has indicated that, should the Global Settlement Term Sheet terminate, it may prosecute objections to the Plan on various grounds, including, without limitation, the following: (a) the Plan's deemed substantive consolidation of the Debtors' estates for distribution purposes is not permitted under applicable law and (b) the Plan's debtor and third-party releases in favor of the D&Os and certain other Released Parties are improper. Additionally, certain parties-in-interest have indicated they may object to the release, exculpation, and injunction provisions of the Plan. Specifically, these parties-in-interest have claimed that the releases are non-consensual, that there is insufficient information regarding the existence of any claims against the Released Parties or any consideration provided by the Released Parties in exchange for the releases, and that the release, exculpation, and injunction provisions are overbroad and inconsistent with applicable law.

The Debtors disagree with these objections, and will continue to defend the Plan against these and other objections. With respect to the foregoing, the Debtors contend, among other things, that (i) the deemed substantive consolidation of the Debtors' estates for distribution purposes is merited as it is consistent with applicable law, creditors have dealt with the Debtors as a single, consolidated enterprise pre- and postpetition, and separating the Debtors' assets and liabilities postpetition will adversely impact all creditors and (ii) the Plan's release, exculpation, and injunction provisions, each of which was part and parcel of the agreements embodied in the Restructuring Support Agreement and the Global Settlement Term Sheet, are consensual, justified with respect to each of the Released Parties (or, if the Investigation determines that a colorable claim exists against a subject of the Investigation and should be transferred to the GUC Trust for prosecution, the Plan will be amended to strike such party from the definition of "Released Parties"), and otherwise consistent with applicable law.

However, as a result of these objections, the Court may deny confirmation of the Plan or require modifications to the Plan (which, in either case, may lead to an erosion of the substantial support the Debtors have for the Plan as currently drafted). Moreover, such objections may lead to substantial litigation with respect to the Plan's confirmation.

### G.    Bankruptcy-Specific Risk Factors That Could Negatively Impact the Debtors' Business

#### 1.    The Debtors Are Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' operations and their ability to execute their business strategy will be subject to risks and uncertainties associated with bankruptcy. These risks include:

(a)    the Debtors' ability to continue as a going concern;

(b)    the Debtors' ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases;

(c)    the Debtors' ability to develop, prosecute, confirm, and consummate the proposed Plan or any other plan of reorganization with respect to the Chapter 11 Cases;

(d)    the ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a plan of reorganization, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 cases;

(e)    the Debtors' ability to retain key vendors or secure alternative supply sources;

(f)    the Debtors' ability to obtain and maintain normal payment and other terms with vendors and service providers;

(g)    the Debtors' ability to maintain contracts that are critical to their operations;

(h)    the Debtors' ability to attract, motivate, and retain management and other key employees; and

(i)    the Debtors' ability to fund and execute their business plan.

## 2.    The Debtors' Business Could Suffer from a Long and Protracted Restructuring

Although the Debtors will seek to make their stay in chapter 11 as brief as possible and to obtain relief from the Bankruptcy Court so as to minimize any potential disruption to their business operations, it is possible that the commencement and pendency of the Chapter 11 Cases could materially adversely affect the relationship among the Debtors, customers, employees, vendors, and service providers.

The Debtors' future results are dependent upon the successful confirmation and implementation of a plan of reorganization. Failure to obtain this approval in a timely manner could adversely affect the Debtors' operating results, as their ability to obtain financing to fund operations may be harmed. Accordingly, if the Plan is not confirmed and implemented within the Milestones, there is a significant risk that the value of the Debtors' enterprise would be substantially eroded to the detriment of all stakeholders.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even once a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders, customers, or vendors to do business with a company that recently emerged from bankruptcy proceedings.

### 3. The Debtors May Be Unable to Obtain Sufficient Liquidity to Confirm the Plan and Exit from Chapter 11

As of the date hereof, the Debtors contemplate that the use of cash collateral will provide the Debtors with sufficient liquidity to fund the Debtors' business operations and administrative expenses during these Chapter 11 Cases. As of the date hereof, the use of cash collateral is still subject to final approval by the Bankruptcy Court and such approval is not guaranteed. Should the Debtors encounter difficulty using cash collateral, the Debtors' ability to market their assets and business and consummate a Transaction could be placed in jeopardy.

## H. Classification and Treatment of Claims and Interests

Bankruptcy Code section 1122 requires that the Plan classify Claims against, and Interests in, the Debtors. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek (a) to modify the Plan to provide for whatever classification might be required for confirmation and (b) to use the acceptances received from any creditor pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such creditor ultimately is deemed to be a member. Any such reclassification of creditors, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such creditor was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan of any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder regardless of the Class as to which such Holder is ultimately deemed to be a member. The Debtors believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim of any creditor or equity holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

### I.        Conditions Precedent to Consummation of the Plan

Article X of the Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

### J.        Liquidation Under Chapter 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that chapter 7 liquidation would have on the recoveries of holders of Claims and the Debtors' Liquidation Analysis is described herein and attached hereto as **Exhibit B**.

