## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MELINTA THERAPEUTICS, INC., *et al.*, | Case No. 19-12748 (LSS) |
| Debtors. | Jointly Administered |
| | Re: Docket Items: 545, 546, 575, 576, 582, 583, 584, 589, 590, 594, 595, 605, 606, 610, 611, 615, 632, 633, 636, 637, 643, 645, 668, 672, 674, 675, 694 |

## MEMORANDUM ON RELIEF SOUGHT BY
## SHAREHOLDERS SEEKING TO "CANCEL SALE"

**Background**

On April 11, 2020, I entered an order confirming a joint chapter 11 plan ("Plan") for

Melinta Therapeutics, Inc. ("Melinta Therapeutics") and certain affiliated entities (with

Melinta Therapeutics, collectively "Debtors" or "Reorganized Debtors" as applicable). The

Plan embodied a prepetition Restructuring Support Agreement among Debtors and certain

Deerfield funds,[1] which were lenders under a prepetition credit agreement. The

Restructuring Support Agreement contemplated that in satisfaction of their prepetition debt,

Deerfield would acquire all the equity in Melinta Therapeutics pursuant to a plan of

reorganization. During the course of the bankruptcy case, the contemplated acquisition was

tested by a marketing process approved by the Court after modifications designed to ensure,

under the circumstances of the case, that any party interested in purchasing all or a portion

of Debtors' assets could tender a bid. No other parties came forward.

---

[1] Deerfield Private Design Fund III, L.P. and Deerfield Private Design Fund IV, L.P. (collectively, "Deerfield").

The Plan also encompassed the results of the settlement of estate claims against Deerfield (negotiated by the Official Committee of Unsecured Creditors ("Committee")) as well as a Global Settlement[2] among Debtors, Deerfield, the Committee, Vatera Healthcare Partners LLC ("Vatera") and The Medicines Company ("MedCo"). The Global Settlement required an investigation into claims Debtors might have against Debtors' current and former directors and officers, Vatera, MedCo and their respective related parties. Debtors conducted the investigation of MedCo. The investigations of claims against the officers, directors and Vatera were conducted by Debtors through an independent director with the assistance of separate counsel. Each of these investigations required the investigator to consult with the Committee. Further, as part of the Global Settlement, Deerfield agreed if it were the successful bidder in the marketing process to waive all unsecured claims against Debtors. Vatera and MedCo agreed to subordinate their unsecured claims (asserted at approximately $78 million and $91 million, respectively) to other holders of general unsecured claims with respect to certain contributions to the GUC Trust, but only if the investigations against them revealed no colorable claims or any such claims were settled prior to confirmation of the Plan.[3]

The Plan encompassed two alternative paths depending on the outcome of the various investigations. If the investigator, in consultation with the Committee, determined

---

[2] Melinta Therapeutics, Inc. Global Settlement Term Sheet, D.I. 275-1.
[3] The GUC Trust is the trust formed under the Plan for the benefit of creditors holding Allowed General Unsecured Claims. It was initially funded with the Initial GUC Funding Amount of $3.5 million. After negotiations with Vatera as a result of the investigation, Vatera contributed another $500,000 (the "Vatera GUC Trust Contribution") to the GUC Trust. The claims of Vatera and MedCo are subordinated to holders of Allowed General Unsecured Claims with respect to the Initial GUC Funding Amount and the Vatera GUC Trust Contribution. The capitalized terms in this paragraph are defined in the Plan.

that colorable claims existed against a subject of the investigation (and the claims were not settled), such claims would be transferred to a litigation trust for prosecution and the subject of the investigation would be free to object to the Plan. If the investigation yielded no colorable claims against a target (or any such claims were settled), then the Plan would contain releases for the subjects of the investigation who would be bound not to object to the Plan.

In recognition of these alternatives, the Disclosure Statement accompanying the Plan described two scenarios which would result in different projected recoveries to holders of general unsecured claims. Scenario 1 assumed that the investigations required in the Global Settlement Term Sheet resulted in determinations that there were no colorable claims against the targets of those investigations or that any such claims were resolved. In this Scenario 1, the Global Settlement Term Sheet would remain in place, the general unsecured claims of Vatera and MedCo would be subordinated in recoveries to other holders of general unsecured claims and the non-Vatera, non-MedCo holders of general unsecured claims would receive a projected recovery of 21%.