## VIII.   Solicitation and Voting Procedures

### A.        Voting Status of Each Class

Under the Bankruptcy Code, creditors are entitled to vote on the Plan if their contractual rights are Impaired by the Plan and they are receiving a distribution under the Plan. Creditors are not entitled to vote if their contractual rights are Unimpaired by the Plan or if they will receive no distribution of property under the Plan. The following table sets forth which Classes of Claims will or will not be entitled to vote on the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Secured Prepetition Credit Agreement Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Unimpaired | Presumed to Accept |
| 6 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 7 | Section 510(b) Claims and Recharacterized Claims | Impaired | Deemed to Reject |
| 8 | Interests in Melinta Therapeutics | Impaired | Deemed to Reject |

### B.        Classes Entitled to Vote

The following Classes are the only Classes entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 3 | Secured Prepetition Credit Agreement Claims | Impaired |
| 4 | General Unsecured Claims | Impaired |

If your Claim or Interest is not included in any of these Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined below).

Under the Bankruptcy Code, acceptance of a plan of reorganization by a Class of Claims is determined by calculating the number and the amount of Claims voting to accept, based on the actual total Allowed Claims voting on the Plan. Acceptance by a Class requires more than one-half of the number of total Allowed Claims in the Class to vote in favor of the Plan and at least two-thirds in dollar amount of the total Allowed Claims in the Class to vote in favor of the Plan.

### C.      Sale-Related Solicitation Matters

As set forth in greater detail in Article V.E—Bidding Procedures, the Debtors are currently soliciting bids for a sale of all or a portion of their assets or the Reorganized Melinta Common Stock. The Debtors will distribute Solicitation Packages to Holders of Claims entitled to vote on the Plan in accordance with the Solicitation Procedures, prior to the Auction date (March 6, 2020) and the RSA/Sale Hearing date (March 13, 2020). As set forth in greater detail in the Bidding Procedures, the Debtors will file a notice identifying the Successful Bidder following the Auction. In addition, following the conclusion of the RSA/Sale Hearing, the Debtors shall file and serve on all Holders of Claims who have received a Solicitation Package a notice describing the outcome of the RSA/Sale Hearing (the "**RSA/Sale Hearing Notice**"). Moreover, in the event that the outcome of the RSA/Sale Hearing necessitates amendments to the Plan or supplemental disclosure, the Debtors will provide notice of such amendments and supplemental disclosure to all Holders of Claims who have received a Solicitation Package as promptly as possible following conclusion of the RSA/Sale Hearing.

Creditors who are entitled to vote and who have not submitted a Ballot upon service of the RSA/Sale Hearing Notice and any Plan amendments or supplemental disclosure should consider such materials prior to casting their Ballots. Creditors who have submitted a Ballot upon service of the RSA/Sale Hearing Notice and any Plan amendments or supplemental disclosure should contact the Solicitation Agent should they wish to make changes to their previously submitted Ballot.

As set forth in in Section V.E hereof, the Bidding Procedures permit the Debtors to admit to the Auction as a Qualified Bid a Bid that proposes a Plan Sale and satisfies the requirements of Bankruptcy Code section 1129 (an "**1129(b) Bid**"), even if such Bid does not offer cash consideration in an amount sufficient to repay in full, in cash, the amount of the then-current Credit Bid. In the event that the Debtors, in consultation with the Committee, identify an 1129(b) Bid as the highest or otherwise best Bid and determine to pursue such Bid, the Debtors would modify the Plan to reflect the terms of such 1129(b) Bid and resolicit such modified Plan. To the extent of any agreement by the Committee in the Global Settlement Term Sheet to forbear from objecting to this Disclosure Statement and the commencement of solicitation thereon in accordance with the milestones set forth in the Final Cash Collateral Order, any such agreement shall not be deemed a

forfeiture or waiver of the Committee's right to advocate for any such 1129(b) Bid in the event the Global Settlement Term Sheet is terminated.

### D.    Voting Procedures[33]

The Debtors retained KCC to, among other things, act as the Debtors' agent in connection with the solicitation of votes to accept or reject the Plan.

### 1.    Voting Record Date

The Record Date (as defined in the Disclosure Statement Motion)[34] is February 20, 2020 (the "**Voting Record Date**"). The Voting Record Date is the date for determining (a) the holders of claims and interests entitled to receive a package containing relevant solicitation materials (the "**Solicitation Package**") in accordance with the Solicitation Procedures (as defined in the Disclosure Statement Motion) (b) the holders of claims entitled to vote to accept or reject the Plan; and (c) whether claims have been properly transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the holder of such claim; *provided, however*, that holders of claims that are not listed on the Debtors' Schedules and did not file a proof of claim by the Record Date shall receive a Solicitation Package, and be entitled to vote to accept or reject the Plan in accordance with the Solicitation Procedures, if such holders of claims file a valid proof of claim by the Bar Date.

### 2.    Distribution of Solicitation Packages

Under the Plan, Holders of Claims in Classes 3 and 4 (collectively, the "**Voting Classes**") are entitled to vote to accept or reject the Plan. As such, the Debtors are providing Solicitation Packages to Holders of Secured Prepetition Credit Agreement Claims and General Unsecured Claims.