Scenario 2 assumes that the relevant investigator determined that colorable claims exist against MedCo or Vatera and those claims would be transferred to a trust for prosecution. In that event, MedCo and/or Vatera would no longer be bound to subordinate their recoveries to other holders of general unsecured creditors and could oppose the Plan. In this Scenario 2, Debtors projected a recovery of .8% without attempting to ascribe a value to litigation claims.

Unfortunately, under the Plan, the equity interests in Debtors were extinguished and equity holders did not receive a recovery. This outcome was consistent with the market-tested sale process that produced no bidder for the company. And, it was also consistent with the liquidation analysis attached as an exhibit to the Disclosure Statement. In a liquidation scenario, Deerfield was projected to receive a 45% to 57% recovery on its secured debt. Holders of administrative claims and general unsecured claims were not projected to receive a recovery.

Against this backdrop of unrefuted evidence, and with an accepting vote of each class entitled to vote, I confirmed the Plan.[4]

### Letters from Ms. Luo, Mr. Pini and other shareholders

Ms. Lin Luo and Mr. Ralph J. Pini filed multiple objections to the Plan and Ms. Luo participated (*pro se*) in the confirmation hearing by telephone.[5] Her objections were fulsome, showing command of the subject matter. But, she did not present any evidence at the hearing. After reviewing her filings and listening to argument, I overruled her objections and confirmed the Plan. The Confirmation Order was entered on April 11, 2020.[6]

On April 21, 2020, Ms. Luo filed a Letter she titled "Motion to Request Recount General Unsecured Claim Ballots and Reevaluation of Intangible Assets and Motion to

---

[4] Findings of Fact, Conclusions of Law, and Order Confirming Modified Amended Joint Chapter 11 Plan of Reorganization of Melinta Therapeutics, Inc. and Its Debtor Affiliates, D.I. 520 (the "Confirmation Order").

[5] The hearing was conducted via video (Skype for business) and audio (though CourtCall). See March 30, 2020 Letter from The Honorable Laurie Selber Silverstein to counsel, D.I. 470.

[6] Objections were also filed by the Office of the United States Trustee and the Securities & Exchange Commission, which objections were primarily focused on the releases, exculpation and injunction provisions in the Plan.

Cancel Sale Order No. 19-12748."[7]  That same day, Ralph J. Pini also made a filing with the Court questioning the vote tabulation process and asserting a generalized fraudulent and unfair sale process.[8]

By letter dated April 28, 2020, I acknowledged the receipt of these two letters and stated I was treating them as motions to reconsider the Confirmation Order.[9]  I gave parties-in-interest until May 12, 2020 to file a response and further stated I would determine after the submissions whether oral argument was necessary.  At the time I issued this letter, I was unaware that Ms. Luo had already filed a Notice of Appeal of the Confirmation Order.[10]

The Reorganized Debtors timely filed their Objection to Shareholder Motions to Reconsider Confirmation Order.[11]  I have reviewed the submissions (the "Shareholder Submissions") made by Ms. Luo and Mr. Pini (collectively, the "Shareholders") as well as the Reorganized Debtors' objection ("Objection").  I have also reviewed the fifty-nine (59) letter submissions made by shareholders since my April 28, 2020 letter.  Ms. Luo made seventeen (17) additional submissions,[12] and ten shareholders filed the remaining forty-two (42) letters.[13]  Of those letters, another ten (10) seek the same relief.[14]  And, sixteen (16) of

---

[7] D.I. 545.
[8] D.I. 546.
[9] D.I. 556.
[10] D.I. 564.  The Notice of Appeal was docketed as of April 24, 2020 (the day it was clocked in by the Clerk's office) but it was not placed on the docket until May 1, 2020.
[11] D.I. 591.
[12] D.I. 578, 581, 585, 612, 613, 614, 615, 646, 647, 648, 694, 695, 696, 697, 707, 708, 709.
[13] Richard Colletti (D.I. 559, 576, 582, 587); Roman L. & Aubrey Stevens (D.I. 575, 583, 584, 588); Christopher Truong (D.I. 562, 589, 633, 635, 637, 639); Van Truong (D.I. 561, 590, 632, 634, 636, 638); Thomas R. Baldwin (D.I. 594, 606, 608); G. Kevin Olsen (D.I. 595, 605, 607); Gerald Cotter (D.I. 609, 610, 611); Duy Mai (D.I. 616, 642, 643, 644, 645); Carolyn Ettari (D.I. 671, 672, 673, 674); Drusilla Scott (D.I. 668, 669, 670, 675).
[14] Motion to Object and Cancel sale order of Melinta – Case No. 19-12748, D.I. 575, 576, 605, 606, 610; Motion to Reconsider Sale Order of Melinta Case No. 19-12748, DI. 636, 637, 645, 668, 674.