### 3.    General Voting Instructions

In order for the Holder of a Claim in the Voting Classes to have such Holder's Ballot (as defined in the Disclosure Statement Motion) counted as a vote to accept or reject the Plan, such Holder's Ballot, must be either (a) properly completed by hand, executed, and delivered in accordance with the instructions included in the Ballot by: (i) first-class mail, (ii) courier, or (iii) personal delivery to the Solicitation Agent, or (b) properly completed electronically using the Solicitation Agent's Electronic Balloting platform. Whether completing the ballot by hand or electronically using the Solicitation Agent's Electronic Balloting Platform, each Holder's Ballot must be **actually received** at the following address: Melinta Therapeutics Balloting Center, c/o Kurtzman Carson Consultants LLC, 222 N. Pacific Coast Highway, Suite 300, El Segundo,

---

[33]    All capitalized terms used in this Section VIII.D and not otherwise defined shall have the meanings ascribed to them in the Solicitation Procedures (as defined in the Disclosure Statement Motion).

[34]    As used herein, the "**Disclosure Statement Motion**" refers to the *Motion of Debtors for Order (I) Approving Adequacy of Debtors' Disclosure Statement, (II) Approving Solicitation and Notice Procedures with Respect to Confirmation of Debtors' Proposed Plan of Reorganization, (III) Approving Form of Various Ballots and Notices in Connection Therewith, and (IV) Scheduling Certain Dates with Respect Thereto* [Docket No. 122].

California 90245, **by 4:00 p.m. (Eastern) on March 30, 2020** (the "**Voting Deadline**"). It is important that the Holder of a Claim in the Voting Classes follow the specific instructions provided on such Holder's Ballot and the accompanying instructions. The Holder of a Claim should also provide all of the information requested by the Ballot, and, if completing the ballot by hand, should complete and return all Ballots received in the enclosed, self-addressed, postage-paid envelope provided with each such Ballot either to the Solicitation Agent. Except in the Debtors' sole discretion, ballots may not be transmitted by facsimile, email, or other electronic means, other than the Solicitation Agent's Electronic Balloting Platform.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE IN THEIR SOLE AND ABSOLUTE DISCRETION.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST.

IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT, AS APPROPRIATE, WHEN SUBMITTING A VOTE.

IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS DISCLOSURE STATEMENT, THE PLAN, OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE SOLICITATION AGENT, KCC, AT (877) 634-7178, WITHIN THE UNITED STATES OR CANADA, OR (424) 236-7224, OUTSIDE OF THE UNITED STATES OR CANADA, OR AT Melintainfo@kccllc.net.

### 4.        Miscellaneous

All Ballots must be signed by the holder of record of the appropriate classes of claims, as applicable, or any person who has obtained a properly completed Ballot proxy from the record holder of the appropriate classes of claims, as applicable, on such date. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted. If you cast more than one Ballot voting the same Claim(s) before the Voting Deadline, the last valid Ballot received on or before the Voting Deadline will be deemed to reflect your intent, and thus, to supersede any prior Ballot. If you cast Ballots received by the Solicitation Agent on the same day, but which are voted inconsistently, such Ballots will not be counted.

Except as provided below, unless the Ballot is timely submitted to the Solicitation Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

## IX.     Statutory Requirements for Confirmation of the Plan

The following is a brief summary of the Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

### A.     The Confirmation Hearing

Bankruptcy Code section 1128(a) provides that the Bankruptcy Court, after notice, may conduct a Confirmation Hearing. Bankruptcy Code section 1128(b) provides that any party in interest may object to Confirmation of the Plan.

The Confirmation Hearing is scheduled for 10:00 a.m. (Eastern) on April 2, 2020.

### B.     Confirmation Standards

The following requirements must be satisfied under Bankruptcy Code section 1129(a) before the Bankruptcy Court may confirm a plan of reorganization.

1.     The Plan complies with the applicable provisions of the Bankruptcy Code.

2.     The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code.

3.     The Plan has been proposed in good faith and not by any means forbidden by law.

4.     Any payment made or to be made by the proponent, by a Debtor, or by a person issuing securities or acquiring property under a Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

5.     The proponent of the Plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an Affiliate of the Debtors participating in a joint Plan with a Debtor or a successor to a Debtor under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and Holders of Interests and with public policies.

6.     The proponent of the Plan has disclosed the identity of any insider that will be employed or retained by the Reorganized Debtors and the nature of any compensation for such insider.

125

7.        Any governmental regulatory commission with jurisdiction, after Confirmation, over the rates of the Debtors has approved any rate change provided for in the Plan.

8.        With respect to each holder within an Impaired Class of Claims or Interests, each such Holder (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest property of value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

9.        With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan or (b) is Unimpaired under the Plan; *provided, however,* that if the Plan is rejected by an Impaired Class, the Plan may be confirmed if it "does not discriminate unfairly" and is "fair and equitable" as to such Class, is feasible, and is in the "best interests" of Holders of Claims and Interests that are Impaired under the Plan.

10.        Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that:

(a)        With respect to a Claim of a kind specified in Bankruptcy Code sections 507(a)(2) or 507(a)(3), on the Effective Date of the Plan, the Holder of the Claim will receive on account of such Claim Cash equal to the Allowed amount of such Claim, unless otherwise agreed;

(b)        With respect to a Class of Claim of the kind specified in Bankruptcy Code sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7), each Holder of a Claim of such Class will receive (a) if such Class has accepted the Plan, deferred Cash payments of a value, on the Effective Date of the Plan, equal to the Allowed amount of such Claim or (b) if such Class has not accepted the Plan, Cash on the Effective Date of the Plan equal to the Allowed amount of such Claim; and

(c)        With respect to a Priority Tax Claim of a kind specified in Bankruptcy Code section 507(a)(8), the Holder of such Claim will receive on account of such claim deferred Cash payments, over a period not exceeding five years after the date of the order for relief, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim.