those letters seek a Rule 3018 hearing or question the vote count on the Plan.[15] Because

these additional letters seek the same relief or raise the same issues as the Shareholder

Submissions, those are ruled on here as well.[16]

I do not believe that a hearing on the Shareholder Submissions will advance the

cause. Rather, I find the allegations in the Shareholder Submissions insufficient to support

revocation of the Confirmation Order. Ms. Luo should now be entitled to pursue her

appeal.

## Discussion

### A. *Appropriate Legal Standard*

The relief requested in the Shareholder Submissions is less than precise.[17] Ms. Luo

asks me to cancel the sale, which was a critical part of the Plan. Mr. Pini's request is

substantially the same.[18] Unfortunately, my April 11, 2020 letter stating that I would treat

the Shareholder Submissions as motions for reconsideration did not bring any needed clarity

to the standard which would guide the analysis.

---

[15] Motion to Allow Vote to Be Counted Rule 3018(a) Melinta Case No. 19-12748, D.I. 582, 583, 584, 589, 590, 594, 595, 611, 615, 632, 633, 643, 672, 675, 694.

[16] The vast majority of these additional letters are substantial copies of the Shareholder Submissions. There are two additional categories of submissions by shareholders. Nine of the additional submissions are titled "Motion to Bar Unliquidated Shareholders Interests and Employees Stock Incentives from participating 'Reorganized Melinta Common Stock' of Melinta Case No. 19-12748." D.I. 613, 638, 639, 642, 647, 669, 673, 697, 708. And, thirteen of the additional submissions are titled "Motion to Unseal Docket 444, 173, and 92, 174 for Case No. 19-12748." D.I. 585, 587, 588, 607, 608, 609, 614, 634, 635, 644, 670, 671, 695. Chambers will reach out to schedule a hearing on these motions.

[17] Luo Submission 2 ("[W]e shareholders demand this insanely fraudulent sale order to be cancelled.").

[18] Pini Submission 12 ("I plead to our system of government to stop this unfolding crime and object to such a fraudulent and unfair sale.").

In essence, the Shareholder Submissions request that the Confirmation Order be negated in its entirety (not altered or amended). Their request, therefore, is best addressed as invoking Rule 9024 of the Federal Rules of Bankruptcy Procedure.[19] Rule 9024 provides that Rule 60 of the Federal Rules of Civil Procedure applies in bankruptcy cases except that, as relevant here, "a complaint to revoke an order confirming a Plan may be filed only within the time allowed by § 1144."[20] Section 1144 specifically addresses relief from confirmation orders:

> On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order *if and only if* such order was procured by fraud.[21]

As evidenced by the italicized language, § 1144 is specific as to the only appropriate bases for revocation of an order confirming a Plan—fraud on the court in procuring the order. While the Third Circuit has not specifically ruled on the meaning of § 1144, in *In re Fesq*,[22] the Third Circuit held that fraud is the only grounds for revoking a Plan confirmed under chapter 13 of the Bankruptcy Code. Section 1330(a) provides:

> On the request of a party in interest at any time within 180 days after the date of the entry of an order of confirmation under section 1325 of this title, and after notice and a hearing, the court may revoke such order *if* such order was procedure by fraud.[23]

In coming to its conclusion, the Third Circuit specifically compared the language of § 1330 (which, if anything, is less definitive) with the language of § 1144 and explored at length the history of the two sections and the reason for the difference in language.[24] After examining

---

[19] Relief under Rule 9024 has been specifically requested in many of the additional letters filed by Ms. Luo and other investors. See e.g. D.I. 636, 637, 645, 646, 648, 668, 674, 696, 707..

[20] 11 U.S.C. § 1144.