11.        If a Class of Claims is Impaired under the Plan, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider as defined in Bankruptcy Code section 101(31).

12.        Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

13.        All fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

14.    The Plan provides that following the Effective Date of the Plan, subject to the Reorganized Debtors' rights, if any, under applicable non-bankruptcy law, unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtors shall continue to pay all retiree benefits, as that term is defined in Bankruptcy Code section 1114, at the level established under subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation, for the duration of the period the debtor has obligated itself to provide such benefits.

### C.    Liquidation Analysis

As described above, Bankruptcy Code section 1129(a)(7) requires that each Holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

Based on the liquidation analysis attached hereto as **Exhibit B** (the "**Liquidation Analysis**"), the Debtors believe that the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be no greater than the value of distributions under the Plan.

### D.    Financial Feasibility

Bankruptcy Code section 1129(a)(11) requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization, unless such liquidation or further financial reorganization is provided for in such plan. In the event that the Supporting Lenders are the Successful Bidders, the proposed Plan provides for distribution of the GUC Trust Distributable Cash to Holders of Allowed Class 4 General Unsecured Claims pursuant to the terms of the Plan. In the event that a third party is the Successful Bidder, the proposed Plan provides for the distribution of Distributable Cash to creditors in accordance with the priority scheme of the Bankruptcy Code and the terms of the Plan. In either case, the ability of the Debtors to make the distributions under the Plan does not depend on future earnings of the Debtors. Accordingly, the Debtors believe the Plan is feasible and meets the requirements of Bankruptcy Code section 1129(a)(11).

### E.    Acceptance by Impaired Classes

The Bankruptcy Code also requires, as a condition to Confirmation, that each Class of Claims or Interests that is Impaired but still receives distributions under the Plan vote to accept the Plan, unless the Debtors can "cramdown" such Classes, as described below. A Class that is Unimpaired is presumed to have accepted the Plan and, therefore, solicitation of acceptances with respect to such Class is not required. A Class is Impaired unless the Plan leaves unaltered the legal, equitable, and contractual rights to which the Claim or Interest entitles the Holder of such Claim or Interest, or the Debtors cure any default and reinstate the original terms of the obligation.

Under Bankruptcy Code sections 1126(c) and 1126(d) and except as otherwise provided in Bankruptcy Code section 1126(e): (a) an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than half in number of the voting Allowed Claims have voted to accept the Plan and (b) an Impaired Class of Interests has accepted the Plan

if the Holders of at least two-thirds in amount of the Allowed Interests of such Class actually voting have voted to accept the Plan.

## F.    Confirmation Without Acceptance by All Impaired Classes

Bankruptcy Code section 1129(b) allows the Bankruptcy Court to confirm the Plan, even if the Plan has not been accepted by all Impaired Classes, provided that the Plan has been accepted by at least one Impaired Class entitled to vote, without counting the vote of any Insider, as defined in Bankruptcy Code section 101(31). Bankruptcy Code section 1129(b) permits the Debtors to confirm the Plan, notwithstanding the failure of any Impaired Class to accept the Plan, in a procedure commonly known as "cramdown," so long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each Impaired Class that has not accepted the Plan.

### 1.    No Unfair Discrimination

A plan "does not discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests. The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation.

### 2.    Fair and Equitable Treatment

With respect to a dissenting class of claims or interests, the "fair and equitable" standard requires that a plan provide that either the claims or interests in each class received everything to which they are legally entitled or, with respect to unsecured claims, that classes junior in priority to the class receive nothing.

The Bankruptcy Code establishes different "fair and equitable" tests for holders of secured claims, unsecured claims, and interests, which may be summarized as follows:

(a)    *Secured Claims*. Either (i) each holder of a claim in an impaired class of secured claims retains its liens securing its secured claim and it receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each holder of a claim in an impaired class of secured claims realizes the indubitable equivalent of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph.

(b)    *Unsecured Claims*. Either (i) each holder of a claim in an impaired class of unsecured claims receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

(c)    *Interests*. Either (i) each holder of an equity interest in an impaired class of interests will receive or retain under the chapter 11 plan property of a value equal to the greater of (y) the fixed liquidation preference or redemption price, if any, of such stock or (z) the value of the stock or (ii) the holders of interests that are junior to the stock will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

The Debtors believe that the distributions provided under the Plan satisfy the "fair and equitable" requirements of the Bankruptcy Code. Certain Classes of Claims and Interests will receive no distribution under the Plan and are therefore deemed to reject the Plan. Accordingly, the Debtors will seek to confirm the Plan under Bankruptcy Code 1129(b) with respect to such Classes. In addition, although the Plan is predicated on the substantial support of certain of the Debtors' creditors, the Debtors reserve the right to seek confirmation of the Plan under Bankruptcy Code section 1129(b) if one or more voting Impaired Classes votes to reject the Plan.

## X.    Alternatives to Confirmation and Consummation of the Plan

The Debtors believe that the Plan affords Holders of Claims and Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, however, the theoretical alternatives include: (a) continuation of the pending Chapter 11 Cases, (b) the sale of the Debtors' assets under Bankruptcy Code section 363, (c) an alternative plan or plans of reorganization, or (d) the liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

### A.    Continuation of the Chapter 11 Cases

If the Debtors remain in chapter 11, they could continue to operate their business and manage their properties as debtors in possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code, and the Debtors will have failed to comply with the milestones set forth in the Cash Collateral Order, thus jeopardizing their continued use of cash collateral. It is not clear whether the Debtors could access such cash or survive as a going concern in protracted chapter 11 cases. In particular, the Debtors could have difficulty gaining access to sufficient liquidity to allow them to continue their operations as a going concern.