[21] *Id.* (Emphasis supplied).

[22] *In re Fesq*, 153 F.3d 113 (3d Cir. 1998).

[23] 11 U.S.C. § 1330 (emphasis supplied).

[24] *Fesq*, 153 F.3d at 117-119.

the (admittedly sparse) legislative history and their precedent, the Third Circuit wrote that

"we adhere to all relevant considerations—plain meaning, logic, case law and the policies

underlying the Code—to hold that fraud is the only ground for relief available for revocation

of a Chapter 13 confirmation order."[25]  Following *Fesq*, I can only conclude that fraud on

the court is the sole ground for relief available for revocation of an order confirming a plan

under chapter 11.[26]

> Fraud on the court involves a five element test:
>
> (1) that the debtor made a representation regarding compliance with Code § 1129 which was materially false;
>
> (2) that the representation was either known by the debtor to be false, or was made without belief in its truth, or was made with reckless disregard for the truth;
>
> (3) that the representation was made to induce the court to rely upon it;
>
> (4) [that] the court did rely upon it; and
>
> (5) that as a consequence of such reliance, the court entered the confirmation order.[27]

### B. *Shareholder Allegations*

Shareholders assert four distinguishable grievances in their filings: (1) the process

leading up to the confirmation hearing had deficiencies regarding solicitation, notice and

disclosures, (2) the Plan improperly categorized insiders, (3) the Plan improperly valued

assets, (4) the Plan improperly tabulated votes.  Shareholders also spend significant time

---

[25] *Id.* at 120.

[26] Even though § 1144 was not squarely at issue in *Fesq* because a chapter 13 plan was before the court, the discussion of § 1144 is not dictum as the discussion was both necessary and fulsome. *In re MIG, Inc.*, 543 B.R. 527, 533 (Bankr. D. Del. 2015) ("Dicta, therefore, is a statement which is unnecessary to a court's holding."); *Sarnoff v. Am. Home Prods. Corp.*, 798 F.2d 1075, 1084 (7th Cir. 1986) ("Dictum has been defined as 'a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it.'")  To the extent, however, that *Fesq* is dictum, I may consider the discussion consistent with its persuasive value. *MIG*, 543 B.R. at 534.  I find the discussion persuasive.

[27] *In re Tenn-Fla Partners*, 170 B.R. 946, 967 (Bankr. W.D. Tenn., 1994).

recounting and challenging the validity of Debtors' pre-bankruptcy conduct.[28] But, they fail to identify any materially false representations made by Debtors, rather, these grievances merely allege legal conclusions regarding the validity of the plan process and the Plan itself. The Shareholder Submissions do not point to any materially false representations made by Debtors during the course of presenting the Plan for confirmation under § 1129.

    *(i)    Alleged Fraud in Voting / Counting Votes*

I will address the tabulation of the votes first because this features prominently in the Shareholder Submissions and was addressed during the confirmation hearing in response to Ms. Luo's questions to witnesses and argument.

Melinta's Plan placed holders of claims and interests into eight classes as set forth in the chart below. Importantly, while the Plan does not specifically establish a separate subset for claims against each Debtor entity, for voting purposes, the Plan is a separate plan for each Debtor.[29]

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Secured Prepetition Credit Agreement Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Unimpaired | Presumed to Accept |
| 6 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 7 | Section 510(b) Claims and Recharacterized Claims | Impaired | Deemed to Reject |
| 8 | Interests in Melinta Therapeutics | Impaired | Deemed to Reject |

---

[28] Pini Submission, D.I. 546 at 4-7; Luo Submission, D.I. 545 at 4-11.
[29] Amended Chapter 11 Plan at 21, D.I. 305-1. The Plan does provide for deemed substantive consolidation for distribution purposes. On the Effective Date all claims will be deemed filed against Melinta Therapeutics and a claim filed against any Debtor shall be deemed to be a single claim against that entity.

As reflected in this chart, only two classes were entitled to vote on the Plan: Class 3, holders

of Secured Prepetition Credit Agreement Claims and Class 4, holders of General Unsecured

Claims.  Class 8—Holders of Interests in Melinta Therapeutics (i.e. shareholders)—were not

entitled to vote on the Plan.  Instead they were deemed to reject the Plan; that is, in

determining whether the Plan could be confirmed, all shareholders were deemed to have

voted against the Plan.[30]

The Ballot Tabulation Summary[31] shows that both classes entitled to vote accepted

the Plan by the requisite number (over 50%) and amount (over 66.6%) at each Debtor entity

as reflected in the following chart.