### B.    Sale of Substantially All of the Debtors' Assets Under Bankruptcy Code Section 363

In lieu of the present Plan, and the sales and marketing process contemplated by the Bidding Procedures and the Bidding Procedures Motion, the Debtors could pursue and alternative sale of all or a portion of their assets under section 363 of the Bankruptcy Code. Through the prepetition marketing process and the sales and marketing process provided for in the Bidding Procedures, the Debtors have established procedures to identify the Transaction that is most value-maximizing. Therefore, the Debtors believe that any sale under section 363 of the Bankruptcy Code other than pursuant to the Bidding Procedures may yield a depressed price for the Debtors' assets, and may result in significantly lower recoveries to Holders of Claims and Interests.

### C.      Alternative Plans of Reorganization

If the Plan is not confirmed, the Debtors, or, after the expiration of the Debtors' exclusive period in which to propose and solicit a reorganization plan, any other party in interest in the Chapter 11 Cases, could propose a different plan or plans. Any such plans proposed by the Debtors or others might involve either a reorganization and continuation of the Debtors' business, or an orderly liquidation of its assets, or a combination of both.

Although alternative plans of reorganization are possible, the present Plan is the result of a thorough assessment of restructuring alternatives undertaken in consultation with key stakeholders, and is being subject to higher and better Transactions through the Bidding Procedures. Accordingly, the Debtors believe the prospect of an alternative plan of reorganization that delivers greater value to economic stakeholders is remote.

### D.      Liquidation Under Chapter 7 or Chapter 11

If no plan is confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code. In chapter 7 cases, a trustee or trustees would be appointed to liquidate the assets of the Debtors. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective Holders of Claims or Interests.

However, the Debtors believe that creditors would lose substantial value if the Debtors were forced to liquidate. In addition, the Debtors believe that in liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants, and other professionals to assist such trustees would cause a substantial diminution in the value of the Estate. The assets available for distribution to creditors would be reduced by such additional expenses and by claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors may also be liquidated under a chapter 11 plan. In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation might result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed. However, any distribution to the Holders of Claims or Interests under a chapter 11 liquidation plan probably would be delayed substantially. In addition, as with a chapter 7 liquidation, the Debtors believe that creditors would lose the materially higher going concern value if the Debtors were forced to liquidate under a chapter 11 plan. Finally, the Debtors believe that any liquidation proceeds realized in a chapter 11 liquidation are likely to be materially lower than those received through the sales and marketing process contemplated by the Bidding Procedures, because, among other reasons, there may be decreased market competition for the Debtors' assets.

## XI.      U.S. Federal Income Tax Considerations Applicable to the Plan

The following summarizes U.S. federal income tax considerations applicable of the Plan

to the Debtor and certain holders of claims or equity interests of the Debtor. This summary is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of the Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtor does not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to holders of claims or equity interests that are not United States persons (as such term is defined in the Tax Code) or that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, partnerships or entities treated as partnerships for U.S. federal income tax purposes; persons whose functional currency is not the U.S. dollar; banks; governmental authorities or agencies; financial institutions; insurance companies; pass-through entities; tax-exempt organizations; brokers and dealers in securities, currencies or commodities; small business investment companies; and regulated investment companies). This summary does not apply to persons whose claims arose in connection with providing services to the Debtor, including in an employment capacity. The following discussion assumes that holders of claims and equity interests hold such claims and equity interests as "capital assets" within the meaning of section 1221 of the Tax Code. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtor and holders of claims or equity interests based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under U.S. federal estate tax law or any state, local, or foreign tax law.

THE FOLLOWING SUMMARY IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED ON THE PARTICULAR CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR EQUITY INTEREST. EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT HIS, HER, OR ITS OWN TAX ADVISORS AS TO THE U.S. FEDERAL INCOME TAX CONSEQUENCES, AS WELL AS OTHER TAX CONSEQUENCES, INCLUDING UNDER U.S. FEDERAL ESTATE TAX LAW OR ANY APPLICABLE STATE, LOCAL, AND FOREIGN LAW, OF THE RESTRUCTURING DESCRIBED IN THE PLAN.

### A.    Holders of Claims and Interests

### 1.    Holders of Other Priority Claims and Other Secured Claims

Pursuant to the Plan, each Other Priority Claim and Other Secured Claim will be paid in full in Cash. If a holder of an Other Priority Claim or Other Secured Claim receives Cash in satisfaction of its claim, the satisfaction would be expected to be treated as a taxable exchange under section 1001 of the Tax Code. Subject to the "market discount" rules described below in Article XI.A.6, the holder should recognize capital gain or loss (which capital gain or loss will be long-term capital gain or loss if the holder has held the debt instrument or other asset underlying its Claim for more than one year) equal to the difference between (x) the amount of Cash received

and (y) the Holder's adjusted tax basis in the debt instrument underlying its claim. To the extent that the Cash received in the exchange is allocable to accrued but unpaid interest that has not already been taken into income by the Holder, the Holder may recognize ordinary interest income (*see* Article XI.A.5 below for further information).