Exhibit A
Ballot Tabulation Summary

| Class | Class Description | Not Tabulated | Members Voted | Members Accepted | Members Rejected | % Members Accepted | % Members Rejected | Total $ Voted | $ Accepted | $ Reject | % $ Accepted | % $ Rejected | Class Accepted or Rejected |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | Secured Prepetition Credit Agreement Claims | 0 | 12 | 12 | 0 | 100.00 | 0.00 | $854,559,946.38 | $854,559,946.38 | $0.00 | 100.00 | 0.00 | Accepted |
|  | CEM-102 Pharmaceuticals, Inc. | 0 | 2 | 2 | 0 | 100.00 | 0.00 | $142,426,657.73 | $142,426,657.73 | $0.00 | 100.00 | 0.00 | Accepted |
|  | Cempra Pharmaceuticals, Inc. | 0 | 2 | 2 | 0 | 100.00 | 0.00 | $142,426,657.73 | $142,426,657.73 | $0.00 | 100.00 | 0.00 | Accepted |
|  | Melinta Subsidiary Corp. | 0 | 2 | 2 | 0 | 100.00 | 0.00 | $142,426,657.73 | $142,426,657.73 | $0.00 | 100.00 | 0.00 | Accepted |
|  | Melinta Therapeutics, Inc. | 0 | 2 | 2 | 0 | 100.00 | 0.00 | $142,426,657.73 | $142,426,657.73 | $0.00 | 100.00 | 0.00 | Accepted |
|  | Rempex Pharmaceuticals, Inc. | 0 | 2 | 2 | 0 | 100.00 | 0.00 | $142,426,657.73 | $142,426,657.73 | $0.00 | 100.00 | 0.00 | Accepted |
|  | Targanta Therapeutics Corporation | 0 | 2 | 2 | 0 | 100.00 | 0.00 | $142,426,657.73 | $142,426,657.73 | $0.00 | 100.00 | 0.00 | Accepted |
| 4 | General Unsecured Claims | 47 | 76 | 72 | 4 | 94.74 | 5.26 | $1,239,974,396.62 | $1,239,189,798.06 | $868,598.56 | 99.93 | 0.07 | Accepted |
|  | CEM-102 Pharmaceuticals, Inc. | 0 | 7 | 7 | 0 | 100.00 | 0.00 | $205,772,276.62 | $205,772,276.62 | $0.00 | 100.00 | 0.00 | Accepted |
|  | Cempra Pharmaceuticals, Inc. | 3 | 9 | 9 | 0 | 100.00 | 0.00 | $205,798,903.90 | $205,798,903.90 | $0.00 | 100.00 | 0.00 | Accepted |
|  | Melinta Subsidiary Corp. | 3 | 23 | 22 | 1 | 95.65 | 4.35 | $209,542,517.54 | $208,699,629.04 | $842,888.50 | 99.60 | 0.40 | Accepted |
|  | Melinta Therapeutics, Inc. | 41 | 26 | 24 | 2 | 92.31 | 7.69 | $206,729,088.64 | $206,706,337.64 | $22,751.00 | 99.99 | 0.01 | Accepted |
|  | Rempex Pharmaceuticals, Inc. | 0 | 6 | 5 | 1 | 83.33 | 16.67 | $205,779,457.68 | $205,776,498.62 | $2,959.06 | 99.99 | 0.01 | Accepted |
|  | Targanta Therapeutics Corporation | 0 | 6 | 6 | 0 | 100.00 | 0.00 | $206,352,152.24 | $206,352,152.24 | $0.00 | 100.00 | 0.00 | Accepted |

The Voting Declaration also lists all ballots that were not included in the ballot count

(Exhibit B) and the reason the ballot was not counted.  It also contains a separate list of

those parties that opted out of the third party releases contained in the Plan (Exhibit C).