### 2.    Holders of Secured Prepetition Credit Agreement Claims

Pursuant to the Plan, if the Supporting Lenders are the Successful Bidders, Secured Prepetition Credit Agreement Claims will be exchanged for Reorganized Melinta Common Stock. The U.S. federal income tax consequences to holders of Prepetition Credit Agreement Claims (other than Unsecured Prepetition Credit Agreement Claims) depend on whether: (i) such claims are treated as "securities" of Melinta for purposes of the reorganization provisions of the Tax Code; and (ii) the Debtor's restructuring qualifies as a tax-free reorganization.

Whether an instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that term-length of a debt instrument at issuance is an important factor in determining whether such an instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including, among others: the security for payment; the creditworthiness of the obligor; the subordination or lack thereof to other creditors; the right to vote or otherwise participate in the management of the obligor; convertibility of the instrument into an equity interest of the obligor; whether payments of interest are fixed, variable, or contingent; and whether such payments are made on a current basis, or accrued. The Secured Prepetition Credit Agreement Claims are generally expected to be treated as securities for this purpose and the remainder of this discussion assumes that such claims will be so treated.

The exchange of Secured Prepetition Credit Agreement Claims for Reorganized Melinta Common Stock pursuant to the Plan should be treated as a tax-free reorganization under the rules applicable to recapitalizations. Each holder of such claim should not recognize any gain or loss on the exchange, although a holder may recognize ordinary income to the extent that Reorganized Melinta Common Stock is treated as received in satisfaction of accrued but unpaid interest on such claim (*see* Section XI.A.5 below for further information). Such holder should obtain a tax basis in the Reorganized Melinta Common Stock equal to the holder's tax basis in its claim surrendered for the Reorganized Melinta Common Stock and should have a holding period for the Reorganized Melinta Common Stock that includes the Holder's holding period in the surrendered claim; provided, however, that the tax basis of any share of Reorganized Melinta Common Stock (or portion thereof) treated as received in satisfaction of accrued interest should equal the amount of such accrued interest, and the holding period for such Reorganized Melinta Common Stock (or portion thereof) should begin on the day following the date of the exchange of the claim for the Reorganized Melinta Common Stock.

### 3.    Holders of Allowed Class 4 General Unsecured Claims

Pursuant to the Plan, if the Supporting Lenders are the Successful Bidders, Holders of Allowed Class 4 General Unsecured Claims may receive distributions from the GUC Trust. Such

holders are expected to be treated in accordance with the treatment described in Section XI.A.1 above.

### 4.    Holders of Equity Interests

Holders of equity interests in Melinta, which are being cancelled under the Plan, generally will be entitled to claim a worthless stock deduction (assuming that the taxable year that includes the Effective Date of the Plan is the same taxable year in which such stock first became worthless and only if such holder had not previously claimed a worthless stock deduction with respect to any equity interest in Melinta) in an amount equal to the holder's adjusted basis in such equity interests. The loss generally will be treated as a capital loss.

### 5.    Accrued But Unpaid Interest

A portion of the Cash or Reorganized Melinta Common Stock received by a holder of a claim may be attributable to accrued but unpaid interest on such claim. Such amount should be taxable to that holder as interest income if such accrued interest has not been previously included in the holder's gross income for U.S. federal income tax purposes.

If the Cash or the fair market value of the Reorganized Melinta Common Stock is not sufficient to fully satisfy all principal and interest on a claim, the extent to which such Cash or Reorganized Melinta Common Stock will be attributable to accrued but unpaid interest is unclear. Under the Plan, the aggregate consideration to be distributed to holders of claims will be treated as first satisfying an amount equal to the stated principal amount of the claim for such holders and any remaining consideration as satisfying accrued but unpaid interest, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes. There can be no assurance, however, that the IRS will not take the position that the consideration received by a holder should be allocated in some way other than as provided in the Plan. Holders of claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### 6.    Market Discount

Holders who exchange claims for Cash or Reorganized Melinta Common Stock may be affected by the "market discount" provisions of sections 1276 through 1278 of the Tax Code. Under these rules, some or all of the gain recognized by a holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such claims not previously included as income by such holder.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) generally is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the Tax Code, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation is not a "market discount bond" if such excess is less than a statutory *de minimis* amount (equal to 0.25 percent of the debt obligation's stated

redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Gain recognized by a holder on the taxable disposition of a claim that was acquired with market discount may be treated as ordinary income to the extent of the market discount that accrued thereon while the claim was held by the holder (unless the holder elected to include market discount in income as it accrued). To the extent that Secured Prepetition Credit Agreement Claims that were acquired with market discount are exchanged in a tax-free transaction for Reorganized Melinta Common Stock, any market discount that accrued on such claims (up to the time of the exchange) but was not recognized by the holder may be carried over to the Reorganized Melinta Common Stock received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such Reorganized Melinta Common Stock will be treated as ordinary income to the extent of such accrued market discount.

Holders who purchased their claims with market discount are advised to consult their tax advisors regarding the tax consequences to them under the market discount rules.

### 7.    Bad Debt Deduction

A holder who, under the Plan, receives an amount less than the holder's tax basis in the claim may be entitled to a bad debt deduction in some amount under section 166(a) of the Tax Code. The rules governing character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Each holder of a claim, therefore, is urged to consult its tax advisors with respect to its ability to take such a deduction.