---

[30]  To confirm the Plan, Debtors needed to show that Class 8 could be "crammed down" under
§ 1129(b).
[31]  Declaration in Support Declaration of P. Joseph Morrow IV of Kurtzman Carson Consultants
LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Amended Joint
Chapter 11 Plan of Reorganization of Melinta Therapeutics, Inc. and Its Debtor Affiliates Filed by
Melinta Therapeutics, Inc. (the "Voting Declaration"), Exhibit A, D.I. 487.

Ms. Luo contends there are multiple errors in the vote count and constructs what she terms a Recalculated Ballot Summary which shows the Plan being rejected. The Recalculated Ballot Summary, however, is built upon multiple faulty assumptions. First, Ms. Luo lists an "Uncounted Class 4 Amount" of $24,979,332.80 and related "Uncounted Class 4 Count" of 168 claim holders.[32] Ms. Luo then includes these claims on the Recalculated Ballot Summary as "assuming to object" and counts them as rejecting the Plan. But, only holders of claims who actually vote are counted for purposes of determining whether a class has accepted or rejected a plan.[33] Creditors who do not vote are not assumed to either accept or reject a plan.

Second, Ms. Luo contends that there were 47 general unsecured creditors that were excluded from voting. She is correct. Exhibit B to the Voting Declaration lists all ballots excluded from voting and the reason for the exclusion. The vast majority of these claims were excluded because they were the subject of a claim objection.[34] The exclusion of these votes comports with the approved solicitation procedures. Holders of claims to which an objection was filed needed to file a motion under Bankruptcy Rule 3018 and ask the Court to permit them to vote notwithstanding the objection. No such motions were filed in this

---

[32] Ms. Luo states that this information comes from the claims register filed on the docket (D.I. 501). Ms. Luo observes that the Claims Register was filed on April 4, 2020, after the Ballot Tabulation Summary was prepared. While true, that statement is not relevant. The Claims Register is simply a compilation of the proofs of claim filed as of a given date. A review of the Claims Register shows proofs of claim filed as of that date, with the first proof of claim filed on January 6, 2020 and the last filed on April 2, 2020.

[33] See 11 U.S.C. § 1126(d); 7 Collier on Bankruptcy P 1126.04 (16th 2020) ("Thus, only creditors that actually voted count in determining whether the requisite majorities in number and amount are met."); S. Rep. No. 95-989, at 123 (1978), *as reprinted in* U.S.C.C.A.N. 5787, 5909 ("The amount and number are computed on the basis of claims actually voted for or against the plan. . . .").

[34] Debtors objected to these proofs of claim on the basis that such claims were actually not claims, but rather equity. First Omnibus Objection to Claims / Debtors' First Omnibus Objection (Non-Substantive) to Claims Filed on Account of Equity Interests, D.I. 399. No hearing has yet been held on this objection.

case. Accordingly, the ballots that were not counted as reflected on Exhibit B to the Voting Declaration were properly excluded.

Ms. Luo argues that the requirement to file a Rule 3018 motion was buried in the significant amount of paper accompanying the Plan. In other words, she argues that she and others did not receive proper notice of the need to file a Rule 3018 notice. I already approved the forms of notice and solicitation procedures[35] which included the notice regarding the need to file Rule 3018 motions and still find that notice to be sufficient. Ms. Luo and the other ten shareholders who filed Rule 3018 submissions after confirmation make their requests too late. Further, of those ten additional shareholders only two filed ballots; Mr. Colletti abstained and Ms. Scott accepted the Plan.[36]

Nonetheless, assuming for the sake of argument that the ballots listed on Exhibit B should have been counted, the outcome would not change. The 47 ballots excluded from the vote calculation break down as follows:

- 8 holders of claims aggregating $570,711.68 voted to reject, with all claims asserted against Melinta Therapeutics.

- 27 holders of claims aggregating $455,907.83 voted to accept, of which

  - 23 claims aggregating $442,303.51 were asserted against Melinta Therapeutics;
  - 3 claims aggregating $13,504.01 were asserted against Cempra Pharmaceuticals, Inc.; and
  - 1 claim of $100.31 was asserted against Melinta Subsidiary Corp.

- 12 holders abstained from voting.

---

[35] Order (I) Approving Adequacy of Debtors' Disclosure Statement, (II) Approving Solicitation and Notice Procedures with Respect to Confirmation of Debtors' Proposed Plan of Reorganization, (III) Approving Form of Various Ballots and Notices in Connection Therewith, and (IV) Scheduling Certain Dates with Respect Thereto, D.I. 342.
[36] Voting Declaration, Exhibit B, D.I. 487.