### 8.    Limitation on Use of Capital Losses

Capital losses are generally available only to offset capital gain income of the holder but not ordinary income (except in the case of individuals, who may offset up to $3,000 of ordinary income each year).

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY TAX LAWS, OTHER THAN FEDERAL INCOME TAX LAWS, ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

**B.    The Reorganized Debtors**

**1.    Cancellation of Debt and Reduction of Tax Attributes**

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, and (y) the fair market value of any non-cash consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce certain of its tax attributes by the amount of COD Income that it excluded from gross income under section 108 of the Tax Code. In general, tax attributes will be reduced in the following order: (a) NOLs; (b) general business tax credit carryovers, (c) minimum tax credits, (d) capital loss carryovers; (e) tax basis in assets; and (f) foreign tax credit carryovers. A debtor with COD Income may elect first to reduce the basis of its depreciable assets under section 108(b)(5) of the Tax Code.

Because the Plan provides that holders of Prepetition Credit Agreement Claims (other than Unsecured Prepetition Credit Agreement Claims) will receive Reorganized Melinta Common Stock, the amount of COD Income, and accordingly the amount of the Debtor's tax attributes required to be reduced, will depend on the fair market value of the Reorganized Melinta Common Stock exchanged therefor. This value cannot be known with certainty until after the Effective Date.

**2.    Limitation of Net Operating Loss Carry Forwards and Other Tax Attributes**

As of the end of 2019, the Debtor believes it has NOL carryovers in excess of $515 million, approximately $310 million are anticipated to be useable notwithstanding limitations on use arising from prior Section 382 ownership changes. The precise amount of NOL carryovers that will be available to the Debtor at emergence is based on a number of factors and is impossible to calculate at this time. Some of the factors that will impact the amount of available NOLs include: the amount of tax losses incurred by the Debtor in 2019; the value of the Reorganized Melinta Common Stock; and the amount of COD Income incurred by the Debtor in connection with consummation of the Plan. The Debtor anticipates that, taking these factors into account, it will have substantial federal NOL carryovers following emergence, subject to the limitations discussed below. As discussed below, the reorganized Debtor's subsequent utilization of any losses and NOL carryovers remaining and possibly certain other tax attributes may be restricted as a result of and upon consummation of the Plan.

Following consummation of the Plan, any remaining NOL and tax credit carryovers and, possibly, certain other tax attributes of the reorganized Debtor allocable to periods prior to the Effective Date (collectively, "**Pre-Change Losses**") may be subject to limitation under section

382 of the Tax Code as a result of an "ownership change" of the reorganized Debtor by reason of the transactions pursuant to the Plan, unless an applicable exception applies. Under section 382 of the Tax Code, if a corporation undergoes an "ownership change" and no exception applies, the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation.

(a)    *General Section 382 Annual Limitation*

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the highest "adjusted federal long-term rate" in effect for the month in which the "ownership change" occurs and the prior two months (currently 1.59% for ownership changes occurring in January 2020). However, the annual limitation is reduced to zero if the corporation fails to continue its business enterprise for the two years following the ownership change. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. In general, an ownership change will occur if there is a cumulative increase in ownership by "5% shareholders" (as defined in the Tax Code) that exceeds 50% over a rolling three-year period.

If the Debtor's assets in the aggregate have a fair market value less than the Debtor's tax basis therein (a "**Net Unrealized Built-in Loss**"), any built-in losses recognized during the following five years (up to the amount of the original Net Unrealized Built-in Loss), including loss on disposition of assets and depreciation and amortization deductions attributable to the excess of the tax basis of the assets of the Debtor over their fair market value as of the date of the ownership change, generally will be treated as Pre-Change Losses subject to the annual limitation.

If the Debtor's assets in the aggregate have a fair market value greater than the Debtor's tax basis therein (such excess, a "**Net Unrealized Built-in Gain**"), any Net Unrealized Built-in Gain recognized by the Debtor in the five years immediately after the ownership change will generally increase the section 382 limitation in the year recognized, such that the Debtor would be permitted to use its pre-change NOLs against such gain in addition to their regular allowance. For these purposes, the Debtor would be permitted to increase its annual section 382 limitation during the five years immediately after the ownership change by an amount determined by reference to the depreciation deductions that a hypothetical purchaser of the Debtor's assets would have been permitted to claim if it had acquired the Debtor's assets in a taxable transaction.

(b)    *Special Bankruptcy Exceptions*

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "**382(l)(5) Exception**"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the Effective Date, and during the part of the taxable year prior to

136

and including the Effective Date, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Debtor undergoes another "ownership change" within two years after consummation of the Plan, then the Debtor's Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "**382(l)(6) Exception**"). When the 382(l)(6) Exception applies, a debtor corporation that undergoes an "ownership change" generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce its NOLs by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without triggering the elimination of its NOLs.

Although a final determination will not be made until the Debtor's 2020 U.S. federal income tax return is filed, the Debtor believes there is a significant likelihood it will be eligible to utilize the 382(l)(5) Exception and will not elect out of its application. In the event that the Debtor were ineligible for, or elected out of the application of, the 382(l)(5) Exception, the Debtor's use of its NOLs after the Effective Date would be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception.