Accordingly, even if all of the ballots on Exhibit B were counted, Class 4 would still have accepted the Plan by amount and number at each Debtor entity.[37]

Third, Ms. Luo objects to the ballot count arguing that the Opt-Out Parties listed in Exhibit C to the Voting Declaration were not included in the count. Ms. Luo misapprehends Exhibit C. Exhibit C does not reflect votes; it has a very different function and provides the Court and all parties with information relevant to third party releases. Exhibit C lists those parties who opted-out of the third party releases contained in the Plan. The votes of creditors listed in Exhibit C (Opt-Out Parties, Classes 3 and 4) were counted if they did not abstain and if their proofs of claim were not the subject of an objection. Those votes are reflected in Exhibit B. The 327 shareholders who opted-out of the releases (Opt-Out Parties Class 8) listed on Exhibit C did not vote. Holders of interests in Class 8 were deemed to reject the Plan and so it was not necessary to solicit equity holders and there were no votes to count.

Fourth, Ms. Luo objects to the Ballot Tabulation because certain of the directors' or ex-directors' claims were counted more than once. Ms. Luo is correct that the schedules underlying the Ballot Tabulation Summary show that certain creditors, including directors and ex-directors, had more than one vote counted in the line that reflects the vote of all Debtors in the aggregate. This is so because those creditors had claims against more than one debtor. But, this line of the Ballot Tabulation Summary is misleading. The Plan provides that while the Plan was proposed jointly, it is a separate plan for each Debtor for

---

[37] 11 U.S.C.A. § 1126(c) ("A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, *that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors*, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan." (emphasis added)).

voting purposes.[38] Accordingly, votes are counted at the Debtor level only. At the Debtor

level, each entity or person has only one vote.

Finally, Ms. Luo objects to counting the votes of the Deerfield entities, MedCo or

Vatera alleging that each is an insider because of their stock ownership and/or alleged

control over the company. At the confirmation hearing, Debtors confirmed that Vatera is

an insider. Therefore, with respect to Vatera, its vote should not be counted in Class 4 if

Class 4 is relied upon by Debtors as the impaired accepting class.[39]

As for Deerfield and MedCo, neither were insiders based on stock ownership

because neither owned, controlled or had the power to vote more than 20 percent of Melinta

Therapeutics's outstanding common stock.[40] As for any alleged control of Debtors, there

was no evidence presented at the confirmation hearing showing that Vatera or Deerfield had

control over the Debtors. While Deerfield exercised its right to credit bid its secured debt

and MedCo otherwise exercised rights it had as a creditor, the fact of the marketing process,

the investigations required by the Global Settlement and the Committee's active

involvement and support of the Global Settlement and Plan refute Shareholders' positions.

The assertion, therefore, that Deerfield and/or MedCo had control of Debtors or the

process has no foundation in the evidence presented.[41] And, once again, even if the votes of

---

[38] Plan 1, 21. The Plan does provide for deemed substantive consolidation for distribution purposes. On the Effective Date all claims will be deemed filed against Melinta Therapeutics and a claim filed against any Debtor shall be deemed to be a single claim against that entity.

[39] Debtors argued at confirmation that they could rely on Class 3 as their impaired accepting class for purposes of § 1129(a)(10). 11 U.S.C.A. § 1129(a)(10) ("The court shall confirm a plan only if all of the following requirements are met. . . . If a class of claims is impaired under the plan, *at least one class of claims that is impaired under the plan has accepted the plan,* determined without including any acceptance of the plan by any insider."(emphasis added)).

[40] 11 U.S.C. §§ 101(31)(B), 101(31)(E), 101(2)(A).

[41] *See e.g. In re Winstar Commc'ns, Inc.*, 554 F.3d 382 (3d Cir. 2009) (discussing non-statutory insiders in the context of an avoidance action) ("Courts focus on three factors to determine if an entity is a

Deerfield, Vatera and MedCo were not counted in Class 4, Class 4 creditors of Melinta Therapeutics still accepted the Plan with 17 creditors asserting $933,400.02 in claims voting to accept the Plan and 2 creditors asserting $22,751 in claims rejecting the Plan.