### 3.    Section 269 of the Tax Code

Aside from the objective limitations of section 382 of the Tax Code, the IRS may disallow the subsequent use of a corporation's losses pursuant to section 269 of the Tax Code. Under section 269, if the IRS determines that the "principal purpose" of an acquisition was to evade or avoid U.S. federal income tax by allowing the taxpayer to secure the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, the IRS may disallow such deduction, credit, or other allowance, including the use of NOL carryovers. Section 269 applies to direct or indirect acquisition of 50% or more (by vote or value) of a corporation's stock, including such acquisition pursuant to a plan of reorganization in chapter 11. The Debtor does not believe that securing a tax benefit is the principal purpose of the acquisition of control of Melinta by the Debtor's creditors pursuant to the Plan.

### C.    Tax Treatment of the GUC Trust

This Section applies to the GUC Trust unless an election is made under Treasury Regulations Section 1.468B-9 to treat the trust as a disputed ownership fund.

### 1.    Classification of Liquidating Trusts

The GUC Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (*i.e.*, a pass-through entity). The IRS, in

137

Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The GUC Trust will be structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the GUC Trustee and the holders of beneficial interests in the liquidating trust) will be required to treat for U.S. federal income tax purposes the GUC Trust as a grantor trust of which the Claimholders are the owners and grantors. While the following discussion assumes that the GUC Trust would be so treated for U.S. federal income tax purposes, no ruling will be requested from the IRS concerning the tax status of the liquidating trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the GUC Trust as a grantor trust. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the GUC Trust and the claimholders could vary from those discussed herein.

### 2.    General Tax Reporting by Trusts and Beneficiaries

For all U.S. federal income tax purposes, all parties (including the GUC Trustee and the holders of beneficial interests in the GUC Trust) will be required to treat the transfer of assets to the GUC Trust, in accordance with the terms of the Plan, as a transfer of those assets directly to the claimholders in respect of their, followed by the transfer of such assets by such holders to the GUC Trust. Consistent therewith, all parties will be required to treat the GUC Trust as a grantor trust of which such holders are to be owners and grantors. Thus, such holders (and any subsequent holders of interests in GUC Trust) will be treated as the direct owners of an undivided beneficial interest in the assets of the GUC Trust for all U.S. federal income tax purposes. Accordingly, each holder of a beneficial interest in the GUC Trust will be required to report on its U.S. federal income tax return(s) the holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the GUC Trust.

The U.S. federal income tax reporting obligation of a holder of a beneficial interest in the GUC Trust is not dependent upon the GUC Trust distributing any cash or other proceeds. Therefore, a holder of a beneficial interest in the GUC Trust may incur a U.S. federal income tax liability regardless of the fact that the GUC Trust has not made, or will not make, any concurrent or subsequent distributions to the holder. If a holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of its beneficial interests in the GUC Trust it holds, the holder may be allowed a subsequent or offsetting loss.

The GUC Trustee will file tax returns with the IRS for the GUC Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a). The GUC Trustee will also send to each holder of a beneficial interest in the GUC Trust a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct the holder to report such items on its U.S. federal income tax return.

### 3.    Allocations of Taxable Income and Loss

The GUC Trust's taxable income will be allocated to the holders of beneficial interests in the GUC Trust in accordance with each such holder's pro rata share of the GUC Trust's interests. The character of items of income, deduction and credit to any holder and the ability of

such holder to benefit from any deductions or losses may depend on the particular situation of such holder.

Any amount a holder receives as a distribution from the GUC Trust in respect of its beneficial interest in the GUC Trust should not be included, for U.S. federal income tax purposes, in the holder's amount realized in respect of its claim but should be separately treated as a distribution received in respect of such holder's beneficial interest in the GUC Trust.

In general, a holder's aggregate tax basis in its undivided beneficial interest in the assets transferred to the GUC Trust will equal the fair market value of such undivided beneficial interest in the assets as of the date the assets are transferred to the trust and the holder's holding period in such assets will begin the day following its receipt of such interest.

## XII.    Plan Supplement

Exhibits to the Plan not attached hereto shall be filed in one or more Plan Supplements. Any Plan Supplement (and amendments thereto) filed by the Debtors shall be deemed an integral part of the Plan and shall be incorporated by reference as if fully set forth therein. The Plan Supplements may be viewed at the office of the clerk of the Court or its designee during normal business hours, by visiting the Bankruptcy Court's website at http://www.deb.uscourts.gov (PACER account required) or at the Solicitation Agent website http://www.kccllc.net/melinta, or by written request to the Solicitation Agent at:

By regular mail, hand delivery, or overnight mail at:

**Melinta Therapeutics Balloting Center**
Kurtzman Carson Consultants LLC
222 N. Pacific Coast Highway, Suite 300,
El Segundo, California 90245

By electronic mail at:

Melintainfo@kccllc.net

By telephone at:

(877) 634-7187 within the United States or Canada; or
(424) 236-7224 outside the United States or Canada.

The documents contained in any Plan Supplements shall be subject to approval by the Bankruptcy Court pursuant to the Confirmation Order.

## XIII.    Recommendation and Conclusion

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other

scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: February 25, 2020

<div style="margin-left: 50%;">

MELINTA THERAPEUTICS, INC.
on behalf of itself and all other Debtors


/s/ Peter Milligan
Name: Peter Milligan
Title: Chief Financial Officer
    Melinta Therapeutics, Inc.

</div>