More importantly for purposes of § 1144 there is no suggestion that in presenting the vote count or in in the presentation of evidence at the confirmation hearing, Debtors made materially false representations to the Court with respect to the vote count or the relationship among Debtors and their various creditors, including Deerfield, Vatera and/or MedCo. While Shareholders are presenting arguments for why certain creditors' votes should be counted or not, Shareholders are working off of information that was filed on the docket of this case, including the Voting Declaration, which clearly accounts for all ballots received, which ballots were counted, which ballots were not counted and reasons for not counting those ballots. As for the relationships between Debtors and each of Deerfield, Vatera and MedCo, those relationships were disclosed in the Disclosure Statement and various documents filed in connection therewith. Further, Shareholders cite extensively to pre-bankruptcy SEC filings to support their position. Given the extensive citation to public documents, filed both in this Court and with the Securities & Exchange Commission, I cannot conclude that Debtors misrepresented facts to this Court which served as a basis for confirmation of the Plan.

---

non-statutory insider of the debtor: (i) the closeness of the relationship between the transferor and transferee, (2) the degree of influence the transfer exerts over the transferor and (3) whether the transactions were at arms-length.").

### (ii)   The Solicitation Process

This bankruptcy case was filed on December 27, 2019.  The confirmation hearing

was held on April 2, 2020 and the Confirmation Order was entered on April 11, 2020.

While this is admittedly a fast track, it was not expedited.  All notice required by the

Bankruptcy Rules was provided.[42]  The Disclosure Statement was approved by the Court as

containing adequate information as required by 11 U.S.C. § 1125(a) and the Plan was

solicited in accordance with procedures approved by the Court.[43]

Further, the solicitation process provided sufficient notice of the proceedings to

Shareholders as both filed objections to the Plan.  Ms. Luo also participated extensively at

the confirmation hearing.  And, there is no suggestion that there was any fraud on the Court

in the solicitation process.  While Shareholders may have preferred to receive more or

different information, there is no suggestion that the information provided was false.  I also

note that Shareholders did not propound discovery prior to confirmation.

### (iii)   The Value of Debtors' Business

Finally, Shareholders assert that past forecasts of Debtors' financial outlook are

inconsistent with the valuation that underlies the Plan and ask for a reevaluation of Debtors'

intangible assets.  To illustrate the difference, and as Ms. Luo did in her objection to

confirmation, Shareholders cite extensively to previous SEC filings which reflected either a

rosier picture of Debtors' financial situation, a company on the verge of financial success

---

[42] Fed. R. Bankr. P. 2002, 3017.

[43] Order (I) Approving Adequacy of Debtors' Disclosure Statement, (II) Approving Solicitation and Notice
Procedures with Respect to Confirmation of Debtors' Proposed Plan of Reorganization, (III) Approving Form
of Various Ballots and Notices in Connection Therewith, and (IV) Scheduling Certain Dates with Respect
Thereto, D.I. 342.

and/or what Shareholders believe were improper impairment charges taken prepetition. Notwithstanding the statements in the SEC filings, the evidence showed that Debtors marketed the company from September 2019 through March 2020, with the post-petition marketing conducted through a court-approved marketing process consistent with the circumstances of this case. And the result of that marketing process was included in the Plan.[44] I cannot conclude that Debtors' representations regarding asset valuations were materially false.

## Conclusion

Shareholders are understandably disappointed with Debtors' Plan which cancelled their equity without providing for any distribution to shareholders. But, the Shareholder Submissions do not demonstrate that there is any evidence of fraud on the Court in connection with the confirmation hearing. As such, there are no grounds to revoke the Confirmation Order.[45] Ms. Luo filed an appeal of the Confirmation Order and that should proceed. For the aforementioned reasons, the relief requested in the Shareholder Submissions will be denied. An Order will be entered.

Dated: July 2, 2020

Laurie Selber Silverstein
United States Bankruptcy Judge

---

[44] Compare *In re SubMicron Sys. Corp.*, 432 F.3d 448, 461 (3d Cir. 2006) ("[T]he market's reaction to a sale best reflects the economic realities of assets' worth.").
[45] I have considered all grounds in the Shareholder Submissions and the additional submissions even if not specifically addressed herein.